# Exhibit A



FILED
NOV 14 2022
JILL E. WHELCHEL
WHITMAN COUNTY CLERK

**CIVIL**

_____ WHITMAN _____ COUNTY SUPERIOR COURT
Case Information Cover Sheet (CICS)

**Case Number** 22-2-00244-38    **Case Title** Rolovich v. Wash. St. Univ., et al.

**Attorney Name** Brian Fahling    **Bar Membership Number** 18894

Please check one category that best describes this case for indexing purposes.  Accurate case indexing not only saves time in docketing new cases, but helps in forecasting needed judicial resources. Cause of action definitions are listed on the back of this form.  Thank you for your cooperation.    *Form updated 6/27/2022*

| | | | | | |
|---|---|---|---|---|---|
| ☐ | ABJ | Abstract of Judgment | ☐ | PRG | Property Damage – Gangs |
| ☐ | ABL | Abusive Litigation | ☐ | PRP | Property Damages |
| ☐ | ALR | Administrative Law Review | ☐ | QTI | Quiet Title |
| ☐ | ALRJT | Administrative Law Review-Jury Trial  (L&I) | ☐ | RDR | Relief from Duty to Register |
| ☐ | BAT | Ballot Title | ☐ | RFR | Restoration of Firearm Rights |
| ☐ | CHN | Non-Confidential Change of Name | ☐ | SDR | School District-Required Action Plan |
| ☐ | CBC | Contractor Bond Complaint | ☐ | SER | Subdivision Election Process Law Review |
| ☐ | COL | Collection | ☐ | SPC | Seizure of Property-Commission of Crime |
| ☐ | CON | Condemnation | ☐ | SPR | Seizure of Property-Resulting from Crime |
| ☐ | COM | Commercial | ☐ | TAX | Employment Security Tax Warrant |
| ☐ | CPO | Civil Protection Orders | ☐ | TAX | L & I Tax Warrant |
| ☐ | CRP | Pet. for Cert. of Restoration of Opportunity | ☐ | TAX | Licensing Tax Warrant |
| ☐ | DOL | Appeal Licensing Revocation | ☐ | TAX | Revenue Tax Warrant |
| ☐ | ECP | Enforce Canadian DV Protection Order | ☐ | TMV | Tort – Motor Vehicle |
| ☐ | EOM | Emancipation of Minor | ☐ | TRJ | Transcript of Judgment |
| ☐ | FJU | Foreign Judgment | ☐ | TTO | Tort – Other |
| ☐ | FOR | Foreclosure | ☐ | TXF | Tax Foreclosure |
| ☐ | FPO | Foreign Protection Order | ☐ | UND | Unlawful Detainer – Commercial |
| ☐ | INJ | Injunction | ☐ | UND | Unlawful Detainer – Residential |
| ☐ | INT | Interpleader | ☐ | VEP | Voter Election Process Law Review |
| ☐ | LCA | Lower Court Appeal – Civil | ☐ | VVT | Victims of Motor Vehicle Theft-Civil Action |
| ☐ | LCI | Lower Court Appeal – Infractions | ☐ | WDE | Wrongful Death |
| ☐ | LUPA | Land Use Petition Act | ☐ | WHC | Writ of Habeas Corpus |
| ☐ | MAL | Other Malpractice | ☐ | WMW | Miscellaneous Writs |
| ☐ | MED | Medical Malpractice | ☐ | WRM | Writ of Mandamus |
| ☐ | MHA | Malicious Harassment | ☐ | WRR | Writ of Restitution |
| ☒ | MSC2 | Miscellaneous – Civil | ☐ | WRV | Writ of Review |
| ☐ | MST2 | Minor Settlement – Civil  (No Guardianship) | ☐ | XRP | Extreme Risk Protection Order |
| ☐ | PCC | Petition for Civil Commitment (Sexual Predator) | ☐ | XRU | Extreme Risk Protection Order Under 18 |
| ☐ | PFA | Property Fairness Act | | | |
| ☐ | PIN | Personal Injury | | | |
| ☐ | PRA | Public Records Act | | | |

**IF YOU CANNOT DETERMINE THE APPROPRIATE CATEGORY, PLEASE DESCRIBE THE CAUSE OF ACTION BELOW**

*Please Note:  Public information in court files and pleadings may be posted on a public Web site.*

## APPEAL/REVIEW

**Administrative Law Review**-Petition to the superior court for review of rulings made by state administrative agencies.

**Appeal of a Department of Licensing Revocation**-Appeal of a DOL revocation (RCW 46.20.308(9)).

**Lower Court Appeal-Civil**-An appeal for a civil case; excludes traffic infraction and criminal matters.

**Lower Court Appeal-Infractions**-An appeal for a traffic infraction matter.

## CONTRACT/COMMERCIAL

**Breach of Contract**-Complaint involving monetary dispute where a breach of contract is involved.

**Contractor Bond Complaint**-Complaint for claim against a contractor or subcontractor bond.

**Commercial Contract**-Complaint involving monetary dispute where a contract is involved.

**Commercial Non-Contract**-Complaint involving monetary dispute where no contract is involved.

**Third Party Collection**-Complaint involving a third party over a monetary dispute where no contract is involved.

## PROTECTION ORDER

**Civil Protection Orders** – Petition seeking protection from harmful or threatening behavior. (Chapt. 7.105 RCW) (eff. 7/1/2022).

**Enforce Canadian DV Protection Order** – Petition seeking order granting recognition and enforcement of Canadian DV PO. (Chapt. 26.55 RCW)

**Extreme Risk Protection Order**-Petition to restrict ownership, possession, custody or control of a firearm or concealed weapons permit.

**Extreme Risk Protection Order Under 18**-Petition to restrict access, possession, purchase, custody or control of a firearm by a minor.

**Foreign Protection Orders**-Any protection order of a court of the United States, or of any state, territory, or tribal land, which is entitled to full faith and credit in this state.

## JUDGMENT

**Abstract Only**-A certified copy of a judgment docket from another superior court, an appellate court, or a federal district court.

**Foreign Judgment**-Any judgment, decree, or order of a court of the United States, or of any state or territory, which is entitled to full faith and credit in this state.

**Judgment, Another County**-A certified copy of a judgment docket from another superior court within the state.

**Judgment, Another State**-Any judgment, decree, or order from another state that is entitled to full faith and credit in this state.

**Tax Warrants** -A notice of assessment by a state agency creating a judgment/lien in the county in which it is filed. (Four types available.)

**Transcript of Judgment**-A certified copy of a judgment from a court of limited jurisdiction to a superior court in the same county.

## OTHER COMPLAINT/PETITION

**Abusive Litigation**- Request to restrict a current or former intimate partner party from filing abusive litigation for the purposes of harassing, intimidating, or maintaining contact with the other party

**Ballot Title**-Action for review of the ballot title (RCW 29A.36.090).

**Petition for Certificate of Restoration of Opportunity**-Request for order that is intended to facilitate obtaining housing and employment (RCW 9.97.020).

**Change of Name**-Petition for a change of name.  If change is confidential due to domestic violence/anti-harassment see case type 5 instead.

**Deposit of Surplus Funds**-Deposit of money or other item with the court.

**Emancipation of Minor**-Petition by a minor for a declaration of emancipation.

**Injunction**-Complaint/petition to require a person to do or refrain from doing a particular thing.

**Interpleader**-Petition for the deposit of disputed earnest money from real estate, insurance proceeds, and/or other transaction(s).

**Malicious Harassment**-Suit involving damages resulting from malicious harassment.

**Minor Settlements**-Petition for a court decision that an award to a minor is appropriate when no letters of guardianship are required (e.g., net settlement value $25,000 or less).

**Petition for Civil Commitment (Sexual Predator)**-Petition for the involuntary civil commitment of a person who 1) has been convicted of a sexually violent offense whose term of confinement is about to expire or has expired, 2) has been charged with a sexually violent offense and who has been determined to be incompetent to stand trial who is about to be released or has been released, or 3) has been found not guilty by reason of insanity of a sexually violent offense and who is about to be released or has been released, and it appears that the person may be a sexually violent predator.

**Property Damage-Gangs**-Complaint involving damage to property related to gang activity.

**Public Records Act**-Actions filed under RCW 42.56.

**Relief from Duty to Register**-Civil action requesting relief from duty to register as a sex offender. Petition can address the registration obligation that arises from multiple cases. RCW 9A.44.142, 9A.44.143.

**Restoration of Firearms Rights**-Petition seeking restoration of firearms rights under RCW 9.41.040 and 9.41.047. *(Eff. 9-2-2014)*

**School District-Required Action Plan**-Petition filed requesting court selection of a required action plan proposal relating to school academic performance.

**Seizure of Property from the Commission of a Crime**-Seizure of personal property that was employed in aiding, abetting, or commission of a crime, from a defendant after conviction.

**Seizure of Property Resulting from a Crime**-Seizure of tangible or intangible property that is the direct or indirect result of a crime, from a defendant following criminal conviction (e.g., remuneration for, or contract interest in, a depiction or account of a crime).

**Subdivision Election Process Review**-Petition seeking court acknowledgement of compliance (RCW 29A.92).

**Subpoenas**-Petition for a subpoena.

**Voter Election Law Review**-Action filed by voters requesting review of Voting Rights Act (RCW 29A.92).

## PROPERTY RIGHTS

**Condemnation**-Complaint involving governmental taking of private property with payment, but not necessarily with consent.

**Foreclosure**-Complaint involving termination of ownership rights when mortgage or tax foreclosure is involved; ownership is not in question.

**Land Use Petition**-Petition for an expedited judicial review of a land use decision made by a local jurisdiction (RCW 36.70C.040).

**Property Fairness**-Complaint involving the regulation of private property or restraint of land use by a government entity brought forth by Title 64 RCW.

**Quiet Title**-Complaint involving the ownership, use, or disposition of land or real estate other than foreclosure.

**Unlawful Detainer**-Complaint involving the unjustifiable retention of lands or attachments to land, including water and mineral rights.

## TORT, MEDICAL MALPRACTICE

**Hospital**-Complaint involving injury or death resulting from a hospital.

**Medical Doctor**-Complaint involving injury or death resulting from a medical doctor.

**Other Health Care Professional**-Complaint involving injury or death resulting from a health care professional other than a medical doctor.

## TORT, MOTOR VEHICLE

**Death**-Complaint involving death resulting from an incident involving a motor vehicle.

**Non-Death Injuries** -Complaint involving non-death injuries resulting from an incident involving a motor vehicle.

**Property Damage Only**-Complaint involving only property damages resulting from an incident involving a motor vehicle.

## TORT, NON-MOTOR VEHICLE

**Asbestos**-Complaint alleging injury resulting from asbestos exposure.

**Other Malpractice**-Complaint involving injury resulting from other than professional medical treatment.

**Personal Injury**-Complaint involving physical injury not resulting from professional medical treatment, and where a motor vehicle is not involved.

**Products Liability**-Complaint involving injury resulting from a commercial product.

**Property Damages**-Complaint involving damage to real or personal property excluding motor vehicles.

**Victims of Motor Vehicle Theft**-Complaint filed by a victim of car theft to recover damages. (RCW 9A.56.078).

**Wrongful Death**-Complaint involving death resulting from other than professional medical treatment.

## WRIT

**Writ of Habeas Corpus**-Petition for a writ to bring a party before the court.

**Writ of Mandamus**-Petition for writ commanding performance of a particular act or duty.

**Writ of Restitution**-Petition for a writ restoring property or proceeds; not an unlawful detainer petition.

**Writ of Review**-Petition for review of the record or decision of a case pending in the lower court; does not include lower court appeals or administrative law reviews.

**Miscellaneous Writs**



FILED

NOV 14 2022

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF WHITMAN

NICHOLAS ROLOVICH,

     Plaintiff,

v.

WASHINGTON STATE UNIVERSITY,
an agency of the State of Washington;
PATRICK CHUN, Director of Athletics for
Washington State University, in his
individual capacity; and JAY INSLEE,
Governor, in his official capacity,

     Defendants.

**No.**  22-2-00244-38

**COMPLAINT**

## I. INTRODUCTION

1.    Plaintiff Nicholas Rolovich brings this action to vindicate his federal and state constitutional, statutory, and contractual rights, which rights were violated by Defendants, causing Mr. Rolovich significant and ongoing damages.

2.    This action arises under the laws of the United States, specifically, 42 U.S.C. §§ 1983, 1988, 42 U.S.C. § 2000e, *et seq*., and the First and Fourteenth Amendments to the United States Constitution. This action also arises under the laws of the State of Washington, including RCW 49.60 *et seq.* (Washington Law Against Discrimination ("WLAD")), RCW 49.48, *et seq.,* RCW 49.52, *et seq.*, Article I, section 9 of the Washington Constitution, and state contract law.

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

## II. JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to RCW 2.08.010.

4.      Venue is proper in this district pursuant to RCW 4.12.025(1) because Washington State University's ("WSU") principal business is located in Whitman County and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices and constitutional violations alleged herein, occurred in Whitman County. Additionally, the Employment Agreement between Mr. Rolovich and WSU requires that any litigation regarding enforcement or construction of the terms of the Agreement be filed in Whitman County Superior Court.

## III. EXHAUSTION OF ADMINISTRATIVE PROCEDURES/REMEDIES

### 1.   WSU Administrative Process

5.      Pursuant to Mr. Rolovich's employment agreement with WSU, he was required to appeal his termination, first, to Mr. Chun, and upon Mr. Chun's denial of the appeal, to WSU President, Kirk Schulz. Mr. Rolovich timely appealed to Mr. Chun, and then President Schulz. President Schulz denied Mr. Rolovich's appeal on December 6, 2021.

### 2.   Equal Employment Opportunity Commission/Washington State Human Rights Commission

6.      On or about February 14, 2022, Mr. Rolovich filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act 1964, 42 U.S.C. §§ 2000 *et seq*. Because the Washington State Human Rights Commission ("WHRC") is a designated Fair Employment Practices Agency ("FEPA") in partnership with the EEOC, Mr. Rolovich's EEOC filing (dual filing) fulfills the State's requirement that a 49.60.030, *et seq.,* claim be filed with the State prior to any court filing. The State and federal claims arise out of the same facts alleged herein.

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

7.      On or about August 16, 2022, Mr. Rolovich received, from the Department of Justice, Civil Rights Division ("DOJ"), a Notice of Right to Sue Within 90 Days in response to his previously filed charge of discrimination with the EEOC. This complaint has been filed within 90 days of Mr. Rolovich's receipt of the DOJ Notice of Right to Sue.

**3.     Department of Enterprise Services—Office of Risk Management (Tort Claim)**

8.      On or about April 27, 2022, Mr. Rolovich filed a tort claim with the State of Washington Department of Enterprise Services, Office of Risk Management.

9.      More than 60 days has elapsed from the date of filing Mr. Rolovich's tort claim. RCW 4.92.110.

10.     Any and all prerequisites to the filing of this lawsuit shave been met.

## IV. PARTIES

11.     Plaintiff Nicholas Rolovich was Head Football Coach for WSU from January 14, 2020, until he was terminated on December 6, 2021. He currently resides in Northern California.

12.     Washington State University is an agency of the State of Washington, with a principal place of business located at Pullman, Washington. WSU has approximately 7,000 employees.

13.     Defendant Patrick Chun is Athletics Director for WSU.  He is sued in his individual capacity only. At all times relevant to this complaint, Patrick Chun was acting as an agent of WSU.

14.     Defendant Jay Inslee is the governor of the State of Washington. He is sued in his official capacity.

## V. STATEMENT OF FACTS

15.     Washington State University ("WSU) terminated head football coach Nicholas Rolovich after he had refused to be vaccinated because of his religious and personal beliefs. WSU claimed that Mr. Rolovich's refusal to be vaccinated gave the University "just

COMPLAINT - 3

1    cause" to terminate him. By claiming that it had just cause to terminate Mr. Rolovich, WSU

2    did not have to pay him liquidated damages as provided for in the employment agreement.

3    The liquidation clause required WSU to pay Mr. Rolovich sixty percent of his $2,000,000+

4    base salary for the approximately three and one-half years remaining on his approximately

5    five-year contract.

6        **A.    The Employment Agreement Between WSU and Mr. Rolovich**

7        16.    On January 14, 2020, Mr. Rolovich entered into an employment agreement

8    with Washington State University to serve as its head football coach. (A true and correct

9    copy of the employment agreement is attached hereto as EXHIBIT A, and incorporated

10   herein.) The Agreement was to expire on June 30, 2025. WSU's termination of Mr. Rolovich

11   became final on December 6, 2021, when President Schulz denied Mr. Rolovich's final

12   appeal.

13       17.    The agreement provides that WSU could terminate Mr. Rolovich "without

14   cause" at any time, but if WSU terminated him without cause, it would be required to pay

15   "liquidated damages in an amount equal to sixty percent (60%) of the remaining base salary

16   due under the terms of [the] Agreement." At the time of his termination, Mr. Rolovich had

17   approximately three and one-half more years to serve as WSU's head football coach.

18       18.    The agreement also provides that WSU could terminate Mr. Rolovich for "just

19   cause" if he was found to be in violation of the just cause provisions set forth in the contract.

20   If WSU terminated Mr. Rolovich for just cause, "all obligations of the University to make

21   further payments under th[e] Agreement and/or to provide any other consideration . . .

22   [would] cease."

23       19.    The employment agreement sets forth the following grounds for "just cause"

24   termination of Mr. Rolovich:

25       **4.1 Termination by University for just cause**. The University shall have the
         right to terminate this Agreement for just cause (Just Cause) prior to its
26       normal expiration. The term Just Cause shall include, in addition to and as

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

examples of its normally understood meaning in employment contracts, any of the following:

**4.1.1** Deliberate and serious violations of the duties outlined in Section 1.2 of this Agreement or refusal or unwillingness to perform such duties in good faith and to the best of Employee's abilities;

**4.1.2** Deliberate and serious violations by Employee of any of the other terms and conditions of this Agreement not remedied after fourteen (14) days' written notice to Employee or, if the violation cannot reasonably be remedied within that period, Employee's failure to make reasonable efforts to cure such violation;

**4.1.3** Any act of misconduct by Employee including, but not limited to, acts of criminal conduct (excluding minor traffic offenses, that don't impede Employee's ability to perform duties), an act of dishonesty, theft or misappropriation of University property, moral turpitude, insubordination, or act injuring, abusing, or endangering others, including physical, psychological, or sexual abuse, misconduct or violence, or acts that constitute use of excessive exercise or training for punitive purposes, or repeated acts of insubordination or a single act of insubordination of significant magnitude;

**4.1.4** An intentional or major violation or repeated instances of secondary violations by Employee, or by any person under Employee's supervision where Employee had knowledge of the intended violation and failed to intervene, or by student-athletes in the Football Program where Employee had knowledge of the intended violation and failed to intervene, of any law, rule, regulation, constitutional provision, bylaw or interpretation of the University, the NCAA, or the Pac-12 which may in the reasonable judgment of the University reflect adversely upon the University or its athletic program including, but not limited to, any such violation which may result in the University being placed on probation by the Pac-12 or the NCAA and including any such violation which may have occurred during prior employment of Employee at another NCAA member institution;

**4.1.5** Conduct of Employee seriously prejudicial to the best interests of the University or its athletic program; or

**4.1.6** Prolonged absence from duty without the consent of Employee's supervisor.

COMPLAINT - 5

20.     Nothing in Mr. Rolovich's employment agreement with WSU contemplates a scenario where WSU could claim "just cause" to terminate him because he refused to violate his religious faith, conscience, or bodily integrity.

**B.      Unlike Other WSU Football Coaches, Mr. Rolovich's Agreement Did Not Include Provisions Requiring Him to Follow State and Federal Health and Safety Guidelines**

21.     Less than two months after Mr. Rolovich entered into his employment contract with WSU, on February 29, 2020, Governor Inslee issued the first of nearly 500 proclamations related to COVID-19, declaring a State of Emergency in the State of Washington.

22.     On or about July 2021, WSU induced some of its football coaches to sign new employment agreements with provisions requiring them to "follow all federal, state, and local health directives, as well as university policies related to health and safety."

23.     Mr. Rolovich never signed an amendment to his employment agreement requiring him to follow health directives or university policies related to health and safety. His contract with WSU contains no such provisions.

**C.      WSU Willfully and Improperly Withheld Wages from Mr. Rolovich**

24.     In or around the summer of 2020, WSU approached Mr. Rolovich and asked him whether he would, in light of the effect of the COVID-19 pandemic on WSU's finances, agree to allow WSU to take out and keep ten percent of his wages.

25.     Mr. Rolovich orally agreed to WSU's proposed ten percent withholding, but only on the condition that WSU not withhold ten percent from his assistant coaches.

26.     Nevertheless, WSU did withhold ten percent from the salaries of its assistant football coaches, who were induced to sign new agreements reflecting the ten percent withholding from their salaries. Despite having violated the conditions set by Mr. Rolovich, WSU withheld ten percent from Mr. Rolovich's salary from May 15, 2020 through July 30, 2020.

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

**D.    Mr. Chun's/WSU's Hostility Toward Mr. Rolovich**

27.    As set forth below, Mr. Chun made a number of statements to Mr. Rolovich that demonstrated his hostility toward Mr. Rolovich's expressed religious, personal, and scientific reasons for refusing to receive a COVID vaccine. Even before Governor Inslee issued his vaccine Mandate, Mr. Chun told Mr. Rolovich that his request for a religious exemption would be denied and he would be fired with cause unless he agreed to comply with the vaccine mandate.

28.    On or around May 24, 2021, Mr. Chun, after Mr. Rolovich said that he was not planning on getting a COVID-19 vaccine, claimed that he was worried about Mr. Rolovich's mental health and accused him of having extreme views regarding many issues.

29.    On or about May 27, 2021, Mr. Rolovich was called to a 3 p.m. meeting at Mr. Chun's office. Mr. Chun told Mr. Rolovich that his beliefs were making him incapable of leading his players. Mr. Chun also tried to get Mr. Rolovich into counseling because he believed that the Mr. Rolovich had mental health issues. Mr. Chun suggested that Mr. Rolovich should talk to Mr. Chun's wife because she had been in a couple different religions he referred to as "cults".

30.    In August 2020, before Governor Inslee's issued a vaccine mandate for state employees, WSU had its employees check boxes on a computer form to designate their reason for not wanting to be vaccinated. The form provided for a medical exemption and a personal/religious exemption. Mr. Rolovich checked the personal/religious box.

31.    On August 16, 2021, Mr. Rolovich was called to an urgent meeting with Mr. Chun and Deputy Director of Athletics, Bryan Blair. At this meeting, Mr. Chun told Mr. Rolovich that Governor Inslee was intending to issue a vaccine mandate that would eliminate the "personal exemption" from the coaching staff's declaration of vaccination status. Mr. Chun warned Mr. Rolovich that any religious exemption request he submitted

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

would be scrutinized to no end, and that Inslee's mandate would have a "high threshold" for religious exemptions moving forward.

32.     At that same meeting, Mr. Chun confidently told Mr. Rolovich that if he did not get the vaccine, he could be expected to be fired with cause on October 19, 2021.

33.     Mr. Chun's predictions about how WSU would treat requests for religious exemptions are consistent with the State's vaccine mandate policy as set forth in an August 3, 2021 email from Kathryn Leathers, Governor's Office General Counsel, to staff with the Attorney General's Office.[1] In that email she explained: "Of possible exemptions [to the vaccine mandate]: medical for sure; and religious (if we have to; if yes, as narrow as possible)."

34.     WSU's statistics on vaccination exemptions reflect the Governor's policy, as well as WSU's bias against religious exemptions: By early October 2021, WSU had approved requests for medical exemptions at almost twice the rate of religious exemption requests ("437 employees have requested religious exemptions. Only 98 have been granted so far. Just over 100 employees have requested medical exemptions of which 41 have been granted so far.")[2]

35.     On August 19, 2021, Mr. Rolovich was summoned to a meeting with Mr. Chun. Assistant Athletics Director Bryan Blair also was present at the meeting. Mr. Chun told Mr. Rolovich that he had four choices: 1. Get the vaccine; 2. Don't get the vaccine and get fired; 3. Claim an exemption; or 4. Resign right now. Mr. Rolovich told Mr. Chun that he was not resigning and that he wanted to coach the team. Mr. Chun said, "but you say you don't care about the money" and "why don't you just resign?" Mr. Chun then accused Mr. Rolovich of having situational integrity. Mr. Chun also called Mr. Rolovich

---

[1] Brandi Kruse, Emails: State sought to make religious vaccine exemption 'as narrow as possible,' FOX 13 Seattle, Aug. 24, 2021, https://www.q13fox.com/news/emails-state-sought-to-make-religious-vaccine-exemption-as-narrow-as-possible.

[2] Erin Robinson, WSU granting fewer religious exemptions than the state as a whole, KXLY Spokane (Oct. 13, 2021),  https://www.kxly.com/wsu-granting-fewer-religious-exemptions-than-the-state-as-a-whole/.

COMPLAINT - 8

a "con-man" and accused him of being selfish. Mr. Chun then stated that Mr. Rolovich's objections to receiving the vaccine were causing Mr. Chun and President Schulz reputational damage. Mr. Chun then stated that all Mr. Rolovich had to do is get vaccinated.

36.   At the same meeting, Mr. Chun admitted his efforts to get Mr. Rolovich to take the vaccination in the past had been coercive, and Mr. Rolovich responded that the present meeting was much more coercive than earlier meetings. Mr. Chun pressed Mr. Rolovich again about the vaccine, and Mr. Rolovich said that he believed he had privacy rights and did not feel comfortable telling Mr. Chun about his reasons for declining to receive a COVID-19 vaccine. Mr. Chun then demanded that Mr. Rolovich tell him what his answer would be.

37.   Mr. Chun then stated that Governor Inslee "did this" just to come after Mr. Rolovich and WSU. Based on the context of Mr. Chun's statement, Mr. Rolovich understood "did this" to mean that Governor Inslee was trying to force Mr. Rolovich's hand with his new mandate because he was angry that the highest paid and one of the highest profile State employees had asserted personal or religious objections to his vaccine mandate. Mr. Chun also admitted to Mr. Rolovich that the Board of Regents wanted him fired. At this point in their heated exchange, Mr. Chun modified his earlier statement: he now said that Mr. Rolovich only had two options: get vaccinated or resign.

38.   Up to this point, Mr. Rolovich had refrained from bringing his religious beliefs into his conversations with Mr. Chun about COVID vaccines. Mr. Rolovich did not feel comfortable talking about his faith because it is a very personal matter to him and he was uncomfortable talking about his religious beliefs with his supervisor.

39.   Mr. Rolovich also was uncomfortable because he did not know how WSU would react to him sharing his religious opposition to medical research based on aborted fetal tissue, given that WSU professors have in the past publicly defended such research. However, after Mr. Chun made it clear that WSU intended to terminate him, Mr. Rolovich

COMPLAINT - 9

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

asked Mr. Chun and Mr. Blair about the University's process for requesting a religious exemption from a vaccine mandate. Mr. Chun and Mr. Blair said they did not know details about the University's process. They said they had been on the phone with WSU's Human Resource Services ("HRS") about that topic earlier in the day. Mr. Rolovich also had emailed HRS about the process by this time, but no one had any answers because the Governor had not yet made his proclamation.

40.    Mr. Chun then told Mr. Rolovich that he needed to have his religious exemption approved by August 29, the Sunday before the Utah State game. Mr. Rolovich asked who at WSU would review and approve religious exemption requests. Mr. Chun and Mr. Blair said they did not know. Mr. Rolovich asked them when the religious exemption application would be available. They said they did not know. Mr. Rolovich then responded that he feared the University would not be able to approve his exemption by Mr. Chun's August 29 deadline, given that the University's policy had not even been made public, let alone made available to him.

41.    Mr. Chun and Mr. Blair told Mr. Rolovich that they were in a time crunch and had to make a decision if he was going to coach that season. They said they did not want to start a season with Mr. Rolovich if they thought they may have to fire him on Oct 18th, pursuant to the Governor's mandate.

42.    Mr. Rolovich responded that he would seek a religious exemption right then if one was available. Mr. Chun and Mr. Blair then got even more heated and started to question Mr. Rolovich's character. Mr. Chun said if Mr. Rolovich got the religious exemption, he would forever question his character. Mr. Chun and Mr. Blair both talked about the early days of the pandemic, and that Mr. Rolovich had not mentioned his faith. Mr. Rolovich said that he did not see the point, as he does not see faith and science as exclusive.

43.    Mr. Chun and Mr. Blair then stressed that the University's religious exemption would be hard to get and that there was no guarantee that Mr. Rolovich's request

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

would be approved. Mr. Rolovich again asked what the criteria was going to be. They said they did not know.

44.    Mr. Rolovich did not feel comfortable talking about his faith because his faith is a very personal matter to him and because he was uncomfortable talking about his religious beliefs with his supervisor.

45.    On August 20, 2021, Governor Inslee issued Proclamation 21-14.1, which required all state employees to be fully vaccinated by October 18, 2021.

46.    Governor Inslee's Proclamation mandated vaccination for state employees "even when the only vaccines available are those authorized under U.S. Food and Drug Administration Emergency Use Authorizations."

**E.    Governor Inslee and WSU Mandated That Coach Rolovich and All State Employees Accept an Experimental Vaccine**

47.    At all times relevant to this Complaint, the only vaccines available to Washington State employees were vaccines authorized under U.S. Food and Drug Administration Emergency Use Authorizations. According to DailyMed, a publication of the National Institute of Medicine, the only FDA-approved vaccine—Comirnaty—was not available to the American public:

SEPTEMBER 13, 2021
Pfizer received FDA BLA license for its COVID-19 vaccine

Pfizer received FDA BLA license on 8/23/2021 for its COVID-19 vaccine for use in individuals 16 and older (COMIRNATY). At that time, the FDA published a BLA package insert that included the approved new COVID-19 vaccine tradename COMIRNATY and listed 2 new NDCs (0069-1000-03, 0069-1000-02) and images of labels with the new tradename.

At present, Pfizer does not plan to produce any product with these new NDCs and labels over the next few months while EUA authorized product is still available and being made available for U.S. distribution. As such, the CDC, AMA, and drug compendia may not publish these new codes until Pfizer has determined when the product will be produced with the BLA labels.[3]

---

[3] *Pfizer received FDA BLA license for its COVID-19 vaccine*, DailyMed (Sept. 13, 2021), https://dailymed.nlm.nih.gov/dailymed/dailymed-announcements-details.cfm?date=2021-09-13 (Last visited

COMPLAINT - 11

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

48.     On August 23, 2021, the United States Food and Drug Administration ("FDA") issued two separate letters pertaining to two separate COVID-19 vaccines. One letter, addressed to Pfizer Inc., concerned the Pfizer-BioNTech COVID-19 Vaccine. Letter, United States Food and Drug Administration to Pfizer, Inc. (Aug. 23, 2021), ("Pfizer Letter") (A true and correct copy of the Pfizer Letter is attached hereto as EXHIBIT B and incorporated herein). The other letter, addressed to BioNTech Manufacturing GmbH, concerned the COMIRNATY vaccine. Letter, United States Food and Drug Administration to BioNTech Manufacturing GmbH (Aug. 23, 2021), ("BioNTech Letter") (A true and correct copy of the BioNTech Letter is attached hereto as EXHIBIT C and incorporated herein).

49.     In the Pfizer Letter, the FDA confirms that, on December 11, 2020, it granted Emergency Use Authorization (EUA) for the Pfizer-BioNTech COVID-19 Vaccine. (Pfizer Letter at 1.) It also notes that the EUA was continued on December 23, 2020, February 25, 2020, May 10, 2021, June 25, 2021, and August 12, 2021. (Pfizer Letter at 1-2).

50.     The FDA stated in the Pfizer Letter that, although it had granted the COMIRNATY vaccine full approval "for certain uses," the Pfizer-BioNTech COVID-19 Vaccine was still only authorized under an EUA. (Pfizer Letter at 2).

51.     At all times relevant to this Complaint, the Pfizer-BioNTech COVID-19 Vaccine remained available only under the authorization of an EUA. (Pfizer Letter).

52.     The Federal Food, Drug, And Cosmetic Act provides that subject to the limitations referenced and described in U.S.C. § 360bbb-3, the Secretary of Health and Human Services "may authorize the introduction into interstate commerce, during the effective period of a declaration [of emergency or threat justifying emergency authorized

---

Nov. 8, 2022); *see also,* Summary Basis of Regulatory Action – Comirnaty, FDA (Nov. 8, 2021) ("November 8 Comirnaty SBRA") at 5, available at: https://www.fda.gov/media/151733/download (last visited November 8, 2022 ("In the U.S., there are no licensed vaccines or anti-viral drugs for the prevention of COVID-19."), available at: https://www.fda.gov/media/151733/download (last visited November 8, 2022).

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

use] under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an 'emergency use.'" 21 U.S.C. § 360bbb-3(a)(1). As an essential part of the explicit statutory conditions for EUA, the EUA Statute mandates that all individuals to whom the EUA product may be administered be given the option to accept or refuse administration of the product:

> With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:
>
> (ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—
>
> (I) that the Secretary has authorized the emergency use of the product;
>
> (II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
>
> (III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3(e)(1)(A).

53.    The statutorily required Fact Sheets for each of the EUA COVID-19 vaccines acknowledge that individuals cannot be compelled to accept or receive the vaccine. *See, e.g.*, Pfizer-BioNTech, Fact Sheet for Recipients and Caregivers (June 25, 2021), https://www.fda.gov/media/144414/download ("It is your choice to receive or not to receive the Pfizer-BioNTech COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care.").

54.    WSU never explained to Mr. Rolovich the potential risks of taking the experimental vaccine.

COMPLAINT - 13

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1    55.    WSU never gave Mr. Rolovich the option to accept or decline the

2    experimental vaccine, telling him only that he would be fired for just cause if he refused.

3    **F.    WSU Established a Blind Review Process for Exemption Requests**

4    56.    In the weeks that followed Governor Inslee's August 20, 2021, proclamation

5    creating a COVID-19 vaccine mandate for State employees, WSU established procedures as

6    to how employees could request, and how the University would consider and approve or

7    deny requests for religious and/or medical exemptions from the vaccine mandate.

8    57.    WSU published its procedures for evaluating requests for religious

9    exemptions from the vaccine mandate on the University's website.[4] Part of this policy is

10   expressed in the form of FAQs. In that context, the University represented that HRS would

11   not share the details of an employee's request for an exemption with the employee's

12   supervisor or manager:

13   **I am requesting a medical or religious exemption, what will my**
**supervisor/manager see as my exemption reason?**

14

15   The Workday process will show as 'in-process' when an exemption is
requested and will be updated to 'complete' once reviewed and accepted. HRS

16   will work directly with employees regarding their requested exemption as
needed.

17
18   58.    The University described its process in more detail in an October 8, 2021,
statement posted on its website:

19   The requests for religious exemptions are evaluated in a 'blind' review
process, meaning the identities of the individuals requesting exemptions are

20   unknown to the members of the review committee except in instances when
additional information is needed through follow-up contact. Separate review

21   committees were created for students and employees. . . .

22
23   For employees, the exemption requests go through a two-step process. The
first is the blind review. Then, if an exemption is approved, the request moves

24   to a separate accommodation review step where a determination is made

25   ─────────────────────────
[4] WSU, Human Resource Services, COVID-19 Vaccination Verification (Oct. 12, 2021), available at

26   https://web.archive.org/web/20211103092159/https://hrs.wsu.edu/covid-19/vax-verification   (last visited Nov.
10, 2022).

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

whether the unvaccinated employee will be able to perform their duties without risking the health and safety of the community.[5]

59.     Phil Weiler, WSU vice president for communications, reiterated the process WSU would use to handle exemption requests:

> If the blind review results in the approval of Rolovich's exemption request, the process would enter a second phase. . . . An approved request would be sent to the human resources department, which would identify the employee in question and send an email to his/her supervisor indicating the exemption had been approved.[6]

At that point, according to Weiler, the supervisor would determine if the unvaccinated employee would be capable of "keeping the public safe" and perform his/her job effectively. *Id.*

### G.     WSU's Blind Review Process Determined that Mr. Rolovich's Religious Beliefs Were Sincere and Granted his Request for a Religious Exemption

60.     On September 28, 2021, Mr. Rolovich completed his application for a religious exemption and submitted it to HRS.

61.     On October 6, 2021, HRS notified Mr. Chun that the University had completed its "good faith review" process and had determined that Mr. Rolovich was entitled to a religious exemption from the COVID-19 vaccine requirement because it found that he had articulated a "sincerely held religious belief" that prevented him from complying with the Governor's mandate.

62.     HRS then informed Mr. Chun that it was "considering approving the employee's request (for accommodation) subject to the following terms and conditions,"

---

[5] Nearly 90% of WSU Employees are Vaccinated, WSU, Oct. 8, 2021, https://everett.wsu.edu/nearly-90-of-wsu-employees-are-vaccinated/ (last visited Nov. 10, 2022).

[6] Jon Wilner, Would WSU actually fire Nick Rolovich? Examining the exemption review process with the vaccine mandate deadline approaching, Mercury News, Oct. 7, 2021, https://www.mercurynews.com/2021/10/07/would-wsu-actually-fire-nick-rolovich-examining-the-exemption-review-process-as-vaccine-mandate-deadline-approaches/ (last visited Nov. 10, 2022).

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

summarizing a proposed list of accommodations, including mask wearing, social distancing, and testing requirements. HRS said the next step would be for the Athletics Department to decide whether it was "able to accommodate this request with the above recommendations." HRS stated in that email that it would not reach out to Mr. Rolovich until the University's "decision on the Religious Accommodation is finalized." HRS requested that the Athletics Department respond to its proposed accommodations by October 8.

**H.      Chun Improperly Inserted Himself Into the Process and Compelled the WSU to Overturn Its Determination that Mr. Rolovich's Religious Beliefs Were Sincere**

63.     Mr. Chun, writing on behalf of the WSU Athletics Department, responded to HRS on October 13 with two memoranda. The first memorandum told HRS that it had rejected HRS' proposed accommodations and had determined that "the department is not able to accommodate this request."

64.     Mr. Chun's and the Athletics Department's second memorandum challenged HRS' conclusion that "Rolovich met the requirements for a religious exemption to the vaccination requirement by demonstrating a sincerely held religious belief against being vaccinated for COVID-19." That challenge was based on the Athletics Department's assertion that "Rolovich had made several statements that cast doubt on his claimed sincerely held religious belief." The memorandum stated that the fact that Rolovich had articulated other reasons for refusing a COVID vaccination before he had told Mr. Chun about his religious objections to the available COVID vaccines "support[ed] re-evaluation of the claimed sincerely-held religious belief."

65.     On October 14, 2021, Department of Environmental Health and Safety ("EH&S") issued a memorandum to Mr. Chun with extensive detail about how it had used its "expertise in environmental and occupational health and safety" to make an "individualized assessment" of Mr. Rolovich's working environment and formulate a list of "reasonable and

COMPLAINT - 16

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

necessary interventions and countermeasures to ensure the safety of the employee and others

the employee may be in contact with."

66.    Mr. Chun, writing on behalf of the Athletics Department, subsequently wrote

HRS a memorandum, copying EH&S, that rejected EH&S' recommendations.

Mr. Chun/Athletics Department rejected EH&S' assessment that its recommendations would

"ensure the safety of the employee and others the employee may be in contact with."

67.    The Mr. Chun and the Athletics Department also rejected EHS's proposed

accommodations on the basis that having an unvaccinated head coach "would create an

undue hardship for WSU Athletics given his assigned duties and responsibilities." The

memorandum states, in part:

- "WSU has already lost significant donor commitments who have withdrawn or withheld donations based on the vaccination decisions of the football staff."

- "[B]ecause employees are not vaccinated, attendance at conference media day was done remotely, (which became a major story and embarrassment to WSU), the weekly Coach's show is now done remotely and has significant decline in attendance, and many media stories concerning the Football Program revolve around the unvaccinated status of the head coach (and assistant coaches)."

- "The damage to the mission and reputation of the University posed by this situation cannot be understated [*sic*], nor can it be resolved by accommodation."

I.    **Mr. Rolovich's Compliance with WSU Protocols, and Mr. Chun's Violation of WSU Protocols, Undermine Mr. Chun's Given Reasons for Not Accommodating Mr. Rolovich's Religious Convictions**

68.    During the pandemic, WSU imposed protocols it hoped would mitigate the

transmission of Covid among its employees and students. Mr. Rolovich was required to

follow specific protocols developed for him because he was unvaccinated. Days before

Mr. Rolovich informed Mr. Chun that he intended to seek a religious exemption from the

vaccine Mandate, Mr. Chun said that he was confident that Mr. Rolovich could safely coach

WSU's football team.

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

69.     The Seattle Times reported that Mr. Rolovich was "undergoing daily COVID-19 testing and wears a mask. Chun said the coach is adhering to all protocols."[7] "WSU athletic director Pat Chun, who is vaccinated, made it clear Wednesday that he backs his coach, saying Rolovich is the right person for the job despite the two being diverged on the vaccine decision." *Id*.

70.     Mr. Chun, however, did not follow WSU's Covid protocols. Four days after he fired Mr. Rolovich for allegedly "undermin[ing] the University's efforts to promote student safety," Mr. Chun was caught violating masking regulations at a donor event;[8] days later Mr. Chun was caught violating masking regulations while in the locker room with WSU football players.[9]

71.     When a local politician pointed out Mr. Chun's double-standard, Mr. Chun went to the City Councilor's place of business, launched a vulgar tirade, and threatened violence in front of the City Councilor's teenage daughter. Mr. Chun became so angry that the police got involved and decided that Mr. Chun would be "permanently trespassed" from the City Councilor's businesses.[10]

---

[7] Scott Hanson, WSU in 'strict COVID management' after football coach Nick Rolovich's decision to not get vaccinated, Spokesman Review, Aug. 13, 2021, https://www.spokesman.com/stories/2021/aug/13/wsu-in-strict-covid-management-after-football-coac/ (last visited Nov. 10, 2022).

[8] Jason Rantz, Rantz: Photo shows WSU's Pat Chun violating COVID policy after Rolovich firing, 770 KTTH, Oct. 25, 2021, https://mynorthwest.com/3203295/rantz-wsu-photo-pat-chun-covid-rolovich-fired/ (last visited Nov. 10, 2022).

[9] Washington State Football (@WSUCougarFB), Twitter (Oct. 30, 2021, 5:20 p.m.), https://twitter.com/wsucougarfb/status/1454589044147441664 (last visited Nov. 10, 2022). Mr. Chun's conduct violated both the University's and host Arizona State University's masking policies. *See* Arizona State University, Implementation of ASU Face Cover Policy, https://www.asu.edu/about/fall-2021 (last visited Nov. 2, 2021) ("face coverings will be required in certain indoor settings, i.e., where distancing may not be possible").

[10] Report: Chun, wife trespassed from businesses: Pullman City Councilor Al Sorensen tells police that WSU AD and wife came to his business and threatened him, The Lewiston Tribune, Nov. 2, 2021, https://lmtribune.com/sports/report-chun-wife-tresspassed-from-businesses/article_f5b69a55-5fce-52c6-a99c-d0f411ab5086.html (last visited Nov. 10, 2022); Simon Gibbs, Washington State athletic director Pat Chun issued trespass order after alleged profanity-ridden tirade, On3, Nov. 2, 2021, https://www.on3.com/college/washington-state-cougars/news/pat-chun-washington-state-cougars-cited-police-report-harrassment-tresspassing-civil-issue/ (last visited Nov. 10, 2022).

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

72.     On November 19, 2021, a local reporter noted that Mr. Chun was disregarding masking rules at a WSU basketball game in Idaho.[11]

**J.     Stanford Public Health and Infectious Disease Expert States that WSU Could Have Safely Accommodated Mr. Rolovich**

73.     Dr. Bhattacharya, a former Professor of Medicine (20+ years) and current Professor of Health Policy at Stanford University School of Medicine submitted a 29 page declaration to Mr. Chun and President Schulz on behalf of Mr. Rolovich. The Declaration provided scientific evidence in support of his conclusion that WSU could keep its employees safe while granting exemptions for those whose medical conditions and religious convictions prevent them from receiving a COVID vaccine.

74.     Dr. Bhattacharya also is a research associate at the National Bureau of Economic Research, and Director of Stanford's Center for Demography and Economics of Health and Aging. Dr. Bhattacharya holds an M.D. and Ph.D. from Stanford University. He has published 154 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health, among others. Dr. Bhattacharya's research has been cited in the peer-reviewed scientific literature more than 11,600 times.

75.     Dr. Bhattacharya has dedicated his professional career to the analysis of health policy, including infectious disease epidemiology and policy, and the safety and efficacy of medical interventions. He has both studied extensively and commented publicly on the necessity and safety of vaccine requirements for those who have contracted and recovered from COVID-19 (individuals who have "natural immunity"). Dr. Bhattacharya is intimately familiar with the emergent scientific and medical literature on this topic and pertinent government policy responses to the issue both in the United States and abroad.

---

[11] Katie Daviscourt, WSU athletic director caught violating COVID protocols after firing head football coach for refusing vaccine, Post Millennial, Nov. 19, 2021, https://thepostmillennial.com/wsu-athletic-director-violating-covid-firing-coach (last visited Nov. 10, 2022).

COMPLAINT - 19

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

76.     Dr. Bhattacharya also is the primary co-author of the Great Barrington Declaration, which describes an alternate policy of focused protection. His co-authors of the Declaration include Prof. Martin Kulldorff of Harvard University and Prof. Sunetra Gupta of Oxford University. Over 12,000 epidemiologists and public health professionals and 35,000 medical professionals had co-signed the Declaration by the time Mr. Rolovich was terminated.

77.     WSU produced no evidence, let alone scientific evidence, that the accommodation plans developed by EH&S would not be effective for Mr. Rolovich.

78.     In his declaration, Dr. Bhattacharya noted, "According to a meta-analysis by Dr. John Ioannidis of every seroprevalence study conducted to date of publication with a supporting scientific paper (74 estimates from 61 studies and 51 different localities worldwide), the median infection survival rate—the inverse of the infection fatality rate— from COVID-19 infection is 99.77%. For COVID-19 patients under 70, the meta-analysis finds an infection survival rate of 99.95%. A separate meta-analysis by other scientists independent of Dr. Ioannidis' group reaches qualitatively similar conclusions.

79.     Dr. Bhattacharya continued, "A study of the seroprevalence of COVID-19 in Geneva, Switzerland (published in *The Lancet*) provides a detailed age breakdown of the infection survival rate in a preprint companion paper: 99.9984% for patients 5 to 9 years old; 99.99968% for patients 10 to 19 years old; 99.991% for patients 20 to 49 years old; 99.86% for patients 50 to 64 years old; and 94.6% for patients above 65."

80.     Those numbers are consistent with what the US CDC has reported. A US CDC report found between 6 and 24 times more SARS-CoV-2 infections than cases reported between March and May 2020. Correspondingly, the CDC's estimate of the infection fatality rate for people ages 0-19 years is 0.003%, meaning infected children have a 99.997% survivability rate. For people ages 20-49 years, it was 0.02%, meaning that young adults have a 99.98% survivability rate. For people age 50-69 years, it was 0.5%, meaning this age group

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

has a 99.5% survivability rate. Finally, for people ages 70+ years, it was 5.4%, meaning

seniors have a 94.6% survivability rate.

81.    Dr. Bhattacharya stated, "It has been found that vaccinated individuals are at

least as likely as unvaccinated individuals to be shedding live virus. Data from studies

indicate that vaccinated and unvaccinated individuals infected with the Delta variant might

transmit infection. Importantly, it has been shown that infectious SARS-CoV-2 is frequently

found even in vaccinated persons."

82.    Also, the CDC reported in July 2021 that "new scientific data" indicated that

vaccinated people who experienced breakthrough infections carried similar viral loads to the

unvaccinated, leading the CDC to infer that vaccinated people transmit the virus at

concerning levels.[12]

83.    Dr. Bhattacharya noted that "[a]symptomatic individuals are an order of

magnitude less likely to infect others than symptomatic individuals, even in intimate settings

such as people living in the same household where people are much less likely to follow

social distancing and masking practices that they follow outside the household. Spread of the

disease in less intimate settings by asymptomatic individuals—including in the context of the

WSU work environment—is likely to be even less likely than in the household."

84.    Dr. Bhattacharya concluded that the best empirical evidence shows that the

probability that an asymptomatic individual will spread the disease is very low. And because

the overwhelming majority of WSU employees were vaccinated in the fall of 2021, they

faced even less risk from any of their asymptomatic, unvaccinated coworkers who receive an

accommodation from WSU for religious or medical reasons.[13]

---

[12] *See* Joel Achenbach, CDC Reversal on Indoor Masking Prompts Experts to Ask, "Where's the Data?" Wash. Post, July 28, 2021, wapo.st/2THpmIQ (last visited Nov. 10, 2022).

[13] President Schulz had said that nearly 90 percent of WSU employees and 97 percent of students were vaccinated. Chuck Culpepper, Washington State Football Coach Nick Rolovich Fired after Failing to Comply with Vaccine Mandate, Washington Post, Oct. 18, 2021, https://www.washingtonpost.com/sports/2021/10/18/nick-rolovich-washington-state-fired-covid-mandate/. *See also* Donald G. McNeil, Jr., How Much Herd Immunity Is Enough?, NY Times, Dec. 24, 2020 (updated Sept. 22, 2021), https://www.nytimes.com/2020/12/24/health/herd-immunity-covid-coronavirus.html ("Dr. Fauci

---

COMPLAINT - 21

1  85. When Mr. Rolovich was asymptomatic, he—like all other asymptomatic

2 individuals—presented an almost 0% chance of infecting others with COVID-19.

3  86. In Dr. Bhattacharya's expert opinion, derived from his personal scientific

4 investigations, and his examination and analysis of a multitude of scientific studies, WSU

5 could have safely accommodated Mr. Rolovich and other unvaccinated employees.

6 **K.** **WSU's Termination of Mr. Rolovich as Head Coach**

7  87. Mr. Rolovich arrived at a meeting on October 18, 2021, and one minute

8 before that meeting, at 4:29, while waiting for Mr. Chun, Mr. Rolovich received an email

9 from HRS Exemptions notifying him that the University was "unable to approve your request

10 for an exemption and accommodation based on a sincerely held religious belief, practice, or

11 observance."

12  88. Though the HRS panel had already determined that Mr. Rolovich's religious

13 beliefs were sincere and granted him a religious exemption on that basis, HRS allowed

14 Mr. Chun to improperly influence and interfere with the final decision made in its blind

15 review process. Mr. Chun notified HRS that he disagreed with HRS's determination

16 regarding Mr. Rolovich's sincerity, and, as a result, HRS reversed its determination, stating,

17 "[b]ased on your comments, in conjunction with the timing of your request for a religious

18 accommodation, the University questions the assertion that your sincerely held religious

19 views conflict with the University's vaccine requirement."

20  89. HRS also reversed its position that Mr. Rolovich's sincere religious beliefs

21 could be accommodated by WSU, adopting Mr. Chun and the Athletics Department's

22 position that Mr. Rolovich could not "safely and effectively do [his] job without undue

23 hardship to the University."

24

25

---

26 noted, a herd-immunity figure at 90 percent or above is in the range of the infectiousness of measles. 'I'd bet
my house that Covid isn't as contagious as measles,' he said.").

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

90.     At the October 18 meeting, Mr. Chun served Mr. Rolovich with Written Notice of Intent to Terminate with Just Cause.

91.     Mr. Chun had a security officer, who was present during the meeting, escort Mr. Rolovich from the building and to Mr. Rolovich's truck.

92.     Mr. Chun did not permit Mr. Rolovich to return to his office to retrieve his private property.

93.     Mr. Chun did not permit Mr. Rolovich to speak with his WSU football players after the meeting.

94.     As a direct and proximate result of WSU's, Governor Inslee's, and Mr. Chun's actions, Mr. Rolovich has suffered, and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, and compensation and benefits for which he is entitled to an award of monetary damages.

**COUNT I**
**BREACH OF CONTRACT**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

95.     Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

96.     Pursuant to the terms of WSU's employment contract with Mr. Rolovich, WSU could terminate him with just cause (as defined in the contract), or without cause, but if it terminated Mr. Rolovich without cause, WSU was required to pay liquidated damages in an amount equal to sixty percent of his remaining base salary. When he was terminated, Mr. Rolovich had approximately three and one-half years remaining on his contract.

97.     WSU terminated Mr. Rolovich in December 2021, claiming that it had just cause to do so, and on that basis denied that it owed Mr. Rolovich any further compensation under Mr. Rolovich's employment agreement.

98.     WSU breached its contract with Mr. Rolovich because it did not have just cause to terminate Mr. Rolovich.

COMPLAINT - 23

99.     WSU violated its own policies by allowing HRS to be improperly and unlawfully influenced by Mr. Chun, who persuaded HRS to reverse its determination that Mr. Rolovich's religious beliefs regarding Covid vaccines were sincere.

100.     Mr. Rolovich reasonably relied upon WSU's representation that it would follow a blind review process in determining whether a request for a religious exemption from the vaccine mandate was grounded in a sincere religious belief.

101.     Mr. Rolovich's determination that he could not receive a COVID-19 vaccine without violating his religious convictions was not a deliberate and serious violation of his contractual duties, it was not an act of misconduct, or an intentional or major violation or repeated instance of secondary violations, nor was it prejudicial to the best interests of the University or its athletic program. It was an act of faith, of conscience.

102.     By taking punitive action against Mr. Rolovich for raising a religious objection that the University's own process deemed sincere, WSU breached its employment agreement with Mr. Rolovich.

103.     After HRS determined that Mr. Rolovich's religious beliefs were sincere, both HRS and EH&S determined that Mr. Rolovich's sincere religious beliefs could be accommodated by requiring countermeasures to ensure his safety and others he may be in contact with.

104.     For approximately a year prior to his termination, Mr. Rolovich had successfully performed his job as head coach while following countermeasures required of him by WSU because of his vaccination status.

105.     Mr. Chun rejected the HRS and EH&S accommodation protocols developed for Mr. Rolovich, without ever seeking input from Mr. Rolovich.

106.     Mr. Rolovich's sincere religious beliefs could have been accommodated as was clearly demonstrated by HRS, and especially EH&S, whose expertise in environmental and occupational health and safety" made an "individualized assessment" of Mr. Rolovich's

COMPLAINT - 24

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

working environment and formulated a list of "reasonable and necessary interventions and countermeasures to ensure the safety of the employee and others the employee may be in contact with."

107.    WSU's refusal to seek input from Mr. Rolovich on his religious accommodation, a duty imposed by law, was a breach of its employment agreement with Mr. Rolovich, as was Mr. Chun's predetermination before Governor Inslee's vaccine mandate that Mr. Rolovich would be fired with cause if he did not get vaccinated.

108.    WSU's decision and actions in terminating Mr. Rolovich, and asserting that it had just cause to do so, also constituted a breach of the implied warranty of good faith and fair dealing.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

## COUNT II
## WASHINGTON LAW AGAINST DISCRIMINATION
### RCW 49.60 *et seq.*

109.    Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

110.    A substantial factor in WSU's decision to terminate Mr. Rolovich "for just cause" was his religious beliefs (creed) as expressed by him in seeking a religious exemption from Governor Inslee's vaccine mandate.

111.    An individual's exercise of religious beliefs in a decision not to be vaccinated, or take medicine, cannot lawfully serve as the basis for a just cause termination.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

COMPLAINT - 25

**COUNT III**
**WASHINGTON CONSTITUTION, ARTICLE 1, SECTION 11**
**DISCRIMINATION AGAINST RELIGION/CONSCIENCE**

112.    Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

113.    The Washington State Constitution guarantees Mr. Rolovich "[a]bsolute freedom of conscience in all matters of religious sentiment, belief, and worship." The same constitutional provision states that "no one shall be molested or disturbed in person or property on account of religion."

114.    Defendants, by their conduct and words, discriminated against Mr. Rolovich because he acted according to his conscience, guided by his religion, in refusing to be vaccinated.

115.    Defendants' threat to fire Mr. Rolovich with "just cause" if he did not take an experimental vaccine was a disturbing and unlawful assault upon Mr. Rolovich's conscience, bodily integrity, and religious faith.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**COUNT IV**
**WRONGFUL WITHHOLDING OF WAGES**
**RCW 49.52, *et. seq.*, and RCW 49.48.010, *et seq.***

116.    Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

117.    From May 15, 2020 to July 15, 2020, WSU improperly and unlawfully withheld approximately ten percent of Mr. Rolovich's wages.

118.    WSU had a pre-existing duty under contract to pay Mr. Rolovich the specific compensation as set forth in the employment contract.

COMPLAINT - 26

1    WHEREFORE, Plaintiff prays for damages against Defendants as provided for by

2  law.

3                                      COUNT V
                        VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.*
4

5    119.    Mr. Rolovich hereby repeats and realleges each and every above-made

6  allegation as if fully set forth herein.

7    120.    Title VII of the Civil Rights Act of 1964 prohibits WSU from discriminating

8  against its employees on the basis of their sincerely held religious beliefs. *See* 42 U.S.C.

9  §2000e-2(a).

10    121.    Mr. Rolovich holds sincere religious beliefs that precluded him from receiving

11  any of the COVID-19 vaccines available during the times relevant to this complaint.

12    122.    Mr. Rolovich notified WSU of those beliefs by requesting a religious

13  exemption and reasonable accommodations from the vaccine mandate.

14    123.    WSU's HRS panel, pursuant to the University's established policies and

15  protocol, determined that Mr. Rolovich had sincere religious beliefs that precluded him from

16  taking the vaccine, thereafter notifying the Athletics Department (Mr. Chun) of its

17  determination.

18    124.    The HRS panel, having concluded that Mr. Rolovich's religious beliefs were

19  sincere, asked only for Mr. Chun's input on whether Mr. Rolovich's sincere religious beliefs

20  could be accommodated.

21    125.    Both HRS and EHS determined that WSU could accommodate

22  Mr. Rolovich's sincere religious beliefs.

23    126.    WSU failed to engage with Mr. Rolovich in the interactive process set forth in

24  the EEOC's  Compliance Manual on Religious Discrimination before concluding that it

25  would not accommodate his request for a religious exemption.

26

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

127.    WSU's disapproval of Mr. Rolovich's sincerely-held religious reasons for refusing to receive a COVID-19 vaccine was one of the University's motives for its discriminatory treatment of Mr. Rolovich.

128.    Accommodating Mr. Rolovich's religious beliefs would not have resulted in an undue hardship on WSU's operations.

129.    WSU's discriminatory actions were intentional and/or reckless and in violation of Title VII.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**COUNT VI**
**42 U.S.C., SECTION 1983**
**First Amendment-Free Exercise of Religion and Fourteenth Amendment-Due Process**
**(Defendant Chun only, in his Individual Capacity)**

130.    Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

131.    All of the acts of Defendant Chun were conducted by him under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

132.    The law regarding the free exercise of religion in employment is well established.

133.    The law regarding due process in employment is well established.

134.    Defendant Chun knew the First Amendment prohibits government officials from discriminating against an employee because of his religious beliefs.

135.    Defendant Chun knew that the First Amendment prohibits governmental officials from demonstrating hostility to religion or prohibiting the free exercise thereof.

136.    Defendant Chun knew the Fourteenth Amendment prohibits government from denying an employee due process.

COMPLAINT - 28

137.    Defendant Chun knew the Fourteenth Amendment prohibits government officials from denying an employee his right to due process.

138.    Defendant Chun acted with willful malice, and/or intentionally and in gross disregard of Mr. Rolovich's constitutional rights, and/or in reckless disregard of Mr. Rolovich's constitutional rights.

139.    As a direct and proximate result of Defendant Chun's actions, Mr. Rolovich has been deprived of his constitutional right to the free exercise of religion, to be free from governmental hostility directed at his religion, and his right to due process and equal protection under the law.

WHEREFORE, Plaintiff prays for damages against Defendant Chun as provided for by law.

**COUNT VII**
**42 U.S.C., SECTION 1983**
**(First Amendment-Free Exercise of Religion)**

140.    Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

141.    All of the acts of Defendants, their officers, agents, servants, and employees, as alleged herein, were conducted by the Defendants under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

142.    Defendants granted twice as many medical exemptions as religious exemptions to WSU employees, reflecting Defendants' discriminatory policy to grant religious exemptions as narrowly as possible.

143.    The creation of a formal mechanism for granting exemptions renders WSU's vaccine mandate not generally applicable because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude.

COMPLAINT - 29

144.    Defendants ultimately denied Mr. Rolovich's religious exemption request, terminated him, and improperly claimed it had just cause to do so, because Mr. Rolovich had informed Defendants that religious convictions precluded him from receiving a COVID-19 vaccine.

145.    Mr. Rolovich's religious conviction to not be vaccinated cannot be punished by WSU by terminating him with just cause.

146.    The actions of Defendants, as alleged herein, are unconstitutional abridgements of Mr. Rolovich's rights to the free exercise of religion secured by the First and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

## COUNT VIII.
## FOURTEENTH AMENDMENT-DUE PROCESS (As Applied)

147.    Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

148.    All of the acts of Defendants, their officers, agents, servants, and employees, as alleged herein, were conducted by the Defendants under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

149.    Defendants' policies, as administratively construed and applied against Mr. Rolovich, granted WSU officials unfettered discretion to disregard the process they created for determining whether a religious exemption would be granted and, therefore, abridged Mr. Rolovich's right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

COMPLAINT - 30

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

a.       Assume jurisdiction over this action;

b.       Award damages in an amount to be determined at trial plus pre and post-judgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

c.       Award liquidated damages, as provided for in the employment contract;

d.       Award punitive damages, as provided for under 42 U.S.C. § 1983, Title VII, RCW 49.60 *et seq.* and as otherwise provide for under federal and state law;

e.       Award double damages as provided for in RCW 49.52, *et seq.*;

f.       Award damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus pre and post-judgment interest;

g.       Award an offset for the adverse federal income tax consequences resulting from damages and award of attorneys' fees;

h.       Award costs that Plaintiff has incurred in this action, including but not limited to expert witness fees, as well as reasonable attorneys' fees and costs to the fullest extent permitted by federal and state law; and

COMPLAINT - 31

1        i.       Award such other and further relief as the Court may deem just and

2   proper.

3        DATED this 11th day of November, 2022.

4

5                                                    By  /s Brian Fahling

6
                                                     Brian Fahling
7                                                    WSBA #18894
                                                     LAW OFFICE OF BRIAN FAHLING
8                                                    8124 NE 166th St
                                                     Kenmore, WA 98028
9                                                    T: 425.802.7326
                                                     E-mail: bfahling@fahlinglaw.com
10

11

12                                                   By  /s Eric Kniffin

13
                                                     Eric Kniffin
14                                                   CO Bar #48016
                                                     (Pending Admission *Pro Hac Vice*)
15                                                   LEWIS ROCA
                                                     90 S. Cascade Ave., Suite 1100
16                                                   Colorado Springs, CO 80907
                                                     T: 719-386-3017
17                                                   E-mail: ekniffin@lewisroca.com

18                                                   Attorneys for Plaintiff

19

20

21

22

23

24

25

26

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

**EMPLOYMENT AGREEMENT**

This Employment Agreement (Agreement) is made between Washington State University (University) and Nicholas R. Rolovich (Employee), and it cancels and replaces any and all prior employment agreements or understandings, whether in writing or otherwise, between these two parties.

1.    **Employment Position**

    1.1.    **Employment as Employee of University**. Employee shall serve as the Head Coach of the University's Intercollegiate Football Program (Football) and shall perform the duties outlined in Section 1.2 herein during the term of this Agreement. Employee is subject to and governed by the terms and conditions of the Agreement.

    1.2    **Description of Employee's responsibilities**

        1.2.1    **Recognition of duties**. Employee agrees to devote Employee's best efforts to the performance of their duties for the University, and to comply with and support all rules, regulations, policies, and decisions established or issued by the University. Employee agrees to abide by all provisions of law, including the Washington State Ethics in Public Service Law, RCW 42.52. Employee also agrees during the term of this Agreement that Employee will not engage, directly or indirectly, in any business that would detract from Employee's ability to apply their best efforts to the performance of their duties hereunder. Employee also agrees not to usurp any economic opportunities of the University.

            1.2.1.1    **General duties and responsibilities**. Employee agrees to undertake and perform properly, efficiently, to the best of Employee's ability, and consistent with the standards of the University all duties and responsibilities (as defined in Section **1.2.1.2** and/or Athletic Director) attendant to the position of Head Coach of the University's Football Program. Employee further agrees to abide by and comply with the constitution, bylaws, and interpretations of the National Collegiate Athletic Association (NCAA) and Pac-12 Conference (Pac-12), Title IX of the Education Amendments Act of 1972 (Title IX) including, but not limited to, ensuring that all Title IX matters are reported in accordance with applicable law, NCAA, Pac-12 and University policy, and all NCAA, Pac-12, and University rules and regulations relating to the conduct and administration of the Football Program as now constituted or as may be amended during the term hereof. In the event Employee becomes aware, or has reasonable cause to believe, that violations of any of the aforementioned rules or regulations may have taken place, Employee shall promptly report the same to the Athletic Director, Director of Compliance, or Faculty Athletic Representative of the University, and cooperate and comply with any related inquiries or investigations. Employee agrees to adhere to, respect, and to follow the academic standards and requirements of the University in regard to the recruitment and eligibility of prospective and current student-athletes for the Football Program. All academic standards, requirements, and policies of the University shall also be observed by Employee at all times.

            1.2.1.2    **Specific duties and responsibilities**. Employee is accountable for the following list of specific duties and responsibilities. This list supplements Employee's other general duties and responsibilities provided elsewhere in this Agreement.

                a. Integrate the Football program into the whole spectrum of academic life to complement the University and its mission in the state and community;

                b. Evaluate, recruit, train, and develop student-athletes to compete successfully against major college competition in a quality Division I Football program;

1

**#15.42**

c. Maintain a competitive Football program consistent with the Athletic Director's goals, which will reasonably be established upon consultation with Employee;

d. Cooperate with and support the University's faculty and administrative officials to ensure that student-athletes participating in the Football program meet all academic requirements;

e. Conduct the Football program with integrity and maintain financial responsibility consistent with the Football program budget, standards, and reasonable expectations of the Athletic Department and the University;

f. Recommend to the Athletic Director the appointment and discharge of assistant Football coaches and all other contracted staff specific to Football. Employee and the Athletic Director shall consult regarding those issues and make reasonable efforts to reach agreement. The Athletic Director shall then make the final decision;

g. Manage the Football program, including, but not limited to, assisting the Athletic Director, or his designee, with Football budget preparation and administration, and the supervision and evaluation of the Football program's staff;

h. Under the direction of the Athletic Director, participate in events, activities, and/or efforts to foster support for the University's Athletic Department and/or the Football program;

i. Serve as director of instructional youth Football programs to be held in athletic facilities at the University's Pullman campus if deemed applicable;

j. The Athletic Director or his designee may reasonably assign other duties from time to time that are consistent with customary duties of a Head Football Coach at a Division I Football program;

k. Cooperate with any investigation relating to the University's athletic programs, including the Football Program;

l. Ensure full compliance with Title IX of the Education Amendments Act of 1972 (Title IX), including but not limited to, ensuring that all Title IX matters are reported in accordance with applicable law, NCAA and Pac-12 policy and univeristy policies and regulations; and

m. Any other reasonable duties as assigned by the Athletic Director.

1.3   **Employee subject to discipline for violations of NCAA rules and regulations.** If Employee is found to be in violation of NCAA rules and regulations, including, but not limited to, the ethical conduct expectations as stated in NCAA Bylaws 10.1, 11.1.1, 11.1.2, 11.1.2.1, and 19.01.2, whether while employed by the University or during prior employment at another NCAA member institution, Employee shall be subject to disciplinary or corrective action as set forth through the NCAA enforcement procedures. Further, the University may suspend Employee for a period of time, without pay, or may terminate employment as provided in Section 4.1 hereof if Employee is found to have been involved in or condoned a major violation or a pattern of uncorrected secondary violations of NCAA, Pac-12, or University rules and regulations.

2

**#15.43**

1.4    **Reporting relationship.** Employee shall report to the Athletic Director, or to such other person as the Athletic Director may designate.

1.5    **Staffing.** The University will provide Employee with a full-time staff as allowed by NCAA and Pac-12 rules.

## 2.    Term of Employment

The University hereby employs and Employee accepts employment for the period beginning on January 14, 2020 and ending on June 30, 2025, subject, however, to prior termination in accordance with the provisions set forth in Section 4. Employee is solely responsible for obtaining legal employment status in the United States and is required to report legal status to University. Employee must immediately inform University if legal employment status is denied or revoked. The University may terminate this agreement if Employee is unable to maintain legal employment status in the U.S. On or before May 31, 2025, Employee will receive written notification from the University of its intent to renew or not renew the Agreement. If Employee obtains new employment commencing prior to June 30, 2025, Employee shall notify University immediately, and all payments and fringe benefits under this Agreement shall cease on the date Employee's new employment commences.

## 3.    Compensation

In consideration for the promises he has made in entering into this Agreement, Employee shall be entitled to the compensation set forth herein. All payments from the University are subject to normal deductions and withholding for state, local, and federal taxes and for any retirement or other benefits to which Employee is entitled or in which Employee participates, and are subject to the terms and conditions of Section 4 concerning termination of this Agreement.

3.1    **Base salary.** The base salary paid by the University to Employee for services and satisfactory performance of the terms and conditions of this Agreement shall be at the annual salary rate of $2,000,000 payable by the University in accord with payroll dates and procedures applicable to University employees generally. Employee shall be eligible for consideration for salary increases to the base salary that are authorized and funded by the state of Washington, subject to a determination by the Athletic Director.

3.2    **Compensation for all collateral opportunities.** University shall pay Employee supplemental compensation in the amount of $1,000,000 each employment year for the term of this contract in consideration of any collateral opportunity available to Employee as a Head Coach of the Football team. This supplemental compensation is intended to reflect income paid by third parties to the University for the types of collateral opportunities described herein. Employee is entitled to receive additional compensation directly from third parties for collateral opportunities not arranged by or in conflict with arrangements made previously by the University with the understanding that Employee must receive prior written approval from the University, which approval shall not be unreasonably withheld. University agrees to pay Employee said compensation in accordance with payroll dates and procedures applicable to general University employees.

3.3    **Fringe benefits.** During the term of this Agreement, the University will provide Employee with the fringe benefits described in this Section 3.2 and no others.

    3.3.1    **Standard University fringe benefits.** Employee shall be entitled to the standard University fringe benefits, including group life insurance, family medical coverage, and retirement plan contributions. Retirement contributions shall be made in accordance with the retirement plan selected by Employee and offered through the University. If any benefit/consideration is based in whole or in part upon the salary paid to Employee, such benefit/consideration shall be made without including any collateral compensation or

3

**#15.44**

incentive or supplemental compensation. Notwithstanding the above, Employee shall not accrue nor be entitled to use annual leave.

3.3.2    **Expenses.** The University will reimburse Employee at the rate authorized by state law and University regulations for all travel and out-of-pocket expenses reasonably incurred by Employee for the purpose of and in connection with the performance of Employee's duties under this Agreement.

3.3.3    **Vehicle.** During the term of this Agreement, the University may provide Employee with either: (a) a donated vehicle on a loan basis; or (b) a stipend in the amount of $450 per month in lieu of a donated vehicle. The University has the sole discretion to determine whether to provide the use of the loaned vehicle or the stipend. Employee shall use, maintain, and service any vehicle provided in compliance with the University's written policies and procedures regarding courtesy cars, as those policies now exist or may be amended. The University's courtesy car program is structured as an "accountable plan" for tax purposes, and Employee understands and agrees that Employee shall be taxed on the annual percentage of personal use of the vehicle, which will be calculated from the mileage records submitted by Employee. Employee shall not remove any dealer identification markings placed on the vehicle for promotional purposes.

3.3.4    **Tickets.** University will provide Employee with use of a 12-seat family suite in Martin Stadium for each WSU home Football contest, and up to twenty (20) tickets for each home, away and post-season Football contest in which the University's Football team competes during the term of this Agreement. Tickets to each home game of each of the University's other varsity intercollegiate athletic teams will be provided in non-priority seating sections according to the provisions of the athletic department's ticket policy for staff members. Employee understands and acknowledges that the value of tickets and passes may be considered income to Employee and will be so reported by the University. Employee also understands that the use of tickets and passes will be subject to normal compliance review for complimentary tickets.

3.3.5    **Guest Travel.** Employee may bring spouse and two guests with the Football team on all away team travel trips; or, Employee may bring spouse and dependent children on all away team travel trips on a space available basis. Employee cannot bring two guests and dependent children on the same away team travel trip, however, dependent children can be considered as part of the permissible two guests. Employee, spouse and any guests or children must be traveling with team on the same trip. The University will pay as compensation to Employee all travel and lodging costs associated with bringing spouse and guests or children on the road trips and related activities in accordance with University travel regulations and, where relevant, NCAA and/or Pac-12 Conference regulations. Compensation paid by the University shall not exceed costs associated with bringing Employee's spouse and guests or children to the contest, including airfare, ground transportation, lodging, and cost of admission to the games and related events. Employee understands and acknowledges that the value of such travel may be considered income to Employee and will be so reported by the University. Travel expenses shall be paid in accordance with applicable IRS regulations.

3.3.6    **Guest travel for post-season competition.** Whenever Employee attends post-season athletic competition because the Football team is participating in the event, Employee may elect to bring their spouse and dependent children, regardless of age, to the event and related activities. The University will pay as compensation to Employee all costs associated with bringing Employee's spouse or partner and dependent children to the event and its related activities in accordance with University travel regulations and, where relevant, NCAA and/or Pac-12 regulations. Compensation paid by the University shall not exceed costs associated with bringing Employee's spouse and dependent children to the event, including, but not limited to, airfare, other travel costs such as rental car or bus fare,

4

**#15.45**

lodging, subsistence, and cost of admission to the game and related events. Employee understands and acknowledges that the value of such travel may be considered income to Employee and will be so reported by the University.

**3.3.7**   **Alaska Lounge**. The University will pay Employee's membership dues to the Alaska Airlines Lounge. Employee understands and acknowledges that the value of this membership may be considered income to the Employee and will be so reported by the University.

**3.3.8**   **Parking**. The University will provide Employee with two (2) permits for parking purposes for each of the University's home Football contests in Pullman, Washington. Employee understands and acknowledges that the value of tickets and passes may be considered income to the Employee and will be so reported by the University.

**3.3.9**   **One-time payment**. The University will pay Employee a one-time payment of $561,803 (five hundred sixty-one thousand, eight hundred and three dollars) in order to reimburse Employee for payment of contractual buy-out obligation to former employer. Employee is solely responsible for satisfying any contractual obligations to the former employer. Employee understands and acknowledges that this payment shall be subject to standard withholding applicable to salary payments for Employee's position at the University.

**3.3.10**   **Golf club membership.** The University, as additional compensation, will pay Employee's membership dues at the Palouse Ridge Country Club. The University will also pay the Employee's fee for joining the club, if any. Employee understands and acknowledges that the value of such membership may be considered income to the Employee and will be so reported by the University.

**3.3.11**   **On-campus summer camp**. The University has the exclusive right to operate summer youth Football camps on its campus using University facilities. Pursuant to Section 1.2.1.2(i) hereof and subject to Section 3.3.11 hereof, Employee shall direct and participate in the University's summer Football camps. Notwithstanding the provisions of Section 4.3.2 hereof, the coaches of the University's Football program will be compensated for their performance of duties in said on-campus summer camps consistent with athletic department policies.

**3.3.12**   **Outside income**. Employee may be compensated for outside activities appropriate to the promotion of athletic programs, provided such activities do not conflict or interfere with the discharge of duties under this Agreement. Employee must receive prior approval from the Athletic Director, or from such other person as the Athletic Director may designate, for all such outside compensation. Such activities must comply with the state ethics law and University policy.

**3.4**   **Incentive Compensation**. Each employment year during the term of this Agreement, in addition to the base salary and supplemental compensation, the University shall pay Employee any applicable incentive compensation as provided in Section 3.4. The University shall pay Employee incentive compensation for an employment year within a reasonable time (generally, 30 days) after the University has determined the amount of the payment and whether the conditions of payment have been met. The University shall annually pay Employee the incentive compensation for the following achievement(s):

| Achievement | Amount of Incentive Payment |
|---|---|
| • Pac-12 North Champion * | $50,000 |
| • Pac-12 Conference Champion * | $100,000 (non-inclusive) |
| | |
| • Final National Ranking Top 25 (CFP, AP, USA Today) * | $50,000 |
| • Final National Ranking Top 10 (CFP, AP, USA Today,) * | $100,000 (non-inclusive) |

#15.46

| | |
|---|---|
| • Pac-12 Public School Graduation Rate #1 * *(based on the WSU Football NCAA GSR)* | $25,000 |
| • Pac-12 Public School Graduation Rate Top 4 * *(based on the WSU Football NCAA GSR)* | $15,000 (non-inclusive) |
| • 7+ Regular Season wins <u>and</u> participation in Bowl Game <u>not</u> Sugar, Rose, Orange, Cotton, Peach, Fiesta * | $25,000 |
| • Sugar, Rose, Orange, Cotton, Peach or Fiesta Bowl Game * | $100,000 (non-inclusive) |
| • College Football Playoff appearance * | $200,000 (non-inclusive) |
| • National Championship Game appearance* | $300,000 (non-inclusive) |
| • National Championship Game victory* | $400,000 (non-inclusive) |
| • Pac-12 Coach of the Year | $25,000 |
| • National Coach of Year (AP, AFCA)** | $50,000 |

*One Payment only in each incentive category for highest level reached
**One Payment only, even if multiple awards

4. **Termination**

4.1 **Termination by University for just cause.** The University shall have the right to terminate this Agreement for just cause (Just Cause) prior to its normal expiration. The term Just Cause shall include, in addition to and as examples of its normally understood meaning in employment contracts, any of the following:

4.1.1 Deliberate and serious violations of the duties outlined in Section 1.2 of this Agreement or refusal or unwillingness to perform such duties in good faith and to the best of Employee's abilities;

4.1.2 Deliberate and serious violations by Employee of any of the other terms and conditions of this Agreement not remedied after fourteen (14) days' written notice to Employee or, if the violation cannot reasonably be remedied within that period, Employee's failure to make reasonable efforts to cure such violation;

4.1.3 Any act of misconduct by Employee including, but not limited to, acts of criminal conduct (excluding minor traffic offenses, that don't impede Employee's ability to perform duties), an act of dishonesty, theft or misappropriation of University property, moral turpitude, insubordination, or act injuring, abusing, or endangering others, including physical, psychological, or sexual abuse, misconduct or violence, or acts that constitute use of excessive exercise or training for punitive purposes, or repeated acts of insubordination or a single act of insubordination of significant magnitude;

4.1.4 An intentional or major violation or repeated instances of secondary violations by Employee, or by any person under Employee's supervision where Employee had knowledge of the intended violation and failed to intervene, or by student-athletes in the Football Program where Employee had knowledge of the intended violation and failed to intervene, of any law, rule, regulation, constitutional provision, bylaw or interpretation of the University, the NCAA, or the Pac-12 which may in the reasonable judgment of the University reflect adversely upon the University or its athletic program including, but not limited to, any such violation which may result in the University being placed on probation

6

**#15.47**

by the Pac-12 or the NCAA and including any such violation which may have occurred during prior employment of Employee at another NCAA member institution;

**4.1.5**    Conduct of Employee seriously prejudicial to the best interests of the University or its athletic program; or

**4.1.6**    Prolonged absence from duty without the consent of Employee's supervisor.

**4.2    Determination of Just Cause and hearing provision**. Just Cause sufficient to satisfy the provisions of Section 4.1 shall initially be determined in good faith by the Athletic Director of the University. The Athletic Director shall give Employee written notice of the provisions of the Agreement alleged to have been violated, together with a statement of the factual basis for those allegations. Employee will have fifteen (15) calendar days within which to respond to the Athletic Director, in writing, with reasons Employee should not be terminated. The Athletic Director, after considering any response provided by Employee, will issue a decision regarding termination for Just Cause. If a summary suspension has been issued in accordance with paragraph 4.3.1, the Athletic Director must issue a decision regarding termination within five (5) calendar days of receipt of Employee's response. If a summary suspension has not been ordered, the Athletic Director shall issue a decision regarding termination within ten (10) calendar days of receipt of Employee's response.

Employee's right to receive any payment under this Agreement, including all portions of Section 3, shall cease the day following the issuance of the decision to terminate for Just Cause.

**4.3    Appeal of termination for Just Cause**. Employee may appeal the Athletic Director's decision to terminate for Just Cause to the University President or designee. Such appeal must be made in writing within fifteen (15) calendar days' notice of the Athletic Director's determination and must contain a statement of the reasons Employee requests the President to set aside the decision to terminate for Just Cause. Employee must provide a copy of the appeal to the Athletic Director at the time it is delivered to the Office of the President. The Athletic Director may, within seven (7) calendar days of receipt of the notice of appeal, provide to the President an additional written statement supporting the Athletic Director's decision and shall provide the President with: 1) the written notice of termination sent to Employee; 2) Employee's written response, if any; and 3) the written decision of termination. The President may allow oral statements in the President's discretion. The President shall render a final decision within thirty (30) calendar days of receiving the materials provided by the Athletic Director, which shall be the final decision of the University.

Employee shall not be entitled to receive any compensation under this Agreement pending the appeal. Should Employee be reinstated by the President, Employee shall be entitled to back pay for compensation not paid during the pendency of the appeal.

**4.3.1    Summary suspension**. Once the preliminary determination of intent to terminate for Just Cause is made, the Athletic Director shall have the administrative authority to order suspension of Employee from Employee's duties and salary pending termination of this Agreement, provided that notice of any such suspension shall be delivered to Employee in writing, detailing the reasons for such suspension. This notice may be contained in the same document as the written notice of termination. Summary suspension may also be imposed if the Athletic Director finds that Employee has committed gross misconduct or poses an immediate threat to the safety of persons or property. The Athletic Director has the authority to issue immediate summary suspension if facts show that Employee has committed gross misconduct or poses an immediate threat to the safety of persons or property. Employee may respond to the notice of summary suspension together with Employee's response, if any, to the notice of termination.

Employee shall not be entitled to receive any compensation under this Agreement during the summary suspension period.

7

**#15.48**

**4.3.2    University's obligations upon termination for Just Cause.** In the event this Agreement is terminated for Just Cause in accordance with the provisions of Sections 4.1 and 4.2, all obligations of the University to make further payments under this Agreement and/or to provide any other consideration shall cease. In no case shall the University be liable to Employee for the loss of any collateral business opportunities or any other benefits, perquisites, or athletically-related income from any other source, nor shall Employee be liable to the University for the loss of any such collateral business opportunities. Employee will be paid all compensation earned up to the date of termination for Just Cause.

**4.4    Termination by University without Just Cause.** The University reserves the right to terminate this Agreement prior to its normal expiration without cause. Termination by the University without cause shall be effectuated by delivering to Employee written notice, signed by the President of the University or by the Athletic Director or such other person as the President may designate, of the University's intent to terminate this Agreement without cause. In such event, University will pay Coach liquidated damages, in lieu of any and all other legal remedies or equitable relief.

**4.4.1    Liquidated damages upon termination by University without Just Cause.** The parties agree that actual damages resulting from termination without just cause would be difficult to calculate and that the payment of liquidated damages by University to Employee shall constitute sufficient and reasonable compensation to Employee for any loss, damages, or injury suffered by Employee because of termination without just cause by University. The parties further agree that the payment of liquidated damages shall not be construed as a penalty.

If the University terminates this Agreement without just cause at any time prior to June 30, 2025, the University shall pay Employee liquidated damages in an amount equal to sixty percent (60%) of the remaining base salary due under the terms of this Agreement specifically in Section 3.1. This payment shall be paid in full, either in one lump sum or a series of payments at the discretion of the University, by no later than March 15 of the calendar year following the effective date of termination. In no case shall the University be liable for the loss of any business opportunities or any other benefits, perquisites, supplemental income or athletically related income from any other source. The parties intend that the provisions of this Agreement comply with, or meet an exemption from, Section 409A of the Code, and the regulations thereunder and all provisions of this Agreement shall be construed in a manner consistent with the requirements for avoiding taxes or penalties thereunder, and neither party shall have the right to accelerate, defer or otherwise modify the manner of payment of any amount set forth in this Section 5.01(e), except for the University's right to determine the payment schedule. Employee shall have no mitigation obligation and WSU shall have no offset rights against any compensation earner or received by Employee subsequent to such termination.

**4.5    Termination by Employee**

**4.5.1    Written notice by Employee.** Employee may terminate this Agreement during its term by giving the University fourteen (14) calendar days' advance written notice of the termination, or affirmatively communicates to the Director of Athletics or their delegate of an intention to leave or accept a coaching position elsewhere. Payment of remaining salary will cease on the date Employee submits a resignation, fails to report to work, or otherwise engages in actions that clearly establish employment with another party.

**4.5.2    Liquidated damages upon termination by employee.** Employee recognizes that University is making a highly valuable investment in their continued employment by entering into this Agreement and that investment would be lost if they were to resign prior to the expiration of this Agreement. The parties agree actual damage to University in such case would be extremely difficult to calculate. The parties further agree that the payment

8

**#15.49**

of liquidated damages by Employee and acceptance by University shall constitute sufficient and reasonable compensation to University for injury and that it shall be enforceable as liquidated damages and not as a penalty.

If Employee terminates this Agreement during the initial term of this Agreement, Employee shall pay liquidated damages to the University as follows:

- On or before June 30, 2021: $8,000,000
- July 1, 2021, through June 30, 2022 (inclusive): $6,000,000
- July 1, 2022, through June 30, 2023 (inclusive): $5,000,000
- July 1, 2023, through June 30, 2024 (inclusive): $2,000,000
- July 1, 2024, through June 30, 2025 (inclusive): $1,000,000

5.      **Restriction on Competition**

Employee agrees and specifically promises that Employee will neither directly nor indirectly through an agent actively seek, negotiate for, or accept employment, under any circumstances, as a coach or in any other capacity related to intercollegiate athletics with any member institution of the NCAA or with any football team participating in any professional league or conference in the United States or elsewhere requiring performance of duties prior to the expiration date of the term of this Agreement or any extension without first notifying the Athletic Director and obtaining permission from the Athletic Director to seek such described employment opportunities, such permission to not be unreasonably withheld.

6.      **Choice of Law**

This Agreement has been entered into under, and shall be governed by, the laws of the State of Washington. In the event that either party for the enforcement or construction of any of the provisions of this Agreement commences litigation, the actions shall be brought in the Superior Court of the State of Washington and the venue shall be in Whitman County, Washington.

7.      **Alternate Dispute Resolution**

Except as otherwise provided in this Agreement, when a dispute arises between the parties and it cannot be resolved by direct negotiation, the parties agree to participate in good faith mediation. The mediator shall be chosen by agreement of the parties. If the parties cannot agree on a mediator, the parties shall use a mediation service that selects the mediator for the parties. The cost of the mediation, if any, shall be shared equally by the parties, unless otherwise agreed. The parties agree that mediation shall precede any action in a judicial tribunal.

Nothing in this Agreement shall be construed to limit the parties' choice of a mutually acceptable alternative resolution method such as a disputes hearing, a Disputes Resolution Panel, or arbitration.

8.      **Merger Clause**

This Agreement supersedes all prior understandings and agreements, oral or written, regarding Employee's employment by the University, including University handbooks or manuals.

9.      **Amendments to Agreement**

This Agreement may be amended at any time only by a written instrument duly approved by the University through its designated representative and accepted by Employee, such approval and acceptance to be acknowledged in writing.

9

**#15.50**

10.     **Acknowledgment**

Employee acknowledges that Employee has read and understands the foregoing provisions of this Agreement and that such provisions are reasonable and enforceable and that Employee agrees to abide by this Agreement and the terms and conditions set forth herein. Employee further acknowledges that Employee has been provided an opportunity to seek the advice of legal counsel before entering into this Agreement.

11.     **Severability**

If any provision of this Agreement is found to be unenforceable, either in whole or in part, then such provision shall be deemed amended to delete or modify, as necessary, the offending provision or provisions or to alter the bound thereof in order to render said provision valid and enforceable. The remainder of this Agreement will not be affected, and will remain in full force and effect to the extent provided by law.

**IN WITNESS WHEREOF, the PARTIES have executed this AGREEMENT.**

**WASHINGTON STATE UNIVERSITY**                          **EMPLOYEE:**

Patrick Chun                                             Nicholas R. Rolovich
Director of Athletics
Date:     April 7, 2020                                  Date:     Apr 6, 2020

Kirk H. Schulz
Office of the President
Date:

Approved as to form:

Office of the Attorney General
Date:     4/10/20

10

#15.51



August 23, 2021

Pfizer Inc.
Attention: Ms. Elisa Harkins
500 Arcola Road
Collegeville, PA 19426

Dear Ms. Harkins:

On February 4, 2020, pursuant to Section 564(b)(1)(C) of the Federal Food, Drug, and Cosmetic Act (the FD&C Act or the Act), the Secretary of the Department of Health and Human Services (HHS) determined that there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad, and that involves the virus that causes Coronavirus Disease 2019 (COVID-19).[1] On the basis of such determination, the Secretary of HHS on March 27, 2020, declared that circumstances exist justifying the authorization of emergency use of drugs and biological products during the COVID-19 pandemic, pursuant to Section 564 of the Act (21 U.S.C. 360bbb-3), subject to terms of any authorization issued under that section.[2]

On December 11, 2020, the Food and Drug Administration (FDA) issued an Emergency Use Authorization (EUA) for emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of COVID-19 for individuals 16 years of age and older pursuant to Section 564 of the Act. FDA reissued the letter of authorization on: December 23, 2020,[3] February 25, 2021,[4] May

---

[1] U.S. Department of Health and Human Services, Determination of a Public Health Emergency and Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3. February 4, 2020.

[2] U.S. Department of Health and Human Services, *Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3*, 85 FR 18250 (April 1, 2020).

[3] In the December 23, 2020 revision, FDA removed reference to the number of doses per vial after dilution from the letter of authorization, clarified the instructions for vaccination providers reporting to VAERS, and made other technical corrections. FDA also revised the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) to clarify the number of doses of vaccine per vial after dilution and the instructions for reporting to VAERS. In addition, the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) and the Fact Sheet for Recipients and Caregivers were revised to include additional information on safety monitoring and to clarify information about the availability of other COVID-19 vaccines.

[4] In the February 25, 2021 revision, FDA allowed flexibility on the date of submission of monthly periodic safety reports and revised the requirements for reporting of vaccine administration errors by Pfizer Inc. The Fact Sheet for Health Care Providers Administering Vaccine (Vaccination Providers) was revised to provide an update to the storage and transportation temperature for frozen vials, direct the provider to the correct CDC website for information on monitoring vaccine recipients for the occurrence of immediate adverse reactions, to include data from a developmental toxicity study, and add adverse reactions that have been identified during post authorization use. The Fact Sheet for Recipients and Caregivers was revised to add adverse reactions that have been identified during post authorization use.

Page 2 – Pfizer Inc.

10, 2021,[5] June 25, 2021,[6] and August 12, 2021.[7]

On August 23, 2021, FDA approved the biologics license application (BLA) submitted by BioNTech Manufacturing GmbH for COMIRNATY (COVID-19 Vaccine, mRNA) for active immunization to prevent COVID-19 caused by SARS-CoV-2 in individuals 16 years of age and older.

On August 23, 2021, having concluded that revising this EUA is appropriate to protect the public health or safety under section 564(g)(2) of the Act, FDA is reissuing the August 12, 2021 letter of authorization in its entirety with revisions incorporated to clarify that the EUA will remain in place for the Pfizer-BioNTech COVID-19 vaccine for the previously-authorized indication and uses, and to authorize use of COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA for certain uses that are not included in the approved BLA.  In addition, the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) was revised to provide updates on expiration dating of the authorized Pfizer-BioNTech COVID-19 Vaccine and to update language regarding warnings and precautions related to myocarditis and pericarditis.  The Fact Sheet for Recipients and Caregivers was updated as the Vaccine Information Fact Sheet for Recipients and Caregivers, which comprises the Fact Sheet for the authorized Pfizer-BioNTech COVID-19 Vaccine and information about the FDA-licensed vaccine, COMIRNATY (COVID-19 Vaccine, mRNA).

Pfizer-BioNTech COVID-19 Vaccine contains a nucleoside-modified messenger RNA (modRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2 formulated in lipid particles.  COMIRNATY (COVID-19 Vaccine, mRNA) is the same formulation as the Pfizer-BioNTech COVID-19 Vaccine and can be used interchangeably with the Pfizer-BioNTech COVID-19 Vaccine to provide the COVID-19 vaccination series.[8]

---

[5] In the May 10, 2021 revision, FDA authorized Pfizer-BioNTech Vaccine for the prevention of COVID-19 in individuals 12 through 15 years of age, as well as for individuals 16 years of age and older.  In addition, FDA revised the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) to include the following Warning: "Syncope (fainting) may occur in association with administration of injectable vaccines, in particular in  adolescents. Procedures should be in place to avoid injury from fainting."  In addition, the Fact Sheet for Recipients and Caregivers was revised to instruct vaccine recipients or their caregivers to tell the vaccination provider about fainting in association with a previous injection.

[6] In the June 25, 2021 revision, FDA clarified terms and conditions that relate to export of Pfizer-BioNTech COVID-19 Vaccine from the United States.  In addition, the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) was revised to include a Warning about myocarditis and pericarditis following administration of the Pfizer-BioNTech COVID-19 Vaccine.  The Fact Sheet for Recipients and Caregivers was updated to include information about myocarditis and pericarditis following administration of the Pfizer-BioNTech COVID-19 Vaccine.

[7] In the August 12, 2021 revision, FDA authorized a third dose of the Pfizer-BioNTech COVID-19 Vaccine administered at least 28 days following the two dose regimen of this vaccine in individuals 12 years of age or older who have undergone solid organ transplantation, or individuals 12 years of age or older who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

[8] The licensed vaccine has the same formulation as the EUA-authorized vaccine and the products can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns. The products are legally distinct with certain differences that do not impact safety or effectiveness.

Page 3 – Pfizer Inc.

For the December 11, 2020 authorization for individuals 16 years of age and older, FDA reviewed safety and efficacy data from an ongoing phase 1/2/3 trial in approximately 44,000 participants randomized 1:1 to receive Pfizer-BioNTech COVID-19 Vaccine or saline control. The trial has enrolled participants 12 years of age and older.  FDA's review at that time considered the safety and effectiveness data as they relate to the request for emergency use authorization in individuals 16 years of age and older.  FDA's review of the available safety data from 37,586 of the participants 16 years of age and older, who were followed for a median of two months after receiving the second dose, did not identify specific safety concerns that would preclude issuance of an EUA.  FDA's analysis of the available efficacy data from 36,523 participants 12 years of age and older without evidence of SARS-CoV-2 infection prior to 7 days after dose 2 confirmed the vaccine was 95% effective (95% credible interval 90.3, 97.6) in preventing COVID-19 occurring at least 7 days after the second dose (with 8 COVID-19 cases in the vaccine group compared to 162 COVID-19 cases in the placebo group).  Based on these data, and review of manufacturing information regarding product quality and consistency, FDA concluded that it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective.  Additionally, FDA determined it is reasonable to conclude, based on the totality of the scientific evidence available, that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine outweigh the known and potential risks of the vaccine, for the prevention of COVID-19 in individuals 16 years of age and older.  Finally, on December 10, 2020, the Vaccines and Related Biological Products Advisory Committee voted in agreement with this conclusion.

For the May 10, 2021 authorization for individuals 12 through 15 years of age, FDA reviewed safety and effectiveness data from the above-referenced, ongoing Phase 1/2/3 trial that has enrolled approximately 46,000 participants, including 2,260 participants 12 through 15 years of age.  Trial participants were randomized 1:1 to receive Pfizer-BioNTech COVID-19 Vaccine or saline control.  FDA's review of the available safety data from 2,260 participants 12 through 15 years of age, who were followed for a median of 2 months after receiving the second dose, did not identify specific safety concerns that would preclude issuance of an EUA.  FDA's analysis of SARS-CoV-2 50% neutralizing antibody titers 1 month after the second dose of Pfizer-BioNTech COVID-19 Vaccine in a subset of participants who had no serological or virological evidence of past SARS-CoV-2 infection confirm the geometric mean antibody titer in participants 12 through 15 years of age was non-inferior to the geometric mean antibody titer in participants 16 through 25 years of age.  FDA's analysis of available descriptive efficacy data from 1,983 participants 12 through 15 years of age without evidence of SARS-CoV-2 infection prior to 7 days after dose 2 confirm that the vaccine was 100% effective (95% confidence interval 75.3, 100.0) in preventing COVID-19 occurring at least 7 days after the second dose (with no COVID-19 cases in the vaccine group compared to 16 COVID-19 cases in the placebo group).  Based on these data, FDA concluded that it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in individuals 12 through 15 years of age. Additionally, FDA determined it is reasonable to conclude, based on the totality of the scientific evidence available, that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine outweigh the known and potential risks of the vaccine, for the prevention of COVID-19 in individuals 12 through 15 years of age.

Page 4 – Pfizer Inc.

For the August 12, 2021 authorization of a third dose of the Pfizer-BioNTech COVID-19 Vaccine in individuals 12 years of age or older who have undergone solid organ transplantation, or individuals 12 years of age or older who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise, FDA reviewed safety and effectiveness data reported in two manuscripts on solid organ transplant recipients.  The first study was a single arm study conducted in 101 individuals who had undergone various solid organ transplant procedures (heart, kidney, liver, lung, pancreas) a median of 97±8 months earlier.  A third dose of the Pfizer-BioNTech COVID-19 Vaccine was administered to 99 of these individuals approximately 2 months after they had received a second dose.  Levels of total SARS-CoV-2 binding antibodies meeting the pre-specified criteria for success occurred four weeks after the third dose in 26/59 (44.0%) of those who were initially considered to be seronegative and received a third dose of the Pfizer-BioNTech COVID-19 Vaccine; 67/99 (68%) of the entire group receiving a third vaccination were subsequently considered to have levels of antibodies indicative of a significant response.  In those who received a third vaccine dose, the adverse event profile was similar to that after the second dose and no grade 3 or grade 4 events were reported.  A supportive secondary study describes a double-blind, randomized-controlled study conducted in 120 individuals who had undergone various solid organ transplant procedures (heart, kidney, kidney-pancreas, liver, lung, pancreas) a median of 3.57 years earlier (range 1.99-6.75 years).  A third dose of a similar mRNA vaccine (the Moderna COVID-19 vaccine) was administered to 60 individuals approximately 2 months after they had received a second dose (i.e., doses at 0, 1 and 3 months); saline placebo was given to 60 individuals or comparison.  The primary outcome was anti-RBD antibody at 4 months greater than 100 U/mL.  This titer was selected based on NHP challenge studies as well as a large clinical cohort study to indicate this antibody titer was  protective.  Secondary outcomes were based on a virus neutralization assay and polyfunctional T cell responses.  Baseline characteristics were comparable between the two study arms as were pre-intervention anti-RBD titer and neutralizing antibodies.  Levels of total SARS-CoV-2 binding antibodies indicative of a significant response occurred four weeks after the third dose in 33/60 (55.0%) of the Moderna COVID-19 vaccinated group and 10/57 (17.5%) of the placebo individuals.  In the 60 individuals who received a third vaccine dose, the adverse event profile was similar to that after the second dose and no grade 3 or grade 4 adverse events were reported. Despite the moderate enhancement in antibody titers, the totality of data (i.e., supportive paper by Hall et al. demonstrated efficacy of the product in the elderly and persons with co-morbidities) supports the conclusion that a third dose of the Pfizer-BioNTech COVID-19 vaccine may be effective in this population, and that the known and potential benefits of a third dose of Pfizer-BioNTech COVID-19 Vaccine outweigh the known and potential risks of the vaccine for immunocompromised individuals at least 12 years of age who have received two doses of the Pfizer-BioNTech COVID-19 Vaccine and who have undergone solid organ transplantation, or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

Having concluded that the criteria for issuance of this authorization under Section 564(c) of the Act are met, I am authorizing the emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of COVID-19, as described in the Scope of Authorization section of this letter (Section II) and subject to the terms of this authorization.  Additionally, as specified in subsection III.BB, I am authorizing use of COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA when used to provide a two-dose regimen for individuals aged 12 through 15 years, or

Page 5 – Pfizer Inc.

to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

## I.      Criteria for Issuance of Authorization

I have concluded that the emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of COVID-19 when administered as described in the Scope of Authorization (Section II) meets the criteria for issuance of an authorization under Section 564(c) of the Act, because:

A. SARS-CoV-2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

B. Based on the totality of scientific evidence available to FDA, it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in preventing COVID-19, and that, when used under the conditions described in this authorization, the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine when used to prevent COVID-19 outweigh its known and potential risks; and

C. There is no adequate, approved, and available[9] alternative to the emergency use of Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19.[10]

## II.     Scope of Authorization

I have concluded, pursuant to Section 564(d)(1) of the Act, that the scope of this authorization is limited as follows:

- Pfizer Inc. will supply Pfizer-BioNTech COVID-19 Vaccine either directly or through authorized distributor(s),[11] to emergency response stakeholders[12] as directed by the U.S.

---

[9] Although COMIRNATY (COVID-19 Vaccine, mRNA) is approved to prevent COVID-19 in individuals 16 years of age and older, there is not sufficient approved vaccine available for distribution to this population in its entirety at the time of reissuance of this EUA.  Additionally, there are no products that are approved to prevent COVID-19 in individuals age 12 through 15, or that are approved to provide an additional dose to the immunocompromised population described in this EUA.

[10] No other criteria of issuance have been prescribed by regulation under Section 564(c)(4) of the Act.

[11] "Authorized Distributor(s)" are identified by Pfizer Inc. or, if applicable, by a U.S. government entity, such as the Centers for Disease Control and Prevention (CDC) and/or other designee, as an entity or entities allowed to distribute authorized Pfizer-BioNTech COVID-19 Vaccine.

[12] For purposes of this letter, "emergency response stakeholder" refers to a public health agency and its delegates that have legal responsibility and authority for responding to an incident, based on political or geographical boundary lines (e.g., city, county, tribal, territorial, State, or Federal), or functional (e.g., law enforcement or public health range) or sphere of authority to administer, deliver, or distribute vaccine in an emergency situation.  In some cases (e.g., depending on a state or local jurisdiction's COVID-19 vaccination response organization and plans), there might be overlapping roles and responsibilities among "emergency response stakeholders" and "vaccination providers" (e.g., if a local health department is administering COVID-19 vaccines; if a pharmacy is acting in an

Page 6 – Pfizer Inc.

government, including the Centers for Disease Control and Prevention (CDC) and/or other designee, for use consistent with the terms and conditions of this EUA;

- The Pfizer-BioNTech COVID-19 Vaccine covered by this authorization will be administered by vaccination providers[13] and used only to prevent COVID-19 in individuals ages 12 and older; and
- Pfizer-BioNTech COVID-19 Vaccine may be administered by a vaccination provider without an individual prescription for each vaccine recipient.

This authorization also covers the use of the licensed COMIRNATY (COVID-19 Vaccine, mRNA) product when used to provide a two-dose regimen for individuals aged 12 through 15 years, or to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

**Product Description**

The Pfizer-BioNTech COVID-19 Vaccine is supplied as a frozen suspension in multiple dose vials; each vial must be diluted with 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP prior to use to form the vaccine. The Pfizer-BioNTech COVID-19 Vaccine does not contain a preservative.

Each 0.3 mL dose of the Pfizer-BioNTech COVID-19 Vaccine contains 30 mcg of a nucleoside-modified messenger RNA (modRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2. Each dose of the Pfizer-BioNTech COVID-19 Vaccine also includes the following ingredients: lipids (0.43 mg (4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate), 0.05 mg 2[(polyethylene glycol)-2000]-N,N-ditetradecylacetamide, 0.09 mg 1,2-distearoyl-sn-glycero-3-phosphocholine, and 0.2 mg cholesterol), 0.01 mg potassium chloride, 0.01 mg monobasic potassium phosphate, 0.36 mg sodium chloride, 0.07 mg dibasic sodium phosphate dihydrate, and 6 mg sucrose. The diluent (0.9% Sodium Chloride Injection) contributes an additional 2.16 mg sodium chloride per dose.

---

official capacity under the authority of the state health department to administer COVID-19 vaccines). In such cases, it is expected that the conditions of authorization that apply to emergency response stakeholders and vaccination providers will all be met.

[13] For purposes of this letter, "vaccination provider" refers to the facility, organization, or healthcare provider licensed or otherwise authorized by the emergency response stakeholder (e.g., non-physician healthcare professionals, such as nurses and pharmacists pursuant to state law under a standing order issued by the state health officer) to administer or provide vaccination services in accordance with the applicable emergency response stakeholder's official COVID-19 vaccination and emergency response plan(s) and who is enrolled in the CDC COVID-19 Vaccination Program. If the vaccine is exported from the United States, a "vaccination provider" is a provider that is authorized to administer this vaccine in accordance with the laws of the country in which it is administered. For purposes of this letter, "healthcare provider" also refers to a person authorized by the U.S. Department of Health and Human Services (e.g., under the PREP Act Declaration for Medical Countermeasures against COVID-19) to administer FDA-authorized COVID-19 vaccine (e.g., qualified pharmacy technicians and State-authorized pharmacy interns acting under the supervision of a qualified pharmacist). See, e.g., HHS. *Fourth Amendment to the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 and Republication of the Declaration*. 85 FR 79190 (December 9, 2020).

Page 7 – Pfizer Inc.

The dosing regimen is two doses of 0.3 mL each, 3 weeks apart.  A third dose may be administered at least 28 days following the second dose of the two dose regimen of this vaccine to individuals 12 years of age or older who have undergone solid organ transplantation, or individuals 12 years of age or older who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

The manufacture of the authorized Pfizer-BioNTech COVID-19 Vaccine is limited to those facilities identified and agreed upon in Pfizer's request for authorization.

The Pfizer-BioNTech COVID-19 Vaccine vial label and carton labels are clearly marked for "Emergency Use Authorization." The Pfizer-BioNTech COVID-19 Vaccine is authorized to be distributed, stored, further redistributed, and administered by emergency response stakeholders when packaged in the authorized manufacturer packaging (i.e., vials and cartons), despite the fact that the vial and carton labels may not contain information that otherwise would be required under the FD&C Act.

Pfizer-BioNTech COVID-19 Vaccine is authorized for emergency use with the following product-specific information required to be made available to vaccination providers and recipients, respectively (referred to as "authorized labeling"):

- Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers): Emergency Use Authorization (EUA) of Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19)

- Vaccine Information Fact Sheet for Recipients and Caregivers About COMIRNATY (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease (COVID-19).

I have concluded, pursuant to Section 564(d)(2) of the Act, that it is reasonable to believe that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine, when used to prevent COVID-19 and used in accordance with this Scope of Authorization (Section II), outweigh its known and potential risks.

I have concluded, pursuant to Section 564(d)(3) of the Act, based on the totality of scientific evidence available to FDA, that it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in preventing COVID-19 when used in accordance with this Scope of Authorization (Section II), pursuant to Section 564(c)(2)(A) of the Act.

Having reviewed the scientific information available to FDA, including the information supporting the conclusions described in Section I above, I have concluded that Pfizer-BioNTech COVID-19 Vaccine (as described in this Scope of Authorization (Section II)) meets the criteria set forth in Section 564(c) of the Act concerning safety and potential effectiveness.

The emergency use of Pfizer-BioNTech COVID-19 Vaccine under this EUA must be consistent with, and may not exceed, the terms of the Authorization, including the Scope of Authorization (Section II) and the Conditions of Authorization (Section III).  Subject to the terms of this EUA and

Page 8 – Pfizer Inc.

under the circumstances set forth in the Secretary of HHS's determination under Section 564(b)(1)(C) described above and the Secretary of HHS's corresponding declaration under Section 564(b)(1), Pfizer-BioNTech COVID-19 Vaccine is authorized to prevent COVID-19 in individuals 12 years of age and older as described in the Scope of Authorization (Section II) under this EUA, despite the fact that it does not meet certain requirements otherwise required by applicable federal law.

## III.   Conditions of Authorization

Pursuant to Section 564 of the Act, I am establishing the following conditions on this authorization:

Pfizer Inc. and Authorized Distributor(s)

    A.   Pfizer Inc. and authorized distributor(s) will ensure that the authorized Pfizer-BioNTech COVID-19 Vaccine is distributed, as directed by the U.S. government, including CDC and/or other designee, and the authorized labeling (i.e., Fact Sheets) will be made available to vaccination providers, recipients, and caregivers consistent with the terms of this letter.

    B.   Pfizer Inc. and authorized distributor(s) will ensure that appropriate storage and cold chain is maintained until delivered to emergency response stakeholders' receipt sites.

    C.   Pfizer Inc. will ensure that the terms of this EUA are made available to all relevant stakeholders (e.g., emergency response stakeholders, authorized distributors, and vaccination providers) involved in distributing or receiving authorized Pfizer-BioNTech COVID-19 Vaccine.  Pfizer Inc. will provide to all relevant stakeholders a copy of this letter of authorization and communicate any subsequent amendments that might be made to this letter of authorization and its authorized labeling.

    D.   Pfizer Inc. may develop and disseminate instructional and educational materials (e.g., video regarding vaccine handling, storage/cold-chain management, preparation, disposal) that are consistent with the authorized emergency use of the vaccine as described in the letter of authorization and authorized labeling, without FDA's review and concurrence, when necessary to meet public health needs during an emergency. Any instructional and educational materials that are inconsistent with the authorized labeling are prohibited.

    E.   Pfizer Inc. may request changes to this authorization, including to the authorized Fact Sheets for the vaccine.  Any request for changes to this EUA must be submitted to Office of Vaccines Research and Review (OVRR)/Center for Biologics Evaluation and Research (CBER).  Such changes require appropriate authorization prior to implementation.[14]

---

[14] The following types of revisions may be authorized without reissuing this letter: (1) changes to the authorized labeling; (2) non-substantive editorial corrections to this letter; (3) new types of authorized labeling, including new fact sheets; (4) new carton/container labels; (5) expiration dating extensions; (6) changes to manufacturing

Page 9 – Pfizer Inc.

F.  Pfizer Inc. will report to Vaccine Adverse Event Reporting System (VAERS):
   - Serious adverse events (irrespective of attribution to vaccination);
   - Cases of Multisystem Inflammatory Syndrome in children and adults; and
   - Cases of COVID-19 that result in hospitalization or death, that are reported to Pfizer Inc.

   These reports should be submitted to VAERS as soon as possible but no later than 15 calendar days from initial receipt of the information by Pfizer Inc.

G.  Pfizer Inc. must submit to Investigational New Drug application (IND) number 19736 periodic safety reports at monthly intervals in accordance with a due date agreed upon with the Office of Biostatistics and Epidemiology (OBE)/CBER beginning after the first full calendar month after authorization. Each periodic safety report is required to contain descriptive information which includes:
   - A narrative summary and analysis of adverse events submitted during the reporting interval, including interval and cumulative counts by age groups, special populations (e.g., pregnant women), and adverse events of special interest;
   - A narrative summary and analysis of vaccine administration errors, whether or not associated with an adverse event, that were identified since the last reporting interval;
   - Newly identified safety concerns in the interval; and
   - Actions taken since the last report because of adverse experiences (for example, changes made to Healthcare Providers Administering Vaccine (Vaccination Providers) Fact Sheet, changes made to studies or studies initiated).

H.  No changes will be implemented to the description of the product, manufacturing process, facilities, or equipment without notification to and concurrence by FDA.

I.  All manufacturing facilities will comply with Current Good Manufacturing Practice requirements.

J.  Pfizer Inc. will submit to the EUA file Certificates of Analysis (CoA) for each drug product lot at least 48 hours prior to vaccine distribution. The CoA will include the established specifications and specific results for each quality control test performed on the final drug product lot.

K.  Pfizer Inc. will submit to the EUA file quarterly manufacturing reports, starting in July 2021, that include a listing of all Drug Substance and Drug Product lots produced after issuance of this authorization. This report must include lot number, manufacturing site, date of manufacture, and lot disposition, including those lots that

---

processes, including tests or other authorized components of manufacturing; (7) new conditions of authorization to require data collection or study. For changes to the authorization, including the authorized labeling, of the type listed in (3), (6), or (7), review and concurrence is required from the Preparedness and Response Team (PREP)/Office of the Center Director (OD)/CBER and the Office of Counterterrorism and Emerging Threats (OCET)/Office of the Chief Scientist (OCS).

Page 10 – Pfizer Inc.

were quarantined for investigation or those lots that were rejected.  Information on the reasons for lot quarantine or rejection must be included in the report.

L.  Pfizer Inc. and authorized distributor(s) will maintain records regarding release of Pfizer-BioNTech COVID-19 Vaccine for distribution (i.e., lot numbers, quantity, release date).

M.  Pfizer Inc. and authorized distributor(s) will make available to FDA upon request any records maintained in connection with this EUA.

N.  Pfizer Inc. will conduct post-authorization observational studies to evaluate the association between Pfizer-BioNTech COVID-19 Vaccine and a pre-specified list of adverse events of special interest, along with deaths and hospitalizations, and severe COVID-19.  The study population should include individuals administered the authorized Pfizer-BioNTech COVID-19 Vaccine under this EUA in the general U.S. population (12 years of age and older), populations of interest such as healthcare workers, pregnant women, immunocompromised individuals, subpopulations with specific comorbidities.  The studies should be conducted in large scale databases with an active comparator.  Pfizer Inc. will provide protocols and status update reports to the IND 19736 with agreed-upon study designs and milestone dates.

Emergency Response Stakeholders

O.  Emergency response stakeholders will identify vaccination sites to receive authorized Pfizer-BioNTech COVID-19 Vaccine and ensure its distribution and administration, consistent with the terms of this letter and CDC's COVID-19 Vaccination Program.

P.  Emergency response stakeholders will ensure that vaccination providers within their jurisdictions are aware of this letter of authorization, and the terms herein and any subsequent amendments that might be made to the letter of authorization, instruct them about the means through which they are to obtain and administer the vaccine under the EUA, and ensure that the authorized labeling [i.e., Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) and Vaccine Information Fact Sheet for Recipients and Caregivers] is made available to vaccination providers through appropriate means (e.g., e-mail, website).

Q.  Emergency response stakeholders receiving authorized Pfizer-BioNTech COVID-19 Vaccine will ensure that appropriate storage and cold chain is maintained.

Vaccination Providers

R.  Vaccination providers will administer the vaccine in accordance with the authorization and will participate and comply with the terms and training required by CDC's COVID-19 Vaccination Program.

Page 11 – Pfizer Inc.

S.  Vaccination providers will provide the Vaccine Information Fact Sheet for Recipients and Caregivers to each individual receiving vaccination and provide the necessary information for receiving their second dose and/or third dose.

T.  Vaccination providers administering the vaccine must report the following information associated with the administration of the vaccine of which they become aware to VAERS in accordance with the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers):

• Vaccine administration errors whether or not associated with an adverse event
• Serious adverse events (irrespective of attribution to vaccination)
• Cases of Multisystem Inflammatory Syndrome in children and adults
• Cases of COVID-19 that result in hospitalization or death

Complete and submit reports to VAERS online at https://vaers.hhs.gov/reportevent.html.  The VAERS reports should include the words "Pfizer-BioNTech COVID-19 Vaccine EUA" in the description section of the report.  More information is available at vaers.hhs.gov or by calling 1-800-822-7967.  To the extent feasible, report to Pfizer Inc. by contacting 1-800-438-1985 or by providing a copy of the VAERS form to Pfizer Inc.; Fax: 1-866-635-8337.

U.  Vaccination providers will conduct any follow-up requested by the U.S government, including CDC, FDA, or other designee, regarding adverse events to the extent feasible given the emergency circumstances.

V.  Vaccination providers will monitor and comply with CDC and/or emergency response stakeholder vaccine management requirements (e.g., requirements concerning obtaining, tracking, and handling vaccine) and with requirements concerning reporting of vaccine administration data to CDC.

W.  Vaccination providers will ensure that any records associated with this EUA are maintained until notified by FDA.  Such records will be made available to CDC, and FDA for inspection upon request.

Conditions Related to Printed Matter, Advertising, and Promotion

X.  All descriptive printed matter, advertising, and promotional material, relating to the use of the Pfizer-BioNTech COVID-19 Vaccine shall be consistent with the authorized labeling, as well as the terms set forth in this EUA, and meet the requirements set forth in section 502(a) and (n) of the FD&C Act and FDA implementing regulations.

Y.  All descriptive printed matter, advertising, and promotional material relating to the use of the Pfizer-BioNTech COVID-19 Vaccine clearly and conspicuously shall state that:

Page 12 – Pfizer Inc.

- This product has not been approved or licensed by FDA, but has been authorized for emergency use by FDA, under an EUA to prevent Coronavirus Disease 2019 (COVID-19) for use in individuals 12 years of age and older; and
- The emergency use of this product is only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of the medical product under Section 564(b)(1) of the FD&C Act unless the declaration is terminated or authorization revoked sooner.

Condition Related to Export

    Z. If the Pfizer-BioNTech COVID-19 Vaccine is exported from the United States, conditions C, D, and O through Y do not apply, but export is permitted only if 1) the regulatory authorities of the country in which the vaccine will be used are fully informed that this vaccine is subject to an EUA and is not approved or licensed by FDA and 2) the intended use of the vaccine will comply in all respects with the laws of the country in which the product will be used. The requirement in this letter that the authorized labeling (i.e., Fact Sheets) be made available to vaccination providers, recipients, and caregivers in condition A will not apply if the authorized labeling (i.e., Fact Sheets) are made available to the regulatory authorities of the country in which the vaccine will be used.

Conditions With Respect to Use of Licensed Product

    AA. COMIRNATY  (COVID-19 Vaccine, mRNA) is now licensed for individuals 16 years of age and older. There remains, however, a significant amount of Pfizer-BioNTech COVID-19 vaccine that was manufactured and labeled in accordance with this emergency use authorization. This authorization thus remains in place with respect to that product for the previously-authorized indication and uses (i.e., for use to prevent COVID-19 in individuals 12 years of age and older with a two-dose regimen, and to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation, or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise).

    BB. This authorization also covers the use of the licensed COMIRNATY (COVID-19 Vaccine, mRNA) product when used to provide a two-dose regimen for individuals aged 12 through 15 years, or to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise. Conditions A through W in this letter apply when COMIRNATY (COVID-19 Vaccine, mRNA) is provided for the uses described in this subsection III.BB, except that product manufactured and labeled in accordance with the approved BLA is deemed to satisfy the manufacturing, labeling, and distribution requirements of this authorization.

## IV.    Duration of Authorization

Page 13 – Pfizer Inc.

This EUA will be effective until the declaration that circumstances exist justifying the authorization of the emergency use of drugs and biological products during the COVID-19 pandemic is terminated under Section 564(b)(2) of the Act or the EUA is revoked under Section 564(g) of the Act.

Sincerely,

--/S/--

_____
RADM Denise M. Hinton
Chief Scientist
Food and Drug Administration

Enclosures



Our STN:  BL 125742/0                                          **BLA APPROVAL**

BioNTech Manufacturing GmbH                                    August 23, 2021
Attention:  Amit Patel
Pfizer Inc.
235 East 42nd Street
New York, NY 10017

Dear Mr. Patel:

Please refer to your Biologics License Application (BLA) submitted and received on
May 18, 2021, under section 351(a) of the Public Health Service Act (PHS Act) for
COVID-19 Vaccine, mRNA.

**LICENSING**

We are issuing Department of Health and Human Services U.S. License No. 2229 to
BioNTech Manufacturing GmbH, Mainz, Germany, under the provisions of section
351(a) of the PHS Act controlling the manufacture and sale of biological products.  The
license authorizes you to introduce or deliver for introduction into interstate commerce,
those products for which your company has demonstrated compliance with
establishment and product standards.

Under this license, you are authorized to manufacture the product, COVID-19 Vaccine,
mRNA, which is indicated for active immunization to prevent coronavirus disease 2019
(COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)
in individuals 16 years of age and older.

The review of this product was associated with the following National Clinical Trial
(NCT) numbers:  NCT04368728 and NCT04380701.

**MANUFACTURING LOCATIONS**

Under this license, you are approved to manufacture COVID-19 Vaccine, mRNA drug
substance at Wyeth BioPharma Division of Wyeth Pharmaceuticals LLC, 1 Burtt Road,
Andover, Massachusetts.  The final formulated product will be manufactured, filled,
labeled and packaged at Pfizer Manufacturing Belgium NV, Rijksweg 12, Puurs,
Belgium and at Pharmacia & Upjohn Company LLC, 7000 Portage Road, Kalamazoo,
Michigan.  The diluent, 0.9% Sodium Chloride Injection, USP, will be manufactured at
Hospira, Inc., (b) (4)                                       and at Fresenius Kabi
USA, LLC, (b) (4)                                    .

Page 2 – STN BL 125742/0 – Elisa Harkins

You may label your product with the proprietary name, COMIRNATY, and market it in 2.0 mL glass vials, in packages of 25 and 195 vials.

We did not refer your application to the Vaccines and Related Biological Products Advisory Committee because our review of information submitted in your BLA, including the clinical study design and trial results, did not raise concerns or controversial issues that would have benefited from an advisory committee discussion.

**DATING PERIOD**

The dating period for COVID-19 Vaccine, mRNA shall be 9 months from the date of manufacture when stored between -90ºC to -60ºC (-130ºF to -76ºF).  The date of manufacture shall be no later than the date of final sterile filtration of the formulated drug product (at Pharmacia & Upjohn Company LLC in Kalamazoo, Michigan, the date of manufacture is defined as the date of sterile filtration for the final drug product; at Pfizer Manufacturing Belgium NV in Puurs, Belgium, it is defined as the date of the (b) (4) Following the final sterile filtration, (b) (4) , no reprocessing/reworking is allowed without prior approval from the Agency.  The dating period for your drug substance shall be (b) (4) when stored at (b) (4) We have approved the stability protocols in your license application for the purpose of extending the expiration dating period of your drug substance and drug product under 21 CFR 601.12.

**FDA LOT RELEASE**

Please submit final container samples of the product in final containers together with protocols showing results of all applicable tests.  You may not distribute any lots of product until you receive a notification of release from the Director, Center for Biologics Evaluation and Research (CBER).

**BIOLOGICAL PRODUCT DEVIATIONS**

You must submit reports of biological product deviations under 21 CFR 600.14.  You should identify and investigate all manufacturing deviations promptly, including those associated with processing, testing, packaging, labeling, storage, holding and distribution.  If the deviation involves a distributed product, may affect the safety, purity, or potency of the product, and meets the other criteria in the regulation, you must submit a report on Form FDA 3486 to the Director, Office of Compliance and Biologics Quality, electronically through the eBPDR web application or at the address below. Links for the instructions on completing the electronic form (eBPDR) may be found on CBER's web site at https://www.fda.gov/vaccines-blood-biologics/report-problem-center-biologics-evaluation-research/biological-product-deviations:

    Food and Drug Administration
    Center for Biologics Evaluation and Research
    Document Control Center

Page 3 – STN BL 125742/0 – Elisa Harkins

   10903 New Hampshire Ave.
   WO71-G112
   Silver Spring, MD 20993-0002

**MANUFACTURING CHANGES**

You must submit information to your BLA for our review and written approval under 21 CFR 601.12 for any changes in, including but not limited to, the manufacturing, testing, packaging or labeling of COVID-19 Vaccine, mRNA, or in the manufacturing facilities.

**LABELING**

We hereby approve the draft content of labeling including Package Insert, submitted under amendment 74, dated August 21, 2021, and the draft carton and container labels submitted under amendment 63, dated August 19, 2021.

**CONTENT OF LABELING**

As soon as possible, but no later than 14 days from the date of this letter, please submit the final content of labeling (21 CFR 601.14) in Structured Product Labeling (SPL) format via the FDA automated drug registration and listing system, (eLIST) as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm.  Content of labeling must be identical to the Package Insert submitted on August 21, 2021.  Information on submitting SPL files using eLIST may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As* at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.

The SPL will be accessible via publicly available labeling repositories.

**CARTON AND CONTAINER LABELS**

Please electronically submit final printed carton and container labels identical to the carton and container labels submitted on August 19, 2021, according to the guidance for industry *Providing Regulatory Submissions in Electronic Format — Certain Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications* at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-regulatory-submissions-electronic-format-certain-human-pharmaceutical-product-applications.

All final labeling should be submitted as Product Correspondence to this BLA STN BL 125742 at the time of use and include implementation information on Form FDA 356h.

**ADVERTISING AND PROMOTIONAL LABELING**

Page 4 – STN BL 125742/0 – Elisa Harkins

You may submit two draft copies of the proposed introductory advertising and promotional labeling with Form FDA 2253 to the Advertising and Promotional Labeling Branch at the following address:

> Food and Drug Administration
> Center for Biologics Evaluation and Research
> Document Control Center
> 10903 New Hampshire Ave.
> WO71-G112
> Silver Spring, MD 20993-0002

You must submit copies of your final advertising and promotional labeling at the time of initial dissemination or publication, accompanied by Form FDA 2253 (21 CFR 601.12(f)(4)).

All promotional claims must be consistent with and not contrary to approved labeling. You should not make a comparative promotional claim or claim of superiority over other products unless you have substantial evidence or substantial clinical experience to support such claims (21 CFR 202.1(e)(6)).

**ADVERSE EVENT REPORTING**

You must submit adverse experience reports in accordance with the adverse experience reporting requirements for licensed biological products (21 CFR 600.80), and you must submit distribution reports at monthly intervals as described in 21 CFR 600.81.  For information on adverse experience reporting, please refer to the guidance for industry *Providing Submissions in Electronic Format —Postmarketing Safety Reports for Vaccines* at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-submissions-electronic-format-postmarketing-safety-reports-vaccines.  For information on distribution reporting, please refer to the guidance for industry *Electronic Submission of Lot Distribution Reports* at http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Post-MarketActivities/LotReleases/ucm061966.htm.

**PEDIATRIC REQUIREMENTS**

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We are deferring submission of your pediatric studies for ages younger than 16 years for this application because this product is ready for approval for use in individuals 16 years of age and older, and the pediatric studies for younger ages have not been completed.

Page 5 – STN BL 125742/0 – Elisa Harkins

Your deferred pediatric studies required under section 505B(a) of the Federal Food, Drug, and Cosmetic Act (FDCA) are required postmarketing studies.  The status of these postmarketing studies must be reported according to 21 CFR 601.28 and section 505B(a)(4)(C) of the FDCA.  In addition, section 506B of the FDCA and 21 CFR 601.70 require you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

Label your annual report as an "**Annual Status Report of Postmarketing Study Requirement/Commitments**" and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements under section 506B of the FDCA are released or fulfilled.  These required studies are listed below:

1. Deferred pediatric Study C4591001 to evaluate the safety and effectiveness of COMIRNATY in children 12 years through 15 years of age.

   Final Protocol Submission:  October 7, 2020

   Study Completion:  May 31, 2023

   Final Report Submission:  October 31, 2023

2. Deferred pediatric Study C4591007 to evaluate the safety and effectiveness of COMIRNATY in infants and children 6 months to <12 years of age.

   Final Protocol Submission:  February 8, 2021

   Study Completion:  November 30, 2023

   Final Report Submission:  May 31, 2024

3. Deferred pediatric Study C4591023 to evaluate the safety and effectiveness of COMIRNATY in infants <6 months of age.

   Final Protocol Submission:  January 31, 2022

   Study Completion:  July 31, 2024

   Final Report Submission:  October 31, 2024

Submit the protocols to your IND 19736, with a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMR sequential number for each study/clinical trial and the submission number as shown in this letter.

Submit final study reports to this BLA STN BL 125742.  In order for your PREA PMRs to be considered fulfilled, you must submit and receive approval of an efficacy or a labeling

Page 6 – STN BL 125742/0 – Elisa Harkins

supplement.  For administrative purposes, all submissions related to these required pediatric postmarketing studies must be clearly designated as:

- **Required Pediatric Assessment(s)**

We note that you have fulfilled the pediatric study requirement for ages 16 through 17 years for this application.

## POSTMARKETING REQUIREMENTS UNDER SECTION 505(o)

Section 505(o) of the Federal Food, Drug, and Cosmetic Act (FDCA) authorizes FDA to require holders of approved drug and biological product applications to conduct postmarketing studies and clinical trials for certain purposes, if FDA makes certain findings required by the statute (section 505(o)(3)(A), 21 U.S.C. 355(o)(3)(A)).

We have determined that an analysis of spontaneous postmarketing adverse events reported under section 505(k)(1) of the FDCA will not be sufficient to assess known serious risks of myocarditis and pericarditis and identify an unexpected serious risk of subclinical myocarditis.

Furthermore, the pharmacovigilance system that FDA is required to maintain under section 505(k)(3) of the FDCA is not sufficient to assess these serious risks.

Therefore, based on appropriate scientific data, we have determined that you are required to conduct the following studies:

4. Study C4591009, entitled "A Non-Interventional Post-Approval Safety Study of the Pfizer-BioNTech COVID-19 mRNA Vaccine in the United States," to evaluate the occurrence of myocarditis and pericarditis following administration of COMIRNATY.

   We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

   Final Protocol Submission:  August 31, 2021

   Monitoring Report Submission:  October 31, 2022

   Interim Report Submission:  October 31, 2023

   Study Completion:  June 30, 2025

   Final Report Submission:  October 31, 2025

5. Study C4591021, entitled "Post Conditional Approval Active Surveillance Study Among Individuals in Europe Receiving the Pfizer-BioNTech Coronavirus

Disease 2019 (COVID-19) Vaccine," to evaluate the occurrence of myocarditis and pericarditis following administration of COMIRNATY.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  August 11, 2021

Progress Report Submission:  September 30, 2021

Interim Report 1 Submission:  March 31, 2022

Interim Report 2 Submission:  September 30, 2022

Interim Report 3 Submission:  March 31, 2023

Interim Report 4 Submission:  September 30, 2023

Interim Report 5 Submission:  March 31, 2024

Study Completion:  March 31, 2024

Final Report Submission:  September 30, 2024

6. Study C4591021 substudy to describe the natural history of myocarditis and pericarditis following administration of COMIRNATY.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  January 31, 2022

Study Completion:  March 31, 2024

Final Report Submission:  September 30, 2024

7. Study C4591036, a prospective cohort study with at least 5 years of follow-up for potential long-term sequelae of myocarditis after vaccination (in collaboration with Pediatric Heart Network).

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  November 30, 2021

Study Completion:  December 31, 2026

Page 8 – STN BL 125742/0 – Elisa Harkins

Final Report Submission:  May 31, 2027

8. Study C4591007 substudy to prospectively assess the incidence of subclinical myocarditis following administration of the second dose of COMIRNATY in a subset of participants 5 through 15 years of age.

   We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this assessment according to the following schedule:

   Final Protocol Submission:  September 30, 2021

   Study Completion:  November 30, 2023

   Final Report Submission:  May 31, 2024

9. Study C4591031 substudy to prospectively assess the incidence of subclinical myocarditis following administration of a third dose of COMIRNATY in a subset of participants 16 to 30 years of age.

   We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

   Final Protocol Submission:  November 30, 2021

   Study Completion:  June 30, 2022

   Final Report Submission:  December 31, 2022

Please submit the protocols to your IND 19736, with a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMR sequential number for each study/clinical trial and the submission number as shown in this letter.

Please submit final study reports to the BLA.  If the information in the final study report supports a change in the label, the final study report must be submitted as a supplement to this BLA STN BL 125742.  For administrative purposes, all submissions related to these postmarketing studies required under section 505(o) must be submitted to this BLA and be clearly designated as:

- **Required Postmarketing Correspondence under Section 505(o)**
- **Required Postmarketing Final Report under Section 505(o)**
- **Supplement contains Required Postmarketing Final Report under Section 505(o)**

Section 505(o)(3)(E)(ii) of the FDCA requires you to report periodically on the status of any study or clinical trial required under this section.  This section also requires you to periodically report to FDA on the status of any study or clinical trial otherwise

Page 9 – STN BL 125742/0 – Elisa Harkins

undertaken to investigate a safety issue.  In addition, section 506B of the FDCA and 21 CFR 601.70 require you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

You must describe the status in an annual report on postmarketing studies for this product.  Label your annual report as an **Annual Status Report of Postmarketing Requirements/Commitments** and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements of section 506B of the FDCA are fulfilled or released.  The status report for each study should include:

- the sequential number for each study as shown in this letter;
- information to identify and describe the postmarketing requirement;
- the original milestone schedule for the requirement;
- the revised milestone schedule for the requirement, if appropriate;
- the current status of the requirement (i.e., pending, ongoing, delayed, terminated, or submitted); and,
- an explanation of the status for the study or clinical trial.  The explanation should include how the study is progressing in reference to the original projected schedule, including, the patient accrual rate (i.e., number enrolled to date and the total planned enrollment).

As described in 21 CFR 601.70(e), we may publicly disclose information regarding these postmarketing studies on our website at http://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/default.htm.

We will consider the submission of your annual report under section 506B of the FDCA and 21 CFR 601.70 to satisfy the periodic reporting requirement under section 505(o)(3)(E)(ii) provided that you include the elements listed in section 505(o) and 21 CFR 601.70.  We remind you that to comply with section 505(o), your annual report must also include a report on the status of any study or clinical trial otherwise undertaken to investigate a safety issue.  Failure to periodically report on the status of studies or clinical trials required under section 505(o) may be a violation of FDCA section 505(o)(3)(E)(ii) and could result in regulatory action.

**POSTMARKETING COMMITMENTS SUBJECT TO REPORTING REQUIREMENTS UNDER SECTION 506B**

We acknowledge your written commitments as described in your letter of August 21, 2021 as outlined below:

10. Study C4591022, entitled "Pfizer-BioNTech COVID-19 Vaccine Exposure during Pregnancy: A Non-Interventional Post-Approval Safety Study of Pregnancy and Infant Outcomes in the Organization of Teratology Information Specialists (OTIS)/MotherToBaby Pregnancy Registry."

    Final Protocol Submission:  July 1, 2021

Page 10 – STN BL 125742/0 – Elisa Harkins

Study Completion:  June 30, 2025

Final Report Submission:  December 31, 2025

11. Study C4591007 substudy to evaluate the immunogenicity and safety of lower dose levels of COMIRNATY in individuals 12 through <30 years of age.

Final Protocol Submission:  September 30, 2021

Study Completion:  November 30, 2023

Final Report Submission:  May 31, 2024

12. Study C4591012, entitled "Post-emergency Use Authorization Active Safety Surveillance Study Among Individuals in the Veteran's Affairs Health System Receiving Pfizer-BioNTech Coronavirus Disease 2019 (COVID-19) Vaccine."

Final Protocol Submission:  January 29, 2021

Study Completion:  June 30, 2023

Final Report Submission:  December 31, 2023

13. Study C4591014, entitled "Pfizer-BioNTech COVID-19 BNT162b2 Vaccine Effectiveness Study - Kaiser Permanente Southern California."

Final Protocol Submission:  March 22, 2021

Study Completion:  December 31, 2022

Final Report Submission:  June 30, 2023

Please submit clinical protocols to your IND 19736, and a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMC sequential number for each study/clinical trial and the submission number as shown in this letter.

If the information in the final study report supports a change in the label, the final study report must be submitted as a supplement.  Please use the following designators to prominently label all submissions, including supplements, relating to these postmarketing study commitments as appropriate:

- **Postmarketing Commitment – Correspondence Study Update**
- **Postmarketing Commitment – Final Study Report**
- **Supplement contains Postmarketing Commitment – Final Study Report**

Page 11 – STN BL 125742/0 – Elisa Harkins

For each postmarketing study subject to the reporting requirements of 21 CFR 601.70, you must describe the status in an annual report on postmarketing studies for this product.  Label your annual report as an **Annual Status Report of Postmarketing Requirements/Commitments** and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements of section 506B of the FDCA are fulfilled or released.  The status report for each study should include:

- the sequential number for each study as shown in this letter;
- information to identify and describe the postmarketing commitment;
- the original schedule for the commitment;
- the status of the commitment (i.e., pending, ongoing, delayed, terminated, or submitted); and,
- an explanation of the status including, for clinical studies, the patient accrual rate (i.e., number enrolled to date and the total planned enrollment).

As described in 21 CFR 601.70(e), we may publicly disclose information regarding these postmarketing studies on our website at http://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/default.htm.

**POST APPROVAL FEEDBACK MEETING**

New biological products qualify for a post approval feedback meeting.  Such meetings are used to discuss the quality of the application and to evaluate the communication process during drug development and marketing application review.  The purpose is to learn from successful aspects of the review process and to identify areas that could benefit from improvement.  If you would like to have such a meeting with us, please contact the Regulatory Project Manager for this application.

Sincerely,


Mary A. Malarkey                           Marion F. Gruber, PhD
Director                                   Director
Office of Compliance                       Office of Vaccines
  and Biologics Quality                      Research and Review
Center for Biologics                       Center for Biologics
  Evaluation and Research                    Evaluation and Research

1
2
3
4
5
6
7

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

8

| | |
|---|---|
| NICHOLAS ROLOVICH, | NO. 22-2-00244-38 |
| Plaintiff, | NOTICE OF APPEARANCE OF COUNSEL |
| v. | **(CLERK'S ACTION REQUIRED)** |
| WASHINGTON STATE UNIVERSITY, et al., | |
| Defendants. | |

9
10
11
12
13
14

TO:          CLERK OF THE ABOVE-ENTITLED COURT

15

AND TO:     BRIAN FAHLING and ERIC KNIFFIN, Counsel for Plaintiff

16          PLEASE TAKE NOTICE that Defendant Washington State University, by and through

17  its attorneys, Robert W. Ferguson, Attorney General, SPENCER W. COATES,

18  Assistant Attorney General, and ZACHARY J. PEKELIS, Special Assistant Attorney General,

19  without waiving objections as to improper service, jurisdiction, or venue, hereby enters its

20  appearances in the above-entitled action and requests that notice of any and all further

21  proceedings in said action be served upon the undersigned counsel at the address stated below.

22          **TRANSMISSION BY FAX OR BY ELECTRONIC MAIL DOES NOT**

23  **CONSTITUTE SERVICE, UNLESS AGREED IN WRITING OR UNLESS**

24  **OTHERWISE REQUIRED BY COURT RULE.**

25
26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    DATED this 15th day of November 2022.

2                                          ROBERT W. FERGUSON
                                           Attorney General
3
                                           /s/ Spencer W. Coates
4                                          SPENCER W. COATES, WSBA #49683
                                           Assistant Attorney General
5                                          800 Fifth Avenue, Suite 2000
                                           Seattle, WA  98104-3188
6                                          (206) 464-7744
                                           Spencer.Coates@atg.wa.gov
7

8                                          /s/ Zachary J. Pekelis
                                           ZACHARY J. PEKELIS, WSBA #44557
9                                          Special Assistant Attorney General
                                           PACIFICA LAW GROUP LLP
10                                         1191 2nd Avenue, Suite 2000
                                           Seattle, WA  98101-3404
11                                         (206) 245-1700
                                           Zach.Pekelis@PacificaLawGroup.com
12
                                           *Attorneys for Defendant Washington State*
13                                         *University*

14

15

16

17

18

19

20

21

22

23

24

25

26

NOTICE OF APPEARANCE OF COUNSEL          2          ATTORNEY GENERAL OF WASHINGTON
                                                           Complex Litigation Division
                                                           800 Fifth Avenue, Suite 2000
                                                           Seattle, WA  98104-3188
                                                               (206) 464-7744

## **DECLARATION OF SERVICE**

I hereby declare that on this day I caused the foregoing document to be served, via U.S. Mail, postage prepaid, via Consolidated Mail Services, and via electronic mail, on the following:

Brian Fahling
Law Office of Brian Fahling
8124 NE 166th Street
Kenmore, WA 98028
bfahling@fahlinglaw.com

Eric Kniffin
Lewis Roca
90 S. Cascade Ave., Suite 1100
Colorado Springs, CO 80907
ekniffin@lewisroca.com

*Counsel for Plaintiff*

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 15th day of November 2022, at Seattle, Washington.

*/s/ Spencer W. Coates*
SPENCER W. COATES, WSBA #49683
Assistant Attorney General

1

2

3

4

5

6

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

7

IN AND FOR THE COUNTY OF WHITMAN

8    NICHOLAS ROLOVICH,

**No.  22-2-00244-38**

9         Plaintiff,

10    v.

11    WASHINGTON STATE UNIVERSITY,    **FIRST AMENDED COMPLAINT**

12    an agency of the State of Washington;
PATRICK CHUN, Director of Athletics for

13    Washington State University, in his
individual capacity; and JAY INSLEE,

14    Governor, in his official capacity,

15         Defendants.

16

17                    **I. INTRODUCTION**

18        1.    Plaintiff Nicholas Rolovich brings this action to vindicate his federal and state

19    constitutional, statutory, and contractual rights, which rights were violated by Defendants,

20    causing Mr. Rolovich significant and ongoing damages.

21        2.    This action arises under the laws of the United States, specifically, 42 U.S.C.

22    § 1983, 42 U.S.C. § 1988, 42 U.S.C. § 2000e, *et seq*., and the First and Fourteenth

23    Amendments to the United States Constitution. This action also arises under the laws of the

24    State of Washington, including RCW 49.60 *et seq.* (Washington Law Against Discrimination

25    ("WLAD")), RCW 49.48, *et seq., RCW 49.52, et seq.*, Article I, section 9 of the Washington

26    Constitution, and state contract law.

COMPLAINT - 1

**II. JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction over this action pursuant to RCW 2.08.010.

4.      Venue is proper in this district pursuant to RCW 4.12.025(1) because Washington State University's ("WSU") principal business is located in Whitman County and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices and constitutional violations alleged herein, occurred in Whitman County. Additionally, the Employment Agreement between Mr. Rolovich and WSU requires that any litigation regarding enforcement or construction of the terms of the Agreement be filed in Whitman County Superior Court.

**III.  EXHAUSTION OF ADMINISTRATIVE PROCEDURES/REMEDIES**

**1.      WSU Administrative Process**

5.      Pursuant to Mr. Rolovich's employment agreement with WSU, he was required to appeal his termination, first, to Mr. Chun, and upon Mr. Chun's denial of the appeal, to WSU President, Kirk Schulz. Mr. Rolovich timely appealed to Mr. Chun, and then President Schulz. President Schulz denied Mr. Rolovich's appeal on December 6, 2021.

**2.      Equal Employment Opportunity Commission/Washington State Human Rights Commission**

6.      On or about February 14, 2022, Mr. Rolovich filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act 1964, 42 U.S.C. §§ 2000 *et seq*. Because the Washington State Human Rights Commission ("WHRC") is a designated Fair Employment Practices Agency ("FEPA") in partnership with the EEOC, Mr. Rolovich's EEOC filing (dual filing) fulfills the State's requirement that a 49.60.030, *et seq.,* claim be filed with the State prior to any court filing. The State and federal claims arise out of the same facts alleged herein.

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

7.      On or about August 16, 2022, Mr. Rolovich received, from the Department of Justice, Civil Rights Division ("DOJ"), a Notice of Right to Sue Within 90 Days in response to his previously filed charge of discrimination with the EEOC. This complaint has been filed within 90 days of Mr. Rolovich's receipt of the DOJ Notice of Right to Sue.

**3.      Department of Enterprise Services—Office of Risk Management (Tort Claim)**

8.      On or about April 27, 2022, Mr. Rolovich filed a tort claim with the State of Washington Department of Enterprise Services, Office of Risk Management.

9.      More than 60 days has elapsed from the date of filing Mr. Rolovich's tort claim. RCW 4.92.110.

10.     Any and all prerequisites to the filing of this lawsuit have been met.

### IV. PARTIES

11.     Plaintiff Nicholas Rolovich was Head Football Coach for WSU from January 14, 2020, until he was terminated on December 6, 2021. He currently resides in Northern California.

12.     Washington State University is an agency of the State of Washington, with a principal place of business located at Pullman, Washington. WSU has approximately 7,000 employees.

13.     Defendant Patrick Chun is Athletics Director for WSU. He is sued in his individual capacity only. At all times relevant to this complaint, Patrick Chun was acting as an agent of WSU.

14.     Defendant Jay Inslee is the governor of the State of Washington. He is sued in his official capacity.

### V. STATEMENT OF FACTS

15.     Washington State University ("WSU) terminated head football coach Nicholas Rolovich after he had refused to be vaccinated because of his religious and personal beliefs. WSU claimed that Mr. Rolovich's refusal to be vaccinated gave the University "just

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 3

1   cause" to terminate him. By claiming that it had just cause to terminate Mr. Rolovich, WSU

2   did not have to pay him liquidated damages as provided for in the employment agreement.

3   The liquidation clause required WSU to pay Mr. Rolovich sixty percent of his $2,000,000+

4   base salary for the approximately three and one-half years remaining on his approximately

5   five-year contract.

6       **A.    The Employment Agreement Between WSU and Mr. Rolovich**

7       16.    Mr. Rolovich's employment as head coach of the WSU football commenced

8   with a Memorandum of Understanding ("MOU"), dated January 13, 2020. The financial

9   terms of the MOU were the same as found in the employment agreement entered into

10  between Mr. Rolovich and WSU in April 2020. (A true and correct copy of the employment

11  agreement is attached hereto as EXHIBIT A, and incorporated herein.) The Agreement was

12  to expire on June 30, 2025. WSU's termination of Mr. Rolovich became final on December

13  6, 2021, when President Schulz denied Mr. Rolovich's final appeal.

14      17.    The agreement provides that WSU could terminate Mr. Rolovich "without

15  cause" at any time, but if WSU terminated him without cause, it would be required to pay

16  "liquidated damages in an amount equal to sixty percent (60%) of the remaining base salary

17  due under the terms of [the] Agreement." At the time of his termination, Mr. Rolovich had

18  approximately three and one-half more years to serve as WSU's head football coach.

19      18.    The agreement also provides that WSU could terminate Mr. Rolovich for "just

20  cause" if he was found to be in violation of the just cause provisions set forth in the contract.

21  If WSU terminated Mr. Rolovich for just cause, "all obligations of the University to make

22  further payments under th[e] Agreement and/or to provide any other consideration . . .

23  [would] cease."

24      19.    The employment agreement sets forth the following grounds for "just cause"

25  termination of Mr. Rolovich:

26

COMPLAINT - 4

**4.1 Termination by University for just cause**. The University shall have the right to terminate this Agreement for just cause (Just Cause) prior to its normal expiration. The term Just Cause shall include, in addition to and as examples of its normally understood meaning in employment contracts, any of the following:

**4.1.1** Deliberate and serious violations of the duties outlined in Section 1.2 of this Agreement or refusal or unwillingness to perform such duties in good faith and to the best of Employee's abilities;

**4.1.2** Deliberate and serious violations by Employee of any of the other terms and conditions of this Agreement not remedied after fourteen (14) days' written notice to Employee or, if the violation cannot reasonably be remedied within that period, Employee's failure to make reasonable efforts to cure such violation;

**4.1.3** Any act of misconduct by Employee including, but not limited to, acts of criminal conduct (excluding minor traffic offenses, that don't impede Employee's ability to perform duties), an act of dishonesty, theft or misappropriation of University property, moral turpitude, insubordination, or act injuring, abusing, or endangering others, including physical, psychological, or sexual abuse, misconduct or violence, or acts that constitute use of excessive exercise or training for punitive purposes, or repeated acts of insubordination or a single act of insubordination of significant magnitude;

**4.1.4** An intentional or major violation or repeated instances of secondary violations by Employee, or by any person under Employee's supervision where Employee had knowledge of the intended violation and failed to intervene, or by student-athletes in the Football Program where Employee had knowledge of the intended violation and failed to intervene, of any law, rule, regulation, constitutional provision, bylaw or interpretation of the University, the NCAA, or the Pac-12 which may in the reasonable judgment of the University reflect adversely upon the University or its athletic program including, but not limited to, any such violation which may result in the University being placed on probation by the Pac-12 or the NCAA and including any such violation which may have occurred during prior employment of Employee at another NCAA member institution;

**4.1.5** Conduct of Employee seriously prejudicial to the best interests of the University or its athletic program; or

**4.1.6** Prolonged absence from duty without the consent of Employee's supervisor.

COMPLAINT - 5

20.     Nothing in Mr. Rolovich's employment agreement with WSU contemplates a scenario where WSU could claim "just cause" to terminate him because he refused to violate his religious faith, conscience, or bodily integrity.

**B.      Unlike Other WSU Football Coaches, Mr. Rolovich's Agreement Did Not Include Provisions Requiring Him to Follow State and Federal Health and Safety Guidelines**

21.     Less than two months after Mr. Rolovich entered into his employment contract with WSU, on February 29, 2020, Governor Inslee issued the first of nearly 500 proclamations related to COVID-19, declaring a State of Emergency in the State of Washington.

22.     On or about July 2021, WSU induced some of its football coaches to sign new employment agreements with provisions requiring them to "follow all federal, state, and local health directives, as well as university policies related to health and safety."

23.     Mr. Rolovich never signed an amendment to his employment agreement requiring him to follow health directives or university policies related to health and safety. His contract with WSU contains no such provisions.

**C.      Mr. Rolovich Discerns that His Religiously-Informed Conscience Precludes him from Receiving Available COVID-19 Vaccines**

24.     By the summer of 2021, Mr. Rolovich discerned that it would violate his conscience to receive any available COVID-19 vaccine.

25.     Mr. Rolovich is a practicing Catholic.

26.     The Catechism of the Catholic Church teaches that each person has a duty to develop a well-formed conscience, which "formulates its judgments according to reason."

27.     The Catechism teaches that, in developing their conscience, Catholics must draw upon the Word of God, prayer, personal experience, the advice of others, and the teaching of the Church.

COMPLAINT - 6

28.    The Catechism teaches that one "must always obey the certain judgment of his conscience. If he were deliberately to act against it, he would condemn himself." In other words, a Catholic is morally obliged to obey his conscience.

29.    As a Catholic, Mr. Rolovich drew upon his study of the Bible, personal prayer, personal experience, personal study, advice from others, advice from a Catholic priest, and the teachings of the Church in concluding that his conscience precluded him from receiving any available COVID-19 vaccine.

**D.    Mr. Chun's/WSU's Hostility Toward Mr. Rolovich**

30.    As set forth below, Mr. Chun made a number of statements to Mr. Rolovich that demonstrated his hostility toward Mr. Rolovich's expressed religious, personal, and scientific reasons for refusing to receive a COVID vaccine. Even before Governor Inslee issued his vaccine Mandate, Mr. Chun told Mr. Rolovich that his request for a religious exemption would be denied and he would be fired with cause unless he agreed to comply with the vaccine mandate.

31.    On or around May 24, 2021, Mr. Chun, after Mr. Rolovich said that he was not planning on getting a COVID-19 vaccine, claimed that he was worried about Mr. Rolovich's mental health and accused him of having extreme views regarding many issues.

32.    On or about May 27, 2021, Mr. Rolovich was called to a 3 p.m. meeting at Mr. Chun's office. Mr. Chun told Mr. Rolovich that his beliefs were making him incapable of leading his players. Mr. Chun also tried to get Mr. Rolovich into counseling because he believed that the Mr. Rolovich had mental health issues. Mr. Chun suggested that Mr. Rolovich should talk to Mr. Chun's wife because she had been in a couple different religions he referred to as "cults".

33.    In August 2020, before Governor Inslee issued a vaccine mandate for state employees, WSU had its employees check boxes on a computer form to designate their

COMPLAINT - 7

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1  reason for not wanting to be vaccinated. The form provided for a medical exemption and a

2  personal/religious exemption. Mr. Rolovich checked the personal/religious box.

3          34.     On August 16, 2021, Mr. Rolovich was called to an urgent meeting with

4  Mr. Chun and Deputy Director of Athletics, Bryan Blair. At this meeting, Mr. Chun told

5  Mr. Rolovich that Governor Inslee was intending to issue a vaccine mandate that would

6  eliminate the "personal exemption" from the coaching staff's declaration of vaccination

7  status. Mr. Chun warned Mr. Rolovich that any religious exemption request he submitted

8  would be scrutinized to no end, and that Inslee's mandate would have a "high threshold" for

9  religious exemptions moving forward.

10         35.     At that same meeting, Mr. Chun confidently told Mr. Rolovich that if he did

11  not get the vaccine, he could be expected to be fired with cause on October 19, 2021.

12         36.     Mr. Chun's predictions about how WSU would treat requests for religious

13  exemptions are consistent with the State's vaccine mandate policy as set forth in an August 3,

14  2021 email from Kathryn Leathers, Governor's Office General Counsel, to staff with the

15  Attorney General's Office.[1] In that email she explained: "Of possible exemptions [to the

16  vaccine mandate]: medical for sure; and religious (if we have to; if yes, as narrow as

17  possible)."

18         37.     WSU's statistics on vaccination exemptions reflect the Governor's policy, as

19  well as WSU's bias against religious exemptions: By early October 2021, WSU had

20  approved requests for medical exemptions at almost twice the rate of religious exemption

21  requests ("437 employees have requested religious exemptions. Only 98 have been granted

22  so far. Just over 100 employees have requested medical exemptions of which 41 have been

23  granted so far.")[2]

24  _____

[1] Brandi Kruse, Emails: State sought to make religious vaccine exemption 'as narrow as possible,' FOX 13
25  Seattle, Aug. 24, 2021, https://www.q13fox.com/news/emails-state-sought-to-make-religious-vaccine-
exemption-as-narrow-as-possible.

26  [2] Erin Robinson, WSU granting fewer religious exemptions than the state as a whole, KXLY Spokane (Oct. 13,
2021), https://www.kxly.com/wsu-granting-fewer-religious-exemptions-than-the-state-as-a-whole/.

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

38.     On August 19, 2021, Mr. Rolovich was summoned to a meeting with Mr. Chun. Assistant Athletics Director Bryan Blair also was present at the meeting. Mr. Chun told Mr. Rolovich that he had four choices: 1. Get the vaccine; 2. Don't get the vaccine and get fired; 3. Claim an exemption; or 4. Resign right now. Mr. Rolovich told Mr. Chun that he was not resigning and that he wanted to coach the team. Mr. Chun said, "but you say you don't care about the money" and "why don't you just resign?" Mr. Chun then accused Mr. Rolovich of having situational integrity. Mr. Chun also called Mr. Rolovich a "con-man" and accused him of being selfish. Mr. Chun then stated that Mr. Rolovich's objections to receiving the vaccine were causing Mr. Chun and President Schulz reputational damage. Mr. Chun then stated that all Mr. Rolovich had to do is get vaccinated.

39.     At the same meeting, Mr. Chun admitted his efforts to get Mr. Rolovich to take the vaccination in the past had been coercive, and Mr. Rolovich responded that the present meeting was much more coercive than earlier meetings. Mr. Chun pressed Mr. Rolovich again about the vaccine, and Mr. Rolovich said that he believed he had privacy rights and did not feel comfortable telling Mr. Chun about his reasons for declining to receive a COVID-19 vaccine. Mr. Chun then demanded that Mr. Rolovich tell him what his answer would be.

40.     Mr. Chun then stated that Governor Inslee "did this" just to come after Mr. Rolovich and WSU. Based on the context of Mr. Chun's statement, Mr. Rolovich understood "did this" to mean that Governor Inslee was trying to force Mr. Rolovich's hand with his new mandate because he was angry that the highest paid and one of the highest profile State employees had asserted personal or religious objections to his vaccine mandate. Mr. Chun also admitted to Mr. Rolovich that the Board of Regents wanted him fired. At this point in their heated exchange, Mr. Chun modified his earlier statement: he now said that Mr. Rolovich only had two options: get vaccinated or resign.

COMPLAINT - 9

41.     Up to this point, Mr. Rolovich had refrained from bringing his religious beliefs into his conversations with Mr. Chun about COVID vaccines. Mr. Rolovich did not feel comfortable talking about his faith because it is a very personal matter to him and he was uncomfortable talking about his religious beliefs with his supervisor.

42.     Mr. Rolovich also was uncomfortable because he did not know how WSU would react to him sharing his religious opposition to medical research based on aborted fetal tissue, given that WSU professors have in the past publicly defended such research. However, after Mr. Chun made it clear that WSU intended to terminate him, Mr. Rolovich asked Mr. Chun and Mr. Blair about the University's process for requesting a religious exemption from a vaccine mandate. Mr. Chun and Mr. Blair said they did not know details about the University's process. They said they had been on the phone with WSU's Human Resource Services ("HRS") about that topic earlier in the day. Mr. Rolovich also had emailed HRS about the process by this time, but no one had any answers because the Governor had not yet made his proclamation.

43.     Mr. Chun then told Mr. Rolovich that he needed to have his religious exemption approved by August 29, the Sunday before the Utah State game. Mr. Rolovich asked who at WSU would review and approve religious exemption requests. Mr. Chun and Mr. Blair said they did not know. Mr. Rolovich asked them when the religious exemption application would be available. They said they did not know. Mr. Rolovich then responded that he feared the University would not be able to approve his exemption by Mr. Chun's August 29 deadline, given that the University's policy had not even been made public, let alone made available to him.

44.     Mr. Chun and Mr. Blair told Mr. Rolovich that they were in a time crunch and had to make a decision if he was going to coach that season. They said they did not want to start a season with Mr. Rolovich if they thought they may have to fire him on Oct 18th, pursuant to the Governor's mandate.

COMPLAINT - 10

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

45.     Mr. Rolovich responded that he would seek a religious exemption right then if one was available. Mr. Chun and Mr. Blair then got even more heated and started to question Mr. Rolovich's character. Mr. Chun said if Mr. Rolovich got the religious exemption, he would forever question his character. Mr. Chun and Mr. Blair both talked about the early days of the pandemic, and that Mr. Rolovich had not mentioned his faith. Mr. Rolovich said that he did not see the point, as he does not see faith and science as exclusive.

46.     Mr. Chun and Mr. Blair then stressed that the University's religious exemption would be hard to get and that there was no guarantee that Mr. Rolovich's request would be approved. Mr. Rolovich again asked what the criteria was going to be. They said they did not know.

47.     Mr. Rolovich did not feel comfortable talking about his faith because his faith is a very personal matter to him and because he was uncomfortable talking about his religious beliefs with his supervisor.

48.     On August 20, 2021, Governor Inslee issued Proclamation 21-14.1, which required all state employees to be fully vaccinated by October 18, 2021.

49.     Governor Inslee's Proclamation mandated vaccination for state employees "even when the only vaccines available are those authorized under U.S. Food and Drug Administration Emergency Use Authorizations."

**E.     Governor Inslee and WSU Mandated That Coach Rolovich and All State Employees Accept an Experimental Vaccine**

50.     At all times relevant to this Complaint, the only vaccines available to Washington State employees were vaccines authorized under U.S. Food and Drug Administration Emergency Use Authorizations. According to DailyMed, a publication of the National Institute of Medicine, the only FDA-approved vaccine—Comirnaty—was not available to the American public:

COMPLAINT - 11

SEPTEMBER 13, 2021
Pfizer received FDA BLA license for its COVID-19 vaccine

Pfizer received FDA BLA license on 8/23/2021 for its COVID-19 vaccine for use in individuals 16 and older (COMIRNATY). At that time, the FDA published a BLA package insert that included the approved new COVID-19 vaccine tradename COMIRNATY and listed 2 new NDCs (0069-1000-03, 0069-1000-02) and images of labels with the new tradename.

At present, Pfizer does not plan to produce any product with these new NDCs and labels over the next few months while EUA authorized product is still available and being made available for U.S. distribution. As such, the CDC, AMA, and drug compendia may not publish these new codes until Pfizer has determined when the product will be produced with the BLA labels.[3]

51.    On August 23, 2021, the United States Food and Drug Administration ("FDA") issued two separate letters pertaining to two separate COVID-19 vaccines. One letter, addressed to Pfizer Inc., concerned the Pfizer-BioNTech COVID-19 Vaccine. Letter, United States Food and Drug Administration to Pfizer, Inc. (Aug. 23, 2021), ("Pfizer Letter") (A true and correct copy of the Pfizer Letter is attached hereto as EXHIBIT B and incorporated herein). The other letter, addressed to BioNTech Manufacturing GmbH, concerned the COMIRNATY vaccine. Letter, United States Food and Drug Administration to BioNTech Manufacturing GmbH (Aug. 23, 2021), ("BioNTech Letter") (A true and correct copy of the BioNTech Letter is attached hereto as EXHIBIT C and incorporated herein).

52.    In the Pfizer Letter, the FDA confirms that, on December 11, 2020, it granted Emergency Use Authorization (EUA) for the Pfizer-BioNTech COVID-19 Vaccine. (Pfizer

---

[3] *Pfizer received FDA BLA license for its COVID-19 vaccine*, DailyMed (Sept. 13, 2021), https://dailymed.nlm.nih.gov/dailymed/dailymed-announcements-details.cfm?date=2021-09-13 (Last visited Nov. 8, 2022); *see also,* Summary Basis of Regulatory Action – Comirnaty, FDA (Nov. 8, 2021) ("November 8 Comirnaty SBRA") at 5, available at: https://www.fda.gov/media/151733/download (last visited November 8, 2022 ("In the U.S., there are no licensed vaccines or anti-viral drugs for the prevention of COVID-19."), available at: https://www.fda.gov/media/151733/download (last visited November 8, 2022).

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1   Letter at 1.) It also notes that the EUA was continued on December 23, 2020, February 25,

2   2020, May 10, 2021, June 25, 2021, and August 12, 2021. (Pfizer Letter at 1-2).

3         53.    The FDA stated in the Pfizer Letter that, although it had granted the

4   COMIRNATY vaccine full approval "for certain uses," the Pfizer-BioNTech COVID-19

5   Vaccine was still only authorized under an EUA. (Pfizer Letter at 2).

6         54.    At all times relevant to this Complaint, the Pfizer-BioNTech COVID-19

7   Vaccine remained available only under the authorization of an EUA. (Pfizer Letter).

8         55.    The Federal Food, Drug, And Cosmetic Act provides that subject to the

9   limitations referenced and described in U.S.C. § 360bbb-3, the Secretary of Health and

10   Human Services "may authorize the introduction into interstate commerce, during the

11   effective period of a declaration [of emergency or threat justifying emergency authorized

12   use] under subsection (b), of a drug, device, or biological product intended for use in an

13   actual or potential emergency (referred to in this section as an 'emergency use.'" 21 U.S.C.

14   § 360bbb-3(a)(1). As an essential part of the explicit statutory conditions for EUA, the EUA

15   Statute mandates that all individuals to whom the EUA product may be administered be

16   given the option to accept or refuse administration of the product:

> With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:
>
> (ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—
>
> (I) that the Secretary has authorized the emergency use of the product;
>
> (II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
>
> (III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1  21 U.S.C. § 360bbb-3(e)(1)(A).

2      56.    The statutorily required Fact Sheets for each of the EUA COVID-19 vaccines

3  acknowledge that individuals cannot be compelled to accept or receive the vaccine. *See, e.g.*,

4  Pfizer-BioNTech, Fact Sheet for Recipients and Caregivers (June 25, 2021),

5  https://www.fda.gov/media/144414/download ("It is your choice to receive or not to receive

6  the Pfizer-BioNTech COVID-19 Vaccine. Should you decide not to receive it, it will not

7  change your standard medical care.").

8      57.    WSU never explained to Mr. Rolovich the potential risks of taking the

9  experimental vaccine.

10     58.    WSU never gave Mr. Rolovich the option to accept or decline the

11 experimental vaccine, telling him only that he would be fired for just cause if he refused.

12     **F.    WSU Established a Blind Review Process for Exemption Requests**

13     59.    In the weeks that followed Governor Inslee's August 20, 2021, proclamation

14 creating a COVID-19 vaccine mandate for State employees, WSU established procedures as

15 to how employees could request, and how the University would consider and approve or

16 deny requests for religious and/or medical exemptions from the vaccine mandate.

17     60.    WSU published its procedures for evaluating requests for religious

18 exemptions from the vaccine mandate on the University's website.[4] Part of this policy is

19 expressed in the form of FAQs. In that context, the University represented that HRS would

20 not share the details of an employee's request for an exemption with the employee's

21 supervisor or manager:

22     **I am requesting a medical or religious exemption, what will my**
       **supervisor/manager see as my exemption reason?**

23

24     The Workday process will show as 'in-process' when an exemption is
       requested and will be updated to 'complete' once reviewed and accepted. HRS

25
_____

26 [4] WSU, Human Resource Services, COVID-19 Vaccination Verification (Oct. 12, 2021), available at
   https://web.archive.org/web/20211103092159/https://hrs.wsu.edu/covid-19/vax-verification (last visited Nov.
   10, 2022).

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1  will work directly with employees regarding their requested exemption as
2  needed.

3      61.    The University described its process in more detail in an October 8, 2021,
statement posted on its website:

4
5  The requests for religious exemptions are evaluated in a 'blind' review
   process, meaning the identities of the individuals requesting exemptions are
6  unknown to the members of the review committee except in instances when
   additional information is needed through follow-up contact. Separate review
7  committees were created for students and employees. . . .

8  For employees, the exemption requests go through a two-step process. The
   first is the blind review. Then, if an exemption is approved, the request moves
9  to a separate accommodation review step where a determination is made
   whether the unvaccinated employee will be able to perform their duties
10 without risking the health and safety of the community.[5]

11
12     62.    Phil Weiler, WSU vice president for communications, reiterated the process
WSU would use to handle exemption requests:

13
14 If the blind review results in the approval of Rolovich's exemption request,
   the process would enter a second phase. . . . An approved request would be
15 sent to the human resources department, which would identify the employee
   in question and send an email to his/her supervisor indicating the exemption
16 had been approved.[6]

17 At that point, according to Weiler, the supervisor would determine if the unvaccinated

18 employee would be capable of "keeping the public safe" and perform his/her job effectively.

19 *Id.*

20
21
22

23 _____

[5] Nearly 90% of WSU Employees are Vaccinated, WSU, Oct. 8, 2021, https://everett.wsu.edu/nearly-90-of-
   wsu-employees-are-vaccinated/ (last visited Nov. 10, 2022).

24 [6] Jon Wilner, Would WSU actually fire Nick Rolovich? Examining the exemption review process with the
   vaccine mandate deadline approaching, Mercury News, Oct. 7, 2021,
25 https://www.mercurynews.com/2021/10/07/would-wsu-actually-fire-nick-rolovich-examining-the-exemption-
   review-process-as-vaccine-mandate-deadline-approaches/ (last visited Nov. 10, 2022).

26

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

### G.    WSU's Blind Review Process Determined that Mr. Rolovich's Religious Beliefs Were Sincere and Granted his Request for a Religious Exemption

63.    On September 28, 2021, Mr. Rolovich completed his application for a religious exemption and submitted it to HRS.

64.    On October 6, 2021, HRS notified Mr. Chun that the University had completed its "good faith review" process and had determined that Mr. Rolovich was entitled to a religious exemption from the COVID-19 vaccine requirement because it found that he had articulated a "sincerely held religious belief" that prevented him from complying with the Governor's mandate.

65.    HRS then informed Mr. Chun that it was "considering approving the employee's request (for accommodation) subject to the following terms and conditions," summarizing a proposed list of accommodations, including mask wearing, social distancing, and testing requirements. HRS said the next step would be for the Athletics Department to decide whether it was "able to accommodate this request with the above recommendations." HRS stated in that email that it would not reach out to Mr. Rolovich until the University's "decision on the Religious Accommodation is finalized." HRS requested that the Athletics Department respond to its proposed accommodations by October 8.

### H.    Chun Improperly Inserted Himself Into the Process and Compelled WSU to Overturn Its Determination that Mr. Rolovich's Religious Beliefs Were Sincere

66.    Mr. Chun, writing on behalf of the WSU Athletics Department, responded to HRS on October 13 with two memoranda. The first memorandum told HRS that it had rejected HRS' proposed accommodations and had determined that "the department is not able to accommodate this request."

67.    Mr. Chun's and the Athletics Department's second memorandum challenged HRS' conclusion that "Rolovich met the requirements for a religious exemption to the vaccination requirement by demonstrating a sincerely held religious belief against being

COMPLAINT - 16

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

vaccinated for COVID-19." That challenge was based on the Athletics Department's assertion that "Rolovich had made several statements that cast doubt on his claimed sincerely held religious belief." The memorandum stated that the fact that Rolovich had articulated other reasons for refusing a COVID vaccination before he had told Mr. Chun about his religious objections to the available COVID vaccines "support[ed] re-evaluation of the claimed sincerely-held religious belief."

68.    On October 14, 2021, Department of Environmental Health and Safety ("EH&S") issued a memorandum to Mr. Chun with extensive detail about how it had used its "expertise in environmental and occupational health and safety" to make an "individualized assessment" of Mr. Rolovich's working environment and formulate a list of "reasonable and necessary interventions and countermeasures to ensure the safety of the employee and others the employee may be in contact with."

69.    Mr. Chun, writing on behalf of the Athletics Department, subsequently wrote HRS a memorandum, copying EH&S, that rejected EH&S' recommendations. Mr. Chun/Athletics Department rejected EH&S' assessment that its recommendations would "ensure the safety of the employee and others the employee may be in contact with."

70.    The Mr. Chun and the Athletics Department also rejected EHS's proposed accommodations on the basis that having an unvaccinated head coach "would create an undue hardship for WSU Athletics given his assigned duties and responsibilities." The memorandum states, in part:

- "WSU has already lost significant donor commitments who have withdrawn or withheld donations based on the vaccination decisions of the football staff."

- "[B]ecause employees are not vaccinated, attendance at conference media day was done remotely, (which became a major story and embarrassment to WSU), the weekly Coach's show is now done remotely and has significant decline in attendance, and many media stories concerning the Football Program revolve around the unvaccinated status of the head coach (and assistant coaches)."

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

- "The damage to the mission and reputation of the University posed by this situation cannot be understated [*sic*], nor can it be resolved by accommodation."

## I.    Mr. Rolovich's Compliance with WSU Protocols, and Mr. Chun's Violation of WSU Protocols, Undermine Mr. Chun's Given Reasons for Not Accommodating Mr. Rolovich's Religious Convictions

71.    During the pandemic, WSU imposed protocols it hoped would mitigate the transmission of Covid among its employees and students. Mr. Rolovich was required to follow specific protocols developed for him because he was unvaccinated. Days before Mr. Rolovich informed Mr. Chun that he intended to seek a religious exemption from the vaccine Mandate, Mr. Chun said that he was confident that Mr. Rolovich could safely coach WSU's football team.

72.    The Seattle Times reported that Mr. Rolovich was "undergoing daily COVID-19 testing and wears a mask. Chun said the coach is adhering to all protocols."[7] "WSU athletic director Pat Chun, who is vaccinated, made it clear Wednesday that he backs his coach, saying Rolovich is the right person for the job despite the two being diverged on the vaccine decision." *Id.*

73.    Mr. Chun, however, did not follow WSU's Covid protocols. Four days after he fired Mr. Rolovich for allegedly "undermin[ing] the University's efforts to promote student safety," Mr. Chun was caught violating masking regulations at a donor event;[8] days later Mr. Chun was caught violating masking regulations while in the locker room with WSU football players.[9]

---

[7] Scott Hanson, WSU in 'strict COVID management' after football coach Nick Rolovich's decision to not get vaccinated, Spokesman Review, Aug. 13, 2021, https://www.spokesman.com/stories/2021/aug/13/wsu-in-strict-covid-management-after-football-coac/ (last visited Nov. 10, 2022).

[8] Jason Rantz, Rantz: Photo shows WSU's Pat Chun violating COVID policy after Rolovich firing, 770 KTTH, Oct. 25, 2021, https://mynorthwest.com/3203295/rantz-wsu-photo-pat-chun-covid-rolovich-fired/ (last visited Nov. 10, 2022).

[9] Washington State Football (@WSUCougarFB), Twitter (Oct. 30, 2021, 5:20 p.m.), https://twitter.com/wsucougarfb/status/1454589044147441664 (last visited Nov. 10, 2022). Mr. Chun's conduct violated both the University's and host Arizona State University's masking policies. *See* Arizona State University, Implementation of ASU Face Cover Policy, https://www.asu.edu/about/fall-2021 (last visited Nov. 2, 2021) ("face coverings will be required in certain indoor settings, i.e., where distancing may not be possible").

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

74.    When a local politician pointed out Mr. Chun's double-standard, Mr. Chun went to the City Councilor's place of business, launched a vulgar tirade, and threatened violence in front of the City Councilor's teenage daughter. Mr. Chun became so angry that the police got involved and decided that Mr. Chun would be "permanently trespassed" from the City Councilor's businesses.[10]

75.    On November 19, 2021, a local reporter noted that Mr. Chun was disregarding masking rules at a WSU basketball game in Idaho.[11]

**J.    Stanford Public Health and Infectious Disease Expert States that WSU Could Have Safely Accommodated Mr. Rolovich**

76.    Dr. Bhattacharya, a former Professor of Medicine (20+ years) and current Professor of Health Policy at Stanford University School of Medicine submitted a 29 page declaration to Mr. Chun and President Schulz on behalf of Mr. Rolovich. The Declaration provided scientific evidence in support of his conclusion that WSU could keep its employees safe while granting exemptions for those whose medical conditions and religious convictions prevent them from receiving a COVID vaccine.

77.    Dr. Bhattacharya also is a research associate at the National Bureau of Economic Research, and Director of Stanford's Center for Demography and Economics of Health and Aging. Dr. Bhattacharya holds an M.D. and Ph.D. from Stanford University. He has published 154 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health, among others.

---

[10] Report: Chun, wife trespassed from businesses: Pullman City Councilor Al Sorensen tells police that WSU AD and wife came to his business and threatened him, The Lewiston Tribune, Nov. 2, 2021, https://lmtribune.com/sports/report-chun-wife-trespassed-from-businesses/article_f5b69a55-5fce-52c6-a99c-d0f411ab5086.html (last visited Nov. 10, 2022); Simon Gibbs, Washington State athletic director Pat Chun issued trespass order after alleged profanity-ridden tirade, On3, Nov. 2, 2021, https://www.on3.com/college/washington-state-cougars/news/pat-chun-washington-state-cougars-cited-police-report-harrassment-tresspassing-civil-issue/ (last visited Nov. 10, 2022).

[11] Katie Daviscourt, WSU athletic director caught violating COVID protocols after firing head football coach for refusing vaccine, Post Millennial, Nov. 19, 2021, https://thepostmillennial.com/wsu-athletic-director-violating-covid-firing-coach (last visited Nov. 10, 2022).

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1   Dr. Bhattacharya's research has been cited in the peer-reviewed scientific literature more

2   than 11,600 times.

3          78.    Dr. Bhattacharya has dedicated his professional career to the analysis of health

4   policy, including infectious disease epidemiology and policy, and the safety and efficacy of

5   medical interventions. He has both studied extensively and commented publicly on the

6   necessity and safety of vaccine requirements for those who have contracted and recovered

7   from COVID-19 (individuals who have "natural immunity"). Dr. Bhattacharya is intimately

8   familiar with the emergent scientific and medical literature on this topic and pertinent

9   government policy responses to the issue both in the United States and abroad.

10         79.    Dr. Bhattacharya also is the primary co-author of the Great Barrington

11  Declaration, which describes an alternate policy of focused protection. His co-authors of the

12  Declaration include Prof. Martin Kulldorff of Harvard University and Prof. Sunetra Gupta of

13  Oxford University. Over 12,000 epidemiologists and public health professionals and 35,000

14  medical professionals had co-signed the Declaration by the time Mr. Rolovich was

15  terminated.

16         80.    WSU produced no evidence, let alone scientific evidence, that the

17  accommodation plans developed by EH&S would not be effective for Mr. Rolovich.

18         81.    In his declaration, Dr. Bhattacharya noted, "According to a meta-analysis by

19  Dr. John Ioannidis of every seroprevalence study conducted to date of publication with a

20  supporting scientific paper (74 estimates from 61 studies and 51 different localities

21  worldwide), the median infection survival rate—the inverse of the infection fatality rate—

22  from COVID-19 infection is 99.77%. For COVID-19 patients under 70, the meta-analysis

23  finds an infection survival rate of 99.95%. A separate meta-analysis by other scientists

24  independent of Dr. Ioannidis' group reaches qualitatively similar conclusions.

25         82.    Dr. Bhattacharya continued, "A study of the seroprevalence of COVID-19 in

26  Geneva, Switzerland (published in *The Lancet*) provides a detailed age breakdown of the

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

infection survival rate in a preprint companion paper: 99.9984% for patients 5 to 9 years old; 99.99968% for patients 10 to 19 years old; 99.991% for patients 20 to 49 years old; 99.86% for patients 50 to 64 years old; and 94.6% for patients above 65."

83.     Those numbers are consistent with what the US CDC has reported. A US CDC report found between 6 and 24 times more SARS-CoV-2 infections than cases reported between March and May 2020. Correspondingly, the CDC's estimate of the infection fatality rate for people ages 0-19 years is 0.003%, meaning infected children have a 99.997% survivability rate. For people ages 20-49 years, it was 0.02%, meaning that young adults have a 99.98% survivability rate. For people age 50-69 years, it was 0.5%, meaning this age group has a 99.5% survivability rate. Finally, for people ages 70+ years, it was 5.4%, meaning seniors have a 94.6% survivability rate.

84.     Dr. Bhattacharya stated, "It has been found that vaccinated individuals are at least as likely as unvaccinated individuals to be shedding live virus. Data from studies indicate that vaccinated and unvaccinated individuals infected with the Delta variant might transmit infection. Importantly, it has been shown that infectious SARS-CoV-2 is frequently found even in vaccinated persons."

85.     Also, the CDC reported in July 2021 that "new scientific data" indicated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated, leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[12]

86.     Dr. Bhattacharya noted that "[a]symptomatic individuals are an order of magnitude less likely to infect others than symptomatic individuals, even in intimate settings such as people living in the same household where people are much less likely to follow social distancing and masking practices that they follow outside the household. Spread of the

---

[12] *See* Joel Achenbach, CDC Reversal on Indoor Masking Prompts Experts to Ask, "Where's the Data?" Wash. Post, July 28, 2021, wapo.st/2THpmIQ (last visited Nov. 10, 2022).

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1    disease in less intimate settings by asymptomatic individuals—including in the context of the

2    WSU work environment—is likely to be even less likely than in the household."

3         87.     Dr. Bhattacharya concluded that the best empirical evidence shows that the

4    probability that an asymptomatic individual will spread the disease is very low. And because

5    the overwhelming majority of WSU employees were vaccinated in the fall of 2021, they

6    faced even less risk from any of their asymptomatic, unvaccinated coworkers who receive an

7    accommodation from WSU for religious or medical reasons.[13]

8         88.     When Mr. Rolovich was asymptomatic, he—like all other asymptomatic

9    individuals—presented an almost 0% chance of infecting others with COVID-19.

10         89.     In Dr. Bhattacharya's expert opinion, derived from his personal scientific

11    investigations, and his examination and analysis of a multitude of scientific studies, WSU

12    could have safely accommodated Mr. Rolovich and other unvaccinated employees.

13         **K.**     **WSU's Termination of Mr. Rolovich as Head Coach**

14         90.     Mr. Rolovich arrived at a meeting on October 18, 2021, and one minute

15    before that meeting, at 4:29, while waiting for Mr. Chun, Mr. Rolovich received an email

16    from HRS Exemptions notifying him that the University was "unable to approve your request

17    for an exemption and accommodation based on a sincerely held religious belief, practice, or

18    observance."

19         91.     Though the HRS panel had already determined that Mr. Rolovich's religious

20    beliefs were sincere and granted him a religious exemption on that basis, HRS allowed

21    Mr. Chun to improperly influence and interfere with the final decision made in its blind

22    review process. Mr. Chun notified HRS that he disagreed with HRS's determination

---

[13] President Schulz had said that nearly 90 percent of WSU employees and 97 percent of students were vaccinated. Chuck Culpepper, Washington State Football Coach Nick Rolovich Fired after Failing to Comply with Vaccine Mandate, Washington Post, Oct. 18, 2021, https://www.washingtonpost.com/sports/2021/10/18/nick-rolovich-washington-state-fired-covid-mandate/. *See also* Donald G. McNeil, Jr., How Much Herd Immunity Is Enough?, NY Times, Dec. 24, 2020 (updated Sept. 22, 2021), https://www.nytimes.com/2020/12/24/health/herd-immunity-covid-coronavirus.html ("Dr. Fauci noted, a herd-immunity figure at 90 percent or above is in the range of the infectiousness of measles. 'I'd bet my house that Covid isn't as contagious as measles,' he said.").

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 22

1    regarding Mr. Rolovich's sincerity, and, as a result, HRS reversed its determination, stating,

2    "[b]ased on your comments, in conjunction with the timing of your request for a religious

3    accommodation, the University questions the assertion that your sincerely held religious

4    views conflict with the University's vaccine requirement."

5        92.    HRS also reversed its position that Mr. Rolovich's sincere religious beliefs

6    could be accommodated by WSU, adopting Mr. Chun and the Athletics Department's

7    position that Mr. Rolovich could not "safely and effectively do [his] job without undue

8    hardship to the University."

9        93.    At the October 18 meeting, Mr. Chun served Mr. Rolovich with Written

10   Notice of Intent to Terminate with Just Cause.

11       94.    Mr. Chun had a security officer, who was present during the meeting, escort

12   Mr. Rolovich from the building and to Mr. Rolovich's truck.

13       95.    Mr. Chun did not permit Mr. Rolovich to return to his office to retrieve his

14   private property.

15       96.    Mr. Chun did not permit Mr. Rolovich to speak with his WSU football players

16   after the meeting.

17       97.    As a direct and proximate result of WSU's, Governor Inslee's, and

18   Mr. Chun's actions, Mr. Rolovich has suffered, and continues to suffer monetary and/or

19   economic damages, including, but not limited to, loss of past and future income, and

20   compensation and benefits for which he is entitled to an award of monetary damages.

21                          **COUNT I**
                    **BREACH OF CONTRACT**
22   **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

23       98.    Mr. Rolovich hereby repeats and realleges each and every above-made

24   allegation as if fully set forth herein.

25       99.    Pursuant to the terms of WSU's employment contract with Mr. Rolovich,

26   WSU could terminate him with just cause (as defined in the contract), or without cause, but if

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1   it terminated Mr. Rolovich without cause, WSU was required to pay liquidated damages in

2   an amount equal to sixty percent of his remaining base salary. When he was terminated,

3   Mr. Rolovich had approximately three and one-half years remaining on his contract.

4        100.    WSU terminated Mr. Rolovich in December 2021, claiming that it had just

5   cause to do so, and on that basis denied that it owed Mr. Rolovich any further compensation

6   under Mr. Rolovich's employment agreement.

7        101.    WSU breached its contract with Mr. Rolovich because it did not have just

8   cause to terminate Mr. Rolovich.

9        102.    WSU violated its own policies by allowing HRS to be improperly and

10  unlawfully influenced by Mr. Chun, who persuaded HRS to reverse its determination that

11  Mr. Rolovich's religious beliefs regarding Covid vaccines were sincere.

12       103.    Mr. Rolovich reasonably relied upon WSU's representation that it would

13  follow a blind review process in determining whether a request for a religious exemption

14  from the vaccine mandate was grounded in a sincere religious belief.

15       104.    Mr. Rolovich's determination that he could not receive a COVID-19 vaccine

16  without violating his religious convictions was not a deliberate and serious violation of his

17  contractual duties, it was not an act of misconduct, or an intentional or major violation or

18  repeated instance of secondary violations, nor was it prejudicial to the best interests of the

19  University or its athletic program. It was an act of faith, of conscience.

20       105.    By taking punitive action against Mr. Rolovich for raising a religious

21  objection that the University's own process deemed sincere, WSU breached its employment

22  agreement with Mr. Rolovich.

23       106.    After HRS determined that Mr. Rolovich's religious beliefs were sincere, both

24  HRS and EH&S determined that Mr. Rolovich's sincere religious beliefs could be

25  accommodated by requiring countermeasures to ensure his safety and others he may be in

26  contact with.

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

107.    For approximately a year prior to his termination, Mr. Rolovich had successfully performed his job as head coach while following countermeasures required of him by WSU because of his vaccination status.

108.    Mr. Chun rejected the HRS and EH&S accommodation protocols developed for Mr. Rolovich, without ever seeking input from Mr. Rolovich.

109.    Mr. Rolovich's sincere religious beliefs could have been accommodated as was clearly demonstrated by HRS, and especially EH&S, whose expertise in environmental and occupational health and safety" made an "individualized assessment" of Mr. Rolovich's working environment and formulated a list of "reasonable and necessary interventions and countermeasures to ensure the safety of the employee and others the employee may be in contact with."

110.    WSU's refusal to seek input from Mr. Rolovich on his religious accommodation, a duty imposed by law, was a breach of its employment agreement with Mr. Rolovich, as was Mr. Chun's predetermination before Governor Inslee's vaccine mandate that Mr. Rolovich would be fired with cause if he did not get vaccinated.

111.    WSU's decision and actions in terminating Mr. Rolovich, and asserting that it had just cause to do so, also constituted a breach of the implied warranty of good faith and fair dealing.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**COUNT II**
**WASHINGTON LAW AGAINST DISCRIMINATION**
**RCW 49.60 *et seq.***

112.    Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

113.    A substantial factor in WSU's decision to terminate Mr. Rolovich "for just cause" was his religious beliefs (creed) as expressed by him in seeking a religious exemption from Governor Inslee's vaccine mandate.

114.    An individual's exercise of religious beliefs in a decision not to be vaccinated, or take medicine, cannot lawfully serve as the basis for a just cause termination.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**COUNT III**
**WASHINGTON CONSTITUTION, ARTICLE 1, SECTION 11**
**DISCRIMINATION AGAINST RELIGION/CONSCIENCE**

115.    Mr. Rolovich hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

116.    The Washington State Constitution guarantees Mr. Rolovich "[a]bsolute freedom of conscience in all matters of religious sentiment, belief, and worship." The same constitutional provision states that "no one shall be molested or disturbed in person or property on account of religion."

117.    Defendants, by their conduct and words, discriminated against Mr. Rolovich because he acted according to his conscience, guided by his religion, in refusing to be vaccinated.

118.    Defendants' threat to fire Mr. Rolovich with "just cause" if he did not take an experimental vaccine was a disturbing and unlawful assault upon Mr. Rolovich's conscience, bodily integrity, and religious faith.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1

2

**COUNT IV**
**VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.***

3      119.    Mr. Rolovich hereby repeats and realleges each and every above-made

4      allegation as if fully set forth herein.

5      120.    Title VII of the Civil Rights Act of 1964 prohibits WSU from discriminating

6      against its employees on the basis of their sincerely held religious beliefs. *See* 42 U.S.C.

7      §2000e-2(a).

8      121.    Mr. Rolovich holds sincere religious beliefs that precluded him from receiving

9      any of the COVID-19 vaccines available during the times relevant to this complaint.

10      122.    Mr. Rolovich notified WSU of those beliefs by requesting a religious

11      exemption and reasonable accommodations from the vaccine mandate.

12      123.    WSU's HRS panel, pursuant to the University's established policies and

13      protocol, determined that Mr. Rolovich had sincere religious beliefs that precluded him from

14      taking the vaccine, thereafter notifying the Athletics Department (Mr. Chun) of its

15      determination.

16      124.    The HRS panel, having concluded that Mr. Rolovich's religious beliefs were

17      sincere, asked only for Mr. Chun's input on whether Mr. Rolovich's sincere religious beliefs

18      could be accommodated.

19      125.    Both HRS and EHS determined that WSU could accommodate

20      Mr. Rolovich's sincere religious beliefs.

21      126.    WSU failed to engage with Mr. Rolovich in the interactive process set forth in

22      the EEOC's Compliance Manual on Religious Discrimination before concluding that it

23      would not accommodate his request for a religious exemption.

24      127.    WSU's disapproval of Mr. Rolovich's sincerely-held religious reasons for

25      refusing to receive a COVID-19 vaccine was one of the University's motives for its

26      discriminatory treatment of Mr. Rolovich.

COMPLAINT - 27

128.    Accommodating Mr. Rolovich's religious beliefs would not have resulted in an undue hardship on WSU's operations.

129.    WSU's discriminatory actions were intentional and/or reckless and in violation of Title VII.

WHEREFORE, Plaintiff prays for damages against Defendants as provided for by law.

## COUNT V
## 42 U.S.C., SECTION 1983
### First Amendment-Free Exercise of Religion and Fourteenth Amendment-Due Process
### (Defendant Chun only, in his Individual Capacity)

130.    Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

131.    All of the acts of Defendant Chun were conducted by him under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

132.    The law regarding the free exercise of religion in employment is well established.

133.    The law regarding due process in employment is well established.

134.    Defendant Chun knew the First Amendment prohibits government officials from discriminating against an employee because of his religious beliefs.

135.    Defendant Chun knew that the First Amendment prohibits governmental officials from demonstrating hostility to religion or prohibiting the free exercise thereof.

136.    Defendant Chun knew the Fourteenth Amendment prohibits government from denying an employee due process.

137.    Defendant Chun knew the Fourteenth Amendment prohibits government officials from denying an employee his right to due process.

COMPLAINT - 28

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

138.    Defendant Chun acted with willful malice, and/or intentionally and in gross disregard of Mr. Rolovich's constitutional rights, and/or in reckless disregard of Mr. Rolovich's constitutional rights.

139.    As a direct and proximate result of Defendant Chun's actions, Mr. Rolovich has been deprived of his constitutional right to the free exercise of religion, to be free from governmental hostility directed at his religion, and his right to due process and equal protection under the law.

WHEREFORE, Plaintiff prays for damages against Defendant Chun as provided for by law.

### COUNT VI
### 42 U.S.C., SECTION 1983
### (First Amendment-Free Exercise of Religion)

140.    Plaintiff hereby repeats and realleges each and every above-made allegation as if fully set forth herein.

141.    All of the acts of Defendants, their officers, agents, servants, and employees, as alleged herein, were conducted by the Defendants under color and pretense of the statutes, regulations, customs, policies and/or usages of the State of Washington and Washington State University.

142.    Defendants granted twice as many medical exemptions as religious exemptions to WSU employees, reflecting Defendants' discriminatory policy to grant religious exemptions as narrowly as possible.

143.    The creation of a formal mechanism for granting exemptions renders WSU's vaccine mandate not generally applicable because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude.

144.    Defendants ultimately denied Mr. Rolovich's religious exemption request, terminated him, and improperly claimed it had just cause to do so, because Mr. Rolovich had

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1    informed Defendants that religious convictions precluded him from receiving a COVID-19

2    vaccine.

3          145.    Mr. Rolovich's religious conviction to not be vaccinated cannot be punished

4    by WSU by terminating him with just cause.

5          146.    The actions of Defendants, as alleged herein, are unconstitutional

6    abridgements of Mr. Rolovich's rights to the free exercise of religion secured by the First and

7    Fourteenth Amendments to the United States Constitution.

8          WHEREFORE, Plaintiff prays for damages against Defendants as provided for by

9    law.

10               **COUNT VII**
     **FOURTEENTH AMENDMENT-DUE PROCESS (As Applied)**

11

12         147.    Plaintiff hereby repeats and realleges each and every above-made allegation as

13   if fully set forth herein.

14         148.    All of the acts of Defendants, their officers, agents, servants, and employees,

15   as alleged herein, were conducted by the Defendants under color and pretense of the statutes,

16   regulations, customs, policies and/or usages of the State of Washington and Washington

17   State University.

18         149.    Defendants' policies, as administratively construed and applied against

19   Mr. Rolovich, granted WSU officials unfettered discretion to disregard the process they

20   created for determining whether a religious exemption would be granted and, therefore,

21   abridged Mr. Rolovich's right to due process as guaranteed by the Fourteenth Amendment to

22   the United States Constitution.

23         WHEREFORE, Plaintiff prays for damages against Defendants as provided for by

24   law.

25

26

COMPLAINT - 30

1

**PRAYER FOR RELIEF**

2          WHEREFORE, Plaintiff respectfully prays that this Court:

3                    a.          Assume jurisdiction over this action;

4                    b.          Award damages in an amount to be determined at trial plus pre and

5     post-judgment interest, to compensate Plaintiff for all monetary and/or economic damages,

6     including but not limited to, the loss of past and future income, wages, compensation, job

7     security and other benefits of employment;

8                    c.          Award liquidated damages, as provided for in the employment

9     contract;

10                   d.          Award punitive damages, as provided for under 42 U.S.C. § 1983,

11    Title VII, RCW 49.60 *et seq.* and as otherwise provide for under federal and state law;

12                   e.          Award double damages as provided for in RCW 49.52, *et seq.*;

13                   f.          Award damages for any and all other monetary and/or non-monetary

14    losses suffered by Plaintiff in an amount to be determined at trial, plus pre and post-judgment

15    interest;

16                   g.          Award an offset for the adverse federal income tax consequences

17    resulting from damages and award of attorneys' fees;

18                   h.          Award costs that Plaintiff has incurred in this action, including but not

19    limited to expert witness fees, as well as reasonable attorneys' fees and costs to the fullest

20    extent permitted by federal and state law; and

21

22

23

24

25

26

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1          i.      Award such other and further relief as the Court may deem just and

2    proper.

3          DATED this 9th day of December, 2022.

4

5                                        By   /s Brian Fahling

6
                                         Brian Fahling
7                                        WSBA #18894
                                         LAW OFFICE OF BRIAN FAHLING
8                                        8124 NE 166th St
                                         Kenmore, WA 98028
9                                        T: 425.802.7326
                                         E-mail: bfahling@fahlinglaw.com
10

11

12                                       By   /s Eric Kniffin

13
                                         Eric Kniffin
14                                       CO Bar #48016
                                         (Pending Admission Pro Hac Vice)
15                                       LEWIS ROCA
                                         90 S. Cascade Ave., Suite 1100
16                                       Colorado Springs, CO 80907
                                         T: 719-386-3017
17                                       E-mail: ekniffin@lewisroca.com

18                                       Attorneys for Plaintiff

19

20

21

22

23

24

25

26

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

COMPLAINT - 32

1

2

3

4

5

6

7

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF WHITMAN

8    NICHOLAS ROLOVICH,

9         Plaintiff,

**No. 22-2-00244-38**

10    v.

**SUMMONS (20 days)**

11

12    WASHINGTON STATE UNIVERSITY,
an agency of the State of Washington;
13    PATRICK CHUN, Director of Athletics for
Washington State University, in his
14    individual capacity; and JAY INSLEE,
Governor, in his official capacity,

15         Defendants.

16

17    **TO:    WASHINGTON STATE UNIVERSITY**

18         A lawsuit has been started against you in the above-entitled court by the above-named

19    plaintiff. Plaintiff's claim is stated in the written complaint, a copy of which is served upon

20    you with this summons.

21         In order to defend against this lawsuit, you must respond to the complaint by stating

22    your defense in writing, and by serving a copy upon the person signing this summons within

23    20 days after the service of this summons, excluding the day of service, or a default judgment

24    may be entered against you without notice. A default judgment is one where plaintiff is

25    entitled to what she or he asks for because you have not responded. If you serve a notice of

26    //

**LAW OFFICE OF BRIAN FAHLING**
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SUMMONS - 1

1   appearance on the undersigned person, you are entitled to notice before a default judgment

2   may be entered.

3          You may demand that the plaintiff file this lawsuit with the court. If you do so, the

4   demand must be in writing and must be served upon the person signing this summons.

5   Within 14 days after you serve the demand, the plaintiff must file this lawsuit with the court,

6   or the service on you of this summons and complaint will be void.

7          If you wish to seek the advice of an attorney in this matter, you should do so promptly

8   so that your written response, if any, may be served on time.

9          This summons is issued pursuant to rule 4 of the Superior Court Civil Rules of the

10  State of Washington.

11         DATED this 9th day of December, 2022.

12

13                                                  By _____

14                                                  Brian Fahling
                                                    WSBA #18894
15                                                  LAW OFFICE OF BRIAN FAHLING
                                                    8124 NE 166th St
16                                                  Kenmore, WA 98028
                                                    T: 425.802.7326
17                                                  E-mail: bfahling@fahlinglaw.com

18

19                                                  Attorney for Plaintiff

20

21

22

23

24

25

26

SUMMONS - 2

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1

2

3

4

5

6

7

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF WHITMAN

8  NICHOLAS ROLOVICH,

9          Plaintiff,

**No. 22-2-00244-38**

10  v.

**SUMMONS (20 days)**

11

12  WASHINGTON STATE UNIVERSITY,
an agency of the State of Washington;

13  PATRICK CHUN, Director of Athletics for
Washington State University, in his

14  individual capacity; and JAY INSLEE,
Governor, in his official capacity,

15

16          Defendants.

17  **TO:    PATRICK CHUN, Director of Athletics for Washington State University**

18          A lawsuit has been started against you in the above-entitled court by the above-named

19  plaintiff. Plaintiff's claim is stated in the written complaint, a copy of which is served upon

20  you with this summons.

21          In order to defend against this lawsuit, you must respond to the complaint by stating

22  your defense in writing, and by serving a copy upon the person signing this summons within

23  20 days after the service of this summons, excluding the day of service, or a default judgment

24  may be entered against you without notice. A default judgment is one where plaintiff is

25  entitled to what she or he asks for because you have not responded. If you serve a notice of

26  //

SUMMONS - 1

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1  appearance on the undersigned person, you are entitled to notice before a default judgment
2  may be entered.

3       You may demand that the plaintiff file this lawsuit with the court. If you do so, the
4  demand must be in writing and must be served upon the person signing this summons.
5  Within 14 days after you serve the demand, the plaintiff must file this lawsuit with the court,
6  or the service on you of this summons and complaint will be void.

7       If you wish to seek the advice of an attorney in this matter, you should do so promptly
8  so that your written response, if any, may be served on time.

9       This summons is issued pursuant to rule 4 of the Superior Court Civil Rules of the
10  State of Washington.

11       DATED this 9th day of December, 2022.

12

13  By _____

14  Brian Fahling
     WSBA #18894
15  LAW OFFICE OF BRIAN FAHLING
     8124 NE 166th St
16  Kenmore, WA 98028
     T: 425.802.7326
17  E-mail: bfahling@fahlinglaw.com

18

19       Attorney for Plaintiff

20

21

22

23

24

25

26

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

SUMMONS - 2

1

2

3

4

5

6            IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

7                   IN AND FOR THE COUNTY OF WHITMAN

8    NICHOLAS ROLOVICH,
                                              **No. 22-2-00244-38**
9            Plaintiff,

10   v.                                       **SUMMONS (20 days)**

11   WASHINGTON STATE UNIVERSITY,
12   an agency of the State of Washington;
     PATRICK CHUN, Director of Athletics for
13   Washington State University, in his
     individual capacity; and JAY INSLEE,
14   Governor, in his official capacity,

15           Defendants.

16

17   **TO:    GOVERNOR JAY INSLEE**

18           A lawsuit has been started against you in the above-entitled court by the above-named

19   plaintiff. Plaintiff's claim is stated in the written complaint, a copy of which is served upon

20   you with this summons.

21           In order to defend against this lawsuit, you must respond to the complaint by stating

22   your defense in writing, and by serving a copy upon the person signing this summons within

23   20 days after the service of this summons, excluding the day of service, or a default judgment

24   may be entered against you without notice. A default judgment is one where plaintiff is

25   entitled to what she or he asks for because you have not responded. If you serve a notice of

26   //

LAW OFFICE OF BRIAN FAHLING
8124 NE 166th St
Kenmore, WA 98028
T: (425) 802-7326
E: bfahling@fahlinglaw.com

1   appearance on the undersigned person, you are entitled to notice before a default judgment

2   may be entered.

3       You may demand that the plaintiff file this lawsuit with the court. If you do so, the

4   demand must be in writing and must be served upon the person signing this summons.

5   Within 14 days after you serve the demand, the plaintiff must file this lawsuit with the court,

6   or the service on you of this summons and complaint will be void.

7       If you wish to seek the advice of an attorney in this matter, you should do so promptly

8   so that your written response, if any, may be served on time.

9       This summons is issued pursuant to rule 4 of the Superior Court Civil Rules of the

10  State of Washington.

11      DATED this 9th day of December, 2022.

12

13                                          By

14                                          Brian Fahling
                                            WSBA #18894
15                                          LAW OFFICE OF BRIAN FAHLING
                                            8124 NE 166th St
16                                          Kenmore, WA 98028
                                            T: 425.802.7326
17                                          E-mail: bfahling@fahlinglaw.com

18

19                                          Attorney for Plaintiff

20

21

22

23

24

25

26