# Exhibit F

# Expert Report of M. Therese Lysaught, PhD.

**Prepared for Defendant Washington State University in**

**Eastern District of Washington Case No. 2:22-cv-00319-TOR**

***Nicholas Rolovich*, plaintiff**

***v.***

***Washington State University*, defendant.**

Dated: August 9, 2024

Signed: _M. Therese Lysaught_

Digitally signed by M. Therese Lysaught
Date: 2024.08.09 14:11:04 -05'00'

M. Therese Lysaught

Expert Report of M. Therese Lysaught – Page 1

# I.    CREDENTIALS

## A.    Expertise and Employment History

1.  I am a Roman Catholic moral theologian with a Mandatum from the Roman Catholic Church to teach in the theological disciplines, pursuant to the encyclical of Pope John Paul II *Ex Corde Ecclesia*. My areas of expertise include Roman Catholic moral theology, Catholic social teaching, the theology and ethics of Catholic health care, health care ethics, and global health.

2.  I am a tenured Professor in the Neiswanger Institute of Bioethics and Health Policy at Loyola University Chicago, Stritch School of Medicine. I have worked at Loyola University Chicago since July 1, 2013, with a joint appointment in the Institute of Pastoral Studies from 2013-2020. In 2020, I was appointed to the Pontifical Academy for Life at the Vatican as a Corresponding Member. From 2012-2013, I served as a Visiting Scholar with the Catholic Health Association. From August 2007-May 2013, I held the position of tenured Associate Professor in the Department of Theology at Marquette University, Milwaukee, Wisconsin. In August 1995, I joined the faculty of the Department of Religious Studies at the University of Dayton as an Assistant Professor, where I received tenure and promotion to the rank of Associate Professor effective 2001. At all three universities, I have held academic administrative positions. From 1995-1998, I served on the Recombinant DNA Advisory Committee at the National Institutes of Health. In 1994-1995, I served as an NIH Fellow in the Program in Molecular and Clinical Genetics/Biomedical Ethics at the University of Iowa, via the Ethical, Legal, and Social Implications Program (ELSI) of the National Center for Human Genome Research (NCHGR).

3.  I earned a BS in Chemistry from Hope College in Holland, Michigan (1985), an MA in Theology from the University of Notre Dame (1986), and a PhD in Religion (Theological Ethics) from Duke University (1992).

4.  Since 2022, I have served as the Editor of the *Journal of Moral Theology*, a scholarly peer-reviewed journal focused on Catholic moral theology. Since 1992, I have also served in a variety of advisory capacities, including with: the Pontifical Academy for Life, the Catholic Medical Mission Board; the Global Faith-Based Health Care initiative sponsored by Georgetown University and the Fondazione Bruno Kessler in Trento, Italy; the Program on Medicine and Religion at the University of Chicago; the Board of Directors of the Society of Christian Ethics; the Anglican-Roman Catholic Theological Consultation U.S.A. under the auspices of the United States Conference of Catholic Bishops; the American Association for the Advancement of Science; the Catholic Health Association; and the Recombinant DNA Advisory Committee of the National Institutes of Health. I also regularly consult with Catholic health systems and universities on matters of theology, mission, and ethics.

Expert Report of M. Therese Lysaught – Page 2

## B.      Publications

5. Since 2007, I have published six books in English—one on Catholic moral theology (*Gathered for the Journey: Moral Theology in Catholic Perspective*, 2007), two on theology and health care ethics (*On Moral Medicine: Theological Perspectives in Medical Ethics*, 2012; and *Catholic Bioethics and Social Justice*, 2019); one on the theological foundations of Catholic health care (*Caritas in Communion: Theological Foundations of Catholic Health Care*, 2014); one on the ethics of neuroscience (*Biopolitics After Neuroscience: Morality and the Economy of Virtue*, 2020); and one on the celebrated global health pioneer, Dr. Paul Farmer (*A Prophet to the Peoples: Paul Farmer's Witness and Theological Ethics*, 2023). Two of these books have been translated into Spanish. Three of these books have received awards—the 2021 Expanded Reason Institute Award from the Universidad Francisco de Vitoria (Madrid) and the Fondazione Vaticana Joseph Ratzinger Benedetto XVI for *Biopolitics After Neuroscience*; in 2019, *Catholic Bioethics and Social Justice* received an honorable mention for Best New Books on Catholic Social Teaching from the Catholic Press Association; and in 2008, *Gathered for the Journey* won third place honors for the annual award for Best New Book in Theology, also from the Catholic Press Association. Within the last ten years, I have also published: 22 peer-reviewed journal articles; 11 chapters in books; many briefer publications; and I have given 11 refereed conference papers and 39 invited lectures on the theology and ethics of Catholic health care and additional topics. These items are also listed in Appendix 1.

## C.      Service as an Expert Witness

6. In the past ten years, I have served as an expert witness in the following cases: *Chavies v. Catholic Health East*, No. 13-1645 (E.D. Pa.); *Medina v. Catholic Health Initiatives*, No. 13-cv-01249-REB-KLM (D. Colo.); *Smith v. OSF Healthcare System*, Case No. 16-CV-467-SMY-RJD (S.D. Ill.)*; Lilian Romero v. Ana Romero*, Los Angeles Superior Court Case No. 16STPB06815, *In re Juan Fernando Romero*, Los Angeles Superior Court Case No. 16STPB07123; and *Capello v. Franciscan Alliance*, No. 3:16-cv-290-TLS-MGG (N.D. Ind.).

## D.      Scope of Work

7. I was asked to evaluate the opinions offered by John Di Camillo regarding Nicholas Rolovich's refusal to receive the COVID-19 vaccination for the stated reason that it conflicted with his sincere religious beliefs as a Roman Catholic.

## E.      Documents Considered

8. The documents I have considered in forming my opinions in this matter include those documents cited in this Report and those listed below. These documents, especially those that represent the teachings of the Roman Catholic Church, are the type of documents that are regularly relied upon by experts in my field.

- The Second Amended Complaint
- Nicholas Rolovich's Exemption Request Form Submitted on September 28, 2021
- The WSU Athletic Department's Memos Submitted to Human Resources Services on October 13, 2021
- The October 18, 2021 email from Human Resources Services with the official notice that his exemption was denied
- The October 18, 2021 letter from Pat Chun to Nicholas Rolovich re: Written Notice of Intent to Terminate for Just Cause
- The November 12, 2021 letter from Pat Chun to Nicholas Rolovich re: Notice of Decision to Terminate for Just Cause

### F.    Compensation

9. I am being compensated for the work on this case at a rate of $300/hour for research, writing, consulting, and testifying at trial or in deposition.

## II.    EXPERT REPORT

10. In his opinion, John Di Camillo addresses the question of whether Mr. Rolovich "may have been <u>required</u> to refuse a COVID-19 vaccination" based on "the teachings of the Roman Catholic Church."[1] In his analysis, he purports to offer a summary of the Roman Catholic teaching on conscience; he applies what he refers to as "the principle of therapeutic proportionality"; and makes statements about Roman Catholic teaching about vaccinations in general. Based on these premises he concludes that "that if, after due diligence in seeking out and critically assessing medical and moral information pertaining to COVID-19 and the vaccines, Nicholas Rolovich came to a sure judgment in conscience that he should not receive a COVID-19 vaccine, then the teachings of the Catholic Church <u>required</u> that he refuse the vaccine."[2]

11. In my opinion, Mr. Di Camillo's presentation of each of his premises is deeply flawed. While he correctly cites one part of the Roman Catholic teaching on conscience, he fails to present the Church's teaching in its entirety. His "principle of therapeutic proportionality" is idiosyncratic. He omits one of the most central principles of Catholic bioethics that helps patients to make morally-informed decisions about medical interventions—namely, the principle of ordinary and extraordinary means. And most importantly, his analysis <u>entirely ignores</u> the robust body of authoritative teaching promulgated by the Roman Catholic magisterium[3] in 2020 and 2021 regarding the moral

---

[1] John Di Camillo, "Expert Declaration of John A. Camillo," July 1, 2024, no. 4, emphasis added.

[2] Di Camillo, no. 47, emphasis added.

[3] Within the Roman Catholic Church, the term "magisterium" (based on the Latin word for "teacher" (magister)) refers to the official teaching authority of the Church, constituted by the Pope and Bishops in union with him.

Expert Report of M. Therese Lysaught – Page 4

acceptability—and, in fact, morally obligatory status—of the COVID-19 vaccines. Roman Catholic teaching <u>requires</u> faithful Catholics to use such teaching to properly form their consciences and to give witness to that teaching in their actions.

12. In addition, in his report, Di Camillo does not even attempt to analyze or evaluate the actual process by which Mr. Rolovich formed his conscience and came to his judgement. The Catholic Church enjoins a clear and robust process for conscience formation. Yet Di Camillo does not appear to have spoken with Mr. Rolovich or reviewed any documents relevant to Mr. Rolovich's process for "seeking out and critically assessing medical and moral information pertaining to COVID-19 and vaccines."

13. My analysis will proceed in four sections:

First, I will review the long list of statements regarding the moral acceptability of the COVID-19 vaccines promulgated by the spectrum of Roman Catholic magisterial authorities in 2020-2021. These authorities include:

   a. Pope Francis (multiple from 2020-2022)
   b. The Congregation for the Doctrine of the Faith (Dec. 2020)
   c. The Vatican COVID-19 Commission/Pontifical Academy for Life (Dec. 2020)
   d. The US Conference of Catholic Bishops (Dec. 2020)

Next, I will review the position of Di Camillo's employer, the National Catholic Bioethics Center, on the COVID-19 vaccines. This position was used to create a vaccine exemption template which was used, in slightly modified fashion, by Mr. Rolovich in his application to Washington State University for a religious exemption. Di Camillo's opinion is largely a restatement of that template. The template also contradicts the consensus of the Roman Catholic magisterium.

Third, I will explain the major flaws in the opinions offered in Di Camillo's report. Specifically, I will address his incomplete presentation of Roman Catholic teaching on conscience, his principle of "therapeutic proportionality," and I will outline the more important and relevant principle by which Catholics are to evaluate whether particular medical interventions are morally obligatory, the principle of ordinary and extraordinary means.

Finally, I will discuss the Church's position on the consequences that conscientious action may entail, namely, that while individuals have rights to follow their consciences, such actions may entail ecclesiastical, civil, and/or employment penalties.

14. Based on all of these factors, I conclude that Mr. Di Camillo is incorrect that Mr. Rolovich was required to refuse the COVID-19 vaccine based on his Roman Catholic faith.

Expert Report of M. Therese Lysaught – Page 5

1. **Statements Regarding the COVID-19 Vaccines by Roman Catholic Magisterial Authorities Consistently Support Vaccination**

15. Mr. Rolovich requested an exemption from Washington State University's COVID-19 vaccine mandate for employees based on his claim that to receive the COVID-19 vaccine would violate his conscience <u>as a member of the Roman Catholic Church</u>. To assess the validity of that claim, the necessary first step is to ascertain the teaching of the Roman Catholic Church on this particular question—specifically, on the moral status of the COVID-19 vaccines. This is necessary for two reasons. First, it establishes whether Mr. Rolovich's claim that his religious objection stems from his Catholic faith is factually true. Second, as we will see in II.3 below, in order to form one's conscience well, Catholics are required to consult and follow the authoritative teaching of the Roman Catholic magisterium.

16. There is a hierarchy of teaching authority in the Roman Catholic Church. Globally, the authority structure proceeds as follows (from highest to lowest):[4]

    a. An Ecumenical Council, such as the Second Vatican Council (1962-1965)
    b. An *ex cathedra* statement by the Pope (rare event)[5]
    c. Official statements by the Pope
    d. Statements of Vatican Curial offices. In this case, the relevant offices would be:[6]
        i. The Dicastery for the Doctrine of the Faith
        ii. The Dicastery for the Promotion of Integral Human Development
            1. Vatican COVID-19 Commission
        iii. The Pontifical Academy for Life

---

[4] Russell Smith, "A Resource for Evaluating Levels of Authority in Church Teaching," *Health Care Ethics* USA (Catholic Health Association, 2007): https://www.chausa.org/docs/defaultsource/hceusa/112fcbb5b75d4c0bbbeba53044bc03461-pdf.

[5] The Pope's authority to issue infallible teachings, or to teach *ex cathedra* ("from the chair" of Peter) is defined in Can. 749, §1 of the *Code of Canon Law* (1983): https://www.vatican.va/archive/cod-iuris-canonici/cic_index_en.html. As it states: "By virtue of his office, the Supreme Pontiff possesses infallibility in teaching when as the supreme pastor and teacher of all the Christian faithful, who strengthens his brothers and sisters in the faith, he proclaims by definitive act that a doctrine of faith or morals is to be held." Such teachings have only been promulgated twice, in 1854 regarding the doctrine of the Immaculate Conception of Mary and in 1950 regarding the doctrine of the Assumption of the Blessed Virgin Mary. Therefore, *ex cathedra* teachings are not relevant in this case.

[6] The Vatican curial offices are analogous to the 15 executive departments that are part of the Cabinet of the US government. E.g., the Vatican Dicastery for Culture and Education would be analogous to the US Department of Education. Altogether, there are 55 dicasteries and other executive bodies, headquartered in Vatican City, that referred to as the Roman Curia. For a complete list of the Vatican curial offices, see: https://www.vatican.va/content/romancuria/en.html.

Expert Report of M. Therese Lysaught – Page 6

17. Within specific countries, additional authorities would include the local bishops' conferences—in this case, the US Conference of Catholic Bishops (USCCB).

18. In order to form one's conscience well as a Catholic on a particular topic, one must first carefully read and follow the teachings of these various entities, ordinarily in this order. Analogously to civil case law, newer teachings by these various authorities build on, sometimes correct, and supersede previous teachings.

19. With regard to the COVID-19 vaccines, in 2021 there was a resounding consensus among these Roman Catholic magisterial statements that the currently available COVID-19 vaccines were all morally acceptable. This was also true of the Pfizer and Moderna vaccines that were available in the summer of 2021. As I detail below, Pope Francis, the Dicastery for the Doctrine of the Faith, the Vatican COVID-19 Commission sponsored by the Dicastery for Promoting Integral Human Development, the Pontifical Academy for Life, and the USCCB concur on this point. These bodies also concur that Catholics have a "moral responsibility" to be vaccinated in order to protect their own lives and health, to protect the lives and health of others, and to promote the common good.

20. These authoritative, magisterial bodies reached these conclusions via thorough, careful, balanced, faithful reasoning processes using the multiple sources of the Catholic tradition: the best scientific evidence about the SARS-COV-2 virus and anti-COVID-19 vaccines as it became available as the pandemic unfolded; the basic tenets of epidemiology and public health; the principles of Catholic bioethics; the principles of Catholic social teaching; and the cardinal and theological virtues. An adequate and credible Catholic moral analysis brings together all of these sources when considering a particular practical question. One can see this process in these documents.

A. Pope Francis

21. In this case, there is neither an ecumenical council nor an *ex cathedra* papal statement that directly addressed COVID-19 vaccines. Therefore, we begin with the statements of Pope Francis. The Second Vatican Council, held from 1962-1965, is the most recent Ecumenical Council. It states clearly that the Pope exercises an:

> …authentic magisterium…even when he is not speaking *ex cathedra*; that is, [regard] must be shown in such a way that his supreme magisterium is acknowledged with reverence, the judgments made by him are sincerely adhered to, according to his manifest mind and will. His mind and will in the matter may be known either from the character of the documents, from his frequent repetition of the same doctrine, or from his manner of speaking.[7]

---

[7] Second Vatican Council, *Lumen Gentium* (Dogmatic Constitution on the Church), §25, emphasis added.

Expert Report of M. Therese Lysaught – Page 7

22. Therefore, the necessary starting point for any analysis regarding the Roman Catholic
position on the moral validity of the COVID-19 vaccines—whether conducted by a
Catholic organization or an individual Catholic—are statements by the Pope.

23. Pope Francis addressed the COVID-19 vaccines at least six times between 2020-2021. In
these statements, he made clear that the all of the COVID-19 vaccines were morally
acceptable, that to be vaccinated against COVID-19 was (for Catholics) a moral
obligation, and that the Roman Catholic Church should work with local governments and
other organizations to ensure universal access to these vaccines.

**(1) September 2020:** In September 2020, Pope Francis addressed members of the Italian
Pharmaceutical Bank.[8] Faced with a global pandemic, the Pope repeatedly decried
global disparities in vaccine distribution and called for redoubled, coordinated efforts for
<u>universal</u> vaccine access. As he noted, "I repeat that it would be sad if, in providing the
vaccine, priority were given to the wealthiest, or if this vaccine became the property of
this or that country, and was no longer for everyone. It must be universal, for all."
Instead, he "propose[d] to globalise treatment, that is, the possibility of access to those
drugs that could save so many lives for all populations." He called on pharmacists,
pharmaceutical companies, and governments to work toward the goal of a "more
equitable distribution of medicines." Pope Francis would not call for universal access to a
medical intervention that the Church deemed morally problematic in any way.

**(2) January 2021:** On January 1, 2021, Pope Francis issued his annual World Day of Peace
message. These statements are generally considered to carry significant weight. Entitled
"A Culture of Care as a Path to Peace," Pope Francis emphasized the centrality of care for
others at the center of the gospel.[9] At this point, the Pfizer, Moderna, and Johnson &
Johnson vaccines had been released and, as we will see below, the Vatican had issued
statements confirming their moral acceptability. Here, he renewed his "appeal to
political leaders and the private sector to spare no effort to ensure access to Covid-19
vaccines and to the essential technologies needed to care for the sick, the poor and
those who are most vulnerable." He grounds this appeal on in Catholic theology and
Catholic social doctrine, which "can serve as a 'grammar' of care: commitment to
promoting the dignity of each human person, solidarity with the poor and vulnerable,

---

[8] Address of His Holiness Pope Francis to the Members of the 'Banco Farmaceutico' Foundation,' (September 19,
2020), https://www.vatican.va/content/francesco/en/speeches/2020/september/documents/papa-
francesco_20200919_banco-farmaceutico.html.

[9] Pope Francis, "A Culture of Care as a Path to Peace. Message of His Holiness Pope Francis for the Celebration of
the 54th World Day of Peace," (January 1, 2021),
https://www.vatican.va/content/francesco/en/messages/peace/documents/papa-
francesco_20201208_messaggio-54giornatamondiale-pace2021.html.

Expert Report of M. Therese Lysaught – Page 8

the pursuit of the common good and concern for protection of creation."[10]

(3) **January 2021:** In January 2021, Vatican City became the first country to offer COVID-19 vaccines to all of its citizens and employees.[11] Shortly thereafter, in an intentionally publicized event, Pope Francis and then-Pope-Emeritus Benedict XVI publicly received the vaccines.[12] In doing so, Pope Francis "referred to the vaccination as 'an ethical action, because [if you don't get vaccinated] you are gambling with your health, you are gambling with your life, but you are also gambling with the lives of others.'" He also rejected vaccine refusal. "There is a suicidal denialism that I would not know how to explain," he stated, "but today people must take the vaccine."[13]

(4) **May 2021:** In a May 2021 video message, Pope Francis continued to call for universal access to the COVID-19 vaccines and for the temporary suspension of patent restrictions that were making such universal access difficult.[14]

(5) **August 2021:** On August 17, 2021, Pope Francis released a video message created in conjunction with a number of Spanish-speaking bishops from North and South America designed to combat vaccine refusal. He attributed the existence of the COVID-19 vaccines "to God's grace." He further made clear: "Getting the vaccines that are authorized by the respective authorities is <u>an act of love</u>. And helping the majority of people to do so is an act of love. Love for oneself, love for our families and friends, and love for all peoples. Love is also social and political. There is social love and political love, it is universal….Getting vaccinated is a simple yet profound way to care for one another, especially the most vulnerable."[15] This position echoes the Catholic teaching that charity—self-gift or self-emptying love for the good of others—is, following the example of Jesus and the teaching of Thomas Aquinas, the center of Catholic moral reasoning.

---

[10] Ibid., §6.

[11] Elise Ann Allen, "Vatican Issues Vaccine Mandate for All Employees," *Crux* (December 24, 2021), https://cruxnow.com/vatican/2021/12/vatican-issues-vaccine-mandate-for-all-employees.

[12] "Pope Francis and the Pope Emeritus Receive COVID-19 Vaccine," *Vatican News* (January 14, 2021), https://www.vaticannews.va/en/pope/news/2021-01/pope-francis-benedict-xvi-covid-19-vaccine.html.

[13] Joshua J. McElwee, "Pope Francis Suggests People Have Moral Obligation to Take Coronavirus Vaccine," *NCR* (January 11, 2021), https://www.ncronline.org/vatican/pope-francis-suggests-people-have-moral-obligation-take-coronavirus-vaccine.

[14] Joe McCarthy, "Pope Francis Calls for Universal Access to COVID-10 Vaccines and Lifting of Patent Restrictions," *Global Citizen* (May 8, 2021): https://www.globalcitizen.org/en/content/pope-francis-covid-19-vaccines-vax-live/.

[15] Pope Francis, "Unity Across the Americas," https://www.youtube.com/watch?v=zY5rwTnJF0U, emphasis added.

Expert Report of M. Therese Lysaught – Page 9

(6) **December 2021:** In December 2021, in the face of the Omicron-variant surge, the
Vatican issued a vaccine mandate for all employees.[16] Employees who were not
vaccinated faced possible demotion salary loss, suspension, and more. The mandate
allowed for health exemptions but not religious conscientious exemptions.[17]

(7) **January 2022:** In January 2022, Pope Francis stated that getting vaccinated against the
coronavirus was "a moral obligation."[18] He also decried "ideological divides [that] were
discouraging people from getting vaccinated [and the]...baseless information" that
encouraged such positions. "Vaccines," he noted "represent, in addition to other
treatments that need to be developed, the most reasonable solution for the
prevention of the disease."

24. Thus, the constant teaching and messaging from Pope Francis over 2020-2022 was that
the COVID-19 vaccines were not only morally acceptable, but they were in fact morally
obligatory and, even further, a generous act of Christian charity directed toward the
promotion of the common good both in our own communities and across the globe. He
mandated that all Vatican City employees be vaccinated and championed universal
access to the vaccines, especially for the poor.

B.  The Congregation for the Doctrine of the Faith

25. The Congregation for the Doctrine of the Faith (CDF) concurred with Pope Francis. The
oldest of the Roman Curia's dicasteries, the CDF is responsible for the oversight of all
matters related to doctrine, faith, and morals throughout the Catholic Church.[19] In
December 20, 2020, the CDF issued a statement addressing the moral acceptability of
the COVID-19 vaccines, entitled "Note on the Morality of Using Some Anti-COVID-19
Vaccines."[20] They analyzed the full slate of vaccines that had been in production since

---

[16] Allen, "Vatican Issues Vaccine Mandate for All Employees."

[17] Claire Giangravé, "Vatican Tightens COVID-19 Restrictions, Applies Mandatory Vaccination," *Religious News
Service* (January 12, 2022), https://religionnews.com/2022/01/12/vatican-tightens-covid-19-restrictions-applies-
mandatory-vaccination/.

[18] Associated Press, "On COVID Vaccinations, Pope Says Health Care is a 'Moral Obligation,'" *NPR* (January 10,
2022), https://www.npr.org/2022/01/10/1071785531/on-covid-vaccinations-pope-says-health-care-is-a-moral-
obligation.

[19] See "Dicastery for the Doctrine of the Faith,"
http://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_pro_14071997_en.html. The
organization's name was changed from the "Congregation for the Doctrine of the Faith" to the "Dicastery for the
Doctrine of the Faith" in 2022. Per footnote 5 above, dicasteries could be considered analogous to US government
executive departments, with authority over aspects of the church that fall under their area of expertise. Insofar as
the CDF adjudicates the Church's doctrine and moral law, it could be considered analogous to the US Supreme
Court.

[20] Congregation for the Doctrine of the Faith, "Note on the Morality of Using Some Anti-Covid-19 Vaccines,"

Expert Report of M. Therese Lysaught – Page 10

the beginning of the pandemic, including Pfizer, Moderna, AstraZeneca, Johnson and Johnson. Knowing that some of the vaccines had been produced using two cell lines from fetuses aborted in 1964 and 1970, they concluded that <u>all the vaccines were morally acceptable</u>.

26. Specifically, they stated: "*it is morally acceptable to receive Covid-19 vaccines that have used cell lines from aborted fetuses in their research and production process*" (§2, italics in original). They continued that due to the "grave danger" presented by the "uncontainable spread of a serious pathological agent—in this case, the pandemic spread of the SARS-CoV2 virus that causes Covid-19," "all vaccinations recognized as clinically safe and effective can be used <u>in good conscience</u> with *the certain knowledge that the use of such vaccines does not constitute formal cooperation with the abortion* from which the cells used in production of the vaccines derive" (§3, italics in original, emphasis added). And they emphasized that while vaccination—like all medical interventions and, in fact, all moral actions—is voluntary, "from the ethical point of view, *the morality of vaccination depends not only on the duty to protect one's own health, but also on the duty to pursue the common good*" (§5, italics in the original). It is important to note here that the CDF refers to reasons for being vaccinated as "duties." A duty is an obligation.

27. As is clear from the above, the CDF stated clearly that the COVID-19 vaccines could be used in good conscience. In the penultimate paragraph of the document, the CDF recognizes that some people may refuse vaccination for reasons of conscience, but they do not endorse, encourage, or affirm this position. Instead, they state that these persons "must do their utmost to avoid, by other prophylactic means and appropriate behavior, becoming vehicles for the transmission of the infectious agent. In particular, they must avoid any risk to the health of those who cannot be vaccinated for medical or other reasons, and who are the most vulnerable."[21] In other words, the onus is on those who refuse.

28. Echoing Pope Francis, the CDF also states that there is "a moral imperative for the pharmaceutical industry, governments and international organizations *to ensure that vaccines, which are effective and safe from a medical point of view, as well as ethically acceptable, are also accessible to the poorest countries in a manner that is not costly for them*" (§6, italics in the original). Again, the CDF would not recommend universal access as "a moral imperative" if it held that the vaccines were in any way morally problematic.

---

(December 12, 2020), https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20201221_nota-vaccini-anticovid_en.html.

[21] Ibid., §5.

Expert Report of M. Therese Lysaught – Page 11

29. Thus, the Church's highest doctrinal office made clear that the COVID-19 vaccines were morally acceptable; that they could be used in good conscience; that there was a duty to use them to protect the fundamental goods of health (one's own and others); and that it was morally imperative that they be made universally available.

C.  The Dicastery for the Promotion of Integral Human Development/Vatican COVID-19 Commission and the Pontifical Academy for Life

30. As the scope of the pandemic emerged in March 2020, Pope Francis established the Vatican COVID-19 Commission within the Dicastery for the Promotion of Integral Human Development as a novel, rapid response to the pandemic.[22] The establishment of this Commission denotes the seriousness with which the Holy Father took the pandemic. That he established it indicates that the work of this Commission had his authorization and blessing. The Commission reports directly to the Holy Father.

31. On December 29, 2020, the Vatican COVID-19 Commission, in conjunction with the Pontifical Academy for Life, issued a 20-point action plan on vaccine equity entitled "Vaccine for All. 20 Points for a Fairer and Healthier World."[23] (The Pontifical Academy for Life is the Vatican's academic body with expertise in questions of bioethics). Per the Commission's website, the document examined equity across the full spectrum of vaccine development and deployment, with a particular focus on awareness-building to foster trust in vaccines against the COVID-19 virus.[24]

32. The Vatican COVID-19 Commission confirmed and discussed in greater detail the position of the CDF. As the Commission noted, Pope Francis "has affirmed the need to make the now imminent Covid-19 vaccines available and accessible to all."[25] In analyzing the moral aspects of the "entire 'life cycle'" of vaccine production, the commission concluded that "all clinically recommended vaccinations can be used with a clear conscience and that the use of such vaccines does not signify some sort of cooperation with voluntary abortion" and that vaccination is "a moral responsibility."[26] They reiterate

---

[22] See the Vatican COVID-19 Commission, https://www.humandevelopment.va/en/vatican-covid-19.html; and Vatican COVID-19 Commission, "2020 Year in Review: Preparing the Future," https://www.humandevelopment.va/content/dam/sviluppoumano/general/vatican-covid19-response/reports/2020-EN-AnnualReport-VaticanCovid19Commission.pdf. Again, a dicastery is one of the executive departments of the Vatican administrative state.

[23] Vatican COVID-19 Commission and Pontifical Academy for Life, "Vaccine for All. 20 Points for a Fairer and Healthier World," (December 29, 2020), https://press.vatican.va/content/salastampa/en/bollettino/pubblico/2020/12/29/201229c.html

[24] Ibid., §14.

[25] Ibid., §1.

[26] Ibid., §5, emphasis in the original.

Expert Report of M. Therese Lysaught – Page 12

the claim that vaccination is a "moral responsibility."[27] They make no mention of exemptions for reasons of conscience.

### D.   US Conference of Catholic Bishops

33. Although the US Conference of Catholic Bishops (USCCB) does not have any authoritative standing in and of itself, at times it issues statements that—like all magisterial statements—require respectful consideration by Catholic individuals and organizations in the US.

34. On November 20, 2020, prior to the approval of the Pfizer and Moderna vaccines and prior to the statements by the CDF and the Vatican COVID-19 Commission, the USCCB's "Committee on Doctrine" in conjunction with their "Committee on Pro-Life Activities" issued a memorandum entitled "Vaccines for COVID-10." In that memorandum, they state clearly: "Some are asserting that if a vaccine is connected in any way with tainted cell lines, then it is immoral to be vaccinated with them. This is an inaccurate portrayal of Catholic moral teaching."[28] They cite as evidence for their position three documents issued by Vatican offices prior to the COVID-19 pandemic.

35. On December 11, 2020, the Chairmen of the USCCB Committee on Doctrine and Committee on Pro-Life Activities issued a further statement entitled "Moral Considerations Regarding the New COVID-19 Vaccines." There they reiterate and expand the above position:

> In view of the gravity of the current pandemic and the lack of availability of alternative vaccines, the reasons to accept the new COVID-19 vaccines from Pfizer and Moderna are sufficiently serious to justify their use, despite their remote connection to morally compromised cell lines. In addition, receiving the COVID-19 vaccine ought to be understood as an act of charity toward the other members of our community. In this way, being vaccinated safely against COVID-19 should be considered an act of love of our neighbor and part of our moral responsibility for the common good.[29]

---

[27] Ibid., §13.

[28] Chairmen of the USCCB Committee on Doctrine and Committee on Pro-Life Activities, "Memorandum on Vaccines for COVID-19," (November 20, 2020), https://www.usccb.org/resources/memo-to-bishops-on-vaccines-for-covid-19_0.pdf. Emphasis added.

[29] Chairmen of the USCCB Committee on Doctrine and the Committee on Pro-Life Activities, "Moral Considerations Regarding the New COVID-19 Vaccines," (December 11, 2020), https://www.usccb.org/resources/moral-considerations-covid-vaccines.pdf. They do conclude that the AstraZeneca COVID-19 vaccine is "more morally compromised" and "should be avoided," but that if it is the only one available to a person, "it would be permissible

Expert Report of M. Therese Lysaught – Page 13

36. The US bishops concur with the Pope and the CDF—that all the COVID-19 vaccines are morally acceptable, that getting vaccinated is an act of love (charity), and that being vaccinated is a morally responsibility. They make no mention of exemptions for reasons of conscience.

37. In summary, the top-level Roman Catholic magisterial authorities spoke with one voice regarding the COVID-19 vaccines. Pope Francis, the Dicastery for the Doctrine of the Faith, the Vatican COVID-19 Commission sponsored by the Dicastery for Promoting Integral Human Development, the Pontifical Academy for Life, and the USCCB all concurred: (1) that all available COVID-19 vaccines were morally acceptable to use; (2) that Catholics have a moral responsibility, duty, or obligation to be vaccinated against COVID-19 in order to protect their own lives and health and the lives and health of others from a serious pathogen with no effective treatments; (3) that being vaccinated against COVID-19 was an act of love; and (4) that the Church should work with public bodies to ensure universal access to vaccines. At no time did any of these Roman Catholic authorities in 2020-2022 advocate, recommend, counsel, or approve Catholics seeking exemptions from vaccine mandates. In fact, Pope Francis himself criticized those who did and sought to persuade them otherwise.

38. To, therefore, to conclude that a baptized Catholic would be "required" as a Catholic "to refuse a COVID-19 vaccination" requires a significant distortion, misunderstanding, or misrepresentation of Catholic teaching.

**2. The Position of the National Catholic Bioethics Center**

39. Despite this clear magisterial guidance on the moral acceptability of the COVID-19 vaccines and the moral obligation for Catholics to be vaccinated, the National Catholic Bioethics Center (NCBC)—John Di Camillo's employer— took a position radically at odds with the Roman Catholic Church. The NCBC is a very small, private organization that has no authoritative standing in the Church; they have no authorization to articulate positions that contravene the teachings of the Roman Catholic magisterium.

40. The NCBC's first statement on the COVID-19 vaccines was issued on December 7, 2020—prior to the statements by the CDF, the Vatican COVID-19 Commission, and the USCCB. This position paper was entitled "Points to Consider on the Use of COVID-19 Vaccines."[30]

---

to accept the AstraZeneca vaccine." This, however, was prior to the determinations by the CDF and the Vatican COVID-19 Commission.

[30] NCBC, "Points to Consider on the Use of the COVID-19 Vaccines," (December 8, 2020), https://static1.squarespace.com/static/5e3ada1a6a2e8d6a131d1dcd/t/5fd3ce39e679895094dd1e49/1607716409962/NCBCVaccineStatementFINAL.pdf.

Expert Report of M. Therese Lysaught – Page 14

Rather than being in conversation with the current Roman Catholic magisterium, it drew on older magisterial documents.[31]

41. Their statement opens with the sentence: "<u>The NCBC</u> recognizes an ethical hierarchy among COVID-19 vaccines."[32] In other words, they state clearly that this is their own position and not Roman Catholic teaching.

42. This posited "ethical hierarchy" among the COVID-19 vaccines is based on a pseudo-'quantitative' relationship between the vaccines and cell-lines used in vaccine research, testing, and manufacturing that were derived from two aborted fetuses in the late 1960s and early 1970s.[33] Per their calculus, vaccines can be more or less "morally compromised" based on: (1) whether these cell lines were used in the manufacturing process (most "morally compromised," e.g., AstraZeneca, Johnson & Johnson); (2) whether said-cell lines were not used in the manufacturing process but in, perhaps, the testing phase (medially "morally compromised," e.g., Pfizer, Moderna, Novavax, Sinofi); or (3) whether said-cell lines were not used at all ('morally pure').[34]

43. In their conclusion, they do state that "the NCBC concludes that <u>none of the vaccines currently in development is excluded or forbidden in principle.</u>"[35] But they then go on to categorize the vaccines in groups (1) and (2) above as "lesser" and "graver" evils. They give the impression that these vaccines are somehow morally problematic. They further state that anyone who decides to receive such vaccines "should do so only 'under protest' and should make known their opposition to abortion and to the use of abortion-derived cell lines."[36] They continue that <u>the better moral course</u> is "to provide witness by <u>declining any vaccine that uses abortion-derived cell lines</u> in one or more phases of development or production. Such a decision can be made in good conscience…"[37]

44. Although conscience is only mentioned once in their document, it is mentioned four times in their executive summary:

---

[31] The NCBC statement cites magisterial documents from 2005 and 2008.

[32] NCBC, "Points to Consider on the Use of the COVID-19 Vaccines," p. 1, emphasis added.

[33] See, for example, a chart compiled by the Charlotte Lozier Institute that similarly focuses on this issue: "COVID-19 Vaccine Candidates and Abortion-Derived Cell Lines," https://lozierinstitute.org/wp-content/uploads/2023/01/CHART-Analysis-of-COVID-19-Vaccines-02June21.pdf.

[34] NCBC, "Points to Consider on the Use of the COVID-19 Vaccines," p. 5.

[35] Ibid., p. 5, emphasis added.

[36] Ibid., p. 6.

[37] Ibid., p. 8, emphasis added.

Expert Report of M. Therese Lysaught – Page 15

Nonetheless, for grave reasons, people could decide in good <u>conscience</u> to accept vaccines that use abortion-derived cell lines in their development and production to protect their own lives and health and that of others in the absence of any satisfactory alternative. The use of an ethically problematic vaccine, however, may be done only 'under protest.' A person who discerns in <u>conscience</u> that he or she can take such a vaccine has an obligation to make known his or her opposition to abortion and the use of abortion-derived cell lines. People may legitimately discern in <u>conscience</u> that they cannot use a vaccine with some connection to abortion and such a refusal can be a courageous witness to help build a culture of life. The Catholic Church neither requires nor forbids the use of ethically problematic vaccines, but instead urges people to discern what decision to make after having carefully formed their <u>consciences</u> about the moral and prudential issues surrounding the vaccines that become available. [Emphases added]

45. In sum, in early December 2020, the NCBC took the position that all of the available COVID-19 vaccines were "morally compromised," that Catholics could receive them but only "under protest," and that the more morally preferable or pure position was to refuse them. They simply assert that this is a matter of conscience.

46. They arrived at this position prior to the issuing of the series of authoritative magisterial statements detailed in Section II.1 above. However, after these statements were issued (December 11-29, 2020), the NCBC <u>did not revise</u> their position.

47. Instead, explicitly contravening Roman Catholic magisterial authority, they doubled-down on it. They spearheaded efforts to advance their alternate position and to convince Catholics to request religious exemptions from COVID-19 vaccine requirements. In July 2021, they created and actively disseminated a "Vaccine Exemption Template Letter" that they sent to bishops, advertised in parish bulletins, and distributed through social media networks.[38]

48. That template includes numerous misleading or erroneous statements. For example, it references the CDF's 2008 Instruction entitled *Dignitatis Personae* (On Certain Bioethical Questions) to support the statement:

There is a general moral duty to refuse the use of medical products, including certain vaccines, that are produced using human cells lines derived from direct abortions. It is permissible to use such vaccines

---

[38] NCBC, "Vaccine Exemption Template Letter," (July 7, 2021), https://www.ncbcenter.org/ncbc-news/vaccineletter.

Expert Report of M. Therese Lysaught – Page 16

only under certain case-specific conditions, based on a judgment of conscience.

*Dignitatis Personae* says nothing of the sort. In fact, it says the opposite. While analyzing at length the responsibilities of <u>research professionals</u> vis a vis such cell lines, with regard to patients it merely states: "Grave reasons may be morally proportionate to justify the use of such 'biological material.' Thus, for example, danger to the health of children could permit parents to use a vaccine which was developed using cell lines of illicit origin...."[39] In other words, the CDF describes <u>no</u> "general moral duty to refuse the use of [such] medical products"; it instead explicitly gave patients permission to use them. I know of nowhere in the authoritative Catholic moral tradition where any such "general moral duty" is articulated.

49. This is just one example of the way that the NCBC's vaccine exemption template distorts or misrepresents Catholic teaching. It is important to note that the NCBC was still presenting such faulty guidance <u>seven months after</u> the CDF, the Vatican COVID-19 Commission, and the USCCB had issued their statements and in spite of the constant messaging of Pope Francis which, as outlined earlier, took a radically different position. Crucially, their vaccine exemption template—which is explicitly identified as being <u>for baptized Catholics</u>—makes no mention of Pope Francis and no mention of any of the other documents, except for one line taken out of context from the CDF statement (see Section II.3 below).

**3. <u>Rebutting Di Camillo's Specific Claims</u>**

50. As mentioned earlier, Di Camillo is an employee of the NCBC and assisted in developing their vaccine exemption template.[40] He concludes his opinion that "that if, after due diligence in seeking out and critically assessing medical and moral information pertaining to COVID-19 and the vaccines, Nicholas Rolovich came to a sure judgment in conscience that he should not receive a COVID-19 vaccine, then the teachings of the Catholic Church <u>required</u> that he refuse the vaccine."[41] His conclusion is based on three premises: Roman Catholic teaching on conscience; what he refers to as the "principle of therapeutic proportionality"; and his assessment of Roman Catholic teaching on vaccinations.

51. In my opinion, his presentation of each of these premises is either incomplete or deeply flawed. He omits multiple central aspects of the Roman Catholic teaching on

---

[39] Congregation for the Doctrine of the Faith, *Dignitatis Personae*, §35.

[40] Di Camillo, no. 14.

[41] Di Camillo, no. 47, emphasis added.

Expert Report of M. Therese Lysaught – Page 17

conscience.[42] His "principle of therapeutic proportionality" is idiosyncratic. He omits one of the most central principles of Catholic bioethics for helping patients to make morally-informed decisions about medical interventions—namely, the principle of ordinary and extraordinary means. And his analysis completely ignores the teaching of the Roman Catholic magisterium regarding the moral acceptability of the COVID-19 vaccines and the moral obligation for Catholics to be vaccinated.

(A) <u>Di Camillo Ignores the Relevant Teachings of the Roman Catholic Magisterium Regarding the Moral Acceptability of the COVID-19 Vaccines</u>

52. Di Camillo's opinion fails to mention any of the teaching of the Roman Catholic magisterium regarding the moral acceptability of the COVID-19 vaccines and the moral obligation of Catholics to be vaccinated detailed in Section II.1 above. He does cite one cherry-picked sentence from the CDF's "Note on the Morality of Using Some COVID Vaccines," but he uses in a misleading way (see Section II.3(D) below).[43] The use of this footnote indicates that Di Camillo is familiar with the CDF document but chose to ignore its content. His opinion therefore gives the impression that there was no authoritative magisterial teaching on the moral acceptability/obligatoriness of the COVID-19 vaccines that would have established for a baptized Roman Catholic what <u>the Roman Catholic position</u> on this question was in August 2021.

(B) <u>Di Camillo Misrepresents Roman Catholic Teaching on Conscience</u>

53. Di Camillo's argument centers on Roman Catholic teaching on conscience. The Roman Catholic tradition provides a rich, complex, and nuanced understanding of conscience. In my opinion, Di Camillo's opinion distorts this tradition by presenting only a partial account. His opinion relies almost entirely on the short entry on "moral conscience" in *The Catechism of the Catholic Church*.[44] He omits a key section of that entry; takes that

---

[42] Other reputable and credentialed Catholic bioethicists have also critiqued the NCBC/Di Camillo position and concur with the reasoning presented in this rebuttal. See e.g., Jason T. Eberl and Tobias Winright, "Catholics Have No Grounds to Claim Exemption from COVID Vaccine Mandates," *NCR* (August 17, 2021), https://www.ncronline.org/news/coronavirus/catholics-have-no-grounds-claim-exemption-covid-vaccine-mandates. Peter J. Cataldo provides a particularly thorough critique of the NCBC's misinterpretation of Catholic teaching in "Why the CDF 'Note on the Morality of Using Some Anti-COVID-19 Vaccines' Suggests a Moral Obligation to Receive SARS-COV-2-Vaccines," *HCEUSA* 31, no. 2 (Fall 2023), https://www.chausa.org/publications/health-care-ethics-usa/archive/issue/fall-2021/why-the-cdf-note-on-the-morality-of-using-some-anti-covid-19-vaccines-suggests-a-moral-obligation-to-receive-sars-cov-2-vaccines.

[43] Di Camillo, fn. 22, p. 35.

[44] The *Catechism of the Catholic Church* is a "catechism"—an introductory summary of the teachings of the Catholic Church. Insofar as it only presents a basic account of church teaching, it is generally not used in professional theological analysis. The *Catechism* was fully revised in 1992 and is periodically updated as Church teaching evolves. The *Catechism* is available online via the Vatican website: https://www.vatican.va/archive/ENG0015/_INDEX.HTM.

Expert Report of M. Therese Lysaught – Page 18

entry out of context of relevant teachings in the *Catechism* itself; and similarly omits to mention aspects of Roman Catholic teaching on conscience detailed in other authoritative church documents that he cites. In the following, I detail what he has omitted.

(1)  Di Camillo Omits a Key Section of the *Catechism's* Entry on "Moral Conscience"

54. The *Catechism of the Catholic Church* summarizes the Church's teaching on conscience in §§1776-1802.[45] These paragraphs outline four aspects of the Church's teaching: what conscience is; that and how conscience is to be formed; how to choose in accord with conscience; and erroneous judgement.

55. Di Camillo's opinion repeats claims from §§1776-1789 in a superficial and selective manner. He correctly states that conscience is held to be an important human faculty,[46] but he does not emphasize that conscience is crucially "a judgement of reason."[47] He selectively highlights sentences about a person's "duty" to obey one's conscience (the *Catechism* does not use the word "duty").[48]

56. He reprises parts of the *Catechism's* emphasis on the formation of conscience.[49] He cites one of the key emphases of this section—namely, that to form one's conscience well requires respectful dialogue with "the authoritative teaching of the Church"[50]; and further that "The education of conscience is indispensable for human beings who are subjected to negative influences and tempted by sin to prefer their own judgement and to reject authoritative teachings."[51] But, although he quotes these passages, they play no role in his analysis.

57. His summary of the Church's position on conscience ends with the first sentence from §1790: "A human being must always obey the certain judgement of his conscience." That is the first line of an section on "Erroneous Judgement," a section that he omits in

---

[45] *Catechism of the Catholic Church,* "Moral Conscience," §§1776-1802, http://www.scborromeo.org/ccc/p3s1c1a6.htm.

[46] Di Camillo, nos. 21-24.

[47] *Catechism of the Catholic Church,* §1776.

[48] Di Camillo, nos. 25-27.

[49] Di Camillo, nos. 28-29.

[50] *Catechism of the Catholic Church,* §1785, §1788.

[51] *Catechism of the Catholic Church*, §1783, emphasis added.

Expert Report of M. Therese Lysaught – Page 19

its entirety.[52] Catholic teaching holds that simply because one chooses in accord with one's conscience, that does not mean that one has chosen correctly or morally.[53] As the *Catechism* notes, conscience can be wrong due to ignorance[54] or personal responsibility.[55] It states specifically: "In such cases, the person is culpable for the evil he commits."[56] Among "the sources of errors of judgement in moral conduct," the *Catechism* includes: "ignorance [due to]…when a man 'takes little trouble to find out what is true and good'" as well as "bad example given by others, enslavement to one's passions, assertion of a mistaken notion of autonomy of conscience, rejection of the Church's authority and her teaching, lack of conversion and charity."[57] If the person is not responsible for their errors, they are less culpable, but their action "remains no less an evil, a privation, a disorder."[58] It remains the responsibility of all to "correct the errors of moral conscience" in themselves and others.[59]

58. Therefore, just because one follows one's conscience does not mean that one's conscience was correct or that one's action was morally good. In addition, as Peter Cataldo, a conservative and respected Catholic bioethicist, notes, the obligation to follow one's conscience "does not include a certain conscience that is based on negligent ignorance of the facts. The only erring judgement of conscience to which one is still morally bound to follow is that judgement in which one is excusably ignorant of the facts."[60] More specifically:

> Catholic teaching recognizes that the proper formation of conscience in part relies on human reason; in the context of vaccines for SARS-CoV-2, the resources of reason on which the formation of conscience depends include peer-reviewed scientific evidence presented by legitimate scientific sources and authorities. The moral obligation to obey one's certain conscience is applicable if, and only if, one

---

[52] *Catechism of the Catholic Church,* §§1790-1794.

[53] "Faced with a moral choice, conscience can make either a right judgement in accordance with reason and the divine law, or, on the contrary, an erroneous judgement that departs from them" (§1786).

[54] *Catechism of the Catholic Church*, §1790.

[55] *Catechism of the Catholic Church*, §1791.

[56] *Catechism of the Catholic Church*, §1791.

[57] *Catechism of the Catholic Church*, §1791-2, emphasis added.

[58] *Catechism of the Catholic Church*, §1793.

[59] *Catechism of the Catholic Church*, §1793.

[60] Cataldo, 2023, citing Thomas Aquinas, *Summa Theologica,* I-II, q. 19, a. 5, a. 6.

Expert Report of M. Therese Lysaught – Page 20

has a certain conscience that is not negligently ignorant of the facts.[61]

59. Thus, Di Camillo entirely omits the *Catechism's* teaching that conscience can be wrong as well as Catholic teaching on negligent (or "vincible") ignorance. Nor does he discuss a person's responsibility to accept the consequences of following their conscience, whether their conscience was correct or not (I will address this further in Section II.4 below).

(2) Di Camillo Omits the *Catechism's* Statements that Conscience Formation Requires Adherence to Authoritative Church Teaching

60. As mentioned above, Di Camillo cites the *Catechism's* counsel that proper formation of conscience requires adhering to the authoritative teachings of the Church and that for Catholics to reject said-teachings is a sin. But he then proceeds to ignore this component. This omission becomes even more glaring when one reads the entry on moral conscience in context of the *Catechism* as a whole, as of course, one must. For the *Catechism* repeatedly emphasizes that individual Catholics are required to follow the guidance of authoritative Catholic teaching, particularly to the guidance of the Pope. To give just a few examples, as the *Catechism* notes elsewhere:

When "the Bishop of Rome…proposes in the exercise of the ordinary Magisterium a teaching that leads to better understanding of faith and morals…the faithful 'are to <u>adhere to it with religious assent</u>.'"[62]

The faithful "<u>have the duty of observing the constitutions and decrees conveyed by the legitimate authority of the Church</u>. Even if they concern disciplinary matters, these determinations call for docility in charity."[63]

"At the same time the conscience of each person should avoid confining itself to individualistic considerations in its moral judgments of the person's own acts. As far as possible conscience should take account of the good of all, as expressed in the moral law, natural and revealed, and consequently in the law of the Church and in the authoritative teaching of the Magisterium on moral questions. <u>Personal conscience and reason should not be set in opposition to the moral law or the Magisterium of the Church</u>."[64]

---

[61] Ibid. The *Catechism* says nothing about 'critically assessing information from various sources' or "judgements about the credibility of sources"; that is Di Camillo's particular gloss and the main criterion he uses to evaluate Mr. Rolovich's decision, even though he does not review any component of Mr. Rolovich's decision-making process (Di Camillo, no. 30).

[62] *Catechism of the Catholic Church*, §892, emphasis added.

[63] *Catechism of the Catholic Church*, §2037, emphasis added.

Expert Report of M. Therese Lysaught – Page 21

> (3)  Di Camillo Omits the Second Vatican Council's Teaching that Individual Conscience Formation Requires Adherence to Authoritative Church Teaching

61. The *Catechism* draws these statements from the Catholic tradition more broadly, including two authoritative documents that Di Camillo cites in his report. First, Di Camillo cites two lines from the Second Vatican Council's Declaration *Dignitatis Humanae* to suggest that a person ought not be prevented from following her or his conscience.[65] But he omits the Council's clear and specific directive that:

> In the formation of their consciences, the Christian faithful ought carefully to attend to the sacred and certain doctrine of the Church….It is her duty to give utterance to, and authoritatively to teach, that truth which is Christ Himself, and also to declare and confirm by her authority those principles of the moral order which have their origins in human nature itself.[66]

62. This same position is also articulated in another document that Di Camillo cites, the Second Vatican Council's Pastoral Constitution on the Church in the Modern World (*Gaudium et Spes*).[67] Again he omits the Constitution's injunctions about the authority of Church teaching vis a vis the consciences of lay Catholics:

> Let the layman not imagine that his pastors are always such experts, that to every problem which arises, however complicated, they can readily give him a concrete solution, or even that such is their mission. Rather [they should be] enlightened by Christian wisdom and giving close attention to the teaching authority of the Church….[68]

> …[with regard to reproductive questions] spouses should be aware that they cannot proceed arbitrarily, but must always be governed according to a conscience dutifully conformed to the divine law itself, and should be submissive toward the Church's teaching office, which authentically interprets that law in the light of the Gospel.[69]

---

[64] *Catechism of the Catholic Church*, §2039, emphasis added. See also §937, §2032, et passim.

[65] Di Camillo, no. 27.

[66] Second Vatican Council, *Dignitatis Humanae*, §14.

[67] Di Camillo, no. 22, no. 26.

[68] Second Vatican Council, *Gaudium et Spes,* §44.

[69] Ibid., §50.

Expert Report of M. Therese Lysaught – Page 22

63. More examples could be adduced,[70] but in sum, Di Camillo presents only a partial and therefore misleading account of the Roman Catholic teaching on conscience. Multiple authoritative sources of church teaching explicitly state that adequate conscience formation requires adherence to the authoritative teaching of the Church and that "rejection of the Church's authority" results in <u>culpable</u> error. Di Camillo's opinion makes no mention of the authoritative teaching of the Roman Catholic Church regarding the COVID-19 vaccines.

Conscience, as presented by Di Camillo, has become exactly what the *Catechism* and the Catholic Church rejects—"a mistaken notion of autonomy of conscience" that "'takes little trouble to find out what is true or good'" "set in opposition to the Magisterium of the Church"—an authority unto itself that can override the Pope and authoritative teaching.

64. It is also worth noting that, even when it comes to applying his own (mistaken) view of the Church's teaching on conscience, Di Camillo does not attempt to analyze Rolovich's actual process for informing his conscience. Instead, he merely opines (incorrectly) that Rolovich would be required to refuse the vaccine *"if,* after due diligence in seeking out and critically assessing medical and moral information pertaining to COVID-19 and vaccines" he determined he should not receive the vaccine.[71] But Di Camillo does not appear to have spoken with Rolovich or reviewed any documents relevant to Rolovich's process for due diligence for assessing the relevant medical and moral information regarding the COVID-19 vaccines.

(C) <u>Di Camillo's Principle of "Therapeutic Proportionality" Is Idiosyncratic</u>

65. The putative principle of "therapeutic proportionality" plays a significant role in Di Camillo's opinion. I have worked in Catholic bioethics for three decades, and I had never heard of this principle until I saw it referenced in the NCBC vaccine exemption template in 2021. As far as I can tell, this is an idiosyncratic principle advanced by the NCBC. Per my research, although the NCBC uses it frequently, references to a principle of "therapeutic proportionality" appear only six times in the literature since 2004.[72]

---

[70] See, e.g., Catholic Church, *Code of Canon Law*, c. 752: "Not indeed an assent of faith, but yet a religious submission of mind and will must be given to the teaching which either the Supreme Pontiff or the College of Bishops pronounce on faith or on morals when they exercise the authentic Magisterium even if they do not intend to proclaim it by a definitive act." See also Fr. William Most, "Four Levels of the Church's Teaching," *ETWN* (n.d.), https://www.ewtn.com/catholicism/library/four-levels-of-the-churchs-teaching-12242.

[71] Di Camillo, no. 47.

[72] A search on "therapeutic proportionality" in the ATLA database (the main database of literature on religion and theology, including Catholic theology) produced no citations. A search on PubMed (the main database of medical and bioethics literature) produced only 6 citations. A Google search produced one additional citation.

Expert Report of M. Therese Lysaught – Page 23

66. This 'principle' appears to me to be an idiosyncratic rephrasing of a concept that is fundamental to both secular and Catholic clinical ethics, namely, cost/benefit or, in Catholic terminology, proportionate/disproportionate analysis.[73] Central to clinical decision-making is that the benefits of a particular medical intervention should outweigh the burdens (costs). The person to weigh the relationship between benefits and burdens is the patient. The patient is to receive, "all <u>reasonable</u> information" regarding possible as to the burdens and benefits so that they are properly 'informed,' and morally, they must do their best to make an objective, reasonable decision.[74]

67. The criterion of proportionality is affirmed in the *Ethical and Religious Directives for Catholic Health Care Services*[75] as is the centrality of informed consent.[76] The *Ethical and Religious Directives for Catholic Health Care Services* (ERDs) is an authoritative document containing doctrinal, moral, and sacramental guidelines for Catholic health care institutions issued by the US Conference of Catholic Bishops. Any health care organization that wishes to identify itself as a Catholic entity must adhere to the ERDs.

68. While Di Camillo correctly notes that, per the ERDs, a patient's informed consent requires "access to moral information,"[77] he again omits that, <u>per the ERDs</u>, a key source of such "moral information" is (for Catholics) the Church. As the ERDs note:

> In a time of new medical discoveries, rapid technological developments, and social change, what is new can either be an opportunity for genuine advancement in human culture, or it can lead to policies and actions that are contrary to the true dignity and vocation of the human person. In

---

[73] While the NCBC employs this concept of "therapeutic proportionality" in their July 2021 vaccine exemption template, at that time they made no mention of considering the COVID-19 vaccines to be "experimental." It does appear that subsequently (in 2022), this became one of their talking points and they began to analyze the vaccines not using the standards for clinical medicine but for medical research. We see this in their April 28, 2022 "Updated Statement on COVID-19 Vaccine Mandates" (https://www.ncbcenter.org/ncbc-news/updatedvaccinestaement ) and the corresponding press release, "The NCBC Updates Its Statement on COVID-19 Vaccine Mandates to Include Children and Vulnerable Persons," (https://static1.squarespace.com/static/5e3ada1a6a2e8d6a131d1dcd/t/626aec4023d5e80ec1de04a3/1651174464 308/Press+Release+Vulnerable+Persons.pdf ) which refers to the "exploitation" of children (apparently via vaccination) and notes that "The updated NCBC statement also recalls the higher ethical standards required in medical research." This shift also appears in Di Camillo's opinion, no. 34.

[74] US Conference of Catholic Bishops, *The Ethical and Religious Directives for Catholic Health Care Services* (2018), Directive no. 27, https://www.usccb.org/resources/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06_0.pdf. This document is referred to as the ERDs, and this abbreviation will be used going forward.

[75] See Directives 30, 33, 47, 49, 50, 51, 56, 57 and the Introduction to Part V of the 6th edition of the ERDs.

[76] ERDs, Directives 26, 27, et passim.

[77] Di Camillo, no. 35.

Expert Report of M. Therese Lysaught – Page 24

consultation with medical professionals, <u>church leaders</u> review these developments, judge them according to the principles of right reason and the ultimate standard of revealed truth, and <u>offer authoritative teaching and guidance about the moral</u> and pastoral <u>responsibilities entailed by the Christian faith</u>. While the Church cannot furnish a ready answer to every moral dilemma, there are many questions about which she provides normative guidance and direction.

69. The COVID-19 vaccines are an excellent example of one of these questions. Throughout his opinion,[78] Di Camillo simply omits this requirement that Mr. Rolovich's moral assessment must respect the magisterium's normative guidance and direction regarding the morally obligatory nature of the COVID-19 vaccines.

70. But while proportionality is an important criterion for Catholic clinical assessment, it never stands alone. It is a subcomponent of a more important principle that helps determine whether a medical intervention is morally obligatory or not.

(D) <u>Di Camillo Entirely Omits the Principle of Ordinary and Extraordinary Means</u>

71. Di Camillo's third section—"Teachings of the Roman Catholic Church on Vaccination in General"—is just bafflingly incorrect. His opinion, again, misleads by presenting only part of the teaching on this question. And it requires <u>entirely ignoring</u> the Church's well-established principle of ordinary and extraordinary means. This principle is found in the ERDs, in nearly every textbook of Catholic bioethics and in the majority of clinical case analyses conducted by professional Catholic bioethicists.

72. First, Di Camillo states that vaccinations "must be voluntary"—full stop.[79] This is a deceptive claim insofar as per both Catholic and secular bioethics, all medical interventions must always be voluntary. One cannot force a patient to accept a medical intervention involuntarily. That does *not*, however, mean that for the Church, some medical interventions are not at the same time voluntary <u>and</u> morally obligatory.

73. To make these determinations, the Church provides individual Catholics (patients, providers, ethicists, etc.) with the principle of ordinary and extraordinary means. Interventions that can be considered "ordinary" means are held to be "morally obligatory." Interventions that are considered "extraordinary" are not. This is clearly stated in the ERDs, and <u>Di Camillo simply omits it</u>.

---

[78] Di Camillo, nos. 31-41.

[79] Di Camillo, no. 42.

Expert Report of M. Therese Lysaught – Page 25

74. As the ERDs note, the Catholic tradition has long taught that "every person is <u>obliged</u> to use ordinary means to preserve his or her health."[80] Because of the sacredness of human life, voluntarily protecting our own life and health is an overriding theological and moral commitment.[81] Thus, in the Catholic tradition, a medical intervention can be both voluntary and 'morally obligatory'—and many are.

75. The ERDs define ordinary means:

> A person has a <u>moral obligation</u> to use ordinary or proportionate means of preserving his or her life. Proportionate [ordinary] means are those that in the judgment of the patient offer a reasonable hope of benefit and do not entail an excessive burden or impose excessive expense on the family or the community.[82]

They continue:

> A person may forgo extraordinary or disproportionate means of preserving life. Disproportionate [extraordinary] means are those that in the patient's judgment do not offer a reasonable hope of benefit or entail an excessive burden, or impose excessive expense on the family or the community.

76. The key terms here are: reasonable and excessive. The COVID-19 vaccines very quickly proved to be highly effective at preventing serious illness, hospitalization, and death from a highly infectious disease that can have serious, long-term or even fatal outcomes and for which there is still no effective treatment. Clearly, they met the bar for reasonable hope of benefit. They do not impose any significant burdens or risks for recipients without medical contraindications, and they were free of charge in the US. Authoritative magisterial guidance concluded that there are no overweening moral obstacles that would change this calculus.

77. Unlike any other medical treatment, vaccines also have the additional benefit that they protect not only the patient but also other people—our immediate families and those we encounter in our communities, particularly those who more vulnerable, preserving their health and life as well. Thus, for vaccines, the benefit/cost ratio is even greater. Consequently, for those without medical contraindications, vaccines are not merely ordinary treatment—the moral obligation to be vaccinated is even greater.

---

[80] ERDs, Directive 32, emphasis added.

[81] ERDs, General Introduction.

[82] Directive 56, emphasis added.

Expert Report of M. Therese Lysaught – Page 26

It was via the principle of ordinary and extraordinary means that the authoritative bodies in the Roman Catholic magisterium deemed the COVID-19 vaccines morally obligatory (Pope Francis), a duty (the CDF), or a moral responsibility (the Vatican COVID-19 Commission and the USCCB).

78. Finally, it is again misleading to suggest that the Church has not taken a position on vaccination. It offered a clear and consistent position on the COVID-19 vaccines, as detailed in Section II.1 above. In addition, neither vaccines nor vaccine mandates are new.[83] The Catholic Church has never opposed state vaccination mandates. Catholic colleges and universities have been mandating a variety of vaccines for decades, even vaccines developed and manufactured in the same way as the COVID-19 vaccines.[84]

Therefore, vaccination overwhelmingly meets the criteria to be considered ordinary treatment and thus, as the consensus of magisterial commentary has noted, any reasonable Catholic who has formed their conscience well should consider it morally obligatory.

**4.** <u>**The Costs of Conscience in the Roman Catholic Tradition**</u>

79. One final aspect of the Roman Catholic teaching on conscience must be mentioned briefly. Catholic teaching on conscience is both old and new. The theoretical frame for the concept was developed most clearly in the work of the 13th century theologian, Thomas Aquinas. After that, the concept had a mixed history in the Catholic tradition. Over the centuries, the Roman Catholic Church punished many martyrs and people of other faiths who sought to conscientiously exercise their religious freedom. The concept had a mixed history even in the 19th and early 20th centuries, until it was revivified by the Second Vatican Council in the 1960s.[85]

80. Behind this history is an aspect of conscience omitted from Di Camillio's account: that while individuals have a right to conscience, that right entails responsibilities and,

---

[83] Kevin Malone and Alan R. Hinman, "Vaccination Mandates: The Public Health Imperative and Individual Rights," in *Law in Public Health Practice*, 2nd ed., ed. Richard A. Goodman, et al. (Oxford University Press, 2007), 338-360, https://www.cdc.gov/vaccines/imz-managers/guides-pubs/downloads/vacc_mandates_chptr13.pdf.

[84] See, e.g., the University of Notre Dame, "Immunization FAQs," (accessed July 19, 2024), https://uhs.nd.edu/for-incoming-students/immunization-faqs/. In 2021, per state mandates, this list also included the COVID-19 vaccines. Similar requirements can be found on the websites of most Catholic educational and health care institutions including all three Catholic universities in Washington state, Seattle University (https://www.seattleu.edu/life-at-seattle-u/health-wellness/student-health-center/immunizations/), St. Martin's University (https://www.stmartin.edu/student-life/student-wellbeing/health-services), and Gonzaga University (https://www.gonzaga.edu/student-life/health-well-being/health-counseling-services/resources/vaccinations).

[85] See, e.g., David DeCosse and Kristin Heyer, eds., *Conscience and Catholicism: Rights, Responsibilities, and Institutional Responses* (Orbis Books, 2015).

Expert Report of M. Therese Lysaught – Page 27

correlatively, consequences. For example, prior to the Second Vatican Council, the Church largely opposed the practice of Catholic conscientious objection to war.[86] The Church raised no objections to governments that jailed Catholics who conscientiously objected to participating in war for pacifist reasons. During the Vietnam War era, the Church began to recognize the moral rights of Catholics who conscientiously objected to war and refused conscription, burned draft cards,[87] or threw blood on nuclear war heads.[88] But they equally acknowledged that such conscientious objectors must face the consequences of their actions—e.g., to serve time in prison. While the Church now has given qualified support to military conscientious objection, it recognizes that such a stance may incur "consequences to person and career," and it agrees that those who object for reasons of conscience must be willing to participate in some sort of alternative service, even if it is still part of the 'war machine' to which they object.[89] The US Government requires military conscientious objectors to go through a rigorous process in which they first detail in writing and/or via a personal presentation how they arrived at their beliefs, the influence those beliefs have had on how they live their lives.[90] The Catholic Church supports such a process.[91] Signing a pre-fabricated template form is not sufficient.

81. This position is rooted in an affirmation of political governance as necessary for human flourishing. Within Catholic theology, there is at least a *prima facie* assumption that polities act for the common good and that citizens have a responsibility to cooperate with such authorities. The Second Vatican Council affirms this in, again, their remarks on conscience:

---

[86] See, e.g., Jeremy Kessler, "The Legal Origins of Catholic Conscientious Objection," *William and Mary Bill of Rights Journal*, 31, no. 2 (2022-2023), 380, https://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=2031&context=wmborj; and Rachel M. Johnston-White, "A New Primacy of Conscience? Conscientious Objection, French Catholicism, and the State During the Algerian War," *Journal of Contemporary History* 54, no. 1 (2019): 112-138.

[87] "The Catonsville Nine," https://en.wikipedia.org/wiki/Catonsville_Nine

[88] Mary Ann Mueller and Ann Brown, "The Plowshares Eight: Thirty Years On," *Waging Nonviolence* (September 9, 2010), https://wagingnonviolence.org/2010/09/the-plowshares-8-thirty-years-on/

[89] See, e.g., the very different tenor in the USCCB statements from 1969 (https://www.usccb.org/resources/statement-catholic-conscientious-objector-division-world-justice-and-peace-october-15) and 2014 (https://www.usccb.org/resources/conscientious-objection).

[90] US Selective Service System, "Conscientious Objectors," https://www.sss.gov/conscientious-objectors/.

[91] Catholic Peace Fellowship, "The Church and Conscientious Objection," http://www.catholicpeacefellowship.org/downloads/conscientious_objection_sheet.pdf. Notably, Mr. Rolovich did not provide answers to any of the legitimate questions WSU asked him on their religious exemption application form, questions that were similar to the US Selective Service conscientious objector process. Insofar as he could not or would not provide justification for his position, it raises a question of whether his conscience was sufficiently well-formed, per Catholic teaching.

Expert Report of M. Therese Lysaught – Page 28

The political community exists, consequently, for the sake of the common good, in which it finds its full justification and significance, and the source of its inherent legitimacy....Yet the people who come together in the political community are many and diverse, and they have every right to prefer divergent solutions. If the political community is not to be torn apart while everyone follows his own opinion, there must be an authority to direct the energies of all citizens toward the common good, not in a mechanical or despotic fashion, but by acting above all as a moral force which appeals to each one's freedom and sense of responsibility.

It is clear, therefore, that the political community and public authority are founded on human nature and hence belong to the order designed by God, even though the choice of a political regime and the appointment of rulers are left to the free will of citizens. It follows also that political authority, both in the community as such and in the representative bodies of the state, must always be exercised within the limits of the moral order and directed toward the common good—with a dynamic concept of that good—according to the juridical order legitimately established or due to be established. <u>When authority is so exercised, citizens are bound in conscience to obey</u>.[92]

This position is also included in the *Catechism*, but again, Di Camillo does not cite it.[93]

82. The Church also reserves the right to impose consequences on those who conscientiously object to its teachings or authority structure. Especially over the last decade, Catholic politicians in the US who—in conscience—vote for legislation supporting abortion rights because such legislation represents the wishes of their constituencies have been denied communion and/or threatened with excommunication by a handful of bishops.[94]

83. The Church also inflicts employment consequences on those who follow their consciences within Catholic institutions. For example, in October 2021, the Vatican inflicted employment consequences on those employees who refused to receive the COVID vaccines when the Vatican instituted its vaccine mandate—either suspending them until they were vaccinated or allowing them to leave their positions.[95] In the US,

---

[92] Second Vatican Council, *Gaudium et Spes*, §74, emphasis added.

[93] *Catechism*, §§1897-1927, http://www.scborromeo.org/ccc/p3s1c2a2.htm#1906.

[94] "Eucharist Denial to Catholic Politicians Over Abortion," *Wikipedia*: https://en.wikipedia.org/wiki/Eucharist_denial_to_Catholic_politicians_over_abortion

[95] Ivana Saric, "Swiss Guards Leave Corps in Order to Avoid Vatican Vaccine Mandate," *Axios* (October 3, 2021), https://www.axios.com/2021/10/03/swiss-guards-covid-vaccine-switzerland

Expert Report of M. Therese Lysaught – Page 29

employees (whether Catholic or not) who follow their consciences are regularly terminated by Catholic employers, and the US courts have regularly supported these consequences.[96] In July 2024, Cardinal Carlo Maria Vigano, the former Papal Nuncio to the US (a very prominent church position) was excommunicated for his consistent vocal conscientious objection to Pope Francis' legitimacy.[97] In November 2023, the bishop of Tyler, Texas, was removed from his position for similar reasons.[98]

5. **Conclusion**

84. Based on the foregoing, it is my opinion that Di Camillo is incorrect that Mr. Rolovich was required to refuse the COVID-19 vaccine based on his Roman Catholic faith. To reach his conclusion, he misrepresents Roman Catholic teaching on conscience, taking sentences and passages out of context and omitting key aspects of the teaching that is included in the very documents he cites. He makes no mention of the fact that Catholic teaching acknowledges that the practice of following one's conscience—whether well-formed or erroneous—may have serious civil, ecclesiastical, or employment consequences.

85. He entirely ignores the teaching promulgated by Pope Francis, the Dicastery for the Doctrine of the Faith, the Vatican COVID-19 Commission sponsored by the Dicastery for Promoting Integral Human Development, the Pontifical Academy for Life, and the USCCB which all concurred: (1) that all available COVID-19 vaccines were morally acceptable to use; (2) that Catholics have a moral responsibility, duty, or obligation to be vaccinated against COVID-19 in order to protect their own lives and health and the lives and health of others from a serious pathogen with no effective treatments; (3) that being vaccinated against COVID-19 was an act of love; and (4) that the Church should work with public bodies to ensure universal access to vaccines. He fails to mention that at no time did any of these Roman Catholic authorities in 2020-2022 advocate, recommend, counsel, or approve Catholics to seek exemptions from vaccine mandates. In fact, Pope

---

[96] For just two of many examples, see "North Carolina Catholic School Had Right to Fire Gay Teacher Who Announced Wedding Online, Court Rules," *CBS News* (May 10, 2024), https://www.cbsnews.com/news/north-carolina-catholic-school-fired-gay-teacher-lonnie-billard-wedding-court-ruling/; and David K. Li and Yasmeen Persaud, "Catholic School Had Legal Right to Fire Unmarried, Pregnant Teacher, New Jersey Court Rules," *NBC News* (August 16, 2023), https://www.nbcnews.com/news/crime-courts/new-jersey-high-court-sides-catholic-school-teacher-fired-premarital-s-rcna100232. See also New Ways Ministries, "Employees of Catholic Institutions Who Have Been Fired, Forced to Resign, Had Offers Rescinded, or Had Their Jobs Threatened Because of LGBT Issues," (updated September 21, 2021): https://www.newwaysministry.org/issues/employment/employment-disputes/.

[97] Christopher White, "Archbishop Vigano Found Guilty of Schism, Excommunicated by Vatican," *NCR* July 5, 2024: https://www.ncronline.org/vatican/vatican-news/archbishop-vigan-found-guilty-schism-excommunication-vatican.

[98] Nicole Winfield, "Pope Francis Removes a Leading US Conservative Critic as Bishop of Tyler, Texas," *AP* (November 11, 2023), https://apnews.com/article/pope-tyler-bishop-strickland-removed-0f9f0be7d5938b36d6e7ead8c33e5150.

Expert Report of M. Therese Lysaught – Page 30

Francis himself criticized those who did and sought to persuade them otherwise.

86. He utilizes an idiosyncratic concept while omitting one of the most central principles of Catholic bioethics—the principle of ordinary and extraordinary means—which is used to determine which medical inventions are morally obligatory.

87. Finally, Di Camillo does not even attempt to analyze or evaluate the actual process by which Mr. Rolovich formed his conscience and came to his judgement to determine whether or not it met the criteria for a well-formed conscience in the Catholic tradition.

88. Thus, in my opinion, to conclude that a baptized Catholic could be "required" as a Catholic to refuse COVID-19 vaccination requires a significant distortion, misunderstanding, or misrepresentation of Catholic teaching.

APPENDIX 1

# M. THERESE LYSAUGHT, PhD

Neiswanger Institute for Bioethics
Stritch School of Medicine, Loyola University Chicago
Pontifical Academy for Life
mlysaught@luc.edu

## EDUCATION

| | | | |
|---|---|---|---|
| PhD | Religion/Theological Ethics | Duke University | 1992 |
| MA | Theology | University of Notre Dame | 1986 |
| BS | Chemistry | Hope College | 1985 |

## TENURED TEACHING & RESEARCH APPOINTMENTS

| | |
|---|---|
| 2013- | Professor, Neiswanger Institute for Bioethics and Health Policy, Stritch School of Medicine; Institute of Pastoral Studies, Loyola University Chicago (joint appointment) |
| 2012-2013 | Visiting Scholar, Catholic Health Association |
| 2007-2013 | Associate Professor, Marquette University, Department of Theology |
| 1995-2007 | Assistant/Associate Professor, University of Dayton, Dept. of Religious Studies |
| 1995 | Postdoctoral Research Fellow, Department of Pediatrics & Genetics, College of Medicine, University of Iowa |
| 1994 | NIH Fellow, Program in Molecular and Clinical Genetics, Program in Biomedical Ethics University of Iowa, funded by the National Institutes of Health (NIH), National Center for Human Genome Research (NCHGR), Ethical, Legal, and Social Implications Program (ELSI) |
| 1992-1994 | Associate, The Park Ridge Center for Health, Faith, and Ethics |

Expert Report of M. Therese Lysaught – Page 32

**ACADEMIC ADMINISTRATION**

| | |
|---|---|
| 2014-2018 | Associate Dean, Institute of Pastoral Studies, Loyola University Chicago |
| 2011-2012 | Director of Graduate Studies, Department of Theology, Marquette University |
| 2008-2010 | Assistant Chair, Department of Theology, Marquette University |
| 1999-2000 | Interim Director of Graduate Studies, Dept. of Religious Studies, Univ. of Dayton |

**CONSULTING & FACILITATION**

| | |
|---|---|
| 2024 | St. Norbert College, Moral Analysis of Health Plan Coverage |
| 2023 | Peace Health, Moral Analysis |
| 2023- | External Member, Dissertation Committee, Sarah Kothe, Candler School of Theology, Emory University: "Catholic Bioethics and Aging: An Ethnographic Study of the Moral Projects of Seniors in Assisted Living" |
| 2022 | St. Xavier University, Moral Analysis of Health Plan Coverage |
| 2022-2023 | External Member, Dissertation Committee, AM Sutherland, University of Kwazulu-Natal, South Africa: "Intertwined Lives: Reconstructing Life After the Death of a Son: An Autoethnography of a Pastoral Counselor and Mother" |
| 2020- | CMMB, Project Lead and Facilitator for "Building Resiliency," Initiative for Zambia, South Sudan, Haiti, Kenya, and Peru. |
| 2020 | Expert Witness, *Capello v. Franciscan Alliance, Inc.* |
| 2019- | CHA Ministry Assessment External Evaluator |
| 2018-2019 | American Association for the Advancement of Science, Science for Seminaries Grant, Content Advisor for Sacred Heart Seminary, Milwaukee, WI |
| 2018-2019 | Department of Religious Studies, Cardinal Stritch University, Milwaukee, WI: Revisioning and restructuring of newly launched graduate program in pastoral ministry. |
| 2018 | Expert Witness, *Romero v. Romero,* LA Superior Court |

Expert Report of M. Therese Lysaught – Page 33

| | |
|---|---|
| 2017- | Global Faith-Based Health Systems: Integrating Technology and Empowering Communities: Georgetown University and the Fondazione Bruno Kessler (Trento, Italy) |
| 2017 | Expert Witness, *Smith v. OSF HealthCare System* |
| 2016 | Trinity Health, Ethics Function Design |
| 2014-2015 | Co-chair, Loyola University Chicago Strategic Plan Steering Committee, Plan 2020 |
| 2015 | Expert Witness, *Medina v. CHI* |
| 2014 | Expert Witness, *Chavies v. Catholic Health East* |
| 2014 | Presence Health, Ministry Leadership Formation Design Team |
| 2013-2014 | Catholic Health East/Trinity Health Ministry Leadership Formation Design Team |
| 2013 | Catholic Health East, Catholic Social Practices Webinar Series Design and Implementation |
| 2013 | Trinity Health, Moral Analyses of Outsourcing and Clinically Integrated Networks |
| 2010 | Catholic Healthcare West, Moral Analysis of a Case at St. Joseph's Hospital, Phoenix |
| 2000-2007 | Ethics Committee, Good Samaritan Hospital, Dayton, Ohio |
| 2000-2007 | Executive Committee, Greater Dayton Healthcare Ethics Consortium |

---

**EDITORIAL & ADVISORY POSITIONS**

| | |
|---|---|
| 2023- | International Bioethics Group |
| 2023- | PACTPAN (Pan-African Catholic Theology and Pastoral Network), Health and Healing Unit |
| 2022 | Catholic Health Association Working Group on the Principle of Double Effect |
| 2020- | Pontifical Academy for Life, Corresponding Member |
| 2020- | The Hank Center for the Catholic Intellectual Heritage, Board |

Expert Report of M. Therese Lysaught – Page 34

| 2022- | Editor, *Journal of Moral Theology*<br>Associate Editor, 2019-2021<br>Editorial Advisory Board, 2009-2018 |
|---|---|
| 2022- | Editorial Board, *Journal of Catholic Social Thought* |
| 2019- | Editorial Board, *Studies in Christian Ethics* |
| 2018-2020 | Northwestern Medical Center CPE Advisory Board |
| 2017-2021 | Editorial Board, *Journal of the Society of Christian Ethics* |
| 2013-2014 | CPE Advisory Board, Presence Health, Chicago |
| 2012-2015 | Program on Medicine and Religion, University of Chicago, Annual Conference Planning Committee |
| 2010-2014 | Society of Christian Ethics, Board of Directors<br>Executive Committee/Program Committee, 2012-2014<br>Chair, Nominating Committee, 2011-2012<br>Program Committee Review Committee, 2011-2014 |
| 2008-2011 | Anglican-Roman Catholic Theological Consultation-USA, USCCB, Member |
| 2008-2012 | Christian Theological Research Fellowship, Vice-President |
| 2005-2006 | Louisville Institute, Christian Faith and Life Sabbatical Grant Program, Reviewer |
| 2003-2006 | Joseph Cardinal Bernardin Center, Catholic Theological Union, Chicago, Working Group on the Consistent Ethic of Life |
| 2002-2009 | Catholic Health Association, Theologian/Ethicist Committee (TEC) of the Board of Directors |
| 2001-2003 | Catholic Health Association Theologians and Ethicists Working Group "Harnessing the Promise of Genetics" |
| 2001-2006 | Catholic Health Association Theologians & Ethicists Working Group, The Principle of Cooperation |
| 1999, 2000 | Catholic Health Association Theologians and Ethicists Colloquium Planning Committee |

Expert Report of M. Therese Lysaught – Page 35

| 1998-2001 | American Association for the Advancement of Science (AAAS), Program of Dialogue Between Science, Religion, and Ethics, Advisory Board Member |
| 1995-1998 | Recombinant DNA Advisory Committee (RAC), National Institutes of Health |
| 1994-1998 | Society of Christian Ethics (SCE) Women's Caucus, co-chair |

---

**PUBLICATIONS (Abridged 2014-2024)**

**Books**

*Biopolítica después de la Neurociencia: Moralidad y la Economía de la Virtud.* Co-escrito con Jeffrey P. Bishop and Andrew A. Michel (Madrid, Espana: Universidad Francisco de Vitoria, in press 2024).

*A Prophet to the Peoples: Paul Farmer's Witness and Theological Ethics*. Co-edited with Jennie Weiss Block and Alexandre A. Martins (Pickwick Publications, February 2023).

*Biopolitics After Neuroscience: Morality and the Economy of Virtue.* Co-authored with Jeffrey P. Bishop and Andrew A. Michel (Bloomsbury Academic, 2022). Winner of a €25,000

*Catholic Bioethics and Social Justice: The Praxis of US Health Care in a Globalized World.* Co-edited with Michael P. McCarthy (Liturgical Press, 2019). 2019 Catholic Press Association Book Award, Catholic Social Teaching, Honorable Mention.

*Reunidos para El Camino: Teología en una Perspectiva Católica*. Co-editado con David Matzko McCarthy. Traducción por Helena Faccia Serrano (Granada, Espana: Editorial Nuevo Inicio, 2019).

*Caritas in Communion: Theological Foundations of Catholic Health Care* (Catholic Health Association, 2014).

*On Moral Medicine: Theological Explorations in Medical Ethics*, 3rd ed. Co-edited with Joseph Kotva (Eerdmans, 2012).

*Gathered for the Journey: Moral Theology in Catholic Perspective.* Co-edited with David M. McCarthy (Eerdmans/SCM, 2007). 2008 Catholic Press Association Book Award, Theology, Third Place Honors.

**Journal Articles**

"Resocializing Catholic Healthcare Leadership: Lessons from Paul Farmer and Pope Francis," *Concilium* 2024, no. 3, Special issue on "Health and Healing: Ethical, Theological, and Pastoral Perspectives," 58-70.

"Risocializzare la leadership cattolica nell'assistenza sanitaria: lezioni da Paul Farmer e papa Francesco," *Concilium*, Anno LX, fascicolo 3 (2024): 82-96

"Resocializar el liderazgo sanitario católico: lecciones de Paul Farmer y el papa Francisco," *Concilium*, 406 (Junio 2024): 71-84.

"*Ad (Synodalem) Theologiam (Moralem) Promovendam*," *Journal of Moral Theology* 13, no. 1 (2024): 1-14.

"The Power of Proximity: Toward an Ethic of Accompaniment in Surgery," with Charles Nicholson, Monica Bodd, Ellery Sarosi, Martha Carlough, and Farr Curlin, *Hastings Center Report* 54, no. 2 (2024): 12-21.

"Vicious Trauma: Poverty, Race, Bodies and the Confounding of Virtue Ethics," with Cory D. Mitchell, *Journal of the Society of Christian Ethics* 42, no. 1 (Fall 2022): 75-100.

"Theological Ethics of Life: A New Volume by the Pontifical Academy for Life," with Roberto Dell'Oro, *Journal of Moral Theology*, 11, no. 2 (July 2022): 65-77.

"Building Caregiver Resiliency in Global Health: Embodying the Catholic Social Tradition in the Face of COVID-19," with Beth Reece, Marcia Grand Ortega, Ana Victoria Guizado, and Cecilia Bustamente-Pixa, *Linacre Quarterly* 89, no. 2 (May 2022): 184-205.

"Looking Backward to Move Forward: Writing Your System's Racial Autobiography," with Sheri Bartlett Browne *Health Progress* (Spring 2022): 43-50.

"Whose Revolution? Which Future? The Legacy of Alasdair MacIntyre for a Radical Pedagogy in Virtue," with Daniel P. Rhodes, *Expositions: Interdisciplinary Studies in the Humanities* 14, no. 1 (2020): 97-125.

"Beyond Stewardship: Reordering the Economic Imagination of Catholic Health Care," *Christian Bioethics* 26, no. 1 (April 2020): 31-55.

"*Las Periferías y el Pan*: Pope Francis, *La Teología del Pueblo*, and the Conversion of Catholic Bioethics," *Perspectiva Teológia* 51, no. 3 (2019): 421-442.

"Equally Strange Fruit: Catholic Health Care and the Appropriation of Residential Segregation," with Cory D. Mitchell, *Journal of Moral Theology* 8, no. 1 (2019): 36-62.

Expert Report of M. Therese Lysaught – Page 37

"A Social Praxis for US Health Care: Revisioning Catholic Bioethics Via Catholic Social Doctrine," *Journal of the Society of Christian Ethics* 38, no. 2 (2018): 111-130, with Michael McCarthy.

"That Jagged Little Pill and the Counter-Politics of the Community of the Expelled: A Sacramental Assessment of Psychiatric Medication," *Christian Bioethics* 24, no. 3 (26 October 2018): 246–264.

Issue editor, *Journal of Medicine and Philosophy* 41, no. 6 (December 2016).  Special issue on *The Anticipatory Corpse*, by Jeffrey P. Bishop.

"From *The Anticipatory Corpse to the Participatory Body*," *Journal of Medicine and Philosophy* 41, no. 6 (December 2016).

"Geographies and Accompaniment: An Ecclesial Re-Ordering of the Art of Dying," *Studies in Christian Ethics* 29, no. 3 (August 2016): 286–293.

"Clinically Integrated Networks: A Cooperation Analysis," *Health Care Ethics: USA* 23, no. 4 (Fall 2015): 6-10.

"Roman Catholic Teaching on International Debt: Toward a New Methodology for Catholic Social Ethics and Moral Theology," *Journal of Moral Theology* 4, no. 2 (June 2015): 1-17.

"Characterization of a Human Powered Nebulizer Compressor for Resource Poor Settings." With Christopher J. Hallberg, Christopher E. Zmudka, William K. Kopesky, Lars E. Olson. *BME Online* (16 June 2014) 13:77.

"Treatment of Asthma Exacerbations with the Human-Powered Nebuliser: A Randomised Clinical Trial." With Christopher J Hallberg, René Antonio Najarro, Fausto Cea Gil, Clara Villatoro, Ana Celia Diaz de Uriarte, and Lars E Olson. *npj Primary Care Respiratory Medicine* 24, Article number: 14016 (26 June 2014).

"Reverse Innovation from the Least of Our Neighbors: Community Health Workers and U.S. Health Care," *Health Progress* 94, no. 1 (Jan/Feb 2013): 45-52.

"Moral Analysis of a Procedure at Phoenix Hospital," *Origins* 40, no. 33 (Jan. 27, 2011): 537-547.

"Docile Bodies: Transnational Research Ethics as Biopolitics," *Journal of Medicine and Philosophy* 34, 2009, pp. 384-408.

"Respect: Or, How Respect for Persons Became Respect for Autonomy," *Journal of Medicine and Philosophy* 29, no. 6 (December 2004): 665-680.

"Reconstruing Genetic Research as Research," *J Law, Medicine, & Ethics* 26 (1998): 48-54.

Expert Report of M. Therese Lysaught – Page 38

## Chapters in Books

"Religion and Theology: Western/Abrahamic" in Methods in Medical Ethics, 3rd edition, eds. Jeremy Sugarman and Daniel Sulmasy. Georgetown University Press (in press 2024), with Jonathan Crane and Aasim Padela.

"A Field Hospital for Catholic Bioethics: The Postconciliar Method of Pope Francis in *Laudato Si'* and *Fratelli Tutti*," in *The Gift of Creation*, ed. Mátyás Szalay. Cascade Press (in press 2024).

"Bringing Christ to Christ: The Sacramental and Trinitarian Heart of the Church's Healing Ministry," in *SVD Health Professionals: Participating in God's Mission to Heal*, ed. by Alexandre Rödlach, 131-147. Rome: SVD Publications, 2023.

"Liberating Theological Ethics from the Invisible Hand: Paul Farmer, the World's Poor, and the Quandaries of the Fortunate," in *A Prophet to the Peoples: Paul Farmer's Witness and Theological Ethics*. Co-edited with Jennie Weiss Block and Alexandre A. Martins. 152-180. Pickwick Press, 2023.

"Jesus is My *Coyote*: Rev. Ramon Dagoberto Quinones and the Sanctuary Movement," in *People of God Get Ready! Twelve Misfits, Malcontents and Dreamers for Troubled Times,* edited by Peter Slade, Shea Tuttle, and Jacqueline A. Bussie. 259-282. Wm B. Eerdmans, 2023.

"After COVID-19: Toward a Sacramental Biopolitics," in *Routledge Companion to Christian Ethics*, eds. Rebecca Miles and D. Stephen Long.  372-388. Routledge Press, 2022.

"Catholicism in the Neonatal Context: Belief, Practice, Challenge, Hope." In *Religion and the Ethics in the Neonatal Intensive Care Unit*, edited by Ron Green and George Little. 37-64. Oxford University Press, 2019.

"A Midwife in Egypt: Sr. Mary Stella Simpson." In *Can I Get a Witness? Can I Get a Witness? Thirteen Peacemakers, Community-Builders, and Agitators for Faith and Justice*, ed. Charles Marsh, Daniel Rhodes, and Shea Tuttle.  296-323. Wm B. Eerdmans, 2019.

"Catholic Bioethics Meets Catholic Social Thought: A Problem, a Primer, and a Plan." In *Catholic Bioethics and Social Justice*, co-edited with Michael P. McCarthy. 1-23. Liturgical Press, 2019.

"Outsourcing." In *Catholic Bioethics and Social Justice*, co-edited with Michael P. McCarthy. 267-281. Liturgical Press, 2019. Co-authored with Robert DeVita.

"Incarnating Caritas." In *Incarnate Grace: Perspectives on the Ministry of Catholic Health Care*, edited by Charles Bouchard. 11-26. Catholic Health Association, November 2017. [This book is a sequel to my *Caritas in Communion*].

Expert Report of M. Therese Lysaught – Page 39

"Ritual – A Framework for Ritual at the Deathbed." In *Dying in the Twenty-First Century*, edited by Lydia Dugdale. 67-86. MIT Press, 2015.

**Encyclopedia and Dictionary Articles**

"Human Gene Transfer Research," *Encyclopedia of Bioethics*, 4th Edition. Edited by Bruce Jennings.  Macmillan Reference USA, 2014.

"Human Gene Transfer Research." In *Encyclopedia of Bioethics*, 3rd ed., edited by Stephen G. Post.  NY: Macmillan Reference USA, 2003.

"Body: II. Social Theories." In *Encyclopedia of Bioethics*, 2nd ed., edited by Warren T. Reich, 300-305. New York, NY: Simon and Schuster Macmillan, 1995.

**Lay Publications**

"Commentary on USCCB "'Doctrinal Note on the Moral Limits to the Technological Manipulation of the Human Body,'" *NCR* May 1, 2023.

"Reclaiming the Catholic Moral and Intellectual Tradition from the Culture Wars," *NCR* (April 7, 2022).

"Catholics Seeking 'Religious' Exemptions to Vaccines Must Follow Authentic Church Teaching on Conscience," *NCR* (September 21, 2021).

"All Vaccines are Morally Acceptable, Says Member of Pontifical Academy for Life," *NCR* (March 5, 2021).

"Vatican: It's Unjust (and Dangerous) for Wealthy Nations to Hoard the Covid Vaccine," *America* (January 27, 2021).

"Jesus is With Us in the Boat — A Perspective [on COVID] from Mumbai," in *Renewing Relationship: Essays as We Evolve and Emerge From Pandemic*, ed. by Bruce Compton. Catholic Health Association (November 2020): 29-37. With Sr. Dr. Beena Madhavath.

"Unmasking Neoliberalism's Invisible Grip: Homo Economicus and the Person in Bioethics," *Contending Modernities*, University of Notre Dame, Science and the Human Person Essay Series. July 18, 2019.

Expert Report of M. Therese Lysaught – Page 40

**PAPERS & PRESENTATIONS (selected)**

**Peer-Reviewed Conference Papers**

"Building Caregivers' Resiliency in the Global South through a Virtual Program," APHA Annual Meeting, Atlanta, November 14, 2023

"Addressing the Hidden Crisis: Building Women Caregivers' Resiliency and Well-being," Women Deliver 2023 Conference, July 2023, with Carol Tosone, Claudia Llanten, Henry Msoka, Isamar Guion, and Alex Garcia.

"Vicious Trauma: Poverty, Race, Bodies and the Confounding of Virtue Ethics," Annual Meeting of the Society of Christian Ethics, January 2021, with Cory D. Mitchell.

"Economizing Ethics: The Emergence of "Value" in the History of Ethical Theory" on a panel entitled "Deconstructing Value: A Multilayered Theological Analysis of Human Meaning-Making," with Jean-Pierre Fortin, Dan Rhodes, and David Byrne at the conference entitled "What Matters: On Value and Valuing," Toronto School of Theology, May 7-8, 2020, Toronto, Canada (cancelled due to COVID-19).

"Tools for Transformation: Chaplains as Facilitators of Post-Traumatic Growth," with Beth Reece, M.Div., BCCC, Program on Medicine and Religion, Columbus, OH, March 2020 (postponed due to COVID-19).

"Trauma-Informed Bioethics," panel discussion with Julie Gunby and Jacqueline Wolf, ASBH, Oct. 24, 2019.

"Tools for Transformation: Chaplains as Facilitators of Post-Traumatic Growth," with Beth Reece, M.Div., BCCC, National Association of Catholic Chaplains Annual Meeting, May 2019.

"Pope Francis: The Lived Integration of Catholic Social Thought and Catholic Bioethics" at "Pope Francis, A Voice Crying Out in the World: Mercy, Justice, Love and Care for the Earth," Villanova University, April 15-18, 2018.

"A Catholic Social Praxis for US Health Care: Revisioning Catholic Bioethics Via Catholic Social Doctrine," Society of Christian Ethics, January 2018, Portland, Oregon.

"Is the Latest the Greatest?  Ethical Perspectives on Novel Interventions," The Annual Conference of the National Association of Catholic Chaplains, Chicago, IL, April 23, 2016.

"Catholic Perspectives on Embodiment," Three plenaries.  The Third Annual Conference for the Program on Medicine and Religion, Chicago, IL, March 7-9, 2014.

Expert Report of M. Therese Lysaught – Page 41

"Stewardship vs. Caritas: A Challenge to the Principle of Stewardship in Catholic Health Care Ethics," Second Annual Conference of the Program on Medicine and Religion, University of Chicago.  Chicago, IL, May 28, 2013

**<u>Invited Lectures & Presentations</u>**

"Catholic Bioethics and Social Justice," The Marianist Lecture, Chaminade University, Honolulu, October 13, 2024.

"The Human Genome and Anthropological Singularity: The Case of Enhancement," International Bioethics Group, Brussels, Belgium, May 24-26, 2024.

Chair, "From Domination to Responsibility: Rethinking Humancentrism," Pontifical Academy for Life Annual Meeting, "Human. Meaning and Challenges," The Vatican, Rome, February 12-13, 2024.

"Commentary on the USCCB *Doctrinal Note on Technological Manipulation of the Body*," Illinois Catholic Health Association, April 17, 2023.

"Pastoral Accompaniment for the Sick Today," Symposium on *The Leadership of Pope Francis in the Global Health* Emergency, the Health and Healing Unit of PACTPAN (Pan-African Catholic Theology and Pastoral Network), March 25, 2023.

Keynote, "Neither Marketplace nor Battleground: Catholic Universities as Field Hospital for a Better Kind of Politics," Association of Catholic Colleges and Universities Annual Meeting, February 2023.

"Toward a Sacramental Biopolitic," Postgraduate Course in "Theopolitics. New Trends in Political Theology" IFES and certificated by the Pontifical University of Salamanca (UPSA), January 12 and 19, 2023.

"Biopolitics After Neuroscience," the Neuroscience Interest Group, Annual Meeting of the Society of Christian Ethics, Chicago, IL, January 6, 2023.

"Toward a Womanist Bioethics: A Response to Wylin Wilson," John Hope Franklin Humanities Institute, Duke University, December 1, 2022.

"Beyond Catholic Discordance: Pope Francis and the Sacramental Vision of the Second Vatican Council," Spanish Bishops' Conference, Avila Spain, November 2022.

"Sr. Mary Stella Simpson and Health Equity," Valparaiso University, October 25, 2022.

Expert Report of M. Therese Lysaught – Page 42

"Biopolitics After Neuroscience," Pontificia Universidad Católica de Puerto Rico, Ponce, Puerto Rico, October 21, 2022.

"Confronting the Invisible Hand: Neoliberalism and the Future of (Bio)Ethics," Magisterial Lecture, Inter-American University of Puerto Rico, San Juan, Puerto Rico, October 20, 2022.

"Norm Wirzba and the Delight of Dirt," panel respondent, Valparaiso University, October 6, 2022.

Symposium on "Life, Solidarity, Fraternity: The Consistent Ethic in Light of *Fratelli Tutti*", The Bernardin Center, Catholic Theological Union, September 17-18, 2022

Expanded Reason Congress, Universidad Francisco Vittoria, Madrid, Spain, May 22-24, 2022.

"War or Peace?: Toward a Better Kind of Biopolitics," at "Pope Francis, Vatican II, and the Way Forward," March 25-26, 2022, Loyola University Chicago, sponsored by the Hank Center for the Catholic Intellectual Heritage (Loyola University Chicago), the Boisi Center (Boston College), and the Center for Religion and Public Life (Fordham University).

"God v. Mammon: Biopolitics After Neuroscience," Theology, Medicine, and Culture Program, Duke University, April 1, 2022.

"Reimagining Theological Bioethics," Contributions to a Postliberal Theology: A New Beginning, Instituto de Filosofía Edith Stein, Archdiocese of Granada, Spain, and the Pontifical University of Salamanca, March 22, 2022.

"Theological Ethics and Neuroscience," the Neuroscience Interest Group, Annual Meeting of the Society of Christian Ethics, Costa Mesa, CA, January 10, 2022.

"Catholic Bioethics and Social Justice," Opening Keynote, Catholic Health Association of Ontario, Toronto, Canada, October 22, 2021.

"Presentación del Volumen: Covid-9 y ética teológica en America Latina"—Catholic Theological Ethics in a World Church, Latin American Section, July 10, 2021

"(How) Are We (Not) Talking About Race?" Catholic Health Association Assembly Table Talk, June 14 and June 15, 2021, with Michael McCarthy.

"COVID, Community Health, and Catholic Social Teaching," OSF Health, April 14, 2021.

"COVID and Catholic Bioethics: Time to Rethink Our Priorities," St. Mary's College, IN, February 17, 2021.

Expert Report of M. Therese Lysaught – Page 43

"'A Heart Open to the Whole World': The Trinitarian Dynamism of an Integral Human Ecology of Social Friendship in *Laudato Si'* and *Fratelli Tutti*," Seminar, Pontifical Academy for Life, February 16, 2021.

"'The Spirit of Revolutionary Change': Catholic Social Thought and the Transformation of Catholic Bioethics in a Time of COVID," 2021 Bessette Lecture on Medical Ethics, Kings College, Wilkes-Barre, PA, February 4, 2021.

"Leaving God for God: Reframing Medical Pastoral Care as a Theological Practice," Opening Keynote, Conference on "Dying a Christian Death," Kennedy Institute of Ethics, Georgetown University, Washington, DC, November 6, 2020.

"Healthcare is a Racial Justice Issue," session 4, with Cory Mitchell and Malik Henfield, sponsored by #whitecoatsforblacklives and the Chicago Coalition of Churches, October 28, 2020.

"Tools for Transformation: Chaplains as Facilitators of Post-Traumatic Growth," with Beth Reece, M.Div., B.C.C.C., National Association of Catholic Chaplains, Webinar, June 2020.

"*Las Periferias y El Pan*: The Latin American Influence on Pope Francis' Sacramental Logic and the Conversion of Catholic Bioethics," Summer Institute, Instituto de la Filosofia Edith Stein, Granada, Spain, June 27, 2019.

"Living Instruments of the Church's Mission: Cultivating the Gift of Lay Ministry," Cardinal Stritch University, Celebration of Lay Ministry Symposium, Milwaukee, WI, January 2019.

"Living Instruments of the Church's Mission: The Theology of the Laity and Catholic Health Care," Illinois Catholic Health Association Annual Meeting, Chicago, IL, November 2018.

"What is Theology and Why Does It Matter to Health Care Boards? Conversation with Authors of *Incarnate Grace*," CHA Assembly, San Diego, CA, June 2018.

"That Jagged Little Pill and the Counter-Politics of the Community of the Expelled: A Sacramental Assessment of Psychiatric Medication," Conference on Taking Our Meds Faithfully: Symposium on Christianity & Psychopharmacology. Duke University, Durham, NC, March 2017.

"Which Faith? Which Reason? Which Justice: A Theological Commentary on *Laudato Si'*," Loyola University Chicago Symposium on *Laudato Si'* & the Environment, Chicago, IL, September 2016.

"Pastoral and Palliative Care Resources for Dying Well," Towards a Contemporary Art of Dying--The 5th Annual McDonald Symposium in Theological Ethics at the University of Cambridge, Cambridge, England, May 18-20, 2015.

Expert Report of M. Therese Lysaught – Page 44

"Theological Foundations of Catholic Health Care," CHE Health Leadership Academy, Philadelphia, PA, June 9, 2014.

"Adam Smith or Mother McCauley?  Can Catholic Health Care Be For-Profit?" The 11th Annual Conference on Contemporary Catholic Health Care Ethics, The Neiswanger Institute for Bioethics, Loyola University Chicago, Chicago, IL, March 14, 2014.

"Catholicism in the Neonatal Context: Belief, Practice, Challenge, Hope," The Annual Gravens Conference on the Physical and Developmental Environment of the High-Risk Infant in collaboration with the March of Dimes, Clearwater Beach, FL, February 7, 2014.

"Theological Foundations of Catholic Health Care," Catholic Health Association Minnesota, Minneapolis, MN, November 8, 2013.

"Solidarity," Catholic Health East/Trinity Health Catholic Social Practices Webinar Series, October 23, 2013.

"Gratuitousness," Catholic Health East/Trinity Health Catholic Social Practices Webinar series, September 23, 2013.

---

**COURSES TAUGHT**

**Loyola University Chicago**

**Masters**

| | |
|---|---|
| IPS 465 | Theology and Ethics at the End of Life |
| IPS 545 | Foundations of Christian Spirituality |
| IPS 553 | Moral Theology and Christian Ethics |
| IPS 570 | Introduction to Theology and Ministry for Catholic Health Care |
| IPS 599 | Praying for Miracles? |
| BEHL 416 | Catholic Bioethics and Social Justice |
| IPS 596 | Dying Well |
| BEHL 491 | Global Bioethics |
| BEHL 500 | Introduction to Healthcare Mission Leadership |

**Doctoral**

| | |
|---|---|
| BEHL 510 | Theological Bioethics |
| BEHL 510 | Theology, Race, and Catholic Health Care |
| BEHL 510 | Paul Farmer: Medicine and Theology from the Margins |
| BEHL 512 | Canon Law for Catholic Healthcare |

Expert Report of M. Therese Lysaught – Page 45

**Marquette University**

**Graduate**

| | |
|---|---|
| THEO 205 | Introduction to Theological Ethics |
| THEO 6410 | Introduction to Theological Ethics |
| THEO 347 | Christian Social Ethics |
| THEO 385 | Social Justice and Health Care (developed for College of Nursing) |
| THEO 8610 | Catholic Moral Theology |
| THEO 8650 | Catholic Healthcare Ethics |

**Undergraduate**

| | |
|---|---|
| THEO 175 | Medical Ethics |
| THEO 179 | Justice and Morality (majors capstone course) |
| THEO 195 | Independent Study in Medical Ethics |
| THEO 195 | Independent Study on Suffering and Embodiment |
| ARSC 3986 | MU-MCW Bioethics Internship |

**University of Dayton**

**Graduate**

| | |
|---|---|
| REL 500A | Research Methods |
| REL 500D | Foundations of Systematic and Moral Theology (also online) |
| REL 547 | Christian Discipleship |
| REL 561 | Approaches to Morality |
| REL 562 | Contemporary Moral Problems |
| REL 660 | Catholicism, Bioethics, and the U.S. Context |
| REL 660 | Catholic Moral Theology |

**Undergraduate**

| | |
|---|---|
| REL 103 | Introduction to Religion |
| ASI 101-102 | CORE: Interdisciplinary Introduction to Religion and Philosophy |
| ASI 150 | Introduction to the University Experience |
| ASI 375 | CORE Capstone: Professional Ethics in a Global Society |
| REL 363 | Faith and Justice ("The Body Politic in Florence: Saints and the Poor," Florence, Italy, Summer 2005) |
| REL 367 | Christian Ethics and Health Care |
| REL 367 | Christian Ethics and Health Care (The Body Politic in Florence: Theology and Medicine from the Early Church to the Renaissance," Florence, Italy, Summer 2005) |

Expert Report of M. Therese Lysaught – Page 46

**FUNDED GRANTS AND RESEARCH SUPPORT**

In addition to the ~$440,000 in grants I have been awarded for my own research, I have also assisted organizations in securing $1.25M and in managing an additional ~$1M in grants.

LILLY ENDOWMENT: Thriving Congregations Grant, 2021-2025, with the Montreat Conference Center and the Black Mountain School of Theology and Community (October 2020: $1,000,000).

LILLY ENDOWMENT: Called to Lives of Meaning and Purpose Planning Grant, Summer 2017 (May 2017: $50,000; Co-PI).

ASSOCIATION OF THEOLOGICAL SCHOOLS: Innovation Grant Program: "Reimagining Theological Contextual Education: Theological Action Research Teams," 2017-2018 (August 2017: $50,000; Co-PI).

ASSOCIATION OF THEOLOGICAL SCHOOLS: Faculty Development Grant, "Forming Faculty for Integrated Ministerial Formation," 2017-2018 (August 2017: $15,000, PI).

CATHOLIC HEALTH ASSOCIATION: Visiting Scholar, 2012-2013 (June 2012. $40,000).

WABASH CENTER FOR TEACHING AND LEARNING IN THEOLOGY AND RELIGION: "Graduate Teaching Program Initiative," 2010-2012 (June 2010. $15,000).

THE ARETE FOUNDATION, Science of Virtue Program: "The Economy of Virtue: Virtue Theory in Light of Poverty and Neuroscience," with Jeffrey P. Bishop, Amy Laura Hall, and Andrew Michel. 2010-2012 (March 2010.  $225,000)

NATIONAL COLLEGIATE INVENTORS AND INNOVATORS ALLIANCE: "The Human-Powered Nebulizer in Central America," with Lars E. Olson, Ph.D., 2010-2011 (January 2010 $42,000).

CELEBRATING THE CENTENNIAL OF WOMEN: "Women in Theology at Marquette University," 2009-2010 (August 2009, $2,000)

RESEARCH COUNCIL SEED GRANT, UNIVERSITY OF DAYTON: "Revision of On Moral Medicine, for the Third Edition," 2006 ($5,500)

LOUISVILLE INSTITUTE: Christian Faith and Life Sabbatical Grant, "Anointing the Sick: Christian Practices, Bodies, and Medical Ethics," 2003-4 ($45,000)

LILLY PROGRAM IN CHRISTIAN LEADERSHIP, UNIVERSITY OF DAYTON: Teaching Grant for "The Vocations of Medicine," 2003 ($3,500)

Expert Report of M. Therese Lysaught – Page 47

INTERDISCIPLINARY FACULTY SEMINAR ON RELIGION AND SCIENCE, UNIVERSITY OF DAYTON: Research Grant, 2000 ($3,500)

RESEARCH COUNCIL SEED GRANT, UNIVERSITY OF DAYTON: "Gene Therapy and Children: A Test-Case for Human Subjects Research," 1999 ($3,000)

RESEARCH COUNCIL SEED GRANT, UNIVERSITY OF DAYTON: Forum on the Catholic Intellectual Tradition Today, "Virgil Michel and the Liturgical Movement: An Undiscovered Source for Liturgy and Ethics," 1998 ($3,000)

DEPARTMENT OF RELIGIOUS STUDIES, UNIVERSITY OF DAYTON: Research Grant, "Liturgy and Ethics in Feminist Theology," 1998 ($3,000)

RESEARCH COUNCIL SEED GRANT, UNIVERSITY OF DAYTON: Forum on the Catholic Intellectual Tradition Today, University of Dayton, "In-Ritualed Bodies: Liturgy as the Foundation for Christian Ethics," 1997 ($3,000)

SUMMER RESEARCH GRANT, DEPARTMENT OF RELIGIOUS STUDIES, UNIVERSITY OF DAYTON: 1996 ($3,000)

NATIONAL INSTITUTES OF HEALTH: ELSI Fellowship in Molecular and Clinical Genetics, University of Iowa, 1994 ($40,000)

---

## HONORS & AWARDS

Expanded Reason Institute, Expanded Reason Award, for *Biopolitics After Neuroscience: Morality and the Economy of Virtue*, 2021.

Catholic Press Association Book Award, Catholic Social Thought, Honorable Mention, for *Catholic Bioethics and Social Justice: The Praxis of US Healthcare in a Globalized World*, 2019.

Catholic Press Association Book Award, Theology, Third Place Honors, for *Gathered for the Journey: Moral Theology in Catholic Perspective*, 2008

University Teaching Fellow, University of Dayton, 1996-97
Graduate Assistantship, Duke University, 1987-1990
Leroy E. Dettman Scholarship, 1987-1988
Graduate Assistantship, University of Notre Dame, 1985-1986
Phi Beta Kappa, Hope College, 1985
Magna Cum Laude, Hope College, 1985
Almon T. Godfrey Senior Prize in Chemistry for Excellence in Scholarship & Research, Hope College, 1985
Sigma Xi Award for Research, Hope College, 1985

Expert Report of M. Therese Lysaught – Page 48

Cupery Research Fellowship, Hope College, 1984
Mortar Board, Hope College, 1984
Jaecker Chemistry Scholarship, Hope College, 1983-1985

---

**PROFESSIONAL MEMBERSHIPS**

Society of Christian Ethics; Catholic Theological Ethics in a World Church

---