ROBERT W. FERGUSON
Attorney General

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
(206) 245-1700

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>                      Plaintiff,<br><br>v.<br><br>WASHINGTON STATE UNIVERSITY,<br><br>                      Defendant. | No. 2:22-cv-00319-TOR<br><br>DEFENDANT'S COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>December 3, 2024<br>Without Oral Argument |

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ
No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................1

II.   FACTUAL AND PROCEDURAL HISTORY ...................................3

      A.   The COVID-19 Pandemic in Washington and at WSU.......................4

      B.   Rolovich's Opposition to the COVID-19 Vaccines.............................4

      C.   The Delta Surge and Proclamation 21-14 .............................6

      D.   Rolovich's Request for a Religious Accommodation..........................6

      E.   WSU Denies Rolovich's Accommodation Request...........................7

      F.   Rolovich's Separation from WSU and Administrative
           Appeals ................................................................................9

      G.   Procedural History...............................................................9

III.  ARGUMENT.........................................................................9

      A.   Summary Judgment Standard................................................9

      B.   WSU is Entitled to Summary Judgment on the Title VII
           and WLAD Claims...............................................................10

           1.   Title VII and WLAD standards..............................10

           2.   Rolovich cannot establish his prima facie case .................11

                a.   Rolovich's Partial MSJ should be denied
                     because the sincerity of his asserted
                     religious beliefs is disputed ....................................11

                b.   As a matter of law, Rolovich's conscience-
                     based objection does not establish a
                     religious conflict with COVID-19
                     vaccination ..........................................................14

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - i
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3.    WSU is entitled to summary judgment because it could not accommodate Rolovich without undue hardship ........................................................16

    a.    Title VII's undue hardship standard ....................................17

    b.    Rolovich's increased risk of contracting and transmitting COVID-19 constitutes an undue hardship ........................................................18

    c.    The economic costs of accommodating Rolovich constitute an undue hardship ..............................23

        i.    Travel costs ................................................23

        ii.    Canceled games ...........................................24

        iii.    Lost donations ............................................25

    d.    Other burdens would have imposed an undue hardship ................................................26

    e.    WSU correctly determined that masking and distancing were not reasonable accommodations for Rolovich ...............................30

C.    WSU Is Entitled to Summary Judgment on the Breach of Contract Claim ........................................................38

D.    WSU Is Entitled to Summary Judgment on the Wage-Withholding Claim ........................................................38

IV.    CONCLUSION ........................................................40

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - ii
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

# <u>TABLE OF AUTHORITIES</u>

## Federal Cases

*Africa v. Pennsylvania*,
  662 F.2d 1025 (1981) ...................................................................16

*Antredu v. Mass. Dep't of Youth Servs.*,
  --- F. Supp. 3d ----, No. CV 22-12016-WGY,
  2024 WL 1539725 (D. Mass. Apr. 9, 2024)..........................................22

*Bartholomew v. Washington*,
  No. 3:23-CV-05209-DGE, 2024 WL 1426308 (W.D. Wash. Mar. 26, 2024).....15

*Bhatia v. Chevron U.S.A., Inc.*,
  732 F.2d 1382 (9th Cir. 1984) (per curiam) ..........................................17

*Bordeaux v. Lions Gate Ent., Inc.*,
  703 F. Supp. 3d 1117 (C.D. Cal. 2023) .......................................... passim

*Callahan v. Woods*,
  658 F.2d 679 (9th Cir. 1981) ................................................ 12, 13, 16

*Caruano v. Bayhealth Med. Ctr., Inc.*,
  714 F. Supp. 3d 461 (D. Del. 2024) ....................................................16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................. 9, 10

*Children's Health Defense v. Rutgers*,
  93 F.4th 66 (3d Cir. 2024) ............................................................ 3, 4, 5

*Conner v. Raver*,
  No. 22-CV-08867-JST, 2023 WL 5498728 (N.D. Cal. Aug. 24, 2023).............22

*Doe v. San Diego Unified Sch. Dist.*,
  19 F.4th 1173 (9th Cir. 2021) ......................................................... 17, 21

*EEOC v. GEO Grp., Inc.*,
  616 F.3d 265 (3d Cir. 2010) ......................................................... 17, 18, 21

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*,
  279 F.3d 49 (1st Cir. 2002) ...................................................................... 11, 12

*Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*,
  877 F.3d 487 (3d Cir. 2017) ...................................................................15

*Finn v. Humane Soc'y of United States*,
  No. GLR-23-2107, 2024 WL 1765702 (D. Md. Apr. 24, 2024)........................15

*Gardner-Alfred v. Fed. Res. Bank of N.Y.*,
  No. 22-CV-1585 (LJL), 2023 WL 6214863 (S.D.N.Y. Sept. 25, 2023)....... 12, 13

*Garrison v. Merch. & Gould, P.C.*,
  No. 09-CV-1728-JPD, 2011 WL 887749 (W.D. Wash. Mar. 10, 2011) .............39

*Groff v. DeJoy*,
  600 U.S. 447 (2023) ...................................................................... 17, 25

*Heller v. EBB Auto Co.*,
  8 F.3d 1433 (9th Cir. 1993) ...................................................................10

*Howe v. Mass. Dep't of Corr.*,
  No. 4:22-CV-40119-MRG, 2024 WL 3536830 (D. Mass. July 25, 2024) ..........22

*Kushner v. NYC Dep't of Educ.*,
  No. 22-CV-5265 (DLI) (VMS), 2023 WL 6214236
  (E.D.N.Y. Sept. 25, 2023) ...................................................................22

*Lavelle-Hayden v. Legacy Health*,
  --- F. Supp. 3d ----, No. 3:22-CV-01752-IM, 2024 WL 3822712
  (D. Or. Aug. 14, 2024)...........................................................................21

*Lee v. Seasons Hospice*,
  696 F. Supp. 3d 572 (D. Minn. Sept. 29, 2023) ....................................................26

*MacDonald v. Or. Health & Sci. Univ.*,
  No. 3:22-CV-01942-IM, 2024 WL 3316199 (D. Or. July 5, 2024)....................22

*Mason v. Gen. Brown Cent. Sch. Dist.*,
  851 F.2d 47 (2d Cir. 1988) ...................................................................14

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*McCarthy v. Boston Med. Ctr.*,
No. 22-11886-RGS, 2024 WL 185392 (D. Mass. Jan. 17, 2024).........................16

*Mohamed v. Full Life Care*,
No. C22-1010-KKE, 2024 WL 4371584 (W.D. Wash. Oct. 2, 2024)................21

*Moore v. Effectual Inc.*,
No. 3:23-CV-05210-DGE, 2024 WL 1091689 (W.D. Wash. Mar. 13, 2024).....13

*Petersen v. Snohomish Reg'l Fire & Rescue*,
No. C22-1674 TSZ, 2024 WL 278973 (W.D. Wash. Jan. 25, 2024)..................22

*Slater v. Behavioral Health Res.*,
No. 23-5270 RJB,2024 WL 4290289 (W.D. Wash. Sept. 25, 2024)..................22

*Sutton v. Providence St. Joseph Med. Ctr.*,
192 F.3d 826 (9th Cir. 1999) ........................................................................10

*Tawnsaura Grp., LLC v. Maximum Human Performance, LLC*,
No. CV 12-07189 SJO (AGRx), 2013 WL 11011698
(C.D. Cal. Sept. 12, 2013) ..........................................................................21

*Together Emps. v. Mass Gen. Brigham Inc.*,
573 F. Supp. 3d 412 (D. Mass. 2021)........................................................ 17, 26

*Trueblood v. Valley Cities Counseling & Consultation*,
No. C23-0269JLR, 2024 WL 3965926 (W.D. Wash. Aug. 28, 2024)................34

*United States v. Seeger*,
380 U.S. 163 (1965) ....................................................................................11

*Welsh v. United States*,
398 U.S. 333 (1970) ....................................................................................15

*White v. Univ. of Washington*,
No. 2:22-CV-01798-TL, 2024 WL 1241063 (W.D. Wash. Mar. 22, 2024)........17

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ....................................................................................14

*Wright v. Belfor USA Group*,
No. C24-0907-JCC, 2024 WL 3917157 (W.D. Wash. Aug. 22, 2024)..............39

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - v
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Zimmerman v. PeaceHealth,*
  701 F. Supp. 3d 1099 (W.D. Wash. 2023) ..........................................39

*Zuccaro v. MobileAccess Networks, Inc.,*
  No. C11-272 MJP, 2012 WL 261342 (W.D. Wash. Jan. 30, 2012).....................39

## State Cases

*Kumar v. Gate Gourmet, Inc.,*
  325 P.3d 193 (Wash. 2014) ...................................................10

*Suarez v. State,*
  552 P.3d 786 (Wash. 2024) ...................................................10

## Federal Statutes

42 U.S.C. § 2000e-2 ............................................................1

## State Statutes

RCW 49.48 ................................................................ 38, 39

RCW 49.52 ................................................................ 38, 39

RCW 49.60.180 .................................................................1

## Federal Rules

Fed. R. Civ. P. 56(a) .........................................................9

Fed. R. Evid. 201(b) ..........................................................3

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - vi
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## I.    INTRODUCTION

Throughout his adult life, Plaintiff Nicholas Rolovich has declined to receive vaccinations of any kind because of his preference for "holistic" medicine, his belief in his own "natural immunity," and his concerns about vaccine safety. Consistent with this history, even at the height of the COVID-19 pandemic, Rolovich refused to comply with Defendant Washington State University's (WSU) employee vaccination requirement—a choice that put others at risk. Then WSU's head football coach, Rolovich's job was dynamic and demanding, requiring near-constant engagement in person with hundreds (or more) of individuals every week. Relying on the authoritative public health guidance available at the time, WSU's Athletics Department understood that allowing a college football coach to continue unvaccinated in his highly interpersonal position would have significantly increased the risk of him contracting COVID-19 and transmitting the virus to others. Thus, the Athletics Department denied Rolovich's request for an accommodation that would have entitled him to remain in his head coaching job unvaccinated.

At the time of WSU's decision, COVID-19 had already killed 750,409 Americans. The global death toll was nearly 5 million. Rolovich's unvaccinated status posed a direct threat to the health and safety of the student-athletes and other employees he led and worked closely with every day. Unlike other WSU employees who received accommodations, Rolovich's job was plainly not one that could be performed effectively via Zoom or in isolation.

For that reason and others, WSU is entitled to summary judgment on all Rolovich's claims. First and foremost, WSU's undue hardship defense to his claims

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 1
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

under Title VII, 42 U.S.C. § 2000e-2, and the Washington Law Against Discrimination (WLAD), RCW 49.60.180, is dispositive. WSU's two *unrebutted* scientific experts demonstrate that, in the relevant fall 2021 time period, unvaccinated individuals were more likely—by orders of magnitude—to contract and transmit COVID-19. Accordingly, both experts conclude, accommodating Rolovich would have significantly increased the risk of his contracting and spreading COVID-19 to others.

WSU's experts also confirm that this danger could not have been adequately reduced by masking, social distancing, or other mitigation measures. Not only are those measures less effective than vaccination, but Rolovich's testimony that he could not coach effectively while masking—as well as his well-documented history of flaunting and denigrating masking rules—show that he would not (or could not) have followed those measures. This public-health justification alone establishes WSU's undue hardship defense as a matter of law, as numerous courts have held in entering summary judgment on Title VII claims by unvaccinated employees whose jobs required regular in-person interaction—from firefighters to teachers to television actors. A football coach poses the same type of health and safety danger.

WSU's undue hardship defense is also supported by its *unrebutted* economic expert's finding that accommodating Rolovich—as well as seven unvaccinated assistant football coaches who also requested accommodations—would have cost WSU hundreds of thousands of dollars in separate travel arrangements alone. In addition, WSU would have faced losing millions more in revenue from games canceled due to an outbreak on the football team. Accommodating Rolovich would

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 2
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

also have damaged WSU's recruitment efforts, donation receipts, and reputation—all seriously jeopardizing the football program's long-term success.

Second, the undisputed record shows that Rolovich's "conscience"-based objection to COVID-19 vaccination—even if sincerely held—is not religious in nature, but is premised on his long-held (and secular) vaccine hesitancy and years-long consumption throughout the COVID-19 pandemic of anti-vaccine and anti-government literature and media. Numerous courts addressing similar anti-vaccine viewpoints have rejected plaintiffs' attempts to recast secular objections in religious terms, as Rolovich seeks to do here.

Rolovich's remaining claims fall with his Title VII and WLAD claims: since Rolovich was unvaccinated and not legally entitled to a religious accommodation from the vaccination requirement, he was ineligible to work for WSU and unable to fulfill his contractual obligations to the University, which properly terminated him for just cause. WSU therefore did not breach Rolovich's employment agreement or wrongfully withhold any wages from him. For those reasons and those explained below, the Court should deny Rolovich's Motion for Partial Summary Judgment (Partial MSJ), ECF No. 88, and enter judgment for WSU on all claims.

## II.    FACTUAL AND PROCEDURAL HISTORY

The evidence in support of this Motion is set forth in WSU's Statement of Material Facts Not in Dispute (SOMF) filed herewith. WSU also requests that the Court take judicial notice of basic facts regarding the COVID-19 pandemic. *See* Fed. R. Evid. 201(b); *Children's Health Defense v. Rutgers*, 93 F.4th 66, 71 (3d Cir. 2024). A brief factual summary follows.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 3
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## A. The COVID-19 Pandemic in Washington and at WSU

COVID-19 is a respiratory disease caused by a virus that is airborne, highly contagious, and can cause serious illness or death. *See* SOMF ¶¶ 12–17. On February 29, 2020, Governor Jay Inslee proclaimed a state of emergency due to the COVID-19 pandemic. *Id.* ¶ 19.

Pursuant to a statewide "Stay Home" order in March 2020, WSU shifted operations so that almost all work and instruction were done remotely. *Id.* ¶¶ 20–22. The pandemic's disruption was challenging for WSU, and its Athletics Department lost significant revenue from foregone ticket sales, parking and concessions, and tournament participation. *Id.* ¶¶ 25–33.

Although remote instruction continued during WSU's 2020 fall semester, many students—including student-athletes—chose to live on campus. *Id.* ¶ 34. This caused several outbreaks during the 2020–21 school year, making WSU a major driver of Whitman County's high COVID-19 case counts. *Id.* Because of an outbreak on the football team in fall 2020, WSU's game against Stanford was canceled, as was the Apple Cup the following week. *Id.* ¶ 31. The football team was also connected to another major outbreak in March 2021. *Id.* ¶¶ 35–36.

## B. Rolovich's Opposition to the COVID-19 Vaccines

Rolovich was announced as WSU's new head football coach in January 2020. *Id.* ¶ 9. Throughout the COVID-19 pandemic, he frequently opined that the virus did not present a significant public health risk and that the pandemic was part of a conspiracy between government officials and public figures like George Soros and Bill Gates. *Id.* ¶ 52. Soon after the FDA authorized the vaccines for emergency use

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 4
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

in late 2020 and early 2021, Rolovich began expressing doubts about their safety, efficacy, and regulatory approval processes. *Id.* Before August 17, 2021, however, none of Rolovich's hundreds of text messages and emails about the COVID-19 vaccines with friends, family members, and coworkers mentioned any religious objection to the vaccines. *Id.* ¶ 54.

Between April and June 2021, Rolovich spoke with other WSU employees about his opposition to the vaccines, including then-WSU Athletics Director Patrick Chun, then-Deputy Athletics Director Bryan Blair, and then-defensive coordinator Jake Dickert. *Id.* ¶¶ 53, 66, 71, 74–76. Rolovich expressed his fears of the vaccines' adverse health consequences and his doubts about their efficacy, but again, did not raise any religious objections in these discussions. *Id.* ¶¶ 54, 61–62, 66, 71.

On June 11, 2021, the Pac-12 conference announced that all football media day attendees would need to be vaccinated against COVID-19. *Id.* ¶¶ 72–74. On July 21, Rolovich tweeted: "I have elected not to receive a COVID-19 vaccine for reasons which will remain private." *Id.* ¶ 77–78. His announcement generated significant negative media attention nationally and locally. *Id.* ¶ 79. Hundreds of WSU alumni and donors wrote to express their disapproval of Rolovich's position, and many threatened to withhold future donations. *Id.* ¶ 80. At the time, WSU's policy required employees to be vaccinated against COVID-19 before the upcoming academic year unless they claimed an exemption for medical, religious, or "philosophical/personal" reasons. *Id.* ¶¶ 43, 47–49.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 5
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## C. The Delta Surge and Proclamation 21-14

Rolovich's announcement in July 2021 coincided with the highly infectious "Delta variant" becoming the dominant COVID-19 strain. *Id.* ¶ 83. COVID-19 cases reached then-unprecedented levels, and hospitalizations and deaths also surged. *Id.* ¶¶ 84–86. According to contemporaneous CDC data, the vaccines proved highly effective at preventing the virus's spread and severe disease, particularly with the Delta variant. *Id.* ¶¶ 87–90.

On August 9, 2021, Governor Inslee issued Proclamation 21-14 (together with subsequent iterations, the Proclamation). *Id.* ¶ 92. The Proclamation initially prohibited healthcare workers and most state employees from working after October 18, 2021, without being fully vaccinated against COVID-19, unless they had an approved accommodation for a religious or medical reason. *Id.* On August 20, the Governor extended the Proclamation to the education sector (including WSU). *Id.* ¶ 94. The Proclamation superseded WSU's policy which previously allowed exemptions for non-religious philosophical/personal reasons. *Id.* ¶ 95.

## D. Rolovich's Request for a Religious Accommodation

On August 16, 2021, Chun and Blair informed Rolovich that the Proclamation would soon be extended to cover WSU, and that accommodations would be permitted for medical or religious reasons only. *Id.* ¶ 147. The next day, Rolovich's agent, Thayer Evans, sent him a template of a vaccine mandate religious exemption request from the website of the National Catholic Bioethics Center (NCBC). *Id.* ¶¶ 148–49. The NCBC exemption request template invoked the "Church's teaching" that a Catholic "must obey the judgment of his or her own informed and certain

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 6
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

conscience." *Id.* Later that day, Rolovich spoke with Father Paul Heric, a Catholic priest he'd met a few weeks earlier. *Id.* ¶ 150. It was only then, Rolovich testified, that he first realized he had a "religious obligation as a Catholic to follow [his] conscience and decline to take a COVID vaccination." *Id.* ¶ 150. A few days later, Evans wrote in a text message to Rolovich and his attorney: "Since Nick's not going to get the shot and we can't find a doctor to write him a note, I think [a religious exemption] is the best alternative strategy we have." *Id.* ¶ 155.

On August 18, 2021, the Governor announced the extension of the Proclamation to educational workers. *Id.* ¶ 93. The following day, Rolovich informed Chun and Blair he would pursue a religious accommodation. *Id.* ¶¶ 151–53. On October 4, Rolovich emailed a religious exemption request to WSU's Human Resource Services (HRS). *Id.* ¶ 158. The request was based on the NCBC template his agent had shared with him, which his attorney then edited. *Id.* ¶¶ 148–49, 156. Rolovich did not personally draft or edit his exemption request. *Id.* ¶ 157.

**E. WSU Denies Rolovich's Accommodation Request**

On October 6, 2021, HRS notified Chun and then-Deputy Athletics Director Anne McCoy that Rolovich's exemption request "support[ed] the accommodation request based on a sincerely held religious belief." *Id.* ¶ 160. HRS advised that it was the Athletics Department's responsibility "to determine if the employee is able to perform essential functions of the position and meet the COVID-19 safety measures consistent with the recommendations of the state and protect the health and safety of the WSU community as part of this accommodation request." *Id.* ¶¶ 161–62. In total, eight football coaches and staff sought religious accommodations. *Id.* ¶ 163.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 7
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Chun, McCoy, and Blair worked together to evaluate Rolovich and the other football employees' job duties, relying on public health data and guidance available at the time, to determine whether they could be accommodated without endangering others. *Id.* ¶¶ 164–67. The Athletics Department leadership also considered a memo prepared by WSU Environmental Health & Safety (EH&S) assessing the football employees' positions and identifying the minimum public health requirements that would have to be followed for them to continue working. *Id.* ¶¶ 170–81.

It is undisputed that the job of head football coach involves frequent in-person contacts and interactions with a wide range of individuals—including student-athletes, assistant coaches, other Athletics Department personnel, donors and boosters, and members of the media. *Id.* ¶ 8. It is also undisputed (or at least unrebutted) that, in fall 2021, unvaccinated persons posed a materially higher risk of contracting and transmitting COVID-19. *Id.* ¶¶ 194–95.

Thus, Chun ultimately determined—with McCoy and Blair's agreement—that Rolovich could not be accommodated without undue hardship to WSU. Chun set forth his reasoning in several memos to HRS, focusing on the increased risk that an unvaccinated football coach would pose of contracting and spreading COVID-19 to others. *Id.* ¶¶ 168, 182. Chun also provided a memo to HRS explaining that "Rolovich has made several statements that cast doubt on his claimed sincerely held religious belief" against COVID-19 vaccination, including his long-expressed fears of the vaccines' potential adverse health effects. *Id.* ¶ 169.

On October 18, 2021, HRS informed Rolovich that his religious accommodation request was denied because WSU could not accommodate him

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 8
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

without experiencing an undue hardship. *Id.* ¶¶ 183–84. HRS also explained that, based on his past comments regarding vaccination and the timing of his accommodation request, WSU had reason to question whether Rolovich's sincerely held religious beliefs conflicted with COVID-19 vaccination. *Id.* ¶ 185.

## F. Rolovich's Separation from WSU and Administrative Appeals

Shortly thereafter, Chun and Blair delivered Rolovich a letter stating that WSU was terminating his employment for just cause pursuant to the terms of his employment contract. *Id.* ¶¶ 186–87. Through counsel, Rolovich submitted a detailed appeal to Chun. *Id.* ¶ 188. On November 12, 2021, Chun denied the appeal. *Id.* ¶ 189. On December 6, 2021, WSU President Kirk Schulz denied Rolovich's second-level appeal, and his termination became final. *Id.* ¶¶ 191–92.

## G. Procedural History

The early procedural history of the case is set forth in WSU's Motion to Dismiss (MTD), ECF No. 22 at 12. After the Court's ruling, ECF No. 33, Rolovich filed a Second Amended Complaint (SAC), ECF No. 53. Four claims remain: Title VII, WLAD, breach of contract, and wage withholding.

## III.    ARGUMENT

## A. Summary Judgment Standard

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the movant demonstrates the absence of a genuine issue of material fact, the opposing party must set forth specific facts showing a genuine issue. *Celotex Corp.*

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 9
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*v. Catrett*, 477 U.S. 317, 322–24 (1986). If the nonmoving party fails, "Rule 56(c) mandates the entry of summary judgment." *Id.* at 322.

**B. WSU is Entitled to Summary Judgment on the Title VII and WLAD Claims**

**1.  Title VII and WLAD standards**

To establish a prima facie case of failure to accommodate religion under Title VII, the plaintiff has the burden to show that "(1) a bona fide religious belief of the employee conflicted with an employment policy; (2) the employee informed the employer of the conflict; and (3) 'the employer threatened him with or subjected him to discriminatory treatment, including discharge, because of his inability to fulfill the job requirements.'" ECF No. 33 at 8 (quoting *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993)). The standard under the WLAD is substantially similar. *See id.* at 12 (citing *Kumar v. Gate Gourmet, Inc.*, 325 P.3d 193 (Wash. 2014)); *see also Suarez v. State*, 552 P.3d 786, 795 (Wash. 2024).[1]

If the employee "establishe[s] a prima facie case, the burden shifts to the defendant to demonstrate 'either that it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship.'" ECF No. 33 at 9–10 (quoting *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830 (9th Cir. 1999)).

---

[1] For that reason, WSU addresses Rolovich's Title VII and WLAD claims together, using "Title VII" to refer to both statutes.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 10
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**2. Rolovich cannot establish his prima facie case**

    **a. Rolovich's Partial MSJ should be denied because the sincerity of his asserted religious beliefs is disputed**

Rolovich cannot establish the first element of his prima facie case as a matter of law at this stage, and certainly not by relying on a single, vague, self-serving declaration. It is well settled that the *sincerity* of a Title VII plaintiff's religious beliefs is an issue of fact not properly resolved on a motion for summary judgment. *See, e.g.*, *United States v. Seeger*, 380 U.S. 163, 185 (1965) (recognizing that "the threshold question of sincerity" of plaintiff's religious beliefs "is, of course, a question of fact"); *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56–57 (1st Cir. 2002) ("Credibility issues such as the sincerity of an employee's religious belief are quintessential fact questions [which] should be reserved for the factfinder at trial, not for the court at summary judgment.") (cleaned up). Tellingly, Rolovich fails to cite a single case awarding summary judgment to the *employee* on his prima facie case where the employer disputed the sincerity of his asserted objections to COVID-19 vaccination. *See* ECF No. 88 at 14.

Here, the record sharply undercuts Rolovich's self-serving and vague assertions of a religious objection to vaccination. Rolovich freely and frequently expressed *secular* concerns about COVID-19 vaccines in late 2020 and early 2021 to friends, family members, and coworkers. *See* SOMF ¶¶ 50–53. Indeed, Rolovich and his friends communicated constantly—often multiple times per day—expressing anti-vaccine disinformation, including that the vaccines were

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 11
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"experimental" and a "hoax," that world leaders who opposed the vaccines had "died unexpectedly," that the vaccines were "a bio-weapon," and that the vaccines enabled "naked authoritarianism," "vakseen [sic] fascism," and "crimes against children." Declaration of Spencer Coates (Coates Decl.), Exs. K, L, RR, TT. Following his separation from WSU, Rolovich continued to voice such secular alarm over the vaccines, even going so far as to ominously state that those allegedly responsible for the COVID-19 "vax poison" "will pay . . . and money will not be the currency." Coates Decl., Ex. SS.

By comparison, in the thousands of pages of written communications about COVID-19 that Rolovich has produced in discovery, in *none* does he invoke a *religious* objection to the vaccines. *Id.*, Exs. B–M; SOMF ¶ 52; Declaration of Renée DiResta, Ex. A (DiResta Rep.) ¶ 50. Given the sheer volume of communications reflecting Rolovich's secular vaccine skepticism, a reasonable jury would at least doubt the sincerity of his realization (the day after he learned of the Proclamation) that he also had religious objections to the vaccines. *See, e.g.*, *Gardner-Alfred v. Fed. Reserve Bank of N.Y.*, No. 22-CV-1585 (LJL), 2023 WL 6214863, at *16 (S.D.N.Y. Sept. 25, 2023) (granting summary judgment to employer where plaintiff "generally opposed the vaccine on non-religious grounds," "exchanged messages . . . regarding what were claimed to be the harmful side effects to the vaccine," and "viewed the Covid-19 vaccine as something to be avoided").

The timing of Rolovich's purported epiphany makes it even less credible. *See, e.g.*, *Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981) ("The existence of a longstanding philosophical belief which has only recently, and to the claimant's

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 12
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

advantage, taken on theological overtones could certainly give rise to reasonable suspicion of dissimulation."). After Pac-12 media day, Rolovich and his agent, Thayer Evans, discussed getting him paperwork to support a *medical* exemption from WSU's vaccination requirement. SOMF ¶ 134–36. When that plan fizzled, Evans shared with Rolovich and his attorney a religious exemption template from the National Catholic Bioethics Center (NCBC). *Id.* ¶ 148–49. The NCBC template states: "if a Catholic comes to an informed and sure judgment in conscience that he or she should not receive a vaccine, then the Catholic Church requires that the person follow this certain judgment of conscience and refuse the vaccine." *Id.* Hours later, Rolovich went to meet with Father Paul. *Id.* ¶ 150. Only *then* did Rolovich conveniently "understand his disquiet in terms of Catholic teaching on the moral conscience." ECF No. 88 at 12; SOMF ¶ 150.

In light of that suspect chronology—and Rolovich's copious written communications expressing his medical, scientific, and political objections to the COVID-19 vaccines—a jury could easily disbelieve that he belatedly "discerned" a separate religious basis for his longstanding opposition to the vaccines. ECF No. 53 ¶ 24. Indeed, WSU submits that no reasonable jury would find Rolovich's conveniently timed religious epiphany to have been sincere. *See, e.g.*, *Moore v. Effectual Inc.*, No. 3:23-CV-05210-DGE, 2024 WL 1091689, at *9 (W.D. Wash. Mar. 13, 2024) (granting summary judgment to employer where plaintiff "had scientific and political objections to the vaccine that he attempted to 'fit' to his religious beliefs in order to potentially qualify for a religious exemption"); *Gardner-Alfred*, 2023 WL 6214863, at *15–16 (same where plaintiff "solicited the vaccine

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

exemption letter on the eve of the Vaccination Policy and for the purpose of obtaining an exemption" and "[n]o reasonable jury thus would be able to conclude that her claimed religious beliefs were anything other than contrived").[2]

In short, Rolovich has not and cannot establish that he is entitled to summary judgment "as to his prima facie case for the Title VII failure to accommodate claim." ECF No. 88 at 2. His Partial MSJ should be denied.

### b. As a matter of law, Rolovich's conscience-based objection does not establish a religious conflict with COVID-19 vaccination

As explained above, Rolovich is not entitled to summary judgment as to his prima facie case because the *sincerity* of his religious beliefs is a question of fact. But whether those asserted beliefs establish a *religious* conflict with COVID-19 vaccination is a question of law. *See Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51 (2d Cir. 1988) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972)). And under the governing law—even assuming arguendo Rolovich honestly believes he

_____

[2] Certainly, no reasonable jury would credit Rolovich's asserted religious belief that "accepting the vaccine will make me complicit in the abortions that produced the human cell lines from which" the COVID-19 vaccines were supposedly "derived." ECF No. 88 at 13. While that language appears in Rolovich's exemption request, it is undisputed that Rolovich neither wrote nor edited that request. SOMF ¶¶ 156–57. And there is no evidence Rolovich ever *mentioned* that particular objection to anyone, whether in conversation or anywhere in his thousands of pages of written communications about the vaccines. *Id.* ¶ 52–54, 61–62, 66, 71.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 14
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"had a religious obligation as a Catholic to follow [his] conscience and decline to take a COVID vaccination," ECF No. 89-2 ¶ 16—that sweeping conscience-based objection does not establish an actual religious conflict with vaccination.

In the leading pre-pandemic Title VII case on employee vaccination requirements, the Third Circuit affirmed the dismissal of a former hospital employee's complaint because it determined his opposition to the flu vaccine was not "religious in nature," despite the employee's assertion that getting vaccinated "would violate his conscience as to what is right and what is wrong." *Fallon v. Mercy Cath. Ctr. of Se. Pa.*, 877 F.3d 487, 492, 494 (3d Cir. 2017). Because the employee "simply worrie[d] about the health effects of the flu vaccine, disbelieve[d] the scientifically accepted view that it is harmless to most people, and wishe[d] to avoid this vaccine," his objection to the vaccine did not "'occupy . . . a place parallel to that filled by God in traditionally religious persons.'" *Id.* at 491–92 (cleaned up) (quoting *Welsh v. United States*, 398 U.S. 333, 340 (1970)).

Consistent with *Fallon*, since the pandemic, dozens of federal courts have rejected similar conscience-based objections to COVID-19 vaccination requirements. *See, e.g.*, *Finn v. Humane Soc'y of United States*, No. GLR-23-2107, 2024 WL 1765702, at *4 (D. Md. Apr. 24, 2024) (dismissing Title VII claim where plaintiff's "entire religious exemption request is essentially a statement that her religion requires that she listen to her conscience and act according to personal preference"); *Bartholomew v. Washington*, No. 3:23-CV-05209-DGE, 2024 WL 1426308, at *4 (W.D. Wash. Mar. 26, 2024) (same where objection was based on belief that "[a]s an individual Christian, and as an expression of your belief, you are

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

commanded to not allow anything to enter your body that violates your conscience");
*McCarthy v. Boston Med. Ctr.*, No. 22-11886-RGS, 2024 WL 185392, at *1
(D. Mass. Jan. 17, 2024) (same where "the cited basis for [plaintiff's] opposition to
vaccination appears to be the dictates of her own conscience, which she maintains
that her religion requires her to follow"); *see also* ECF No. 22 at 30–31; ECF No.
31 at 12–13 n.3. The principle underlying these decisions is that "[a]llowing [a]
[p]laintiff the ability to object to anything that 'goes against . . . her 'conscience'
would amount to the type of 'blanket privilege' that does not qualify as religious
belief." *Caruano v. Bayhealth Med. Ctr., Inc.*, 714 F. Supp. 3d 461, 469 (D. Del.
2024) (quoting *Africa v. Pennsylvania*, 662 F.2d 1025, 1031 (1981)).

Rolovich's conscience-based objection is indistinguishable. To be sure, "a
coincidence of religious and secular claims in no way extinguishes the weight
appropriately accorded the religious one." *Callahan*, 658 F.2d at 684. But
Rolovich's conscience-based objection to the vaccines does not merely *coincide*
with his health-based and other secular objections; it is entirely *derivative* of them.
Thus, even assuming his conscience-based objection is *sincere*, it does not establish
a *religious* conflict with the vaccine requirement under Title VII, defeating his claim
on the first element of his prima facie case.

### 3. WSU is entitled to summary judgment because it could not accommodate Rolovich without undue hardship

Ultimately, the Court need not even address the prima facie elements of
Rolovich's Title VII claim because WSU is entitled to summary judgment on the
basis of its complete defense of undue hardship.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 16
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### a. Title VII's undue hardship standard

An "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). In assessing undue hardship, a court "must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact," and "in the common-sense manner that it would use in applying any such test." *Id.* at 470–71. The analysis must also account for the "aggregate effects when multiple employees are granted the same accommodation." *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 437 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022).

Noneconomic costs, such as an "accommodation's effect on co-workers," are relevant to the undue hardship analysis. *Groff*, 600 U.S. at 472. Like other circuits, the "Ninth Circuit has long recognized valid safety concerns as establishing undue hardship." *White v. Univ. of Washington*, No. 2:22-CV-01798-TL, 2024 WL 1241063, at *8 (W.D. Wash. Mar. 22, 2024) (citing *Bhatia v. Chevron U.S.A., Inc.*, 732 F.2d 1382, 1384 (9th Cir. 1984) (per curiam)); *see also Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1180 (9th Cir. 2021) ("[A]n employee's request for an exemption from a COVID-19 vaccination mandate can be denied on the ground that . . . such an exemption would pose an undue hardship by . . . increasing the risk of the spread of COVID-19 to other employees or to the public.") (cleaned up); *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

hardship . . . ."); EEOC, *Religious Discrimination*, https://www.eeoc.gov/religious-discrimination (last visited Oct. 9, 2024) ("An accommodation may cause undue hardship if it . . . compromises workplace safety.").

### b. Rolovich's increased risk of contracting and transmitting COVID-19 constitutes an undue hardship

There is no genuine dispute as to the heightened public health risk an unvaccinated head football coach would have posed in October 2021—at the height of the Delta surge—to himself and those around him. As a matter of law, an accommodation that would materially exacerbate the spread of a deadly virus, particularly during a once-a-century global health crisis, cannot be "reasonable," and constitutes an undue hardship under Title VII.

The undisputed record establishes that football coaches at WSU—and especially the head football coach—faced a heightened risk of contracting and spreading COVID-19 due to their frequent and close in-person contacts. *See* SOMF ¶¶ 4–8. The head coach routinely works in close proximity to hundreds of individuals: players, assistant coaches, Athletics Department staff, members of the media, opposing coaches and players, and others. *Id*. He attends practices, training sessions, and games, and in each setting interacts closely with others. *Id.* ¶ 4. Coaches also travel with the team, stay in the same hotel as the team, and eat meals with the team. *Id.* Before and after games, the head coach has media responsibilities and gives interviews to the press. *Id.* ¶ 7. The head coach also meets with donors—in fact, he is usually the most in-demand University employee for donor engagement. *Id*. ¶¶ 6, 8. In his declaration, WSU's current head football coach, Jake Dickert,

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 18
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

walks through a typical week of his job: he interacts with "perhaps 1,000 or more" people in a variety of environments, mostly face-to-face and in close proximity. Declaration of Jacob Dickert (Dickert Decl.) ¶¶ 26–39. No doubt the same was true for Rolovich, who testified that whenever he encountered his players or football staff, his leadership strategy was to never "pass them in person without engaging them." SOMF ¶ 11.

In short, each week an unvaccinated head football coach would have hundreds or thousands of opportunities to contract COVID-19 while performing his official duties. And if he were to contract COVID-19, either at work or in his personal life, he would risk infecting hundreds or thousands of individuals: students, coworkers, staff, donors, and other members of the WSU community. SOMF ¶¶ 194–95.

Rolovich's unvaccinated status also increased the risk of him missing practices, training sessions, meetings, and games, if he either contracted COVID-19 or interacted with someone who had. The very fact that Rolovich was unvaccinated made him more likely to *test* positive for COVID-19—not only because unvaccinated persons were more susceptible to infection but because of mandatory testing requirements for *unvaccinated* staff only. Declaration of Dr. Guy Palmer, Ex. A (Palmer Rep.) ¶ 62. Under EH&S's "minimum" countermeasures, even a close contact with someone testing positive would have compelled Rolovich to quarantine for 14 days—and for *24 days* if the close contact were in his household. SOMF ¶¶ 178–79. In the wrong 24-day period, that would have left WSU's football team leaderless for one-third of its season. *Id*. ¶ 180. As Chun testifies, "[t]he risk of our head football coach contracting COVID-19, potentially developing severe disease,

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

and needing to take significant time away from work, would have been seriously harmful to the football team." Declaration of Patrick Chun (Chun Decl.) ¶ 69.

The heightened public health risk of having an unvaccinated head football coach in October 2021 is established by the *unchallenged* expert testimony of WSU's two scientific experts: Dr. John Lynch, the Associate Medical Director of Harborview Medical Center and leader of the Medical-Technical Team for University of Washington Medicine's COVID-19 Emergency Operations Center; and, Dr. Guy Palmer, WSU's Chief Science Advisor for its COVID-19 response and a world-renowned expert in vaccines and zoonotic diseases (those that, like COVID-19, spread between humans and animals). Their findings include that: (1) numerous public health authorities at the time of WSU's accommodation decision had concluded that the COVID-19 vaccines were safe and effective at reducing the transmissibility of the virus and the likelihood of severe disease, hospitalization, and death (particularly against the Delta variant dominant in fall 2021), *see* SOMF ¶¶ 194–95; (2) vaccination was the single most effective strategy for mitigating the spread of the virus, *id.* ¶ 194; and (3) other countermeasures such as masking (which was already required of Rolovich, but often disregarded) or frequent COVID-19 testing would not have sufficiently mitigated the risk of unvaccinated coaches spreading the virus, *id.* ¶¶ 194–95.

Based on those findings, Dr. Lynch concludes that "allowing Rolovich and seven other football coaches or professionals to continue working in their positions unvaccinated in the fall of 2021 would have significantly increased the risk of their contracting and transmitting COVID-19 to . . . other football coaches, Athletics

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 20
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Department staff, student-athletes, members of the media, WSU donors, and others." *Id.* ¶ 194. And Dr. Palmer—who wholly agrees with Dr. Lynch's opinions, *id.* ¶ 195—concludes that "granting accommodations to Mr. Rolovich and the other coaches would have resulted in a significantly greater risk of them getting infected with COVID-19 and transmitting it to others." *Id.*

Rolovich did not disclose any scientific experts. Therefore, Dr. Lynch's and Dr. Palmer's detailed findings and conclusions are unrebutted and must be treated as undisputed for the purposes of summary judgment. *See, e.g.*, *Tawnsaura Grp., LLC v. Maximum Human Performance, LLC*, No. CV 12-07189 SJO (AGRx), 2013 WL 11011698, at *6 (C.D. Cal. Sept. 12, 2013) ("Because Plaintiff has not attempted to rebut the factual assertions made by Defendant's expert, Plaintiff has failed to show that there is a genuine dispute as to [those facts]"). Accordingly, there is no genuine dispute that, had WSU allowed Rolovich and seven other football coaches and staff to continue working in their positions unvaccinated, it would have materially increased the risk of their contracting and spreading COVID-19 to students, coworkers, donors, or other members of the WSU community. This alone creates an undue hardship. *Doe*, 19 F.4th at 1180.

In a wide variety of employment contexts, many courts in this Circuit have granted summary judgment on undue hardship based on the increased risk of unvaccinated employees infecting coworkers or others with COVID-19. *See, e.g.*, *Mohamed v. Full Life Care*, No. C22-1010-KKE, 2024 WL 4371584, at *2 (W.D. Wash. Oct. 2, 2024) (mental health services coordinator); *Lavelle-Hayden v. Legacy Health*, --- F. Supp. 3d ----, No. 3:22-CV-01752-IM, 2024 WL 3822712, at *2–3,

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 21
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*15 (D. Or. Aug. 14, 2024) (phone operator, safety security officer, and other jobs involving "direct, in-person contact with patients and coworkers"); *Slater v. Behavioral Health Res.*, No. 23-5270 RJB, 2024 WL 4290289, at *1, *5 (W.D. Wash. Sept. 25, 2024) (office specialist); *MacDonald v. Or. Health & Sci. Univ.*, No. 3:22-CV-01942-IM, 2024 WL 3316199, at *2, *12 (D. Or. July 5, 2024) (nurse); *Petersen v. Snohomish Reg'l Fire & Rescue*, No. C22-1674 TSZ, 2024 WL 278973, at *1, *7 (W.D. Wash. Jan. 25, 2024) (firefighters); *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1121, 1135–36 (C.D. Cal. 2023) (television actor).

Courts in other circuits have also found undue hardship on the same grounds. *See, e.g.*, *Howe v. Mass. Dep't of Corr.*, No. 4:22-CV-40119-MRG, 2024 WL 3536830, at *1, *6 (D. Mass. July 25, 2024) (corrections officer); *Antredu v. Mass. Dep't of Youth Servs.*, --- F. Supp. 3d ----, No. CV 22-12016-WGY, 2024 WL 1539725, at *1, *5 (D. Mass. Apr. 9, 2024) (juvenile offender case worker); *Kushner v. NYC Dep't of Educ.*, No. 22-CV-5265 (DLI) (VMS), 2023 WL 6214236, at *1, *5 (E.D.N.Y. Sept. 25, 2023) (public school teacher); *Conner v. Raver*, No. 22-CV-08867-JST, 2023 WL 5498728, at *1, *6 (N.D. Cal. Aug. 24, 2023) (executive assistant). In all these cases, the critical factor was that the employee's "unvaccinated presence would have imposed 'substantial increased costs in relation to the conduct of [the employer's] particular business' by creating a health and safety risk." *Kushner*, 2023 WL 6214236, *5 (quoting *Groff*, 600 U.S. at 470).

WSU is entitled to summary judgment for the same reason. Rolovich's job as head football coach undisputedly required frequent interactions with students, coworkers, donors, and others. Unrebutted expert testimony establishes that his

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

unvaccinated status materially increased the risk of him contracting and spreading COVID-19, and that no other possible accommodation would have negated that risk. Thus, accommodating Rolovich—and the seven other football employees who requested accommodations—would have imposed an undue hardship on WSU. Summary judgment is warranted on this basis alone.

### c.  The economic costs of accommodating Rolovich constitute an undue hardship

Accommodating Rolovich would have also forced WSU to incur significant financial costs: (i) providing separate travel accommodations to allow for proper distancing from the rest of the team and staff; (ii) lost revenue resulting from canceled games in the event of another COVID-19 outbreak on the football team; and (iii) the loss of significant contributions from donors who expressed disappointment and anger at WSU for compromising community safety by allowing Rolovich to continue coaching while unvaccinated.

### i.  Travel costs

During the football season, the team travels extensively by charter plane and charter bus. To protect the health and safety of student-athletes and football staff, at a minimum Rolovich and the other unvaccinated football coaches would have been required to maintain six feet of distance from others. Palmer Rep. ¶ 59; Chun Decl. ¶ 78, Ex. T. Distancing would not have been possible on flights and buses, so WSU would have had to charter separate flights and buses to accommodate the unvaccinated coaches—just as EH&S's "minimum" countermeasures provided. *See* SOMF ¶ 178; Palmer Rep. ¶ 59; Chun Decl. ¶ 84.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 23
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

The cost to charter separate flights would have been approximately $28,000 per game, totaling $168,000 for all six away games. SOMF ¶ 196. Separate buses would have totaled approximately $28,500 for the season. *Id.* ¶ 197. These costs, totaling approximately $196,500, alone constitute an undue economic hardship. *See Bordeaux*, 703 F. Supp. 3d at 1137 ($300,000 to accommodate actor on set would be undue hardship for major international entertainment company).

### ii. Canceled games

Additionally, allowing Rolovich and the other unvaccinated coaches to continue working would have risked significant lost revenue from ticket sales and media rights due to canceled games. It is undisputed that unvaccinated coaches would have significantly increased the risk of a COVID-19 outbreak among the football team. SOMF ¶¶ 194–95; Chun Decl. ¶ 82. This was not a remote possibility—during the 2020 season, one COVID-19 outbreak forced the team to cancel two games. SOMF ¶ 31.

WSU's economic expert reviewed revenue from ticket sales for fiscal years 2018 through 2020 and conservatively estimated the lost revenue from ticket sales alone from one canceled game at $1.25 million. SOMF ¶ 198. If a bowl game had been canceled, lost ticket sale revenue would have reached approximately $1.8 million. *Id.* ¶ 199.

The economic impact of canceled games also encompasses lost media-rights revenues. *Id.* ¶ 200. Media-rights revenues—those realized from the Pac-12 conference's contracts with broadcasters—are the largest income source for WSU's

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

football program. *Id.* WSU's economic expert conservatively estimated media-rights revenue lost from one canceled game at approximately $170,000. *Id.* ¶ 201.

Overall, then, if WSU had been forced to cancel one regular season game and one bowl game, it would have incurred over $3 million in losses from ticket sales and media-rights revenue. SOMF ¶¶ 198–201. If six games and a bowl game were canceled, losses would have reached $10 million. *Id.*

Such losses are analogous to the undue hardship found in *Bordeaux*. There the court specifically considered the costs of temporarily shutting down production of a television show—which the actor plaintiff's unvaccinated status made more likely—and determined that projected losses of $1.5 to 3 million would constitute an undue hardship to the production company. 703 F. Supp. 3d at 1128, 1137, 1139–40. The same reasoning applies here, particularly where WSU had already suffered financial losses from games canceled due to COVID-19 outbreaks during the 2020 season. SOMF ¶ 29–33. These millions of dollars in potential losses would undoubtedly be "substantial" in the context of WSU's business. *See Groff*, 600 U.S. at 471.

### iii. Lost donations

Accommodating Rolovich also risked the loss of significant revenue from WSU donors. Donor contributions to the WSU Athletics Department generally range from $2.3 to 3.8 million each year. SOMF ¶ 204. Once Rolovich's vaccine refusal became publicly known, many donors—including several that had previously given millions to WSU—expressed anger and disappointment that Rolovich was endangering the WSU community. *Id.* ¶¶ 79–80, 205–06. Multiple major donors explicitly threatened to withhold further giving based on Rolovich's vaccine stance,

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 25
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

including one donor who canceled a planned $1 million bequest to the university. *Id*. ¶ 206.

In sum, the economic burdens of accommodating Rolovich were substantial. This, too, conclusively establishes undue hardship.

### d. Other burdens would have imposed an undue hardship

In assessing undue hardship, courts consider not just directly quantifiable economic costs, but also non-economic harms like reputational and institutional damage. *Lee v. Seasons Hospice*, 696 F. Supp. 3d 572, 579–80 (D. Minn. Sept. 29, 2023) ("reputational damage" can "create an undue hardship"); *Together Emps.*, 573 F. Supp. 3d at 435 (same). Undisputed facts show that accommodating Rolovich would have damaged WSU's football program and reputation.

***First***, Rolovich's unvaccinated status limited his ability to recruit high school and junior college players, a critical requirement for the football program's long-term success. SOMF ¶ 5; Declaration of Anne McCoy (McCoy Decl.) ¶ 17; Chun Decl. ¶ 17. Indeed, Rolovich's limited ability to recruit was apparent early in the 2021 recruiting cycle; his recruiting activities in 2020 and 2021 lagged far behind those of his successor over a similar time period. SOMF ¶¶ 69–70; Declaration of Brad Corbin ¶¶ 6–9.

This discrepancy is at least partially attributable to COVID-19 restrictions in 2021, including vaccination requirements. In 2021, many state and local jurisdictions (including some where Rolovich had conducted his few recruiting visits the previous year) mandated masking and social distancing—measures that

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Rolovich had proven incapable of consistently honoring. SOMF ¶ 68; *see infra* subsection II.B.3.e. Several jurisdictions also restricted or barred unvaccinated visitors from accessing school facilities. SOMF ¶ 68; McCoy Decl., Exs. D–E.

With these restrictions, Rolovich's limited ability to meet recruits in their homes or schools would have hindered the football program's long-term success—a hardship compounded by Rolovich being the only unvaccinated Pac-12 head coach in 2021, putting him at an immediate conference disadvantage. *See* SOMF ¶ 82; Chun Decl. ¶ 55. Nor did Rolovich demonstrate the ability or capacity to bridge the gap by relying on phone or video recruiting, which is less effective than in-person recruiting. McCoy Decl. ¶¶ 17, 49–51; Chun Decl. ¶ 64; Dickert Decl. ¶ 20. Furthermore, after any recruiting trips, Rolovich would have had to quarantine for five days upon his return to campus because he was unvaccinated, and thus would have been unable to participate in practices and other football activities. SOMF ¶ 67. Such absences would have hindered team development. Chun Decl. ¶ 40, Ex. A.

***Second***, accommodating Rolovich would have further damaged WSU's reputation with donors, fans, alumni, and the public at large. Meeting face-to-face with donors, for instance, is critical to WSU's Athletics program, and Rolovich would have been unable to accomplish this effectively while unvaccinated in 2021. SOMF ¶ 6; Chun Decl. ¶¶ 23, 50, 53; McCoy Decl. ¶ 19. Because of donor uproar and other local health restrictions on the unvaccinated, WSU had to cancel a number of previously scheduled in-person donor events for Rolovich, including the "Kickoff with the Cougs" event on August 26, 2021, multiple donor dinners, and the Coaches' Luncheon the Friday before home games. SOMF ¶ 81. Given the many donors

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 27
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

already curbing their giving, Rolovich's inability to cultivate new donors through in-person interactions would likely have compounded the economic challenges facing WSU.

Similarly, Rolovich's ability to interact with fans, the media, and the football team itself in 2021 was significantly limited because of his unvaccinated status, and would have continued to be for the remainder of the 2021 season. Being unvaccinated, Rolovich was barred from attending Pac-12 media day, a signature event for generating excitement about the upcoming season. SOMF ¶¶ 72–74, 82; Chun Decl. ¶¶ 45–46. For the same reason, Rolovich could not attend the Coaches' Show broadcast in person and had to conduct that weekly interview by Zoom, which reduced fan attendance. Chun Decl. ¶ 70. Worse, the distancing, masking, testing, and quarantining requirements that applied only to unvaccinated persons caused Rolovich to miss numerous team meetings and constrained his interactions with his coaching staff and team. Chun Decl. ¶ 66; Dickert Decl. ¶ 44.

***Finally***, there is no reasonable dispute that Rolovich's announcement of his unvaccinated status in July 2021 was met with a large—and overwhelmingly negative—public reaction that reflected poorly on WSU.[3] SOMF ¶¶ 79–80, 205. After Rolovich's announcement, WSU was bombarded by hundreds of messages from donors, students, parents, alumni, and concerned Washingtonians outraged by

---

[3] Soon after his announcement, one metric used regularly by WSU to survey public sentiment reported that Rolovich's vaccine stance was the single largest driver of negative WSU coverage in years. Bones Rep. at 34; Coates Decl., Ex. EE.

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Rolovich's anti-vaccine stance and public flouting of public safety measures. SOMF ¶¶ 80, 205; Chun Decl. ¶¶ 49–53; Declaration of Kirk Schulz (Schulz Decl.) ¶¶ 25–28; Declaration of Adam Ganders ¶ 5; Declaration of Mitchell Straub ¶¶ 10–15. Many questioned how a world-class scientific research university with a medical school, a global health school, and significant science-based research funding could credibly claim to prioritize community health and safety while employing an unvaccinated head football coach. Schulz Decl. ¶¶ 22, 36. These complaints continued, and in many cases worsened, as the football season began and thousands of WSU fans witnessed Rolovich frequently remove his mask during televised games in contravention of Pac-12, WSU, and local health requirements. SOMF ¶¶ 125–26; McCoy Decl. ¶¶ 30, 54; Chun Decl. ¶ 67. WSU had ample reason to believe that continuing to employ Rolovich would have increased the reputational and institutional damage it had already suffered.

In sum, accommodating Rolovich as head football coach would have imposed an undue hardship on WSU four times over—by damaging its community's health and safety, its finances, its football team, and its reputation.[4] Because undue hardship

---

[4] WSU is not alone in appreciating the undue hardship in having an unvaccinated head football coach, as evidenced by Rolovich's admitted inability to secure a coaching job with at least four other universities—the University of Nevada, the University of Hawaii, and two private Christian universities in Texas—because he was unvaccinated. SOMF ¶¶ 213–15.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 29
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

is a complete defense to Rolovich's WLAD and Title VII claims, WSU is entitled to summary judgment on those claims.

### e. WSU correctly determined that masking and distancing were not reasonable accommodations for Rolovich

Rolovich claims that he "could have been accommodated" by "requiring countermeasures to ensure his safety and others he may be in contact with," such as masking and distancing. ECF No. 53 ¶ 106. According to Rolovich, he "successfully performed his job as head coach while following countermeasures required of him by WSU because of his vaccination status." *Id.* ¶ 107. The undisputed facts refute both those assertions.

***First***, as Dr. Lynch's and Dr. Palmer's unrebutted scientific findings establish, "[v]accination was and is the single best tool available for stemming the spread of COVID-19 and its variants," and alternative mitigation measures like masking ("whether viewed in isolation or together") would not have been "an adequate substitute for vaccination." SOMF ¶¶ 194, 195.

***Second***, not only were countermeasures like masking and distancing insufficient to mitigate the risk of Rolovich contracting and spreading COVID-19, it is undisputed that Rolovich could not do his job effectively while following them. *See, e.g.*, *Bordeaux*, 703 F. Supp. 3d at 1127 (undue hardship where "the nature of Plaintiff's work required close, unmasked contact with other[s]"). Despite Pac-12 and WSU requirements that unvaccinated coaches wear masks during games and practices, in his deposition Rolovich admitted to repeatedly removing his to effectively communicate with players, coaches, and officials. SOMF ¶¶ 120–26.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 30
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Indeed, in six of the seven games he coached in 2021, Rolovich was caught on camera flagrantly removing his mask—usually in close proximity to other people:



Washington State head coach Nick Rolovich speaks with an official, not pictured, during the second half of an NCAA college football game against Utah State, Saturday, Sept. 4, 2021, in Pullman, Wash. (AP Photo/Young Kwak)



DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 31
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750





DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 32
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750





Coates Decl., Ex. UU.

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

In his deposition, Rolovich justified these—and thirteen more recorded mask-removals—as necessary for communication with players, coaches, or officials. SOMF ¶¶ 127–29. Rolovich testified that removing his mask was necessary "to make sure they heard me" in a noisy "football stadium with 30,000 people." *Id.* ¶ 129. Rolovich explained that unmasking was not only necessary to "un-muffle [his] voice," but also to "mak[e] sure [players were] able to understand body language of the importance of whatever I was communicating," and to allow them to "read[] lips" when he was "sending in plays and/or information." *Id.* Rolovich further justified his actions by arguing that masks reduced oxygen flow and exacerbated the "party headaches" he had from yelling during games. *Id.* ¶ 131.

Rolovich's inability to wear a mask continuously while coaching is not surprising. It is undisputed that a head football coach must speak frequently during games, often at loud volumes, in close proximity to dozens of other players, coaches, and officials. *Id.* ¶ 4. Because Rolovich admitted he had to remove even his cloth face covering to be heard, wearing an N95 respirator (as EH&S's memo prescribed) would undoubtedly have proven even more cumbersome. *Id.* ¶¶ 176–77. But WSU could not reasonably accommodate a coach who needed to violate state masking law, Pac-12 rules, or WSU's own safety requirements to do his job effectively. *See Trueblood v. Valley Cities Counseling & Consultation*, No. C23-0269JLR, 2024 WL 3965926, at *13 (W.D. Wash. Aug. 28, 2024) ("Even a 'danger' of violating the law suffices to show undue hardship.") (quoting *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006)).

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 34
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

***Third***, Rolovich's statements show that he not only found masking impracticable during games—but objectionable as a matter of principle. Even *before* the Proclamation, Rolovich was lackadaisical at best, and often openly contrarian, about masking rules. McCoy Decl. ¶ 27; Chun Decl. ¶ 33. In 2020, Rolovich openly mocked WSU's request that he wear a mask during media interviews; when a colleague texted a picture of Rolovich wearing his mask on his forehead while on set, Rolovich joked, "They told me to wear a mask":



Coates Decl., Ex. P.

Rolovich's hostility to masks only intensified after vaccines became available. During a donor trip to Seattle in May 2021, when Washington announced that *vaccinated* persons could remove their masks in public, Rolovich promptly removed

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 35
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

his in a hotel lobby, and proceeded to dine maskless with several major donors without informing them he was unvaccinated. SOMF ¶¶ 111–14. At one wine bar, Rolovich misled staff to gain entry when asked if he was vaccinated. *Id*. ¶¶ 115–16. Rolovich then removed his mask, stayed for an hour, and posed for a maskless picture with a WSU alumna who worked at the wine bar (and was entirely unaware of Rolovich's unvaccinated status):



*Id.* ¶ 116; Kennedy Decl., Ex. A.

On July 17, 2021, when state law still required unvaccinated persons to wear face coverings in public, Rolovich was photographed at an indoor football game not only unmasked, but while posing for photos and blowing through a vuvuzela:

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 36
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750



SOMF ¶ 118; Chun Decl., Exs. L (cicle added), M.

Rolovich's position on masks—as well as vaccination—is summarized succinctly in this text message he sent on July 11, 2021:



Coates Decl., Ex. M.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 37
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

The record is replete with other examples of both Rolovich's noncompliance with and obvious disagreement with masking as a COVID-19 safety measure, including his deposition testimony acknowledging his "concern [with] the detriments of masking to your general health." Coates Decl., Ex. A at 127:16–17; SOMF ¶¶ 109, 119, 209–11, 215. Simply put, Rolovich's longstanding and volitional noncompliance with masking rules showed that he could not—or would not—fulfill his coaching duties while distanced and without removing his mask.

## C. WSU Is Entitled to Summary Judgment on the Breach of Contract Claim

Rolovich's claim for breach of contract also fails as a matter of law. ECF No. 53 ¶¶ 98–111. This Court has already ruled that "Plaintiff's breach of contract claim rests on the determination of whether Plaintiff's exemption and accommodation would have imposed an undue hardship," and is "appropriately resolved at summary judgment." ECF No. 33 at 27–28. Because Rolovich did not have a bona fide religious belief that conflicted with an employment policy and because accommodating Rolovich would have imposed an undue hardship, WSU had just cause for termination, and his contract claim accordingly fails.[5]

## D. WSU Is Entitled to Summary Judgment on the Wage-Withholding Claim

Summary judgment is also warranted on Rolovich's wage-withholding claim, whether it arises under RCW 49.52 or RCW 49.48. ECF No. 53 ¶¶ 112–17. As this Court confirmed, RCW 49.52 claims are not actionable where a "bona fide" dispute

---

[5] Rolovich's contract claim also fails for the additional reasons explained in WSU's Motion to Dismiss. *See* ECF No. 22 at 49–51; ECF No. 31 at 24–27.

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 38
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

exists over whether all or a portion of the wages must be paid. ECF No. 51 at 7. Accordingly, violations are typically found only "where an employer consciously withholds a quantifiable and undisputed amount of accrued pay," such as a failure to pay wages or issue regular paychecks. *Wright v. Belfor USA Group*, No. C24-0907-JCC, 2024 WL 3917157, at *4 (W.D. Wash. Aug. 22, 2024) (citations omitted). Indisputably, WSU paid Rolovich for the pay periods in which he actually worked. SOMF ¶ 189. And the record is clear that WSU had a "bona fide dispute" over its obligation to pay Rolovich liquidated damages—because it rightly believed it had just cause to terminate his employment. That alone defeats Rolovich's RCW 49.52 claim. *See, e.g.*, *Garrison v. Merch. & Gould, P.C.*, No. 09-CV-1728-JPD, 2011 WL 887749, at *10 (W.D. Wash. Mar. 10, 2011) (granting summary judgment for employer that "acted on its genuine belief that it was not obligated to pay [plaintiff] additional compensation under the contract"); *Zuccaro v. MobileAccess Networks, Inc.*, No. C11-272 MJP, 2012 WL 261342, at *4 (W.D. Wash. Jan. 30, 2012) ("genuine question" as to contractual requirement was sufficient to defeat wage-withholding claim).

Any claim for wage theft under RCW 49.48 fares no better. ECF No. 53 ¶¶ 121–24. To prevail on this claim, Rolovich cannot simply point to damages associated with his other claims; he must allege that WSU "did not pay [him] for all hours worked before [he was] placed on leave or illegally deducted an amount from [his] paychecks." *Zimmerman v. PeaceHealth*, 701 F. Supp. 3d 1099, 1117 (W.D. Wash. 2023). Rolovich cannot establish any right to liquidated damages because he was rightly fired for just cause, as explained above. And because WSU undisputedly

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 39
Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    did not withhold any wages from Rolovich for the pay periods when he actually

2    worked for WSU, his claim fails as a matter of law.

3    **IV.    CONCLUSION**

4         WSU respectfully requests that the Court enter summary judgment in WSU's

5    favor on all claims, and deny Rolovich's Partial MSJ.

6

7         I certify that this memorandum contains 9,140 words, in compliance with the

8    Court's Order of September 18, 2024, ECF No. 86.

9

10         DATED this 14th day of October, 2024.

11                 PACIFICA LAW GROUP LLP

12                 *s/Zachary J. Pekelis*

13                 Zachary J. Pekelis WSBA #44557
Ai-Li Chiong-Martinson, WSBA #53359

14                 Erica P. Coray, WSBA #61987
W. Scott Ferron, WSBA #61154

15                 Special Assistant Attorneys General
1191 Second Ave., Suite 2000

16                 Seattle, WA 98101

17

18                 ROBERT W. FERGUSON
Attorney General

19

20                 Spencer W. Coates, WSBA #49683
Assistant Attorney General

21                 800 Fifth Avenue, Suite 2000
Seattle, WA 98101-3404

22

23                 *Counsel for Defendant*
*Washington State University*

24    DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 40

25    Case No. 2:22-cv-00319-TOR

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1

## CERTIFICATE OF SERVICE

2

   I hereby certify that on this 14th day of October, 2024, I electronically filed

3

4

the foregoing document with the Clerk of the United States District Court using the

CM/ECF system which will send notification of such filing to all parties who are

5

6

registered with the CM/ECF system.

7

8

   DATED this 14th day of October, 2024.

9

10

_____

11

Erica Knerr, Legal Assistant

12

13

14

15

16

17

18

19

20

21

22

23

24

DEF.'S COMBINED CROSS-MSJ & RESP.
TO PLF.'S MOT. FOR PARTIAL SJ - 41
Case No. 2:22-cv-00319-TOR

25

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750