1
2
3
4

ALEXANDRIA T. DRAKE, WSBA #45188
Dunn & Black, P.S.
111 North Post, Ste. 300
Spokane, WA 99201-0907
(509) 455-8711

5
6
7

ERIC JOB SEESE
Frost Brown Todd LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990

8
9
10
11

ERIC KNIFFIN
Kniffin Law PLLC
102 S. Tejon St., Suite 1100
Colorado Springs, CO 80903
(719) 212-4391

12
13

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

14

NICHOLAS ROLOVICH,

15

Plaintiff,

16

v.

17

18

WASHINGTON STATE
UNIVERSITY,

19

Defendant.

20

NO. 2:22-cv-00319

**PLAINTIFF'S COMBINED
RESPONSE TO
DEFENDANT'S CROSS-
MOTION FOR SUMMARY
JUDGMENT AND REPLY
TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY
JUDGMENT**

21
22

December 3, 2024
Without Oral Argument

23
24

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY IN
SUPPORT OF PTF.'S MOTION FOR
PARTIAL SUMMARY JUDGEMENT
NO. 2:22-cv-00319-TOR

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## INTRODUCTION

WSU's *Combined Response to Plaintiff's Partial Motion for Summary Judgment and Cross-Motion for Summary Judgment* (WSU's "Brief") is a tour de force of post-hoc rationales for why WSU would have suffered undue hardship had it accommodated Plaintiff ("Rolovich"). At most, however, WSU's "undisputed" evidence is highly disputed, speculative and often inconsistent with WSU's actual practice at the time. Much of WSU's evidence is also inappropriate under current Title VII jurisprudence, either because it was not within WSU's knowledge at the time of the termination decision or because it relies on impermissible considerations under Title VII. The sheer scope of the factual record that WSU cites—and the ambiguity of that record—underscores the fact-intensive nature of Rolovich's claims and WSU's defenses. Additionally, WSU omits the growing number of COVID-19 vaccine cases in the Ninth Circuit and elsewhere that are headed to juries or have already gone to juries. Rolovich's case should as well.

**A. Triable Issues of Fact Preclude WSU's Request for Summary Judgment on Rolovich's Title VII Claim**

    **1.    Rolovich has satisfied the elements of his prima facie case. Alternatively, as WSU admits, sincerity is a question of fact for the jury which necessarily precludes granting summary judgment.**

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 1

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Rolovich has asked the Court to find that he has established a prima facie case under Title VII.[1] ECF No. 88 at 14. WSU argues the Court should deny Rolovich's motion because it claims Rolovich did not sincerely hold the religious beliefs described in his exemption letter.  ECF No. 93 at 18-21. If the Court concludes that a reasonable jury could doubt Rolovich's sincerity, despite the evidence in his motion, then Rolovich concedes that his sincerity is an issue of fact not properly resolved on summary judgment. *See Id.* at 18, ll. 6-14.

To the extent WSU is asking the Court to rule that Rolovich's convictions are not religious, *id.* at 21, the Court should decline. Both reasons described in his exemption letter are grounded in Catholic teaching.  ECF No. 88 at 12-14. As to Rolovich's convictions about aborted fetal issue, the Ninth Circuit has affirmed that such concerns count as "religious beliefs" that "conflict with receiving the COVID-19 vaccine." *Keene v. City & Cnty. of San Francisco*, No. 22-16567, 2023 WL 3451687, at *2 (9th Cir. May 15, 2023). As to Rolovich's convictions

---

[1] Rolovich follows WSU's practice and uses "Title VII" to refer to both Title VII and WLAD. *See* ECF No. 93 at 10, n.1.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 2

about therapeutic proportionality, the cases WSU relies on[2] are all ones where "plaintiffs failed to adequately articulate their religious exemptions." ECF No. 88 at 11 (collecting cases). WSU provides no example of a court that has rejected as non-religious a conviction "rooted in identified teachings" and "developed through study and consultation with religious authorities." *Id.* at 12 (collecting cases).

---

[2] *Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania*, 877 F.3d 487, 489 (3d Cir. 2017) ("While Fallon does not belong to any religious organization, he holds strong personal beliefs"); *Finn v. Humane Soc'y of United States*, No. CV GLR-23-2107, 2024 WL 1765702, at *4–5 (D. Md. Apr. 24, 2024) ("Finn [] does not identify if she subscribes to any particular religion or the specific nature of any religious beliefs"); *Bartholomew v. Washington*, No. 3:23-CV-05209-DGE, 2024 WL 1426308, at *5 (W.D. Wash. Mar. 26, 2024) (Bartholomew "focused on his belief in his own 'natural immunity'"); *McCarthy v. Bos. Med. Ctr.*, No. CV 22-11886-RGS, 2024 WL 185392, at *1 n.2 (D. Mass. Jan. 17, 2024) (plaintiff failed to "plead some modicum of plausible facts sufficient to create an inference that the conflict arises from some specific religious tenet or principle"); *Caruano v. Bayhealth Med. Ctr., Inc.*, 714 F. Supp. 3d 461, 468 n.3 (D. Del. 2024) (court found plaintiff had not "sufficiently connected her objection to the vaccine to a religious belief tied to her Christian faith").

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 3

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

In any event, WSU itself contends that the sincerity of a Title VII plaintiff's religious belief is an issue of fact not properly resolved on a motion for summary judgment. *Id.* at 18, ll. 6-14. At best, Rolovich has satisfied the "sincerely held religious belief" element of his *prima faci*e case (which is a "not onerous" burden), and if the Court finds that he has not, WSU has conceded that it is a question of fact for the jury to decide.

**2.      WSU has not established "undue hardship" as a matter of law**

**a.      Title VII's Undue Hardship Standard**

Just last year, the Supreme Court clarified an employer-defendant's burden on the defense of undue hardship: "showing 'more than a *de minimis* cost' as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). Instead, an "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *id.* at 468, and "is more severe than a mere burden," *id.* at 469. Post-*Groff*, WSU "must show that the burden of granting an accommodation would result in **substantial** increased costs **in relation** to the conduct of its particular business." *Id.* at 470 (emphasis added).

WSU cannot "escape liability simply by showing that an accommodation would impose some sort of additional costs. Those costs would have to rise to the

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 4

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

level of hardship, and adding the modifier 'undue' means that the requisite burden, privation, or adversity must rise to an 'excessive' or 'unjustifiable' level." *Id.* Additionally, WSU's "[u]ndue hardship cannot be supported by merely conceivable or hypothetical hardships." *WSU Tooley v. Martin–Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir.1981) (affirming lower court's finding that defendant's proffered hypothetical costs did not constitute cognizable undue hardship). Further, "[w]here an employer determines a particular accommodation request would cause undue hardship, the employer must consider alternative accommodation options." *Zimmerman v. PeaceHealth*, 701 F.Supp.3d 1099, 1111 (W.D. Wash. 2023) (quoting *Groff*, 600 U.S. at 473).

Lastly, while WSU focuses on COVID-19 cases in which courts have granted summary judgment due to the "undue burden" caused to the employer, other recent COVID vaccination decisions in both the Ninth Circuit and elsewhere have allowed these claims to go forward to trial. For example, in *Chavez v. San Francisco Bay Area Rapid Transit Dist.* ("*BART*"), in a case involving six plaintiffs with Title VII claims very similar to Rolovich's claim, the court denied cross-motions for summary judgment on the view that "whether a given accommodation would cause undue hardship is, in any case, a fact-intensive inquiry." No. C 22-06119 WHA, 2024 WL 3334741, at *10 (N.D. Cal.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 5

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Mar. 18, 2024). Relevant to this case, the *Chavez* trial court found that resolving plaintiffs' Title VII claims on summary judgment "would run afoul of the Supreme Court's discretion to engage in 'context-specific application.'" *Id.* at *12 (*quoting Groff v. DeJoy*, 600 U.S. 447, 473 (2023). The court ultimately denied the cross-motions for summary judgment and sent the issues to the jury, which resulted in a $7.4 million verdict for plaintiffs.

*Chavez* is one of at least four Title VII vaccine mandate cases where courts in the Ninth Circuit have this year rejected employers' motions for summary judgment. In *Kidd v. Univ. Med. Ctr. of S. Nevada*, No. 2:22-CV-01990-ART-NJK, 2024 WL 4046249 (D. Nev. July 2, 2024), the court held there were material issues of fact on undue hardship given that defendant had "granted religious exemptions to 85% of employees who requested them." *Id*. at *5–6 In *Carroll v. Tobii Dynavox LLC*, No. 523CV00124HDVSPX, 2024 WL 1600632 (C.D. Cal. Apr. 3, 2024), the court held there were issues of material fact on "whether [the defendant] engaged in a good-faith effort to explore various possible accommodations." *Id*. at *6. Though the defendant produced evidence that it had reviewed the possibility of accommodating the plaintiff, it was unclear whether the employer had even "sat down with [p]laintiff to review and discuss other options.") *Id*. Finally, in *Varkonyi v. United Launch All., LLC*, No. 2:23-CV-

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 6

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

00359-SB-MRW, 2024 WL 1677523 (C.D. Cal. Feb. 21, 2024), the court denied summary judgment because employer's undue hardship arguments did not take into account that its workforce was over 90% vaccinated.   *Id.* at *5. The court also found that while the employer had offered many undue hardship arguments, "the problem with this evidence is that none of it demonstrates how much it would have cost [defendant] to accommodate [plaintiff]." *Id*.

>    **b.    Rolovich's "increased risk of contracting and transmitting COVID-19" is largely hypothetical and whether it constituted an undue hardship is a question of fact**

WSU's "public safety risk" argument is mostly hypothetical. WSU argues that Rolovich's unvaccinated status caused such a heightened public health risk that it imposed an undue burden. However, this argument ignores the risk that WSU had already willingly undertaken, and is now applied to Rolovich differently. At the time Rolovich was terminated, WSU was already halfway into the 2021 season, had been testing all unvaccinated coaches (and presumably players under the Pac-12 guidelines at the time), and had provided exemptions to fourteen unvaccinated players while providing no accommodations to them nor making any changes to their interactions with the football team and/or travel and lodging accommodations for away games. SADMF ¶¶ 4, 24, and 199.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 7

WSU had already evaluated the risk of public safety and determined it could move forward with unvaccinated individuals on the football team. While Proclamation 21-14 did not apply to students, WSU itself had a vaccine requirement for students, as well as exemption process. *See* WSU Statement of Undisputed Facts, ¶ 43. Tellingly—and in the face of the same public health considerations that allegedly informed WSU's consideration of Rolovich's exemption request—WSU granted exemptions to 14 unvaccinated players (12 religious and two medical exemptions).  SADMF ¶ 4. A reasonable jury could deduce from such evidence that accommodating Rolovich would not have posed an incremental public safety risk that would rise to the level of an undue hardship. While WSU argues that the head coach position carried unique duties, the jury may take note of the fact that players would not only have had considerable and prolonged physical contact with another on the field, in lockers, and in practice, they also interacted with the general student population and mixed in dormitories and housing.

WSU's reliance on the typical interactions of the current football coach, Jake Dickert, is misleading at best.  The interactions which Jake Dickert claims to have in a typical day are what is experienced *now*, not what was experienced in 2021 or even 2022. The interactions in 2021 and 2022 were limited, due to

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 8

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

guidelines and policies in place by Washington and by WSU itself. Recruiting itself had been adjusted by Pac-12, as further discussed below, which had moved a significant portion of recruiting through Zoom. At a time when most people had limited interactions, WSU now argues that, at a time Americans were practicing social distancing, Rolovich's recruiting activities would have involved extensive travel to, and into, recruits' home. In fact, Pac-12 had instituted recruitment dead periods up through May 31, 2021. Remote recruiting was the norm for the months leading up to June 1, 2021.  SADMF ¶ 68.

The evidence in the record shows that the refusal to accommodate Rolovich was WSU succumbing to pressure from external forces instead of complying with Title VII. The status of players was not public, and so there were no negative reactions or pressure from fans, alumni, donors, or the public. The argument of the safety risk that one unvaccinated coach would have had is hypothetical at this point and undermined by the numerous exemptions and accommodations that WSU already provided to members of the football team. That WSU granted these exemptions, and accommodated (or decided no special accommodations were necessary even given their unvaccinated status) these players throughout the 2021 and 2022 football seasons, is direct evidence that contradicts WSU's assertion of any alleged undue hardship. That WSU chose not

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 9

to isolate or distance the unvaccinated players during travel for games is further evidence from which a jury could conclude that the alleged public safety risk of allowing the head coach, like his players, to remain unvaccinated would not have posed an undue hardship. SADMF ¶ 205.

The hypothetical and conjectural nature of WSU's "public safety risk" argument is underscored by the four weeks of pre-season camp coupled with the seven games of the 2021 season that WSU's football team had already completed. Over ten weeks in which numerous players and coaches – unvaccinated – interacted with other members of the football program, participated in practices, training, travel, and games. And during these ten plus weeks, there were no outbreaks. SADMF ¶¶ 205 & 210.  The scenarios that WSU now offers are merely hypotheticals.

Further, the analysis of whether Rolovich's unvaccinated status had such an incremental impact on public safety as to cause an undue hardship must be viewed at the time, based upon what was known at the time. "It is axiomatic that an employer can make decisions based only on the information known to it at the time of the decision." *Lavelle-Hayden v. Legacy Health*, No. 3:22-CV-01752-IM, 2024 WL 3822712, at *10 (D. Or. Aug. 14, 2024) (quoting Kluge *v. Brownsburg*

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

*Cmty. Sch. Corp.*, 64 F.4th 861, 888 (7th Cir. 2023)). As the *Lavelle-Hayden* court explained:

> Along with considering both economic and non-economic costs when assessing undue hardship, this Court further holds that it is appropriate to confine the analysis to the information available to the employer when it made its undue hardship decision. This approach comports with how courts analyze whether a plaintiff has alleged a prima facie case against an employer—by assessing the information the plaintiff provided to the employer and, thus, the information of which the employer had notice.

*Id.*

As of October 18, 2021, WSU knew the risks of unvaccinated individuals and the impact of those unvaccinated individuals on the football team. It had guidelines in place for the team, and weekly testing. SADMF ¶ 140. Based upon what was known at the time, there was no incremental impact on public safety caused by Rolovich that rises to the level of establishing an undue hardship upon WSU's football program as a matter of law.

### c. A reasonable jury, viewing the evidence in the light most favorable to Rolovich, could find that the fiscal costs of providing accommodation did not constitute an undue hardship

WSU cites a parade of horribles regarding the *theoretical* fiscal costs of accommodating Rolovich. WSU asserts that the cost of accommodating Rolovich's exemption request would have approximated $196,500 in additional

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 11

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

travel costs and that it would constitute an undue economic hardship. ECF No. 93 at 30-31. But courts must "apply the [undue hardship] test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Groff*, 600 U.S. at 470-71 (internal quotations omitted). Thus, this $196,500—even if the jury credits it—is the cost of travel accommodations across two football seasons. SADMF ¶ 225.

Relevant here are the total operating expenses and revenues of the WSU football program over the years. For the 2018 through 2022 football seasons, WSU's total operating expenses ranged from $16,533,539 to $25,335,772. SADMF ¶ 221. When deposed, WSU's expert admitted that he failed to determine the actual costs for each season and performed no calculation to determine the costs against the overall operating expenses. SADMF ¶ 224. Rather, he only looked at the incremental cost across two seasons. *Id.*

WSU's estimated cost of $28,500 for hiring separate buses, which WSU incorrectly stated was for the 2021 season, ECF No. 93 at 31; ECF No. 94 at ¶ 197, is for a total of 13 games across two football seasons. SADMF, ¶ 200. If $196,500 is compared against total expenses for the 2021 and 2022 seasons (a total of $48,158,117), it amounts to 0.4 percent of WSU's total expenses.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 12

Compared against the team travel expenses alone (a total of $2,696,708), it amounts to 7.295 of the travel expenses across two seasons. SADMF, ¶ 202. These costs are minimal and do not rise to the level of undue hardship to bar accommodation requirements under Title VII.

This economic analysis not only is a litigation-inflated number, but is also hypothetical and speculative. *Lavelle-Hayden,* 2024 WL 3822712, at *10 ("It is axiomatic that an employer can make decisions based only on the information known to it at the time of the decision.") For example, WSU's non-retained expert Dr. Guy Palmer—whom another WSU expert, David Bones, relied upon exclusively to calculate the costs of accommodation—"would have also recommended that" all unvaccinated coaches would have had to travel separately – by chartered plane, separate buses, and separate accommodations. ECF No. 106 at 34, ¶ 60; ECF No. 96 at 27-28. These are litigation-manufactured recommendations that go beyond what the Athletics Department and Pac-12's required, or what WSU actually did with respect to exempted unvaccinated players.

In reality, Dr. Palmer's primary recommendations were for WSU to "follow all requirements from the Athletics Department and the Pac-12." ECF No. 106 at 34, ¶ 59. The Athletics Department's accommodations would have

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 13

been wearing masks and maintaining social distancing. *Id.* The Pac-12 would have required surveillance testing of a PCR test or three antigen tests per week, negative PCR test prior to any games, refraining from returning to campus from *non-team* related travel without a negative PCR test, and quarantining upon return to campus from any *non-team* related travel until a negative PCR test was obtained. *Id.* The cost of quarantine and testing would have been minimal—so minimal that WSU's expert did not find them worthy of analysis. SADMF ¶ 226. Further, these testing costs had already been undertaken by WSU throughout the 2021 football season.

At trial, the jury may reasonably find that Rolovich's separate travel would not have posed an undue hardship, whether evaluated in context of WSU's overall operations or evaluated just in the context of the football program. WSU generated total operating revenue of $47,625,476 in the 2021 football season and $48,758,639 in the 2022 football season. ECF No. 96 at 66-67. A jury could reasonably find that these added costs did not "rise to the level of hardship" of being "excessive" or "unjustifiable." Given the small percentages and that WSU already chartered flights for its football team, these accommodation expenses would not be "unduly costly, extensive, substantial, or disruptive, or that would fundamentally alter the nature or operation of the business" of the football team

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 14

and WSU. *Poole v. Centennial Imports, Inc.*, No. 2:12-cv-00647-APG-VCF, at *10 (D. Nev. May 19, 2014).

Additionally, the largely hypothetical nature of the cost of accommodating Rolovich is further evidenced by the football players were unvaccinated and traveling *with* the rest of the team (players and coaches that were vaccinated), SADMF, ¶ 4. There is even less basis for WSU to take on additional costs to provide different and exclusive accommodations to Rolovich by the fictitious assumption that he would have needed to travel separately from both vaccinated and unvaccinated members of the football team.

It is entirely unclear why WSU would have needed to charter a separate plane and a separate bus for Rolovich. This is especially true given that the record shows WSU did not take that measure (separate charter transportation) for the 14 unvaccinated players whom WSU granted exemptions. *Id.* A reasonable jury could conclude that there was no need for separate accommodation, and therefore WSU created its own illusion of hardship. Simply put, there was no undue hardship to accommodate Rolovich.

Even assuming that the accommodations provided to unvaccinated players included separate travel from the rest of the team, it is inconceivable that the incremental cost of including Rolovich to those travel costs would cause an undue

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 15

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

hardship. There is also no evidence that WSU considered alternative options at the time. *United States v. Cal. Dep't of Corr. & Rehab.*, 2:24-cv-00925-DJC-DB, at *30 (E.D. Cal. June 20, 2024) (" The Supreme Court's ruling in *Groff* is clear that before declaring that providing an accommodation for an employee's religious beliefs creates an undue hardship, an employer must consider other options, not simply assess 'the reasonableness of a particular possible accommodation or accommodations.'"). For example, WSU already had the costs of weekly testing and seven games that were played under this model, yet this alternative was not considered. Dr. Palmer had recommended that the Pac-12 guidelines and Athletics Department policies were followed. While Mr. Bones admitted that these costs were minimal, there is no evidence that WSU considered these alternative *and reasonable* accommodations, which certainly would not have posed an undue hardship due to their minimal costs.

WSU has not established that, as a matter of law, its litigation-generated calculation of speculative fiscal costs would pose an undue hardship.

### d. Donor Opposition to Accommodating Rolovich Is Not Cognizable to Factor into Undue Hardship

WSU contends that the *potential* lost donations would have caused an undue hardship for the University. EFC No. 93 at 25-26 ("Accommodating Rolovich also *risked* the loss of significant revenue" (emphasis added)).

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 16

Specifically, WSU argues that many high-level donors had expressed "anger and disappointment that Rolovich was endangering the WSU committee." *Id.* at 25. WSU contends that after the termination of Rolovich, $3.5 million was donated. ECF No. 94 ¶ 208. However, WSU has withheld whether the impetus for the $3.5 million in donations was specifically because of Rolovich's termination, or that it had been withheld because WSU had continued to employ Rolovich.

First, as noted above, under *Groff* any alleged undue hardship must be measured against the overall context of the employer's business. "[T]he decision of whether a particular accommodation works an undue hardship on … an employer … must be made by considering 'the particular factual context of each case.'" *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981) (quoting *Anderson v. General Dynamics Convair Aerospace Div.*, 489 F.2d 397, 400 (9th Cir. 1978)).

Here, WSU represents that in a typical year its football program typically received between $2.3 and 3.8 million in donor contributions. ECF No. 94 ¶ 204. The money that had allegedly been threatened to be withheld were donations overall to WSU, not those specifically earmarked for the athletics department as a whole. From fiscal year 2018 through 2023, the WSU Athletics Department received donations that ranged from $7.7 to 14.5 million. SADMF ¶ 210.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 17

In fiscal year 2022, WSU received $120.9 million in philanthropic support, "the highest activity since FY2015." SADMF ¶ 213. In fiscal year 2023, WSU received $167.9 million in annual fundraising. *Id.* The threatened withholding of donations, and the economic impact of such withheld donations, must also be analyzed in the context of the business – WSU as a whole. The range of $2.3 to 3.8 million which WSU's football program receives is nominal from the overall donations WSU receives each year.

WSU claims that multiple donors explicitly threatened to withhold further donations, but only provides that one donor canceled a $1 million bequest to the university and that another reinstated a $1.5 million bequest after Rolovich's termination. The others shown in the table provide that most have given, over their lifetime, less than $500,000. ECF No. 102, pp. 17-18. More importantly, is what level their giving was over the years. Only two gave $25,001 and above each year, from fiscal years 2021 through 2023. *Id.*

When compared against the annual giving WSU received each year, the economic impact of the threatened withholding of donations (which is something every university must contend with, as it is the nature of their business) amounts to approximately one percent of the giving it received. This does not count as "significant" under *Groff*.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 18

Second, and more fundamentally, the Supreme Court made clear in *Groff*

that Title VII forbids This takes into consideration the sentiments and opinions of

donors to WSU. However, current Title VII jurisprudence forbids failure-to-

accommodate by proxy. The *Groff* Court noted that, to the extent it "was not

previously clear," "a coworker's dislike of 'religious practice and expression in

the workplace' or 'the mere fact [of] an accommodation' is not 'cognizable to

factor into the undue hardship inquiry.'" 600 U.S. at 472. The Court elaborated

that, "a hardship that is attributable to employee animosity to a particular religion,

to religion in general, or to ***the very notion of accommodating religious practice***

cannot be considered 'undue.'" *Id.* (emphasis added).

The Supreme Court's caution about taking co-worker hostility into account

applies with full force to WSU's reliance on its donors' sentiments: "If bias or

hostility to a religious practice or a religious accommodation provided a defense

to a reasonable accommodation claim, Title VII would be at war with itself."

*Id*.  Here, permitting donors to influence the decision of whether an

accommodation is appropriate, is contrary to Title VII caselaw and its purpose.

"If relief under Title VII can be denied merely because the majority group of

employees, who have not suffered discrimination, will be unhappy about it, there

will be little hope of correcting the wrongs to which the Act is directed."

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 19

*Anderson v. v. General Dynamics Convair Aerospace Div.*, 489 F.2d 397, 402

(9th Cir. 1978) (quoting *U.S. v. Bethlehem Steel Corp.*, 446 F.2d 652, 663 (2d Cir.

1971)).

Given the financial model of universities, donors are comparable to a

business' customers. In *Diaz v. Pan Am World Airways, Inc.*, the court held that

customer preference may be taken into account only when it is based on the

company's inability to perform the primary function or service it offers. 442 F.2d

385 (5th Cir. 1971). Here, WSU's core function is to educate its students.

For all these reasons, WSU's donors' "expressed anger and

disappointment" at Rolovich's decision to exercise his rights under Title VII, the

WLAD, and the Governor's Proclamation are not relevant to the undue hardship

analysis. Even if the donations that were withheld were substantial in the context

of WSU's operations—which they were not—the donors' bias against Rolovich's

request for a religious accommodation cannot be considered under the Title VII

undue hardship analysis.

        **e.**    **Hypothetical game cancellations and lost ticket revenue do
not constitute cognizable "undue hardship," must less
establish undue hardship as a matter of law**

The argument now of potential cancelled games and lost ticket revenue is a

claim of undue hardship that WSU offers now, during litigation. At the time

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 20

Rolovich was terminated, no games had been cancelled. No outbreaks had occurred. And this was under the existing weekly testing that WSU had undertaken, which it then cancelled once it terminated all of the football coaches. At the time Rolovich was provided the Notice of Intent to Terminate, the alleged undue hardship from cancelled games and lost ticket revenue was not a factor in consideration. This is because at that time, WSU was aware that there would be no cancelled games as a result of Rolovich's unvaccinated status. Therefore, it was not a factor or point of consideration in WSU's undue hardship analysis.

Now, during litigation, WSU has developed an analysis of cancelled games and potential lost ticket revenue as a result, in order to increase their numbers for the undue hardship analysis. At this time, it is known that in the 2021 season, Pac-12 did not cancel the one game that was impacted by COVID-19, but instead rescheduled it. Therefore, the potential lost ticket revenue, media rights, and conference distributions are all hypothetical and created for litigation. "The Ninth Circuit has echoed the Sixth Circuit's 'skepticism' about ''hypothetical hardships' based on assumptions about accommodations which have never been put into practice.'" *E.E.O.C. v. Alamo Rent-A-Car LLC*, 432 F.Supp.2d 1006, 1016 (D. Ariz. May 26, 2006) (quoting *Anderson v. General Dynamics Convair Aerospace Division*, 589 F.2d 397, 402 (9th Cir. 1978)).

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 21

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

Under this faulty series of hypotheticals, "virtually no accommodation could overcome the undue hardship test." *Id.* WSU has asserted facts that are grounded only in assumptions in what could have happened, and opinion based on hypothetical scenarios, developed long after the 2021 and 2022 football seasons to support litigation. "Because 'undue hardship canoe be proved by assumptions nor by opinions based on hypothetical facts …. [WSU] has not raised a material factual issue concerning undue burden." *Id.* at 1017.

Furthermore, the canceled games and resulting lost ticket revenue, media rights, and conference distributions is admitted by WSU to not be an undue hardship based upon their actions. This was a risk that WSU had already accepted when it granted exemptions to 14 football players, and did not require any accommodations or changes to the team despite the 14 unvaccinated football players. Despite the 14 unvaccinated football players, WSU did not cancel any games in the 2021 or 2022 football seasons before the vaccine mandate was lifted. WSU had already determined that the potential losses from a COVID-19 outbreak on the football team, due to unvaccinated individuals, was not an undue hardship to prevent providing exemptions or to even require accommodations. WSU had determined these potential losses were not "substantial" in the context of WSU's business.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 22

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

1

2

3

### f.  The arguments offered by WSU related to alleged reputational and institutional damage are based on faulty assumptions of fact and do not amount to "undue hardship" as a matter of law

4

5

6

7

8

9

10

11

WSU's position regarding the impact on reputation is related to Rolovich's ability to meet with donors, fans, alumni, the public-at-large, fans, the media, and that the football team itself was significantly limited in 2021. ECF No. 93 at 34-35. However, each of these limitations existed because WSU refused to contemplate any alternative options or accommodations. *See generally,* ECF Nos. 93 and 94. Rather, WSU determined that in-person interactions were required, and therefore it could not accommodate Rolovich.

12

13

14

15

16

17

18

19

20

21

22

However, there is nothing that made in-person interactions a requirement to achieve the job duties of cultivating relationships. During a period where the pandemic was still in place, and society had largely learned to interact and build relationships virtually, it is strange that WSU contends its reputation could only be cultivated through in-person interactions. WSU admits that it canceled a number of previously scheduled in-person donor events, yet WSU provided no alternatives, made no other plans to conduct other forms of interaction – something that nearly every charitable organization had to shift to in order to continue operating during the pandemic shut-down.

23

24

"Although Title VII 'directs that any reasonable accommodation by the

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 23

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

employer is sufficient to meet its accommodation obligation,' the availability of options that would allow the employee to keep working may affect the reasonableness of an option that would not." *Zimmerman v. PeaceHealth*, 701 F.Supp.3d 1099, 1110 (W.D. Wash. 2023) (quoting *Ansonia Bd. Of Educ. V Philbrook*, 479 U.S. 60, 68 (1986)). "Where an employer determines a particular accommodation request would cause undue hardship, the employer must consider alternative accommodation options." *Zimmerman v. PeaceHealth*, 701 F.Supp.3d 1099, 1111 (W.D. Wash. 2023) (quoting *Groff*, 600 U.S. at 473).

There is no evidence WSU considered any alternatives to accommodate Rolovich as it related to interactions with fans, alumni, donors, and the public-at-large to determine whether they were reasonable and could be implemented. At the time of Rolovich's termination, weekly testing was already in place as required by Pac-12 (and should have continued even after Rolovich's termination due to Pac-12 rules). Therefore, WSU had sufficient information as to whether Rolovich could attend these events, if it had continued the weekly COVID-19 tests.

WSU relies upon the objections and negative reaction to Rolovich's unvaccinated status. However, WSU admittedly was receiving a mixture of responses to Rolovich's unvaccinated status. Instead of providing reasonable

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 24

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

accommodation, and providing the necessary public relations support for it, WSU opted to simply walk away and refuse to accommodate, claiming an "undue hardship" that it cannot prove.

### g. WSU's recruitment analysis is factually incorrect and, at a minimum, raises a factual issue for the jury

It is important to note that the NCAA did not permit in-person recruiting from March 2020 to June 1, 2021. Vaccine status was not relevant, it was simply not permitted. Rolovich was not permitted to recruit from August 1, 2021 through August 31, 2021 per the NCAA rules. SADMF ¶ 70. The permitted evaluation period ran from September 1, 2021 through November 27, 2021. *Id.* at ¶ 71. However, during this period, no in-person, off-campus recruiting contacts with the prospective student-athlete was permitted. *Id.* It was not until the contact period of November 28, 2021 through December 11, 2021 that Rolovich could have engaged in in-person, off-campus recruiting. *Id.* Rolovich was terminated on October 18, 2021, long before he could have engaged in any in-person recruiting.

Further, WSU contends that Rolovich did not leave campus for the purpose of recruiting between January 1 and September 30, 2021, because of his unvaccinated status, which caused him to lag behind in recruiting. ECF No. 93 at 33-34; ECF No. 94 at ¶ 94. And that further, as training began in June 2021, "it would not have been practical for Rolovich to quarantine for five-day periods" if

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 25

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

he left for in-person recruiting. *Id.* However, this position fails to take into account the NCAA recruiting calendar. The NCAA had put in place an immediate ban on in-person recruiting for Division I coaches and put in place a recruiting dead period at the onset of COVID-19 on March 18, 2020. SADMF ¶ 70. This dead period was continuously extended throughout 2020. *Id.* On November 18, 2020, the NCAA extended the recruiting dead period for all Division I sports through April 15, 2021. *Id.* This dead period did not allow in-person recruiting. *Id.* Instead, the NCAA permitted additional flexibility in virtual recruiting in football by allowing all coaches, full-time school staff members and current students to conduct recruiting calls (telephone and video) without a countable coach being present. *Id.* On February 17, 2021, the NCAA extended the dead period through May 31, 2021. *Id.* Therefore, Rolovich could not perform any in-person recruiting from January 1, 2021 through May 31, 2021.

In June 2021, there was no vaccine mandate nor any restrictions on the participation of coaches that were unvaccinated. The NCAA permitted on-campus evaluations during unofficial visits during the days football camps and clinics were allowed in June and July 2021 only, but otherwise the recruiting calendar was followed with a waiver of the telephone call legislation. SADMF ¶ 71. The quiet period (which does not permit in-person recruiting contacts or evaluations

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 26

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

on or off WSU's campus) ran from June 1 through June 27, 2021. *Id.* The dead period ran from June 28, 2021 through July 24, 2021, followed by a quiet period from July 25, 2021 through July 31, 2021. *Id.* For the 2021-2022 recruiting period, the dead period was in place from August 1, 2021 through August 31, 2021. *Id.*

Simply, Rolovich was severely restricted, by the NCAA, from in-person recruiting. Once the football season began, Rolovich's focus was on the team and its performance for that season. Even then, no in-person, off-campus recruiting contacts were permitted during the evaluation period of September 1, 2021 through November 27, 2021. *Id.* Further, other coaches could have contributed to the recruitment, as was part of their job. Due to the significant dead periods that were instituted by the NCAA, it is only logical that his recruitment numbers are different from Jake Dickert, who had no such restrictions in place during his recruitment period.

For the 2022 season, which is a mixture of recruits from Rolovich and Dickert, there were 27 enrollees, 19 of which were scholarship enrollees. Of those 19, 7 had committed to WSU under Rolovich in 2021. SADMF ¶ 5. This was all obtained after offers were made under significant dead periods imposed by the NCAA. In short, the impact on recruiting as a result of Rolovich's unvaccinated

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 27

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

status was minimal. WSU has not shown that Rolovich's unvaccinated status damaged WSU's football program and its ability to recruit and fill its roster.

WSU has failed to establish undue hardship as a matter of law. Based on the record, WSU's cited hardships are either litigated-created statistics that WSU did not calculate or know at the time it terminated Rolovich or are sufficiently minimal in the overall context of WSU's business that a reasonable jury could find them not to be "undue."

### 3.   In the alternative, disputed facts regarding WSU's motives preclude summary judgment on Rolovich's Title VII claim

According to WSU, an "undue hardship" is a "complete defense" to Rolovich's Title VII (and WLAD) claim. ECF No. 93 at 16. Fortunately for Rolovich and civil rights plaintiffs everywhere, WSU is mistaken. Federal civil rights law does not let bad actors off the hook so easily. The 1991 Amendments to Title VII "expressly overruled the basic premise that an employer could avoid all liability under Title VII by establishing the absence of 'but for' causation." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 850–51 (9th Cir. 2002).

As amended, Title VII's "disparate-treatment provision prohibits actions taken with the *motive* of avoiding the need for accommodating a religious practice." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). *See also* 42 U.S.C. § 2000e-2(m). "[M]otive is especially easy to infer

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 28

where an employee has submitted a request for an accommodation or where the employer knows of the employee's religious practice." *Hebrew v. Texas Dep't of Crim. Just*., 80 F.4th 717, 724 (5th Cir. 2023).

The Ninth Circuit has held that a plaintiff may establish her Title VII case by "simply produc[ing] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *McGinest v. GTE Service Corp*., 360 F.3d 1103, 1122 (9th Cir.2004). Even "a single discriminatory comment by a plaintiff's supervisor is decisionmaker is sufficient to preclude summary judgment for the employer." *Dominguez–Curry v. Nev. Transp. Dep't*, 1039 (9th Cir. 2005).

In Section B.3 below, Rolovich details a litany of text messages and statements that create issues of fact as to whether WSU followed its own procedures and acted in good faith in the course of denying Rolovich's request for a religious exemption. Under the same evidence, a reasonable jury could easily find that WSU was motivated to deny Rolovich's request for a religious accommodation or that it made disparaging remarks about his religious beliefs. These facts preclude summary judgment for WSU on Rolovich's Title VII/WLAD claim.

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

## B. WSU Is Not Entitled to Summary Judgement Rolovich's Claim for Breach of Contract

In its Brief, WSU summarily addresses Rolovich's breach of contract claim in one short paragraph, Brief at 38, and incorrectly concludes that this cause of action is irrevocably tethered to Rolovich's Title VII claim. WSU's perfunctory treatment of this claim is premised on its assumption that disposing of Rolovich Title VII claim automatically disposes of his breach of contract claim. That is not the case.

Admittedly, the Court's May 30, 2023 Order regarding Defendants' Motions to Dismiss noted that "Plaintiff's breach of contract claim rests on the determination of whether Plaintiff's exemption and accommodation would have imposed an undue hardship." ECF No. 33 at 27. Both this dicta and WSU's assumption that Rolovich's breach of contract claim must necessarily fail if his Title VII fails appear premised on a misunderstanding of the nature of the breaches that Rolovich has alleged. They also overlook what discovery has revealed over the intervening 17 months since the May 30, 2023 Order.

At its core, Rolovich's breach of contract argument is that – even if the finder of fact concludes that accommodating Rolovich would have imposed an undue hardship (thus relieving WSU from Title VII liability) – WSU breached his contract by characterizing his resulting termination as a "just cause" termination.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 30

Rolovich contends that this was done in order to avoid owing liquidated damages to Rolovich.[3] Although WSU's Brief elides it, Rolovich has also pled that WSU's actions in his termination also breached the duty of good faith and fair dealing. SAC at 24, ll. 9-10 ("COUNT I - BREACH OF CONTRACT – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING"). *See also id.* ¶ 111 ("WSU's decision and actions in terminating Mr. Rolovich, and asserting that it had just cause to do so, also constituted a breach of the implied warranty of good faith and fair dealing.").

Whether an employer properly determined that it had just cause for a termination is a factual question for the jury. *Lund v. Grant Cnty. Pub. Hosp. Dist. No. 2*, 85 Wash. App. 223, 228, 932 P.2d 183, 185 (1997); *see also Trainer v. Kitsap Cnty.*, 107 Wash. App. 1035 (2001) ("[I]t was and is the proper role of the jury to determine just cause."). Given that WSU has not presented *any* evidence on the topic, the Court should allow this cause of action to proceed to the jury. Additionally, Rolovich highlights below multiple examples of why the

---

[3] It is not disputed that WSU could have terminated Rolovich's employment at any time. But his Employment Agreement required that WSU pay Rolovich liquidated damages in the amount of 60% of his salary for the remainder of his five-year term unless the termination was for "just cause."

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 31

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

issue of whether WSU properly terminated Rolovich's employment agreement for

"just cause" is a question of fact for a jury.

### 1.    Official FAQs accompanying Proclamation 21-14 imposing the mandate provided that terminations for refusal to get vaccinated were to be "non-disciplinary"

On August 9, 2021, Governor Jay Inslee issued a binding directive which

mandated that Washington State employees who refused to receive the COVID-

19 vaccine should *not* receive any type of disciplinary termination

characterization. SADMF ¶ 167.  Specifically, accompanying Proclamation 21-14

were "FAQs for vaccine mandate for some state employees and certain private

employers" ("FAQS").  *Id*. One FAQ specifically reads: "What if someone

refuses to get vaccinated?" Answer: "[E]mployees who refuse will be subject to

*non-disciplinary dismissal* from employment for failing to meet the qualifications

of the job." *Id*.  (emphasis added). Whatever persuasive authority the FAQs may

have, a jury could well conclude this guidance should have guided WSU's "just

cause" determination. *Id*. at ¶ 209.

Lisa Gehring, a member of WSU's HRS department, acknowledged in her

deposition that this language from the FAQs meant WSU was precluded from

firing someone "for cause" based on an employee's failure to comply with the

vaccine mandate. *Id*. A reasonable jury could find that, in light of the

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 32

unambiguous language in the Governor's FAQs, WSU erred when it elected to terminate Rolovich for "just cause."

### 2. WSU negotiated and included language in other football coaches' agreements concerning the consequences of electing not to get vaccinated. No such provision was included in Rolovich's employment agreement.

Other WSU football coaches were similarly terminated based on their failure to receive the COVID-19 vaccine. SADMF ¶ 217. These coaches had contracts that were largely identical to Rolovich's except for this material difference: the assistant coaches' agreement expressly included an obligation missing from Rolovich's agreement: "**Employee agrees to follow all federal, state, and local health directives as well as university policies related to health and safety**." *Id*. (emphasis in original). This inclusion and omission raise a question for trial – namely, whether the omission in Rolovich's agreement of a requirement to "follow all federal, state, and local health directives" should have factored into WSU's "just cause" termination decision. Even more specifically, it raises an issue of fact as to whether WSU's "just cause" determination should be viewed by the jury with added skepticism since WSU was capable to negotiating the "shall follow all health directives" provision when in fact it wished to make it clear that failure to follow such directives was a term of employment. In a related vein, a reasonable jury could conclude that WSU's diligence in amending other

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 33

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

coaches' contracts indicates that WSU believed it gained something that it did not believe it had under Rolovich's agreement. There is an issue of fact (a) as to whether WSU failed to follow its own stated procedures for evaluating Rolovich's exemption request and (b) if so, whether such failure breached the implied covenant of good faith and fair dealing.

There are significant issues of material fact as to whether WSU resolved Rolovich's request for a religious exemption according to its established procedures. Most significantly, WSU documents and testimony offer conflicting accounts of how its review process determined whether an employee's request for a religious exemption was based on a sincerely held religious belief.

First, WSU internal documents and talking points consistently state that this determination was made by its blind review committee before the employee's department was contacted regarding possible accommodations:

- Internal procedures drafted by HRS state that the review committee "***determines*** if the employee holds sincerely held religious beliefs, practice, or observance" and the employee's department is contacted only after a "sincerely held religious belief is ***confirmed.***" SADMF ¶ 110.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 34

- On October 8, Ms. Gehring affirms as "correct" a draft statement to the Governor's office stating that the review committee makes the "***final decision*** as to whether to grant a religious exemption." (emphasis added). *Id*. at ¶ 107.

- A WSU Insider article published the same day, which HHS reviewed before publication, says that the employee's department is notified by email only "if an exemption is ***approved***." (emphasis added). *Id*. at ¶ 108.

- October 15 WSU talking points state, "If an employee exemption is ***approved***, the application goes through a second process…" *Id*. at ¶ 103. (emphasis added).

- On October 19, WSU's current Chief Human Resource Officer, Theresa Elliot-Cheslek, wrote, "Once a determination was made, the process moved to HRS for notification. If the [Religious Exemption] was ***approved***, the next step was the accommodation process." *Id*. at ¶ 104. (emphasis added).

These documents describe the way that WSU actually evaluated employee requests for religious exemptions: in 473 of 475 applications (99.6%), the review committee made the final determination as to whether an employee had a

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 35

sincerely held religious objection to the vaccine mandate. *Id*. at ¶ 112. [1] When WSU review committee member Bonnie Dennler was asked if there was "any other employee at WSU whose application for religious exemption was treated the way Nick Rolovich's was treated," she answered: "I do not believe so." *Id*. at ¶ 113.

Very recently, WSU has claimed that its blind review committee—which its talking points said made its review process "**fair and equitable** for all requestors," *id*. at ¶ 104, —*never* made the final call on whether an exemption request was based on a sincerely held religious belief. "Ultimately, department as the appointing authority had the authority and responsibility to decide whether the employee had a sincerely held belief in conflict with COVID-19 vaccination…." *Id*.

WSU claims that the Governor's Proclamation and EEOC guidance *precluded* the University from entrusting the sincerity determination to a blind review process. *Id*. It has made no effort to reconcile this claim with its statements elsewhere lauding the significance of its blind review process.

These differing accounts create issues of material fact as to what WSU's process for evaluating requests for religious exemptions actually was and whether WSU knowingly departed from those procedures in denying that Rolovich's

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 36

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

request was based on a sincerely held religious belief. It will be up to a jury to decide whether WSU rejected Rolovich's exemption request through the process it described as "fair and equitable" and whether WSU made good on President Schulz's promise: "Regardless of (how much money) the person makes, what position they have, we have to treat people the same." SADMF ¶ 125. These issues of material fact preclude summary judgment for WSU.

Just as there are issues of material fact as to whether WSU processed Rolovich's religious exemption request the same way it treated hundreds of others, there are issues of fact as to whether WSU prejudged Rolovich's exemption request, denying him his right to a full and fair consideration of his religious objection.

- Discovery has uncovered behind-the-scenes communications among WSU's top officials that provide ample evidence from which the jury could find that WSU decided in August 2021—long before it decided on criteria for reviewing religious exemption requests, and long before it saw Rolovich's application stating his religious objections—that it was going to deny his request. A reasonable jury could find that WSU developed this "Rolo strategy" so it could create a case for a "just cause" termination and avoid paying

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 37

1    Rolovich liquidated damages. Such an inference would also support

2    a jury finding that, in exercising its discretion in terminating

3    Rolovich's employment, WSU breached its implied duty of good

4    faith and fair dealing. *Silvey v. Numerica Credit Union*, 519 P.3d

5    920, 931 (2022). On August 17, 2021, three days before the

6    Governor's Proclamation was made applicable to state employees in

7    higher education (but after WSU officials were aware that such a

8    change was coming), a WSU Board of Regents member texted

9    President Kirk Schulz asking, "What is our game plan in dealing

10   with Rolovich?" SADMF ¶ 95.

11   • Within an hour and a half, President Schulz texted Athletics

12   Director Patrick Chun, "We have a plan - so let me get some

13   details and I will give you a call." *Id*. at ¶ 96.

14   • An hour later, President Schulz texted the Chair of the Board of

15   Regents, Marty Dickinson, "Let me know how schedule looks for

16   next few days - we have a Rolo strategy." *Id*.

17   • Two days later, immediately upon learning that Rolovich

18   intended to seek a religious exemption, President Schulz texted

19   the Chair again:

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 38

FROST BROWN TODD LLP
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

1
2
3
4

Not to be too depressing this evening – but it appears that Nick is going to claim a religious exemption to the vaccine mandate. I asked Phils to engage a Seattle firm to assist us – and I intend to be pretty public expressing my disappointment with his decision. Right now we are so angry (Pat and myself) that we cannot see straight.

5

*Id*. at ¶ 97.

6
7
8
9
10
11

- Chair Dickinson responded to President Schulz: "So disappointed and pissed!!  Right there with you Kirk!  And can you pls tell me his devoted religion?" President Schulz responded, "I have no $&$@@ idea.  Probably searching on the internet as we speak." *Id*.

12
13
14
15
16
17
18

- The next morning, Chair Dickinson texted President Schulz that they needed to "recognized all the nuances" of the situation, including "From firing and paying $$$ while Seattle beats us up on deficit yet want the coach gone!!!! . . . time to take the reigns and in my opinion no longer protect Nick who has tarnished WSU Brand." *Id*. at ¶ 98.

19
20
21
22
23

- Later that day, President Schulz sent the Board of Regents an update expressing his "disappointment" in Rolovich's decision to file for a religious exemption. Schulz stated that while he has "the greatest respect" for other WSU employees "whose religious

24

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 39

convictions prevent them from taking the vaccine," he was "deeply disappointed that WSU's football coach has opted to use the exemption process." *Id*. at ¶ 99.

- Eleven days before Rolovich had even submitted his exemption request, Chun texted a friend, "Our head coach has put himself in a bad situation by not getting Vax. It's going to be a great lesson for current or future coaches about decisions you can or cannot make as a head coach." *Id*. at ¶ 100.

Viewed in the light most favorable to Rolovich, this evidence could lead a reasonable jury to conclude that WSU was never going to follow its own process or the process mandated by Title VII. Even viewed in the most innocent light for WSU, it indicates that before WSU officials knew anything about the bases of Rolovich's religious objection (and, thus, of its viability or authenticity), they were "angry" and "pissed." WSU leadership set in motion a "Rolo strategy" and "plan" to that would be "a great lesson for current or future coaches about decisions you can or cannot make as a head coach." A reasonable jury could conclude that this "Rolo strategy" involved denying Rolovich's request for a religious exemption and thus avoid his liquidated damages. These issues of material fact preclude summary judgment on Rolovich's breach of contract claim.

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 40

**C. Disputed issues of material fact preclude summary judgment on Rolovich's claim that WSU willfully withheld wages.**

Similarly, factual disputes preclude summary judgment for WSU on Rolovich's withholding of wages claim. *See* ECF No. 93 at 38-40. It is the employer's burden to show that it had a "bona fide" belief that the employee was not due the wages in question. *Hvidtfeldt v. Sitrion Sys. Americas, Inc.*, 190 Wash. App. 1031 (2015) (citing *Wash. State Nurses Ass'n v. Sacred Heart Med. Ctr.*, 175 Wn.2d 822, 834, 287 P.3d 516 (2012)). "The issue of whether an employer acts willfully is generally a question of fact. But the issue may be resolved on summary judgment when no material facts are in dispute." *Ruhl v. ProjectCorps, LLC*, 192 Wash. App. 1041 (2016) (citing *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 161, 961 P.2d 371 (1998)). If "reasonable minds could reach different conclusions from the evidence presented," summary judgment on Rolovich's wrongful withholding of wages claim is "improper." *Zimmerman v. W8LESS Prod., LLC,* 160 Wash. App. 678, 695, 248 P.3d 601, 609 (2011), *disapproved of on other grounds by Crossroads Mgmt., LLC v. Ridgway*, 540 P.3d 82 (Wash. 2023).

Here, summary judgment for WSU is improper because there are disputed material facts as to whether WSU's decision to terminate Rolovich was made in good faith. First, as noted above in Section B.3, WSU President Schulz understood that he had to treat people the same and his public statements was careful to pledge that he would do so: "Regardless of [how much money] the

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 41

person makes, what position they have, we have to treat people the same." SADMF ¶ 125. He noted that the relevant question was whether he was "willing to terminate a faculty member [or] a staff member for the same decision[.]" *Id*. Yet behind closed doors, he expressed an intent to treat Rolovich's application different from everyone else's. SADMF ¶¶ 104 & 176. Schulz knew this was a risky strategy, privately texting, "While I know I have to be careful—I would like to include a quote expressing my disappointment in this decision." SADMF ¶ 176. Yet he did so regardless.

Second, although WSU's above-described internal policies entrusted HRS's review committee with making judgments on sincerity, and though Chun's October 13 memo to HRS requested "re-evaluation of the claimed sincerely held religious belief," WSU now claims that "ultimately," the "appointing authority"—here, the Athletics Department—had the authority and responsibility to decide whether the employee had a sincerely held belief in conflict with COVID-19 vaccination." *Id*. at ¶ 115.

Third, the blind review committee made the final sincerity determination in 99.6% of requests for religious exemptions, but WSU recently confirmed that it was Athletics itself that made the final sincerity determination on Rolovich's application. *Id*. at 123.

In short, there is palpable dissonance between WSU's public commitment to fairness and impartiality and its internal talk about a "Rolo strategy," between

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 42

its public statements and its 30(b)(6) testimony on its review procedures, and between the way it decided over 450 exemption requests and the way it handled Rolovich's. These tensions create material issues of fact as to whether WSU really believed that it was acting in good faith when it allowed Chun to overturn the review committee's sincerity determination, when WSU decided not to accommodate Rolovich's religious convictions, and when it then concluded that it had "just cause" to terminate him and avoid paying out his liquidated damages provision.

For all these reasons, Rolovich's wrongful withholding claim should proceed to the jury.

## CONCLUSION

For the reasons provided above, Plaintiff Nicholas Rolovich respectfully requests that the Court

a) deny WSU's request for summary judgment on the Title VII, WLAD, breach of contract, and wage-withholding claims;

b) grant summary judgment on the first element of Rolovich's *prima facie* case for the Title VII failure to accommodate claim, that Rolovich has a religious belief which conflicted with WSU's vaccine mandate;

c) grant summary judgment on the second element of Rolovich's *prima facie* case for his Title VII failure to accommodate claim, that Rolovich informed WSU of his religious belief and conflict; and

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 43

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

d)  grant summary judgment on the third element of Rolovich's *prima facie*
    case for his Title VII failure to accommodate claim, that Rolovich was
    terminated by WSU for Rolovich's inability to comply with the vaccine
    mandate, a job requirement.


I certify that this memorandum contains 9401 words, in compliance with
the Court's Order of September 18, 2024, ECF No. 86.

DATED this 4th day of November, 2024.

                          */s/ Alexandria T. Drake*

                          Alexandria T. Drake, WSBA #45188
                          DUNN & BLACK, P.S.
                          111 North Post, Ste. 300
                          Spokane, WA 99201-0907
                          (509) 455-8711
                          adrake@funnandblack.com

                          */s/ E. Job Seese*
                          E. Job Seese
                          *Admitted pro hac vice*
                          FROST BROWN TODD LLP
                          1801 California Street, Suite 2700
                          Denver, CO 80202
                          (303) 406-4901
                          jseese@fbtlaw.com

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 44

1

2    Eric Kniffin
     *Admitted pro hac vice*
3    KNIFFIN LAW PLLC
     102 S. Tejon Street, Suite 1100
     Colorado Springs, CO 80903
4    (719) 212-4391
     eric@kniffin.law
5

6    *Attorneys for Plaintiff*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 45

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com

1

## CERTIFICATE OF SERVICE

2

3      I hereby certify that on the 4th day of November, 2024, I electronically filed

4  the forgoing PLAINTIFF'S COMBINED RESPONSE TO DEFENDANT'S

5  CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT

6  OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT with the

7  Clerk of Court using the CM/ECF System, which in turn automatically generated

8  a Notice of Electronic Filing (NEF) to all parties in the case who are registered

9  users of the CM/ECF system. The NEF for the foregoing specifically identifies

10  recipients of electronic notice. I hereby certify that none of the represented parties

11  are non-CM/ECF participants.

By:____/s/ E. Job Seese_____
12                              E. Job Seese

13

14
0157347.0787550   4892-5978-6997v7
15

16

17

18

19

20

21

22

23

24
PLAINTIFF'S COMBINED RESP. TO
DEF.'S CROSS-MSJ AND REPLY I/S/O PTF.'S MPSJ

NO. 2:22-cv-00319-TOR - 46

**FROST BROWN TODD LLP**
1801 California Street, Suite 2700
Denver, CO 80202
(303) 406-4990
E: jseese@fbtlaw.com