ROBERT W. FERGUSON
Attorney General

SPENCER W. COATES, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

ZACHARY J. PEKELIS, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
(206) 245-1700

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICHOLAS ROLOVICH,<br><br>                    Plaintiff,<br><br>v.<br><br>WASHINGTON STATE UNIVERSITY,<br><br>                    Defendant. | No. 2:22-cv-00319-TOR<br><br>DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY |

DEFENDANT'S NOTICE OF
SUPPLEMENTAL AUTHORITY - 1
No. 2:22-cv-00319-TOR.

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Defendant Washington State University (WSU) respectfully submits this notice to bring the Court's attention to the attached recent decisions in *Kizer v. St. Jude Children's Research Hospital*, No. 24-5207, 2024 WL 4816856 (6th Cir. Nov. 18, 2024) (unpublished); *Goff v. PeaceHealth*, No. 6:22-CV-01991-MTK, 2024 WL 4979432 (D. Or. Dec. 4, 2024); *Sano v. PeaceHealth*, No. 6:22-CV-01210-MTK, 2024 WL 4979429 (D. Or. Dec. 4, 2024); *Parsons v. PeaceHealth*, No. 6:22-CV-01246-MTK, 2024 WL 4979430 (D. Or. Dec. 4, 2024); and *Parker v. PeaceHealth*, No. 6:23-CV-00450-MTK, 2024 WL 4993472 (D. Or. Dec. 5, 2024).

In *Kizer*, the Sixth Circuit affirmed entry of summary judgment for the employer on a Title VII failure-to-accommodate-religion claim where the unrebutted evidence showed that allowing "unvaccinated individuals to work on campus would pose a safety risk to the hospital's [patients], thereby creating an undue hardship for [defendant]," plaintiff "could not perform her essential job functions remotely," and accommodating plaintiff "would create a substantial burden in the overall context of [defendant's] business, and thus an undue hardship." 2024 WL 4816856, at *6–7.

In *Goff*, *Sano*, *Parsons*, and *Parker*, the U.S. District Court for the District of Oregon entered summary judgment on plaintiffs' Title VII failure-to-accommodate-religion claims in favor of the employer where there was "no genuine dispute of fact that allowing unvaccinated employees to work in person significantly increased health and safety risks to its employees and patients at times relevant in this Complaint," "Plaintiff does not dispute that she could not perform her job fully remotely and that performance of her job required close contact with other

DEFENDANT'S NOTICE OF
SUPPLEMENTAL AUTHORITY - 2
No. 2:22-cv-00319-TOR.

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

employees" and patients, and "Defendant also considered the number of employees seeking a similar accommodation and reasonably concluded that the cumulative burden was substantial." *Parker*, 2024 WL 4993472, at \*9; *Goff*, 2024 WL 4979432, at \*9; *Sano*, 2024 WL 4979429, at \*9; *Parsons*, 2024 WL 4979430, at \*9.

This supplemental authority is submitted in support of WSU's Cross-Motion for Summary Judgment, ECF No. 93.

DATED this 12th day of December, 2024.

PACIFICA LAW GROUP LLP

*s/Zachary J. Pekelis*
Zachary J. Pekelis WSBA #44557
Ai-Li Chiong-Martinson, WSBA #53359
Erica P. Coray, WSBA #61987
W. Scott Ferron, WSBA #61154
Special Assistant Attorneys General
1191 Second Ave., Suite 2000
Seattle, WA 98101


ROBERT W. FERGUSON
Attorney General

Spencer W. Coates, WSBA #49683
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98101-3404

*Counsel for Defendant*
*Washington State University*

DEFENDANT'S NOTICE OF
SUPPLEMENTAL AUTHORITY - 3
No. 2:22-cv-00319-TOR.

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of December, 2024, I electronically

filed the foregoing document with the Clerk of the United States District Court

using the CM/ECF system which will send notification of such filing to all parties

who are registered with the CM/ECF system.

DATED this 12th day of December, 2024.

_____

Erica Knerr, Legal Assistant

DEFENDANT'S NOTICE OF
SUPPLEMENTAL AUTHORITY - 4
No. 2:22-cv-00319-TOR.

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Case 2:22-cv-00319-TOR    ECF No. 132    filed 12/12/24    PageID.5014    Page 5 of 47

Kizer v. St. Jude Children's Research Hospital, Not Reported in Fed. Rptr. (2024)

2024 WL 4816856

2024 WL 4816856
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Lynn KIZER, Plaintiff-Appellant,

v.

ST. JUDE CHILDREN'S RESEARCH
HOSPITAL, Defendant-Appellee.

No. 24-5207
|
FILED November 18, 2024

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

**Attorneys and Law Firms**

Kristin Fecteau Mosher, Law Offices of Kristin Fecteau, Nashville, TN, Ronald Hackenberg, Pacific Justice Institute, Sacramento, CA, for Plaintiff-Appellant.

Lisa A. Krupicka, Sarah Elizabeth Stuart, Burch, Porter & Johnson, Memphis, TN, for Defendant-Appellee.

Before: BATCHELDER, MOORE, and BUSH, Circuit Judges.

OPINION

KAREN NELSON MOORE, Circuit Judge.

**\*1** Lynn Kizer appeals from the district court's decision granting summary judgment in favor of her employer, St. Jude Children's Research Hospital, on Kizer's claims that, in violation of Title VII, St. Jude failed to provide her with a religious accommodation. Because we hold that St. Jude presented evidence showing that accommodating Kizer would have caused an undue hardship for St. Jude, and because Kizer's evidence to the contrary cannot support a jury verdict in her favor, we **AFFIRM** the district court's grant of summary judgment in favor of St. Jude.

**I. BACKGROUND**

In 2021, Lynn Kizer was employed by St. Jude Children's Research Hospital as an Electronic Health Record ("EHR")

Applications Analyst assisting with preparations for the hospital's two-year-long transition to a complex new EHR system known as "Epic." R. 1 (Compl. ¶ 4) (Page ID #1–2). That same year, a vaccine for COVID-19 became available. Because St. Jude primarily treats vulnerable pediatric patients, the hospital implemented a mandatory COVID vaccine policy for its employees and established a process for considering requests for religious and medical accommodations. R. 31-5 (Bottenfield Decl. ¶¶ 22–25) (Page ID #178–79). Kizer submitted one such request, stating that her sincerely held religious beliefs prevented her from receiving the vaccine and asking for permission to work remotely. R. 31-14 (Accommodation Req. at 5–6) (Page ID #343–44). St. Jude gathered information about Kizer's position, including about the upcoming launch (or "go live") of the new Epic system and determined that it could not reasonably accommodate Kizer because her job required her to work in person in clinical areas and in contact with clinical people. R. 31-5 (Bottenfield Decl. ¶¶ 36–43) (Page ID #182–83). St. Jude ultimately terminated Kizer for failing to become vaccinated. R. 1 (Compl. ¶ 6) (Page ID #2). Kizer brought suit for religious discrimination and failure to accommodate under Title VII, id. ¶¶ 46–64 (Page ID #10–13), and now appeals from the district court's grant of summary judgment in favor of St. Jude.

**II. ANALYSIS**

**A. Standard of Review**

We review de novo a district court's grant of summary judgment. 🚩⚠️ Tepper v. Potter, 505 F.3d 508, 513 (6th Cir. 2007). Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[B]oth the movant and the opponent must support their factual positions either by directing the court's attention to materials in the record or by showing that the cited materials do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce any admissible evidence to support the fact." 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2721 (4th ed. June 2024 Update). We construe all reasonable inferences in favor of the nonmoving party. 🚩⚠️ Tepper, 505 F.3d at 513. The ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

Kizer v. St. Jude Children's Research Hospital, Not Reported in Fed. Rptr. (2024)

2024 WL 4816856

that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## B. Title VII

**\*2**  An employer violates Title VII if, as relevant here, the employer:

(1) ... fail[s] or refuse[s] to hire or ... discharge[s] any individual, or otherwise ... discriminate[s] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) ... limit[s], segregate[s], or classif[ies] [its] employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

For purposes of Title VII, "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Here, Kizer alleges that St. Jude violated Title VII by failing to accommodate her sincerely held religious belief that prevented her from complying with St. Jude's COVID vaccine mandate. R. 1 (Compl. at 10–13) (Page ID #10–13).

"The analysis of any religious accommodation case begins with the question of whether the employee has established a prima facie case of religious discrimination." *Tepper*, 505 F.3d at 514 (quoting *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987)). To establish a prima facie case, a plaintiff must show that: "(1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement." *Id.* (quoting *Smith*, 827 F.2d at 1085).

The district court found, and we agree, that Kizer established her prima facie case: First, "Defendant[ ] ... assumed that all employees who requested religious accommodations held sincere religious beliefs. Second, Plaintiff informed St. Jude of her beliefs by submitting an accommodation request and stating the reason for her objection to the vaccine. [St. Jude] received and reviewed Plaintiff's request. Third, St. Jude discharged Plaintiff on September 24, 2021, when she did not comply with its mandatory vaccine policy." R. 42 (Order at 9) (Page ID #692) (citations omitted).

The burden then shifted to St. Jude "to show that it could not reasonably accommodate the employee without undue hardship." *Tepper*, 505 F.3d at 514 (quoting *Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002)). The employer must thus show that "the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business," meaning that the statutory requirement of " 'undue hardship' is [met] when a burden is substantial in the overall context of an employer's business." *See Groff v. DeJoy*, 600 U.S. 447, 468, 470 (2023).

## C. Kizer's Legal Arguments

**\*3**  On appeal, Kizer first argues that she submitted evidence to the district court showing that St. Jude failed to engage her in an interactive process to find an accommodation (which she believes was required by Title VII) and that the district court considered improper expert testimony. Appellant Br. at 28, 34, 38–42. Kizer also intimates that the district court erred by not ruling on her discovery-related sanctions motion. *Id.* at 36–38.

### 1. Interactive Process

Kizer argues that the district court erred in granting St. Jude's motion for summary judgment because she presented evidence below that St. Jude did not consult her or her direct supervisor personally in the course of considering her accommodation request and thus failed to engage in a "[g]ood [f]aith [i]nteractive [p]rocess." Appellant Br. at 28–34. Though Kizer frames this assertion as a factual dispute, she has pointed to no legal authority that would require employers considering Title VII accommodations (rather than accommodations under the Americans with Disabilities Act (ADA)) to engage in such a process, much less any legal authority holding that Title VII required St. Jude to consult specifically with Kizer or her direct supervisor,

Christyna Carter, rather than Kizer's ultimate supervisor, Colette Hendricks. [1]

Neither the ADA nor Title VII contains a statutory reference to a required interactive process, but the regulations implementing the ADA state that "[t]o determine the appropriate reasonable [disability] accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). Title VII's regulations contain no similar reference to an interactive process. Kizer does not ask us to determine whether the ADA's regulatory interactive-process requirement applies to religious-accommodation claims under Title VII. But even if we assume that such a requirement applied, St. Jude would satisfy it, particularly as defined by regulatory guidance specific to Title VII.

The Equal Employment Opportunity Commission (EEOC) publishes a nonbinding compliance guide for employers covered by Title VII which provides that, "[a]lthough an employer is not required by Title VII to conduct a discussion with an employee before making a determination on an accommodation request, as a practical matter it can be important to do so." U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2021-3, *Compliance Manual on Religious Discrimination* § 12-IV(A)(2) (2021) (hereinafter "EEOC Compliance Manual"). The manual continues, "[o]nce the employer becomes aware of the employee's religious conflict, the employer should obtain promptly whatever additional information is needed to determine whether a reasonable accommodation is available without posing an undue hardship on the operation of the employer's business." *Id.* Importantly, the EEOC concludes that "[f]ailure to confer with the employee is not an independent violation of Title VII. But as a practical matter, such failure can have adverse legal consequences." *Id.*

**\*4** As an example, the manual cites our decision in *EEOC v. Arlington Transit Mix, Inc.,* 957 F.2d 219, 222 (6th Cir. 1991), noting that "where an employer has made no effort to act on an accommodation request, courts have found that the employer lacked the evidence needed to meet its burden of proof to establish that the plaintiff's proposed accommodation would actually have posed an undue hardship." EEOC

Compliance Manual § 12-IV(A)(2). In *Arlington Transit Mix*, we held that the defendant-employer had violated the plaintiff-employee's Title VII rights because there was no evidence that the employer "made any effort to find a way to avoid the collision" between a new scheduling system and the employee's religious beliefs. 957 F.2d at 222.

The same is not true here. St. Jude submitted undisputed evidence that it developed and implemented a systematic process for considering requests for religious accommodation, including by "obtain[ing] promptly whatever additional information [was] needed to determine whether a reasonable accommodation [was] available." EEOC Compliance Manual § 12-IV(A)(2); *see* R. 31-5 (Bottenfield Decl. ¶¶ 30–31, 33–35) (Page ID #180–81); R. 31-8 (Bottenfield Dep. at 38:13–41:9) (Page ID #386–89). Kizer's request provided ample information about her religious beliefs regarding the vaccine. R. 31-14 (Accommodation Req. at 5–6) (Page ID #343–44). St. Jude presented evidence that it obtained and developed information about the risk of COVID exposure in the context of its mission of treating vulnerable juvenile patients, R. 31-5 (Bottenfield Decl. ¶ 6, 25) (Page ID #175, 179); R. 31-20 (Hijano Decl. ¶ 9) (Page ID #419), as well as evidence that St. Jude obtained information about Kizer's essential duties and whether her job could be performed remotely, R. 31-19 (Hendricks Decl. ¶ 7) (Page ID #414); R. 31-5 (Bottenfield Decl. ¶ 41) (Page ID #183); R. 31-16 (Bottenfield Notes at 1) (Page ID #347); R. 31-18 (Bottenfield Dep. at 39:20–40:15, 51:10–20, 53:1–12) (Page ID #387–88, 394–95).

Even under the ADA, an employer's failure to engage in an interactive process "is actionable only if it prevents identification of an appropriate accommodation *for a qualified individual.*" *EEOC v. Ford Motor Co.,* 782 F.3d 753, 766 (6th Cir. 2015) (en banc) (quoting *Basden v. Pro. Transp., Inc.,* 714 F.3d 1034, 1039 (7th Cir. 2013)) (emphasis in *Ford*). "In other words, if the employee fails to create a genuine dispute of material fact that a reasonable accommodation would have allowed her to perform the essential functions of her job, she cannot survive summary judgment on an interactive-process claim." *Williams v. AT&T Mobility Servs. LLC,* 847 F.3d 384, 395 (6th Cir. 2017). As we hold below, Kizer has not "present[ed] evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with

an accommodation." *Ford Motor Co.*, 782 F.3d at 766 (quoting *Basden*, 714 F.3d at 1039).

Kizer argues that St. Jude should be required to present evidence that it considered various alternative accommodations proposed by Kizer after the fact, and she asserts that St. Jude failed to engage in a good-faith interactive process because "[t]he only accommodation it ever considered ... was that all the job duties of the [religious objector] had to be able to be performed off campus." Appellant Br. at 28. But even under the ADA's explicit interactive-process requirement, "... [an] employer has the burden of showing how [a proposed] accommodation would cause an undue hardship, but the employer is not required to propose a counter accommodation in order to participate in the interactive process in good faith." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202–03 (6th Cir. 2010). And we have held in other Title VII contexts that "[i]n deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

**\*5** Ultimately, St. Jude presented evidence that, because unvaccinated people posed a safety risk to its vulnerable and unable-to-be-vaccinated juvenile patient population, the presence of any unvaccinated staff on campus would be an undue hardship in the context of St. Jude's core business and mission. *See* R. 31-5 (Bottenfield Decl. ¶ 6, 25) (Page ID #175, 179); R. 31-20 (Hijano Decl. ¶ 9) (Page ID #419). Kizer has submitted no contrary evidence showing that it would be safe for unvaccinated people to be on campus. In fact, she expressly disclaims any "challenge[ ] [to] the legitimacy of St. Jude to implement a mandatory COVID-19 vaccine policy." Appellant Br. at 12.

We thus cannot say that, as a matter of law, St. Jude violated an implicit interactive-process duty under Title VII (as yet unrecognized in this circuit). St. Jude has presented evidence of a thorough information-gathering process with input from Kizer herself. And the EEOC is clear that Title VII contains no such hard and fast requirement of an interactive process. As discussed below, Kizer has not provided legal authority to support a contrary conclusion or sufficient factual evidence

to allow a reasonable jury to find that St. Jude could have accommodated Kizer without undue hardship.

We first dispense with two (arguably) legal issues before reaching the meat of the issue on appeal—whether there is a dispute of material fact about whether St. Jude could have accommodated Kizer without undue hardship.

### 2. Expert Evidence

Kizer argues that, because "[s]he did not challenge the mandate nor ask for an accommodation that in any way could be construed as asking to be present among a vulnerable population or her co-workers," it was reversible error for the district court to consider what Kizer considers to be expert evidence and testimony from Dr. Diego Hijano regarding the effects of COVID-19 and efficacy of the vaccine. [2] Appellant Br. at 38–42.

Although we are inclined to agree with the district court that Dr. Hijano's testimony was proper lay testimony about St. Jude's rationale for its business judgment to implement a vaccine mandate, *see* R. 42 (Order at 4 n.3) (Page ID #687), we note that the district court only briefly cited Dr. Hijano's declaration in its background section to describe St. Jude's reasoning in implementing its response to COVID-19, *id.* at 3–4 (Page ID #686–87).

Even if Dr. Hijano's testimony were improper expert evidence, Kizer does not explain what relevance it can have on appeal given that she expressly disclaims any argument about the legitimacy of the COVID vaccine mandate and attacks only St. Jude's failure to accommodate her. Because these arguments do not turn on the characteristics of COVID or the vaccine, we decline to address Kizer's objection to Dr. Hijano's testimony.

### 3. Sanctions

On appeal, Kizer alleges that "St. Jude intentionally attempted to obstruct and prevent [Kizer] from interviewing the immediate supervisor, Christyna Carter, and as such [Kizer] submitted a Motion for Sanctions, which was never addressed by the District Court." Appellant Br. at 36–37. Kizer argues that St. Jude withheld information about Carter because Carter had superior knowledge of Kizer's responsibilities and would testify that "Kizer could have 'easily' been accommodated in a number of ways." *Id.* at 33, 36–37. But Kizer does not explain how or why the district court's failure to rule on her sanctions motion should constitute reversible

error. Nor does Kizer explain how the alleged nondisclosure of contact information regarding Carter prejudiced Kizer given that she ultimately submitted a declaration from Carter attached to her opposition to summary judgment. *See* R. 32-3 (Carter Decl.) (Page ID #503–05).

**\*6** Instead, Kizer appears to complain that this alleged nondisclosure is a reason to send the case to a jury. Appellant Br. at 37 ("Ms. Kizer was looking forward to trial, then, where she could cross-examine [St. Jude's witness] in front of a jury, as well as present testimony from her witness, Ms. Carter, so they could determine who actually had the knowledge critical to determining whether or not Ms. Kizer's employment had to be terminated or whether an accommodation could have been made."). Because we hold below that the district court did not weigh witnesses' credibility and because, even after considering Carter's declaration, the district court correctly found that no dispute of material fact existed, we need not address Kizer's unelaborated sanctions argument on appeal.

### D. Kizer's Factual Arguments

Kizer further argues that the declaration authored by Carter, Kizer's direct supervisor, created a dispute of material fact as to whether St. Jude could have accommodated Kizer by allowing her to work remotely 100% of the time (potentially assigning her in-person duties to vaccinated employees), transferring her to another job that could have been completed 100% remotely, or simply delaying the issue with a "temporary accommodation." *See id.* at 12–13, 25, 27. Accordingly, Kizer argues that the district court erred by resolving factual disputes and credibility issues that should have been left to the jury. *Id.* at 13.

### 1. St. Jude's Evidence

St. Jude presented evidence that to allow unvaccinated individuals to work on campus would pose a safety risk to the hospital's vulnerable juvenile patients (who were largely immunocompromised and unable to be vaccinated), thereby creating an undue hardship for St. Jude. *See* R. 31-5 (Bottenfield Decl. ¶ 6, 25) (Page ID #175, 179); R. 31-20 (Hijano Decl. ¶ 9) (Page ID #419). St. Jude's evidence also showed that retaining its pre-vaccine COVID control measures for unvaccinated employees, including extensive testing and contact-tracing protocols, would be costly in both time and money. *See* R. 31-5 (Bottenfield Decl. ¶¶ 26–27) (Page ID #179); R. 31-18 (Bottenfield Dep. at 14:10–15:4, 59:1–4) (Page ID #375–76, 399); *see generally id.* at 58:13–61:12 (Page ID #398–401).

Critically, St. Jude presented evidence that, in the course of considering Kizer's request for an accommodation, it learned that Kizer could not perform her essential job functions remotely; in particular, in August and September 2021, Kizer's team was halfway through the two-year process of designing, building, and implementing a new electronic-health-record system known as Epic, and, as part of that process in the run up to the system's "go live" date, "it was anticipated that Ms. Kizer would shadow clinicians, nurses, research coordinators, clinical laboratory personnel, pharmacists and others involved in clinical research, often in yellow-zoned clinical areas, to better understand decision-making and workflow for the build of the new system." R. 31-19 (Hendricks Decl. ¶¶ 3, 7) (Page ID #413–14). Colette Hendricks, the leader of St. Jude's Epic-transition team and Kizer's ultimate supervisor, told the vaccine-accommodations team that, "[a]s the project got closer to 'go live,' [Kizer's] job would increasingly involve this 'at the elbow' support [and that] [a]fter 'go live' the person in Ms. Kizer's position would still be required to meet regularly in person with clinical research team members to trouble-shoot, refine and add new research protocols to the system." *Id.*; *see also* R. 31-5 (Bottenfield Decl. ¶ 41) (Page ID #183); R. 31-16 (Bottenfield Notes at 1) (Page ID #347); R. 31-18 (Bottenfield Dep. at 39:20–40:15, 51:10–20, 53:1–12) (Page ID #387–88, 394–95). This evidence indicates that, contrary to Kizer's suggestion, it would be less than a full year before her in-person duties kicked in. *See* Appellant Br. at 25–26. St. Jude thus presented evidence that in-person, "at the elbow" shadowing was an essential function of Kizer's job not easily "swapped" with another employee. *See* Reply Br. at 12–13. And because Kizer could not be safely on campus while unvaccinated, she could not be accommodated without undue hardship.

**\*7** St. Jude's evidence also revealed that Kizer's other proposed accommodations would create a substantial burden in the overall context of its business, and thus an undue hardship. St. Jude submitted evidence that it maintained no 100% remote positions; even Kizer's out-of-state colleagues were required to come to campus on a regular basis. R. 31-5 (Bottenfield Decl. ¶ 46) (Page ID #184); R. 31-19 (Hendricks Decl. ¶ 3) (Page ID #413–14). Because transferring Kizer to an alternate position that could be performed 100% remotely would require St. Jude first to identify a new position for which Kizer was qualified and then to determine anew whether that position could be modified to accommodate her, such a transfer would not

alleviate the undue hardship. R. 31-5 (Bottenfield Decl. ¶ 46) (Page ID #184). And St. Jude submitted evidence that it developed a thorough and systematic process for considering requests for accommodations, *see id.* ¶¶ 30–31, 33–35 (Page ID #180–81), that several dozen employees had requested religious accommodations, and that, unlike Kizer, the small number who were ultimately accommodated already occupied positions that could be modified to be 100% remote, *id.* ¶¶ 44–46 (Page ID #183–84). The district court thus correctly found that St. Jude's evidence demonstrated that it would be "a substantial burden in the overall context of St. Jude's business," to identify and modify new positions for religious objectors, "especially considering the number of people seeking accommodation." R. 42 (Order at 34) (Page ID #717); *see* 🚩*Groff*, 600 U.S. at 468. As addressed below, Kizer submitted no evidence to the contrary that would sustain a jury verdict in her favor.

**2. The Carter Declaration**

In support of her argument that a dispute of material fact precludes summary judgment, Kizer relies primarily on a declaration wherein Carter, Kizer's former direct supervisor, asserts that "Kizer could have easily been accommodated by working at home and attending meetings remotely without any effort whatsoever on the part of Saint Jude." R. 32-3 (Carter Decl. ¶ 10) (Page ID #504). The district court correctly found that this declaration was conclusory and amounted to a collection of "unsupported contention[s]" that did "not create a question of fact." R. 42 (Order at 17) (Page ID #700)

(quoting 🚩*Wright v. Murray Guard, Inc.*, 455 F.3d 702, 709 (6th Cir. 2006)).

Carter's declaration does not explain the factual basis for her assertions. Carter begins by declaring, "I know what all of [the ambulatory, beacon and research teams] did and I totally understand the way Epic was to be implemented." R. 32-3 (Carter Decl. ¶ 3) (Page ID #503). But Carter does not explain how she acquired this knowledge (except that she was "in charge" of those teams). *Id.* Nor does Carter explain what those teams actually did or precisely how Epic was to be implemented in order to support her contention that she "was the most knowledgeable to speak about [Kizer]'s job duties and responsibilities." *Id.* ¶ 6 (Page ID #503). Carter also does not explain the factual underpinnings for her assertions that "Kizer did not even need to be in the office. Her job could be done completely from home. She never went to contact end-users or patients at all," and that "she would not have ever worked anywhere near patients." *Id.* ¶¶ 9, 11 (Page ID #504).

Carter made the further blanket assertion that "[w]hen the 'go live' would occur a year after [Kizer] was fired, St Jude could not have known she would be at the elbow of clinical people. That was never going to happen." *Id.* ¶ 13 (Page ID #504).

Carter's declaration reads almost like an applied recitation of each legal argument that Kizer posed to the district court in her opposition to summary judgment. Kizer is correct that Carter's credibility and trustworthiness are not relevant at this stage. *See* Appellant Br. at 34. Instead, Carter must provide a factual basis to support her bare assertions that, based on her personal knowledge, Kizer could have been accommodated. Such a factual basis is required if a declaration or affidavit is to defeat summary judgment. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and *show that the affiant or declarant is competent to testify on the matters stated.*" (emphasis added)); *see also Alexander v. Kellogg USA, Inc.*, 674 F. App'x 496, 499 (6th Cir. 2017) ("It is the burden of the party submitting the [declaration or] affidavit to show circumstances indicating the [affiant or declarant] has based the statement on personal knowledge." (quoting *Gaskey v. Fulton Bellows, LLC*, No. 3:05-cv-540, 2007 WL 869621, at *3 (E.D. Tenn. Mar. 20, 2007)); *Gill v. Fed. Kemper Life Assurance Co.*, No. 85-3670, 1986 WL 17518, at *4 (6th Cir. Aug. 1, 1986) ("To contravene the defendant's proof" and defeat summary judgment, "plaintiff's affidavit [or declaration] on proof must indicate <u>on its face</u> that the information it contains is given upon personal knowledge.").

**\*8** Carter's declaration cannot support a jury finding that, contrary to St. Jude's extensive evidence, Kizer could have been accommodated without undue hardship. It is "merely conclusory, restating the requirements of the law ...."

🚩*Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 598–99 (6th Cir. 1999) (holding no dispute of material fact created by physician's conclusory affirmation that ADA plaintiff met the legal requirements for disability); *see* 🚩*Quoc Viet v. Victor Le*, 951 F.3d 818, 823 (6th Cir. 2020) ("Just as a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." (citations omitted)).

Kizer's deposition testimony contradicts her own arguments and parts of the Carter declaration. Kizer herself admitted in her deposition that at the Epic system's "go live," she would

Kizer v. St. Jude Children's Research Hospital, Not Reported in Fed. Rptr. (2024)
2024 WL 4816856

expect all personnel to be on campus, R. 31-2 (Kizer Dep. Excerpt at 139:9–14) (Page ID #149), though her counsel now argues the opposite, Appellant Br. at 33–34 ("... it was never anticipated that Ms. Kizer would have worked 'at the elbow' at 'go live' because it did not make sense for her to" (citing R. 32-3 (Carter Decl. ¶ 12) (Page ID #504))). Kizer also admitted that, although some of her coworkers worked remotely some of the time, they were required to and did come to campus regularly. R. 33-3 (Kizer Dep. Excerpt at 129:1–131:10) (Page ID #555–57). And Kizer testified that as part of the Epic team she did in fact work on campus. *Id.* at 32:23–25 (Page ID #553).

When faced with St. Jude's evidence that the presence of unvaccinated staff on campus was a safety risk for St. Jude's vulnerable juvenile patients, that Kizer's job could not be performed remotely, that transferring Kizer to a position that could be performed remotely would require St. Jude first to identify and then to modify a position, and that Kizer's in-person duties were essential to her position, Carter's bare declaration would not allow a reasonable jury to rule in Kizer's favor. The declaration contains no facts supporting

Carter's assertion that Kizer could do her job remotely, whether temporarily or permanently, or that certain tasks could be allocated to other employees. And the declaration contains no facts showing that another remote position existed into which Kizer could be transferred, with or without further accommodation. The declaration contains only unsupported conclusions and does not "present[ ] specific evidence allowing a rational jury to conclude that" St. Jude violated Title VII. *See Quoc Viet*, 951 F.3d at 823. Nor does Kizer rely on any further factual evidence that would support a jury verdict in her favor.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of St. Jude's motion for summary judgment.

### All Citations

Not Reported in Fed. Rptr., 2024 WL 4816856

---

### Footnotes

1    The authority Kizer cites in support of her contention that Title VII requires an interactive or cooperative process refers to an employee's duty to cooperate with the employer, rather than the inverse. *See* Appellant Br. at 28 (citing *Smith*, 827 F.2d at 1085); *Smith*, 827 F.2d at 1085 ("Although the burden is on the employer to accommodate the employee's religious needs, the employee must make some effort to cooperate with an employer's attempt at accommodation," a duty which the employee " 'cannot shirk' " (quoting *Chrysler Corp. v. Mann*, 561 F.2d 1282, 1285 (8th Cir. 1977)).

2    Dr. Hijano was a corporate witness for St. Jude under Rule 30(b)(6). *See* R. 31-4 (St. Jude Statement of Undisputed Material Facts ¶ 13) (Page ID #164). As medical director of St. Jude's occupational health program and member of committees overseeing the hospital's COVID response, vaccine mandate, and accommodation processes, Dr. Hijano was competent to and did testify about St. Jude's rationale for implementing the vaccine mandate. *See* R. 31-20 (Hijano Decl. ¶¶ 1–5, 10) (Page ID #418–20).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:22-cv-00319-TOR    ECF No. 132    filed 12/12/24    PageID.5021    Page 12
of 47
SHANE GOFF, an Individual, Plaintiff, v. PEACEHEALTH, a..., Slip Copy (2024)
2024 WL 4979432

2024 WL 4979432
Only the Westlaw citation is currently available.
United States District Court, D. Oregon.

SHANE GOFF, an Individual, Plaintiff,

v.

PEACEHEALTH, a corporation, Defendant.

Case No. 6:22-cv-01991-MTK
|
Filed 12/04/2024

## OPINION AND ORDER

MUSTAFA T. KASUBHAI (He / Him) United States District Judge

**\*1** Plaintiff Shane Goff ("Plaintiff") brings this religious discrimination claim against his former employer, Defendant PeaceHealth ("Defendant"). Plaintiff alleges Defendant violated Title VII of the Civil Rights Act, 📄 42 U.S.C. § 2000e-5 (Second Claim for Relief) and Or. Rev. Stat. § ("ORS") 659A.030 (First Claim for Relief) by failing to reasonably accommodate his religious beliefs when he objected to taking the COVID-19 vaccine. Defendant moves to exclude the opinions and report of Plaintiff's expert (ECF No. 35) and moves for summary judgment (ECF No. 24) on Plaintiff's claims. Defendant's motions are granted.

## BACKGROUND

Defendant is a not-for-profit Catholic healthcare system with approximately 16,250 employees in medical centers, hospitals, and clinics across Alaska, Washington, and Oregon. Le Decl. ¶ 3, ECF No. 28. Its mission is to promote personal and community health through safe and compassionate care. Le Decl. ¶ 5, Ex. 1.

In early 2020, the SARS-CoV-2 virus, and the COVID-19 infection it causes, began spreading in Oregon. Koekkoek Decl. ¶¶ 4-5, ECF No. 26. Defendant mitigated exposure risks using screening, testing, masking, other forms of personal protective equipment ("PPE"), and social distancing. Le Decl. ¶ 7; Kroll Decl. ¶ 5, ECF No. 27. Once COVID-19 vaccines became available in December 2020, Defendant encouraged its employees to get vaccinated. Le Decl. ¶ 8; Kroll Decl. ¶ 6.

In the summer of 2021, a more transmissible and deadly Delta variant hit Oregon communities and hospitals. The number of COVID-19 cases increased by 300% nationwide. Koekkoek Decl. ¶ 37, Ex. 12 at 1. On August 3, 2021, Defendant announced it would require all employees to be fully vaccinated against COVID-19 by September 1, 2021, if able, and to show proof of COVID-19 vaccination or submit a medical or religious exemption on or before August 31, 2021. Koekkoek Decl. ¶ 29; Le Decl. ¶ 10, Ex. 2 at 5.

Defendant established a committee to review religious exemption requests and began processing such requests. Le Decl. ¶ 18. When Defendant approved a request for religious exemption, the employee's HR partner or supervisor initiated an interview with the employee. Le Decl. ¶ 21. Defendant placed exempted employees who could not work fully remotely on unpaid leave, permitting use of remaining PTO and continuing their health benefits coverage through the later of November 30, 2021, or the end of the month in which they exhausted PTO. Le Decl. ¶ 23.

Defendant employed Plaintiff as a sterile processing technician in the sterile processing department. Le Decl. ¶ 29. Plaintiff's job duties included coordinating, assembling, and distributing supplies, equipment, and instruments for surgical cases and sterilizing instruments and equipment. Le Decl. Ex. 13 at 1. Plaintiff requested a religious exemption to Defendant's COVID-19 vaccine requirement, which Defendant approved. Le Decl. ¶ 30, Ex. 14; Riggs Decl. I Ex. 1 at 9 (RFA Request No. 4), ECF No. 25-1. Plaintiff's supervisor and HR partner interviewed Plaintiff to process his request and determined that he could not perform his duties as a medical technician fully remotely. Le Decl. ¶ 31, Ex. 15; Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). On September 1, 2021, Defendant placed Plaintiff on unpaid administrative leave. Le Decl. ¶ 32. Plaintiff filed his Complaint on December 28, 2022. Compl. ECF No. 1. He alleges that Defendant failed to reasonably accommodate his religious opposition to receiving a COVID-19 vaccine in violation of Title VII and ORS 659A.030.

## STANDARDS

### I. Federal Rules of Evidence 702 and *Daubert*

**\*2** The admissibility of an expert's testimony is governed by Fed. R. Evid. 702, as elaborated by the Supreme Court in *Daubert* and its progeny. Rule 702 provides that a witness

SHANE GOFF, an individual, Plaintiff, v. PEACEHEALTH, a..., Slip Copy (2024)
2024 WL 4979432

who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

### II. Local Rule 56-1(b)

Under LR 56-1(b), rather than filing a motion to strike, the moving party must assert any evidentiary objections in its reply memorandum. "If an evidentiary objection is raised by the moving party in its reply memorandum, the non-moving party may file a surreply memorandum ... within seven days addressing only the evidentiary objection; the moving party may not file further briefing on its evidentiary objection." LR 56-1(b).

### III. Motion for Summary Judgment — Fed. R. Civ. Pro. 56(a)

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Service, Inc.*, 809 F.2d at 630.

### DISCUSSION

Defendant contends that Plaintiff's expert's opinion and report are inadmissible evidence under Rule 702 and *Daubert* and moves for summary judgment on Plaintiff's claims. Defendant argues that it reasonably accommodated Plaintiff and as a matter of law it is entitled to prevail on its affirmative defense that it could not allow Plaintiff to continue working unvaccinated without undue hardship.

### I. Defendant's Motion to Strike

Defendant moves under Rule 702 to exclude the opinions and report of Plaintiff's expert, Dr. French. Defendant asserts that Dr. French's opinions and report are inadmissible evidence because they are based on unreliable methodologies and reasoning. Defendant attaches to its motion the expert report of Dr. Cohen, a Clinical Associate Professor in the Division of Allergy and Infectious Diseases at the University of Washington and the Medical Director of Infection Prevention at the University of Washington Medical Center. Rigg's Decl. II Ex. 1 ("Cohen Report") ¶ 5, ECF No. 36-1. Dr. Cohen's report is a review of Dr. French's report and provides commentary on Dr. French's opinions and use of cited literature. Despite the opportunity to do so under LR 56-1(b), Plaintiff did not submit a surreply in response to Dr. Cohen's well-reasoned rebuttal report.

**\*3** Dr. French is a board-certified emergency medicine physician. Expert Report of Dr. Richard Scott French ("French Report") ¶ 2, ECF No. 34-1. He attests to having extensive experience treating and managing COVID-19 patients in several states and extensive experience and expertise in setting up COVID-19 prevention protocols for hospital facilities. French Report ¶¶ 2, 7–10. Dr. French also has professional experience teaching and presenting at medical schools on immunology, as well as viral transmission prevention, diagnosis, treatment, and management. French Report ¶ 4. The French Report can be categorized into two overarching opinions: (1) the safety and efficacy of the COVID-19 vaccine are unproven, and (2) COVID-19 exposure risks can be effectively mitigated without requiring vaccination. [1]

SHANE GOFF, an individual, Plaintiff, v. PEACEHEALTH, a..., Slip Copy (2024)
2024 WL 4979432

When ruling on a motion to strike under Rule 702 and *Daubert*, trial judges are tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 🔖 *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993). The Supreme Court in *Daubert* elaborated that expert testimony should be based on a reliable and scientifically valid methodology that fits with the facts of a case. 🔖 *Id.* at 592–93. "Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." 🔖 *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982 (9th Cir. 2011) (quoting 🔖 *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 145 (1999)).

"For scientific opinion, the court must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." 🔖 *Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) "[T]he trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on 'the particular circumstances of the particular case.' " *Id.* (quoting 🔖 *Kumho Tire Co.,* 526 U.S. at 147).

The Court must ensure that the French Report is reliable by examining "whether the expert's testimony reflects scientific knowledge, whether their findings are derived by the scientific method, and whether their work product amounts to good science." 🔖 *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1315 (9th Cir. 1995) (*Daubert II*) (quotation marks removed) (citing 🔖 *Daubert,* 509 U.S. at 591–93). And the Court must ensure that the French Report is relevant in that it "logically advances a material aspect of [Plaintiff's] case." *Id.*

The Court has reviewed the French Report and finds that every portion of it falls below the admissibility standard. For the purposes of explanation, the Court discusses the following three significant examples.

In support of his opinion that the COVID-19 vaccines are neither safe nor effective, Dr. French relies on Exhibit 6, which he describes as a "a comprehensive report with many graphs, charts, references and [a] description of their methodology." French Report ¶ 26, citing Ex. 6 [2] ("Rancourt Study"). Dr. French's explanation of the Rancourt Study's scientific legitimacy is cursory and grossly deficient. That the Rancourt Study includes a description of the authors' methodology and contains many graphs, charts, and references is not indicative of its scientific legitimacy. Similarly, its 180 pages proves only its length, not its quality. Having conducted "a preliminary assessment of whether the reasoning or methodology underlying [the French Report] is scientifically valid", 🔖 *Daubert,* 509 U.S. at 592–93, the Court finds that the Rancourt Study is junk science. [3]

**\*4** The Rancourt Study is a "study regarding COVID-19 vaccine-associated mortality in the Southern Hemisphere looking at the excess mortality rate associated with COVID-19 vaccines in 17 countries, spanning four continents." Rancourt Study at 1-3. It claims "there is no evidence ... of any beneficial effect of COVID-19 vaccines." *Id.* at 1-2. Despite being a correlative study, the authors claim that "[t]he scientific tests for causality are amply satisfied, [and] extensively demonstrate[ ] ... COVID-19 vaccines did not save lives and appear to be lethal toxic agents[.]" *Id.* at 131. Purportedly, its "analysis of ACM [(all cause mortality)] by time in the 17 countries studied shows that the global COVID-19 vaccination campaign was in effect a mass iatrogenic event that killed (0.213 ± 0.006) % of the world population [(approximately 17,000,000 people)] and did not measurably prevent any deaths." *Id.* at 119.

The Rancourt Study's "[m]ethod is designed for cases (jurisdictions) in which there is no evidence in the ACM data for mortality caused by factors other than the vaccine rollouts." *Id.* at 16. The study's methodology is grossly flawed. It relies on a finding that, "no excess mortality occur[ed] in the [COVID-19] pre-vaccination period." *Id.* This finding is baseless given that the data relied on shows that following vaccine rollouts, excess ACM decreased in eight of the 17 countries studied. *Id.* at 26. When looking at the Rancourt Study's data for the 17 countries combined, excess ACM also decreased following vaccine rollouts. *Id.* (table 1, showing total excess ACM in the year preceding vaccine rollout as 2,392,831, and total excess ACM following vaccine rollout as 1,744,829). Plaintiff fails to rebut Defendant's expert's compelling opinion that the Rancourt Study "[i]nexplicably ... ignores that excess deaths across the world correlated with spikes of confirmed COVID-19 cases rather than vaccine rollouts." Cohen Report ¶ 19. Lastly, Dr.

SHANE GOFF, an individual, Plaintiff, v. PEACEHEALTH, a..., Slip Copy (2024)
2024 WL 4979432

French also fails to explain why the Rancourt Study, and his opinion from which it flows, are reliable despite running contrary to broad scientific consensus that the COVID-19 vaccines are safe. Koekkoek Decl. ¶ 32.

Dr. French's expert opinion is also unreliable because he misconstrues the exhibits cited in his report. In support of his opinion on vaccine efficacy, Dr. French cites to Exhibit 2, an outbreak report describing the transmission of COVID-19 that occurred at a large public event in a Massachusetts town in the summer of 2021. French Report, Ex. 2 [4] ("Outbreak Report") at 1. The Outbreak Report found that 74% of the COVID-19 cases occurred in people who were fully vaccinated. *Id.* From this finding, Dr. French opines that "even as early as 2021, the literature did not demonstrate that the COVID-19 vaccines were effective in transmission mitigation of COVID-19 infection." French Report ¶ 31, citing Ex. 2.

Contrary to Dr. French's opinion, the Outbreak Report explicitly states that "vaccination is the most important strategy to prevent severe illness and death." Outbreak Report at 2. The Outbreak Report continues, "[a]s population-level vaccination coverage increases, vaccinated persons are likely to represent a larger proportion of COVID-19 cases." *Id.* In other words, the fact that many of the people infected at the public gathering were fully vaccinated merely reflects high vaccination rates in that geographical area at the time. The Outbreak Report concludes, "data from this report are insufficient to draw conclusions about the effectiveness of COVID-19 vaccines against SARS-CoV-2, including the Delta variant, during this outbreak." *Id.* at 3. The limitation on the conclusions to be drawn from the data do not call into question the efficacy of COVID-19 vaccines. Rather, the mismatch between Dr. French's opinion and the findings and recommendations of the evidence he relies on, calls into question his capacity to comprehend scientific literature. His specious use of the Outbreak Report undermines the reliability of his methods and reasoning.

**\*5** Similarly, Dr. French incorrectly concludes that Exhibit 3 "indicate[s] that the COVID-19 vaccine was in fact increasing the risk of COVID-19 transmission." French Report ¶ 15, citing Ex. 3. Exhibit 3 is a cohort study on community transmission in vaccinated and unvaccinated individuals in the UK. French Report Ex. 3 [5] ("Cohort Study") at 1. Dr. French's opinion is troubling, given that the Cohort Study explicitly recommends "[i]ncreasing population immunity via booster programmes and vaccination" and concludes

that "[this] analysis suggests that direct protection of individuals at risk of severe outcomes, via vaccination and non-pharmacological interventions, will remain central to containing the burden of disease caused by the delta variant." *Id.* at 12. Dr. French's opinion directly contradicts the scientific research it relies on. Dr. French's interpretation of the Outbreak Report and the Cohort Study are at best incompetent, and at worst, dishonest.

This Court is not alone in finding that Dr. French's opinion on this subject falls below accepted standards of reliability. *See Malone v. Legacy Health*, No. 3:22-CV-01343-HZ, 2024 WL 3316167, at \*3 (D. Or. July 5, 2024) (admonishing Dr. French for his misrepresentation of Exhibits 2 and 3 and citing other district court cases where misrepresentations of these same reports have been called out). Based on the unreliable methods and reasoning of Dr. French, the Court finds that Dr. French's opinions are inadmissible under Rule 702 and *Daubert*.

## II. Motion for Summary Judgment

Plaintiff brings religious discrimination claims based on Defendant's alleged failure to reasonably accommodate his religiously based opposition to receiving a COVID-19 vaccine. Defendant moves for summary judgment on the grounds that there is no genuine dispute that, under the circumstances, allowing Plaintiff to work in person in a healthcare setting would have been an undue hardship and that it reasonably accommodated Plaintiff with unpaid leave. Plaintiff responds that material disputes of fact remain regarding (1) the safety and efficacy of COVID-19 vaccines; (2) the process Defendant used to determine the vaccine mandate; (3) and the process Defendant used when deciding to place Plaintiff on unpaid leave.

### A. Title VII — Failure to Accommodate

Under Title VII, "[t]o establish religious discrimination on the basis of a failure-to-accommodate theory, [the plaintiff] must first set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). If established, the burden then shifts to the defendant to show that it "initiated good faith efforts to

accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Id.* Courts construe Oregon's statutory counterpart, Or. Rev. Stat. § 659.030, as identical to Title VII. *Heller v. EBB Auto Co.*, 8 F.3d 1433, n.2 1437 (9th Cir. 1993). The Court analyzes the state and federal claims under the same legal standards.

On April 24, 2023, the Court bifurcated the present case into two phases, Phase One consisted of two threshold legal questions: (1) was continuing to allow Plaintiff to work at the hospital unvaccinated an undue hardship on Defendant, and (2) was unpaid leave a reasonable accommodation? Scheduling Order 2, ECF No. 15. Phase Two related to the prima facie showing of a failure to accommodate claim. The Court set a dispositive motion deadline on the Phase One questions and ordered Phase Two discovery stayed pending the outcome of Phase One dispositive motions. The Court finds that Defendant is entitled to summary judgment on its affirmative defense of undue hardship. Because undue hardship is dispositive, the Court does not address whether unpaid leave was a reasonable accommodation.

### 1. Undue Hardship

**\*6** Until recently, some lower courts interpreted *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) as holding that an undue hardship under Title VII is merely something more than *de minimis*. *Groff v. DeJoy*, 600 U.S. 447, 471 (2023). In *Groff v. DeJoy*, 600 U.S. 447 (2023), the Supreme Court clarified that under Title VII, an " 'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Id.* at 468. Whether a burden is substantial is a fact-specific inquiry that should be resolved in a "common-sense manner." *Id.* at 471. Under the *Groff* standard, "courts must apply the test in a manner that takes into account all relevant factors in the case at hand." *Id.* at 470. For example, courts may consider "the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer." *Id.* (citation to record and alterations omitted). Consistent with this contextualized and common-sense approach, when conducting an undue hardship analysis, the Court finds it appropriate to consider the following factors: (1) the information available at the time the defendant made its accommodation decision; (2) economic and non-economic costs of the accommodation; and (3) the cumulative

or aggregate effects of an accommodation requested by multiple, similarly situated employees. [6]

Pre-*Groff* EEOC guidance on the undue hardship standard remains instructive. *Id.* at 471 (rejecting full adoption of EEOC's pre-*Groff* interpretation of undue hardship but explaining a "good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by" the Court's clarifying decision). Specific to evaluating undue hardship in the context of COVID-19 vaccinations, the EEOC provides sensible and relevant guidance consistent with *Groff*:

> Considerations relevant to undue hardship can include, among other things, the proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with non-employees, whose vaccination status could be unknown or who may be ineligible for the vaccine. (§ K.12, Updated May 28, 2021).

> Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business—including, in this instance, the risk of the spread of COVID-19 to other employees or to the public.... An employer cannot rely on speculative or hypothetical hardship when faced with an employee's religious objection but, rather, should rely on objective information. Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals). Another relevant consideration is the number of employees who are seeking a similar accommodation, i.e., the cumulative cost or burden on the employer. (§ L.3, Updated March 1, 2022).

*What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, EEOC (last visited September 25, 2024), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-adarehabilitation-act-and-other-eeo-laws [https://perma.cc/73RS-7L62].

### 2. Defendant's Evidence of Undue Hardship

Here, Defendant asserts that for employees who could not work fully remotely, any accommodation other than leave

created an undue hardship by significantly increasing the health and safety risks of its employees and patients. Plaintiff responds that allowing him to continue to work using pre-vaccine protocols would not have created an undue hardship, and that Defendant failed to conduct an individual analysis before placing him on leave.

Having found that the opinions of Plaintiff's expert are inadmissible, Plaintiff's Response in opposition to Defendant's Motion for Summary Judgment is unsupported by admissible evidence. Nonetheless, the Court must view all inferences drawn from the underlying facts in the light most favorable to Plaintiff and resolve all reasonable doubts as to the existence of genuine issues of material fact against Defendant. 🔖 *T.W. Elec. Service, Inc.*, 809 F.2d at 630.

**\*7** Defendant relies on the declarations of the following individuals to support its affirmative defense of undue hardship. First, Defendant relies on the declaration of Dr. Koekkoek, Defendant's Chief Physician and Clinical Executive. Koekkoek Decl. ¶ 2. During the summer of 2021 he led Defendant's clinical response to the COVID-19 pandemic and was a member of the Senior Leadership Team. *Id.* ¶ 3. Dr. Koekkoek was also a member of Defendant's Ethical Discernment team, which, after deliberations, decided to implement Defendant's vaccination policy in August 2021. *Id.* ¶¶ 25–29. Second, Defendant offers the declaration of Catherine Kroll, Defendant's System Director of Infection Prevention. Kroll Decl. ¶ 2. Ms. Kroll has worked in Defendant's Infection Prevention Department for over 10 years and has held the System Director role since 2022. Kroll Decl. ¶ 2. And third, is the declaration of Caroline Le, Defendant's Program Director for HR Integration. Le Decl. ¶ 2. Ms. Le has worked in Defendant's HR department for approximately ten years and was elevated to program director in February 2021. Le Decl. ¶ 2. Ms. Le facilitated Defendant's system-wide implementation of its COVID-19 mandate. Le Decl. ¶ 9. Each of these declarations is further supported by numerous exhibits, none of which Plaintiff meaningfully challenges. The Court explores Defendant's evidence in detail below.

Throughout the pandemic, Defendant relied on federal and state recommended and mandated safety measures to develop its policies and responses to the COVID-19 outbreak. Le Decl. ¶ 8; Kroll Decl. ¶¶ 4, 13; Koekkoek Decl. ¶ 9. Early in the pandemic, Defendant mitigated exposure risks using screening, testing, masking, other forms of PPE, and social distancing. Le Decl. ¶ 7; Kroll Decl. ¶ 5. Once COVID-19 vaccines became available in December 2020, Defendant encouraged its employees to get vaccinated. Le Decl. ¶ 8; Kroll Decl. ¶ 6. However, by late July 2021, 19.7% of Defendant's Oregon employees remained unvaccinated or declined to state their vaccination status. Le Decl. ¶ 13.

In the summer of 2021, a more transmissible and deadly Delta variant hit Oregon communities and hospitals. Koekkoek Decl. ¶¶ 10–11. Nationwide, the number of COVID-19 cases increased by 300%. Koekkoek Decl. ¶ 37, [7] Ex. 12 at 1. Defendant monitored COVID-19 forecast models developed at Oregon Health & Science University ("OHSU"). Koekkoek Decl. ¶¶ 13, 19. In mid-July, the OHSU modeling for a faster-spreading variant and slower vaccination rates predicted a September peak exceeding 1,000 COVID-19 hospitalizations in Oregon. Koekkoek Decl. ¶ 19(a), Ex. 4 at 19. By August 26, 2021, the statewide census exceeded 1,000 COVID-19 hospitalizations, and an updated model from OHSU predicted that there would be a peak of approximately 1,200 COVID-19 hospitalizations by September 6—effectively doubling the previous record in November 2020. Koekkoek Decl. ¶ 19(b), Ex. 5 at 23.

With the growing surge and severity of COVID-19 cases, Defendant reasonably believed that it faced a foundational risk to its ability to deliver healthcare services. Koekkoek Decl. ¶¶ 22-23. Defendant convened an Ethical Discernment process to evaluate whether it should require its employees to be vaccinated against COVID-19. Koekkoek Decl. ¶ 24. On July 21, 2021, the Ethical Discernment team reviewed and discussed internal infection prevention data, as well as publicly available information regarding COVID-19 and the vaccines. *Id.* ¶¶ 26, 31.

As part of the ethical discernment process related to the COVID-19 Vaccination Policy, Dr. Koekkoek used his medical background and clinical expertise to synthesize the medical and scientific literature and recommendations from regulatory and accrediting bodies, commonly referenced publications in highly reputable, peer-reviewed medical journals, and epidemiologic, and public health bodies to provide clinical expertise to others on the Ethical Discernment team. *Id.* ¶ 31. For example, Dr. Koekkoek relied on an August 2, 2021 study published in the New England Journal of Medicine which showed that through the end of June 2021, COVID-19 vaccines had averted an estimated 279,000 deaths and 1.25 million hospitalizations in the United States. *Id.* ¶ 33, Ex. 9 [8] (concluding, "[a]s the delta variant affects various countries, including the United

States, the current imperative is to vaccinate as many people as possible, as quickly as possible."). Dr. Koekkoek also relied on The Thompson Study, published in the New England Journal of Medicine on June 30, 2021. Koekkoek Decl. Ex. 10 [9] ("Thompson Study"). The Thompson Study researchers "conducted a prospective cohort study involving 3975 health care personnel, first responders, and other essential and frontline workers." Thompson Study at 1. The results showed that being fully vaccinated reduced the risk of infection by 91% and still protected against severe illness and hospitalization if breakthrough infection occurred. Koekkoek Decl. ¶ 34, Thompson Study at 1. Some of the other sources that Dr. Koekkoek consulted included the Oregon Health Authority, the Washington Department of Health, the Centers for Medicare and Medicaid Services, the Centers for Disease Control, the World Health Organization, and the Association for Professionals in Infection Control and Epidemiology. Koekkoek Decl. ¶ 31. Dr. Koekkoek's synthesis of medical and scientific literature and recommendations showed a broad consensus from reliable sources that the vaccines were safe and not only protected the vaccine recipient from contracting the virus but also decreased the likelihood that the recipient would transmit the virus. Koekkoek Decl. ¶ 32.

 **8** Dr. Koekkoek advised the Ethical Discernment team that the protections afforded by vaccines were vitally important in healthcare facilities, where caregivers treated patients with COVID-19, and the risk of exposing other caregivers and patients, including children and elderly patients and patients with underlying conditions that make them particularly susceptible to COVID-19, was especially prevalent. *Id.* On July 27, 2021, after additional deliberation, the Ethical Discernment team decided unanimously that it would require all its employees to get vaccinated. *Id.* ¶ 27. A CDC report published two days later further supported the Ethical Discernment team decision. Koekkoek Decl. Ex. 11. The CDC report indicated that, when compared with vaccinated individuals, unvaccinated individuals were eight times more likely to contract COVID-19, twenty-five times more likely to be hospitalized if they got COVID-19, and twenty-five times more likely to die as a result of a COVID-19 infection. Koekkoek Decl. ¶ 36, Ex. 11 at 3.

On August 3, 2021, Defendant announced it would require all employees to be fully vaccinated against COVID-19 by September 1, 2021, if able, and to show proof of COVID-19 vaccination or submit a medical exemption on or before August 31, 2021. Koekkoek Decl. ¶ 29; Le Decl. ¶ 10, Ex. 2 at 3. Defendant included information about seeking medical and

religious exemptions to the policy but had not yet finalized a decision as to how it would accommodate employees with approved exemptions. Le Decl. ¶ 12, Ex. 4 at 2, 4; Koekkoek Decl. ¶ 29.

On August 4, 2021, Oregon Governor Brown announced that the OHA was issuing a regulation to require all Oregon healthcare providers and staff to be fully vaccinated against COVID-19 or submit to regular testing; the OHA issued a temporary rule to that effect one day later. 🚩Or. Admin. R. 333-019-1010 ("OHA Rule"). Initially, the OHA Rule provided two alternatives for healthcare workers to either: (1) be fully vaccinated by September 30, 2021, or (2) submit to weekly testing. 🚩Or. Admin. R. 333-019-1010 (eff. Aug. 5, 2021, to Aug. 24, 2021). However, on August 19, 2021, Governor Brown announced that the OHA would be updating its rule to remove the testing option and require healthcare workers to be fully vaccinated by October 18, 2021, unless they had a documented religious or medical exemption. Governor Kate Brown, Governor Brown Press Conference 8.19.2021, at 22:30, YOUTUBE (Aug. 19, 2021), https:// www.youtube.com/watch?v=AxfQIRoPjyw.

On August 16, 2021, the Ethical Discernment team met again to consider potential changes to the COVID-19 Vaccine Requirement Policy and accommodations in light of updated guidance, employee feedback, and the OHA Rule. Koekkoek Decl. ¶ 42, Ex. 18. Defendant's internal epidemiological study determined that its patients were 7.1 times more likely to have been exposed to COVID-19 and 11.6 times more likely to get COVID-19 from an unvaccinated employee as compared to a vaccinated employee. Koekkoek Decl. ¶ 21; Kroll Decl. ¶ 19, Exs. 3, 4. This data were collected while Defendant's other methods of risk exposure mitigation—such as PPE (including N95 masks), testing, social distancing, restrictions on visitation, and additional hand hygiene protocols—were already the "baseline" requirements in use. Koekkoek Decl. ¶ 44. Because of the substantial increase of patient infections due to exposure from unvaccinated employees, the Ethical Discernment team reaffirmed its overall position requiring all employees, absent an approved medical or religious exemption, to be fully vaccinated against COVID-19. *Id.* ¶ 42.

Defendant then considered potential accommodations for exempted employees who could not work fully remotely. *Id.* ¶ 43. While Defendant generally concluded that multiple methods of protection against COVID-19 were important, the medical science at the time confirmed that vaccination was

the single most important method. *Id.* Unlike vaccination, the "baseline" requirements did not provide continuous protection 24 hours per day and were susceptible to human error. *Id.* ¶ 44. The Ethical Discernment team concluded that the so-called baseline requirements were no longer sufficient. *Id.* ¶¶ 43-44. Defendant determined that allowing unvaccinated employees to work in person would have subjected other employees and patients to a higher risk of contracting COVID-19, amplifying the risk of severe illness or death among its patients. *Id.* ¶ 48.

**\*9** Defendant then established a committee to review religious exemption requests and began processing such requests. Le Decl. ¶ 18. When Defendant approved a request for religious exemption, the employee's HR partner or supervisor initiated an interview with the employee. *See* Le Decl. ¶¶ 21, 31. However, because Defendant determined that contact between unvaccinated employees and patients or coworkers posed an unacceptable health and safety risk, the only substantive issue during these interviews was whether the employee could perform the essential functions of their position fully remotely. Le Decl. ¶ 21. Defendant placed employees who could not work fully remotely on unpaid leave, permitting use of remaining PTO and continuing their health benefits coverage through the later of November 30, 2021, or the end of the month in which they exhausted PTO. Le Decl. ¶ 23. By August 31, 2021, the review committee had approved 219 of the 226 religious exemption requests it received from its Oregon employees. Le Decl. ¶ 19.

Plaintiff requested a religious exemption to Defendant's COVID-19 vaccine requirement, which Defendant approved. Le Decl. ¶ 30, Ex. 14; Riggs Decl. I Ex. 1 at 9 (RFA Response No. 4). Plaintiff's supervisor and HR partner interviewed Plaintiff to process his request and determined that he could not perform his duties as a medical technologist fully remotely. Le Decl. ¶ 30, Ex. 15; Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). Plaintiff admits that he could not perform the essential functions of his position fully remotely. Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). On September 1, 2021, Defendant placed Plaintiff on unpaid administrative leave. Le Decl. ¶ 32.

### 3. Analysis

Defendant's determination—that contact between unvaccinated employees and co-workers, patients, and community members in its facilities posed an unacceptable health and safety risk—was directly supported by its internal epidemiological study, consensus among the scientific

medical community at the time, and reliance on guidance from authoritative sources such as the CDC and the OHA. The Court finds there is no genuine dispute of fact that allowing unvaccinated employees to work in person significantly increased health and safety risks to its employees and patients at times relevant in this Complaint. Plaintiff does not dispute that he could not perform his job fully remotely and that performance of his job required close contact with other employees who provided direct care to medically vulnerable individuals. Defendant reasonably concluded that the health and safety risks of allowing unvaccinated employees to work in person created a substantial burden by conflicting directly with its business mission to provide safe and adequate healthcare to the community. Defendant also considered the number of employees seeking a similar accommodation and reasonably concluded that the cumulative burden was substantial.

Plaintiff does not dispute that Defendant conducted an interview with him before making its determination that he could not perform his job fully remotely. Plaintiff argues, without evidence or supporting case law, that Defendant owed him more process before placing him on leave. Defendant's decision to place Plaintiff on unpaid leave was made after it met with him and determined that he could not perform his job fully remotely. Defendant was in the midst of a healthcare crisis which posed an existential threat to its operational abilities. It had hundreds of religious and medical exemption requests to process in a short amount of time. Defendant's decision to place Plaintiff on unpaid leave was made individually. Having reviewed the evidence in the record, the Court finds that there is no genuine dispute of material fact that any accommodation other than leave would have posed an undue hardship on Defendant. Because Defendant has successfully established the affirmative defense of undue hardship, the Court grants Defendant's Motion for Summary Judgment.

### CONCLUSION

For the reasons above, Defendant's motion to strike (ECF No. 35) and motion for summary judgment (ECF No. 24) are GRANTED.

**\*10** DATED this 4th day of December 2024.

2024 WL 4979432

**All Citations**

Slip Copy, 2024 WL 4979432

---

### Footnotes

1    In ruling on the admissibility of Dr. French's opinions, the Court need not, and does not, opine on the truth of these opinions. Rather, the Court's ruling is narrowly tailored to whether Dr. French's opinions are based on reliable methodologies and reasoning under Rule 702 and *Daubert*.

2    Dr. French labelled two different exhibits as Exhibit 6. The Court's reference to Exhibit 6 relates to the second Exhibit 6, pdf pages 64-243 of the French Report, Rancourt, D.G., Baudin, M., Hickey, J., Mercier, J. "COVID-19 vaccine-associated mortality in the Southern Hemisphere". *CORRELATION Research in the Public Interest*, Report, 17 September 2023. https://correlation-canada.org/covid-19-vaccine-associated-mortality-in-the-Southern-Hemisphere/.

3    *Oxford English Dictionary* defines "junk science" as "[s]cientific assertions or conclusions which are presented as fact but based on flawed or biased research or analysis[.]" *Junk Science*, Oxford English Dictionary, (online ed. 2023) https://doi.org/10.1093/OED/2767395868 (last visited Nov. 8, 2024).

4    Brown, Catherine M. "Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021." MMWR. Morbidity and Mortality Weekly Report 70 (2021). https://doi.org/10.15585/mmwr.mm7031e2.

5    Singanayagam, Anika, Seran Hakki, Jake Dunning, Kieran J. Madon, Michael A. Crone, Aleksandra Koycheva, Nieves DerquiFernandez, et al. "Community Transmission and Viral Load Kinetics of the SARS-CoV-2 Delta (B.1.617.2) Variant in Vaccinated and Unvaccinated Individuals in the UK: A Prospective, Longitudinal, Cohort Study." The Lancet. Infectious Diseases 22, no. 2 (February 2022): 183–95. https://doi.org/10.1016/S1473-3099(21)00648-4.

6    For a thorough and well-reasoned explanation of these three factors and their relation to *Groff*, *see Lavelle-Hayden v. Legacy Health*, No. 3:22-CV-01752-IM, 2024 WL 3822712, at *8–*10 (D. Or. Aug. 14, 2024).

7    The declaration of Dr. Koekkoek contains a scrivener's error. The paragraphs proceeding ¶ 36 begin at "33". See Koekkoek Decl. at 11. The Court refers to the corrected paragraph number.

8    Stephen J.W. Evans, M.Sc., and Nicholas P. Jewell, Ph.D., *Vaccine Effectiveness Studies in the Field*, The New England Journal of Medicine, Aug. 2. 2021.

9    Mark G. Thompson, et al., *Prevention and Attenuation of Covid-19 with the BNT162b2 and mRNA-1273 Vaccines*, 385(4) N. Eng. J. Med. 320–329 (June 30, 2021).

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4979429
Only the Westlaw citation is currently available.
United States District Court, D. Oregon.

TANYA RENEE SANO, an Individual, Plaintiff,

v.

PEACEHEALTH, INC., a corporation, Defendant.

Case No. 6:22-cv-01210-MTK
|
Filed 12/04/2024

## OPINION AND ORDER

MUSTAFA T. KASUBHAI (He / Him) United States District Judge

**\*1** Plaintiff Tanya Renee Sano ("Plaintiff") brings this religious discrimination claim against her former employer, Defendant PeaceHealth, Inc. ("Defendant"). Plaintiff alleges Defendant violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5 (Second Claim for Relief) and Or. Rev. Stat. § ("ORS") 659A.030 (First Claim for Relief) by failing to reasonably accommodate her religious beliefs when she objected to taking the COVID-19 vaccine. Defendant moves to exclude the opinions and report of Plaintiff's expert (ECF No. 39) and moves for summary judgment (ECF No. 28) on Plaintiff's claims. Defendant's motions are granted.

## BACKGROUND

Defendant is a not-for-profit Catholic healthcare system with approximately 16,250 employees in medical centers, hospitals, and clinics across Alaska, Washington, and Oregon. Le Decl. ¶ 3, ECF No. 32. Its mission is to promote personal and community health through safe and compassionate care. Le Decl. ¶ 5, Ex. 1.

In early 2020, the SARS-CoV-2 virus, and the COVID-19 infection it causes, began spreading in Oregon. Koekkoek Decl. ¶¶ 4-5, ECF No. 30. Defendant mitigated exposure risks using screening, testing, masking, other forms of personal protective equipment ("PPE"), and social distancing. Le Decl. ¶ 7; Kroll Decl. ¶ 5, ECF No. 31. Once COVID-19 vaccines became available in December 2020, Defendant encouraged its employees to get vaccinated. Le Decl. ¶ 8; Kroll Decl. ¶ 6.

In the summer of 2021, a more transmissible and deadly Delta variant hit Oregon communities and hospitals. The number of COVID-19 cases increased by 300% nationwide. Koekkoek Decl. ¶ 37, Ex. 12 at 1. On August 3, 2021, Defendant announced it would require all employees to be fully vaccinated against COVID-19 by September 1, 2021, if able, and to show proof of COVID-19 vaccination or submit a medical or religious exemption on or before August 31, 2021. Koekkoek Decl. ¶ 29; Le Decl. ¶ 10, Ex. 2 at 5.

Defendant established a committee to review religious exemption requests and began processing such requests. Le Decl. ¶ 18. When Defendant approved a request for religious exemption, the employee's HR partner or supervisor initiated an interview with the employee. Le Decl. ¶ 21. Defendant placed exempted employees who could not work fully remotely on unpaid leave, permitting use of remaining PTO and continuing their health benefits coverage through the later of November 30, 2021, or the end of the month in which they exhausted PTO. Le Decl. ¶ 23.

Defendant employed Plaintiff as a certified Medical Technologist in the Transfusion Services Department. Le Decl. ¶ 29. Plaintiff's job duties included performing high complexity laboratory tests and consulting with clinicians on the results. Le Decl. ¶ 29, Ex. 13 at 1. Plaintiff requested a religious exemption to Defendant's COVID-19 vaccine requirement, which Defendant approved. Le Decl. ¶ 30, Ex. 14; Riggs Decl. I Ex. 1 at 9 (RFA Response No. 4), ECF No. 30-1. Plaintiff's supervisor and HR partner interviewed Plaintiff to process her request and determined that she could not perform her duties as a medical technologist fully remotely. Le Decl. ¶ 31, Ex. 15; Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). On September 1, 2021, Defendant placed Plaintiff on unpaid administrative leave. Le Decl. ¶ 32. Plaintiff filed her Complaint on August 17, 2022. Compl. 15, ECF No. 1. She alleges that Defendant failed to reasonably accommodate her religious opposition to receiving a COVID-19 vaccine in violation of Title VII and ORS 659A.030.

## STANDARDS

### I. Federal Rules of Evidence 702 and *Daubert*

**\*2** The admissibility of an expert's testimony is governed by Fed. R. Evid. 702, as elaborated by the Supreme Court in *Daubert* and its progeny. Rule 702 provides that a witness

Case 2:22-cv-00319-TOR    ECF No. 132    filed 12/12/24    PageID.5031    Page 22 of 47
TANYA RENEE SANO, an individual, Plaintiff, v. PEACEHEALTH,..., Slip Copy (2024)
2024 WL 4979429

who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

### II. Local Rule 56-1(b)

Under LR 56-1(b), rather than filing a motion to strike, the moving party must assert any evidentiary objections in its reply memorandum. "If an evidentiary objection is raised by the moving party in its reply memorandum, the non-moving party may file a surreply memorandum ... within seven days addressing only the evidentiary objection; the moving party may not file further briefing on its evidentiary objection." LR 56-1(b).

### III. Motion for Summary Judgment — Fed. R. Civ. Pro. 56(a)

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec. Service, Inc., 809 F.2d at 630.

## DISCUSSION

Defendant contends that Plaintiff's expert's opinion and report are inadmissible evidence under Rule 702 and *Daubert* and moves for summary judgment on Plaintiff's claims. Defendant argues that it reasonably accommodated Plaintiff and as a matter of law it is entitled to prevail on its affirmative defense that it could not allow Plaintiff to continue working unvaccinated without undue hardship.

### I. Defendant's Motion to Strike

Defendant moves under Rule 702 to exclude the opinions and report of Plaintiff's expert, Dr. French. Defendant asserts that Dr. French's opinions and report are inadmissible evidence because they are based on unreliable methodologies and reasoning. Defendant attaches to its motion the expert report of Dr. Cohen, a Clinical Associate Professor in the Division of Allergy and Infectious Diseases at the University of Washington and the Medical Director of Infection Prevention at the University of Washington Medical Center. Rigg's Decl. II Ex. 1 ("Cohen Report") ¶ 5, ECF No. 40-1. Dr. Cohen's report is a review of Dr. French's report and provides commentary on Dr. French's opinions and use of cited literature. Despite the opportunity to do so under LR 56-1(b), Plaintiff did not submit a surreply in response to Dr. Cohen's well-reasoned rebuttal report.

**\*3** Dr. French is a board-certified emergency medicine physician. Expert Report of Dr. Richard Scott French ("French Report") ¶ 2, ECF No. 38-1. He attests to having extensive experience treating and managing COVID-19 patients in several states and extensive experience and expertise in setting up COVID-19 prevention protocols for hospital facilities. French Report ¶¶ 2, 7–10. Dr. French also has professional experience teaching and presenting at medical schools on immunology, as well as viral transmission prevention, diagnosis, treatment, and management. French Report ¶ 4. The French Report can be categorized into two overarching opinions: (1) the safety and efficacy of the COVID-19 vaccine are unproven, and (2) COVID-19 exposure risks can be effectively mitigated without requiring vaccination. [1]

When ruling on a motion to strike under Rule 702 and *Daubert*, trial judges are tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Supreme Court in *Daubert* elaborated that expert testimony should be based on a reliable and scientifically valid methodology that fits with the facts of a case. *Id.* at 592–93. "Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999)).

"For scientific opinion, the court must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) "[T]he trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on 'the particular circumstances of the particular case.' " *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 147).

The Court must ensure that the French Report is reliable by examining "whether the expert's testimony reflects scientific knowledge, whether their findings are derived by the scientific method, and whether their work product amounts to good science." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (*Daubert II*) (quotation marks removed) (citing *Daubert*, 509 U.S. at 591–93). And the Court must ensure that the French Report is relevant in that it "logically advances a material aspect of [Plaintiff's] case." *Id.*

The Court has reviewed the French Report and finds that every portion of it falls below the admissibility standard. For the purposes of explanation, the Court discusses the following three significant examples.

In support of his opinion that the COVID-19 vaccines are neither safe nor effective, Dr. French relies on Exhibit 6, which he describes as a "a comprehensive report with many graphs, charts, references and [a] description of their methodology." French Report ¶ 26, citing Ex. 6 [2] ("Rancourt Study"). Dr. French's explanation of the Rancourt Study's scientific legitimacy is cursory and grossly deficient. That the Rancourt Study includes a description of the authors' methodology and contains many graphs, charts, and references is not indicative of its scientific legitimacy. Similarly, its 180 pages proves only its length, not its quality. Having conducted "a preliminary assessment of whether the reasoning or methodology underlying [the French Report] is scientifically valid", *Daubert*, 509 U.S. at 592–93, the Court finds that the Rancourt Study is junk science. [3]

**\*4** The Rancourt Study is a "study regarding COVID-19 vaccine-associated mortality in the Southern Hemisphere looking at the excess mortality rate associated with COVID-19 vaccines in 17 countries, spanning four continents." Rancourt Study at 1-3. It claims "there is no evidence ... of any beneficial effect of COVID-19 vaccines." *Id.* at 1-2. Despite being a correlative study, the authors claim that "[t]he scientific tests for causality are amply satisfied, [and] extensively demonstrate[ ] ... COVID-19 vaccines did not save lives and appear to be lethal toxic agents[.]" *Id.* at 131. Purportedly, its "analysis of ACM [(all cause mortality)] by time in the 17 countries studied shows that the global COVID-19 vaccination campaign was in effect a mass iatrogenic event that killed (0.213 ± 0.006) % of the world population [(approximately 17,000,000 people)] and did not measurably prevent any deaths." *Id.* at 119.

The Rancourt Study's "[m]ethod is designed for cases (jurisdictions) in which there is no evidence in the ACM data for mortality caused by factors other than the vaccine rollouts." *Id.* at 16. The study's methodology is grossly flawed. It relies on a finding that, "no excess mortality occur[ed] in the [COVID-19] pre-vaccination period." *Id.* This finding is baseless given that the data relied on shows that following vaccine rollouts, excess ACM decreased in eight of the 17 countries studied. *Id.* at 26. When looking at the Rancourt Study's data for the 17 countries combined, excess ACM also decreased following vaccine rollouts. *Id.* (table 1, showing total excess ACM in the year preceding vaccine rollout as 2,392,831, and total excess ACM following vaccine rollout at 1,744,829). Plaintiff fails to rebut Defendant's expert's compelling opinion that the Rancourt Study "[i]nexplicably ... ignores that excess deaths across the world correlated with spikes of confirmed COVID-19 cases rather than vaccine rollouts." Cohen Report ¶ 19. Lastly, Dr.

French also fails to explain why the Rancourt Study, and his opinion from which it flows, are reliable despite running contrary to broad scientific consensus that the COVID-19 vaccines are safe. Koekkoek Decl. ¶ 32.

Dr. French's expert opinion is also unreliable because he misconstrues the exhibits cited in his report. In support of his opinion on vaccine efficacy, Dr. French cites to Exhibit 2, an outbreak report describing the transmission of COVID-19 that occurred at a large public event in a Massachusetts town in the summer of 2021. French Report, Ex. 2 [4] ("Outbreak Report") at 1. The Outbreak Report found that 74% of the COVID-19 cases occurred in people who were fully vaccinated. *Id.* From this finding, Dr. French opines that "even as early as 2021, the literature did not demonstrate that the COVID-19 vaccines were effective in transmission mitigation of COVID-19 infection." French Report ¶ 31, citing Ex. 2.

Contrary to Dr. French's opinion, the Outbreak Report explicitly states that "vaccination is the most important strategy to prevent severe illness and death." Outbreak Report at 2. The Outbreak Report continues, "[a]s population-level vaccination coverage increases, vaccinated persons are likely to represent a larger proportion of COVID-19 cases." *Id.* In other words, the fact that many of the people infected at the public gathering were fully vaccinated merely reflects high vaccination rates in that geographical area at the time. The Outbreak Report concludes, "data from this report are insufficient to draw conclusions about the effectiveness of COVID-19 vaccines against SARS-CoV-2, including the Delta variant, during this outbreak." *Id.* at 3. The limitation on the conclusions to be drawn from the data do not call into question the efficacy of COVID-19 vaccines. Rather, the mismatch between Dr. French's opinion and the findings and recommendations of the evidence he relies on, calls into question his capacity to comprehend scientific literature. His specious use of the Outbreak Report undermines the reliability of his methods and reasoning.

**\*5** Similarly, Dr. French incorrectly concludes that Exhibit 3 "indicate[s] that the COVID-19 vaccine was in fact increasing the risk of COVID-19 transmission." French Report ¶ 15, citing Ex. 3. Exhibit 3 is a cohort study on community transmission in vaccinated and unvaccinated individuals in the UK. French Report Ex. 3 [5] ("Cohort Study") at 1. Dr. French's opinion is troubling, given that the Cohort Study explicitly recommends "[i]ncreasing population immunity via booster programmes and vaccination" and concludes

that "[this] analysis suggests that direct protection of individuals at risk of severe outcomes, via vaccination and non-pharmacological interventions, will remain central to containing the burden of disease caused by the delta variant." *Id.* at 12. Dr. French's opinion directly contradicts the scientific research it relies on. Dr. French's interpretation of the Outbreak Report and the Cohort Study are at best incompetent, and at worst, dishonest.

This Court is not alone in finding that Dr. French's opinion on this subject falls below accepted standards of reliability. *See Malone v. Legacy Health*, No. 3:22-CV-01343-HZ, 2024 WL 3316167, at \*3 (D. Or. July 5, 2024) (admonishing Dr. French for his misrepresentation of Exhibits 2 and 3 and citing other district court cases where misrepresentations of these same reports have been called out). Based on the unreliable methods and reasoning of Dr. French, the Court finds that Dr. French's opinions are inadmissible under Rule 702 and *Daubert*.

## II. Motion for Summary Judgment

Plaintiff brings religious discrimination claims based on Defendant's alleged failure to reasonably accommodate her religiously based opposition to receiving a COVID-19 vaccine. Defendant moves for summary judgment on the grounds that there is no genuine dispute that, under the circumstances, allowing Plaintiff to work in person in a healthcare setting would have been an undue hardship and that it reasonably accommodated Plaintiff with unpaid leave. Plaintiff responds that material disputes of fact remain regarding (1) the safety and efficacy of COVID-19 vaccines; (2) the process Defendant used to determine the vaccine mandate; (3) and the process Defendant used when deciding to place Plaintiff on unpaid leave.

### A. Title VII — Failure to Accommodate

Under Title VII, "[t]o establish religious discrimination on the basis of a failure-to-accommodate theory, [the plaintiff] must first set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). If established, the burden then shifts to the defendant to show that it "initiated good faith efforts to

accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Id.* Courts construe Oregon's statutory counterpart, Or. Rev. Stat. § 659.030, as identical to Title VII. *Heller v. EBB Auto Co.*, 8 F.3d 1433, n.2 1437 (9th Cir. 1993). The Court analyzes the state and federal claims under the same legal standards.

On April 24, 2023, the Court bifurcated the present case into two phases, Phase One consisted of two threshold legal questions: (1) was continuing to allow Plaintiff to work at the hospital unvaccinated an undue hardship on Defendant, and (2) was unpaid leave a reasonable accommodation? Scheduling Order 2, ECF No. 18. Phase Two related to the prima facie showing of a failure to accommodate claim. The Court set a dispositive motion deadline on the Phase One questions and ordered Phase Two discovery stayed pending the outcome of Phase One dispositive motions. The Court finds that Defendant is entitled to summary judgment on its affirmative defense of undue hardship. Because undue hardship is dispositive, the Court does not address whether unpaid leave was a reasonable accommodation.

### 1. Undue Hardship

**\*6** Until recently, some lower courts interpreted *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) as holding that an undue hardship under Title VII is merely something more than *de minimis*. *Groff v. DeJoy*, 600 U.S. 447, 471 (2023). In *Groff v. DeJoy*, 600 U.S. 447 (2023), the Supreme Court clarified that under Title VII, an " 'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Id.* at 468. Whether a burden is substantial is a fact-specific inquiry that should be resolved in a "common-sense manner." *Id.* at 471. Under the *Groff* standard, "courts must apply the test in a manner that takes into account all relevant factors in the case at hand." *Id.* at 470. For example, courts may consider "the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer." *Id.* (citation to record and alterations omitted). Consistent with this contextualized and common-sense approach, when conducting an undue hardship analysis, the Court finds it appropriate to consider the following factors: (1) the information available at the time the defendant made its accommodation decision; (2) economic and non-economic costs of the accommodation; and (3) the cumulative

or aggregate effects of an accommodation requested by multiple, similarly situated employees.[6]

Pre-*Groff* EEOC guidance on the undue hardship standard remains instructive. *Id.* at 471 (rejecting full adoption of EEOC's pre-*Groff* interpretation of undue hardship but explaining a "good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by" the Court's clarifying decision). Specific to evaluating undue hardship in the context of COVID-19 vaccinations, the EEOC provides sensible and relevant guidance consistent with *Groff*:

> Considerations relevant to undue hardship can include, among other things, the proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with non-employees, whose vaccination status could be unknown or who may be ineligible for the vaccine. (§ K.12, Updated May 28, 2021).

> Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business—including, in this instance, the risk of the spread of COVID-19 to other employees or to the public.... An employer cannot rely on speculative or hypothetical hardship when faced with an employee's religious objection but, rather, should rely on objective information. Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals). Another relevant consideration is the number of employees who are seeking a similar accommodation, i.e., the cumulative cost or burden on the employer. (§ L.3, Updated March 1, 2022).

*What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, EEOC (last visited September 25, 2024), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-adarehabilitation-act-and-other-eeo-laws [https://perma.cc/73RS-7L62].

### 2. Defendant's Evidence of Undue Hardship

Here, Defendant asserts that for employees who could not work fully remotely, any accommodation other than leave

Case 2:22-cv-00319-TOR    ECF No. 132    filed 12/12/24    PageID.5035    Page 26
of 47
TANYA RENEE SANO, an individual, Plaintiff, v. PEACEHEALTH,..., Slip Copy (2024)
2024 WL 4979429

created an undue hardship by significantly increasing the health and safety risks of its employees and patients. Plaintiff responds that allowing her to continue to work using pre-vaccine protocols would not have created an undue hardship, and that Defendant failed to conduct an individual analysis before placing her on leave.

Having found that the opinions of Plaintiff's expert are inadmissible, Plaintiff's Response in opposition to Defendant's Motion for Summary Judgment is unsupported by admissible evidence. Nonetheless, the Court must view all inferences drawn from the underlying facts in the light most favorable to Plaintiff and resolve all reasonable doubts as to the existence of genuine issues of material fact against Defendant. *T.W. Elec. Service, Inc.*, 809 F.2d at 630.

**\*7** Defendant relies on the declarations of the following individuals to support its affirmative defense of undue hardship. First, Defendant relies on the declaration of Dr. Koekkoek, Defendant's Chief Physician and Clinical Executive. Koekkoek Decl. ¶ 2. During the summer of 2021 he led Defendant's clinical response to the COVID-19 pandemic and was a member of the Senior Leadership Team. *Id.* ¶ 3. Dr. Koekkoek was also a member of Defendant's Ethical Discernment team, which, after deliberations, decided to implement Defendant's vaccination policy in August 2021. *Id.* ¶¶ 25–29. Second, Defendant offers the declaration of Catherine Kroll, Defendant's System Director of Infection Prevention. Kroll Decl. ¶ 2. Ms. Kroll has worked in Defendant's Infection Prevention Department for over 10 years and has held the System Director role since 2022. Kroll Decl. ¶ 2. And third, is the declaration of Caroline Le, Defendant's Program Director for HR Integration. Le Decl. ¶ 2. Ms. Le has worked in Defendant's HR department for approximately ten years and was elevated to program director in February 2021. Le Decl. ¶ 2. Ms. Le facilitated Defendant's system-wide implementation of its COVID-19 mandate. Le Decl. ¶ 9. Each of these declarations is further supported by numerous exhibits, none of which Plaintiff meaningfully challenges. The Court explores Defendant's evidence in detail below.

Throughout the pandemic, Defendant relied on federal and state recommended and mandated safety measures to develop its policies and responses to the COVID-19 outbreak. Le Decl. ¶ 8; Kroll Decl. ¶¶ 4, 13; Koekkoek Decl. ¶ 9. Early in the pandemic, Defendant mitigated exposure risks using screening, testing, masking, other forms of PPE, and social distancing. Le Decl. ¶ 7; Kroll Decl. ¶ 5. Once COVID-19

vaccines became available in December 2020, Defendant encouraged its employees to get vaccinated. Le Decl. ¶ 8; Kroll Decl. ¶ 6. However, by late July 2021, 19.7% of Defendant's Oregon employees remained unvaccinated or declined to state their vaccination status. Le Decl. ¶ 13.

In the summer of 2021, a more transmissible and deadly Delta variant hit Oregon communities and hospitals. Koekkoek Decl. ¶¶ 10–11. Nationwide, the number of COVID-19 cases increased by 300%. Koekkoek Decl. ¶ 37, [7] Ex. 12 at 1. Defendant monitored COVID-19 forecast models developed at Oregon Health & Science University ("OHSU"). Koekkoek Decl. ¶¶ 13, 19. In mid-July, the OHSU modeling for a faster-spreading variant and slower vaccination rates predicted a September peak exceeding 1,000 COVID-19 hospitalizations in Oregon. Koekkoek Decl. ¶ 19(a), Ex. 4 at 19. By August 26, 2021, the statewide census exceeded 1,000 COVID-19 hospitalizations, and an updated model from OHSU predicted that there would be a peak of approximately 1,200 COVID-19 hospitalizations by September 6—effectively doubling the previous record in November 2020. Koekkoek Decl. ¶ 19(b), Ex. 5 at 23.

With the growing surge and severity of COVID-19 cases, Defendant reasonably believed that it faced a foundational risk to its ability to deliver healthcare services. Koekkoek Decl. ¶¶ 22-23. Defendant convened an Ethical Discernment process to evaluate whether it should require its employees to be vaccinated against COVID-19. Koekkoek Decl. ¶ 24. On July 21, 2021, the Ethical Discernment team reviewed and discussed internal infection prevention data, as well as publicly available information regarding COVID-19 and the vaccines. *Id.* ¶¶ 26, 31.

As part of the ethical discernment process related to the COVID-19 Vaccination Policy, Dr. Koekkoek used his medical background and clinical expertise to synthesize the medical and scientific literature and recommendations from regulatory and accrediting bodies, commonly referenced publications in highly reputable, peer-reviewed medical journals, and epidemiologic, and public health bodies to provide clinical expertise to others on the Ethical Discernment team. *Id.* ¶ 31. For example, Dr. Koekkoek relied on an August 2, 2021 study published in the New England Journal of Medicine which showed that through the end of June 2021, COVID-19 vaccines had averted an estimated 279,000 deaths and 1.25 million hospitalizations in the United States. *Id.* ¶ 33, Ex. 9 [8] (concluding, "[a]s the delta variant affects various countries, including the United

States, the current imperative is to vaccinate as many people as possible, as quickly as possible."). Dr. Koekkoek also relied on The Thompson Study, published in the New England Journal of Medicine on June 30, 2021. Koekkoek Decl. Ex. 10 [9] ("Thompson Study"). The Thompson Study researchers "conducted a prospective cohort study involving 3975 health care personnel, first responders, and other essential and frontline workers." Thompson Study at 1. The results showed that being fully vaccinated reduced the risk of infection by 91% and still protected against severe illness and hospitalization if breakthrough infection occurred. Koekkoek Decl. ¶ 34, Thompson Study at 1. Some of the other sources that Dr. Koekkoek consulted included the Oregon Health Authority, the Washington Department of Health, the Centers for Medicare and Medicaid Services, the Centers for Disease Control, the World Health Organization, and the Association for Professionals in Infection Control and Epidemiology. Koekkoek Decl. ¶ 31. Dr. Koekkoek's synthesis of medical and scientific literature and recommendations showed a broad consensus from reliable sources that the vaccines were safe and not only protected the vaccine recipient from contracting the virus but also decreased the likelihood that the recipient would transmit the virus. Koekkoek Decl. ¶ 32.

**\*8** Dr. Koekkoek advised the Ethical Discernment team that the protections afforded by vaccines were vitally important in healthcare facilities, where caregivers treated patients with COVID-19, and the risk of exposing other caregivers and patients, including children and elderly patients and patients with underlying conditions that make them particularly susceptible to COVID-19, was especially prevalent. *Id.* On July 27, 2021, after additional deliberation, the Ethical Discernment team decided unanimously that it would require all its employees to get vaccinated. *Id.* ¶ 27. A CDC report published two days later further supported the Ethical Discernment team decision. Koekkoek Decl. Ex. 11. The CDC report indicated that, when compared with vaccinated individuals, unvaccinated individuals were eight times more likely to contract COVID-19, twenty-five times more likely to be hospitalized if they got COVID-19, and twenty-five times more likely to die as a result of a COVID-19 infection. Koekkoek Decl. ¶ 36, Ex. 11 at 3.

On August 3, 2021, Defendant announced it would require all employees to be fully vaccinated against COVID-19 by September 1, 2021, if able, and to show proof of COVID-19 vaccination or submit a medical exemption on or before August 31, 2021. Koekkoek Decl. ¶ 29; Le Decl. ¶ 10, Ex. 2 at 3. Defendant included information about seeking medical and

religious exemptions to the policy but had not yet finalized a decision as to how it would accommodate employees with approved exemptions. Le Decl. ¶ 12, Ex. 4 at 2, 4; Koekkoek Decl. ¶ 29.

On August 4, 2021, Oregon Governor Brown announced that the OHA was issuing a regulation to require all Oregon healthcare providers and staff to be fully vaccinated against COVID-19 or submit to regular testing; the OHA issued a temporary rule to that effect one day later. Or. Admin. R. 333-019-1010 ("OHA Rule"). Initially, the OHA Rule provided two alternatives for healthcare workers to either: (1) be fully vaccinated by September 30, 2021, or (2) submit to weekly testing. Or. Admin. R. 333-019-1010 (eff. Aug. 5, 2021, to Aug. 24, 2021). However, on August 19, 2021, Governor Brown announced that the OHA would be updating its rule to remove the testing option and require healthcare workers to be fully vaccinated by October 18, 2021, unless they had a documented religious or medical exemption. Governor Kate Brown, Governor Brown Press Conference 8.19.2021, at 22:30, YOUTUBE (Aug. 19, 2021), https://www.youtube.com/watch?v=AxfQIRoPjyw.

On August 16, 2021, the Ethical Discernment team met again to consider potential changes to the COVID-19 Vaccine Requirement Policy and accommodations in light of updated guidance, employee feedback, and the OHA Rule. Koekkoek Decl. ¶ 42, Ex. 18. Defendant's internal epidemiological study determined that its patients were 7.1 times more likely to have been exposed to COVID-19 and 11.6 times more likely to get COVID-19 from an unvaccinated employee as compared to a vaccinated employee. Koekkoek Decl. ¶ 21; Kroll Decl. ¶ 19, Exs. 3, 4. This data were collected while Defendant's other methods of risk exposure mitigation—such as PPE (including N95 masks), testing, social distancing, restrictions on visitation, and additional hand hygiene protocols—were already the "baseline" requirements in use. Koekkoek Decl. ¶ 44. Because of the substantial increase of patient infections due to exposure from unvaccinated employees, the Ethical Discernment team reaffirmed its overall position requiring all employees, absent an approved medical or religious exemption, to be fully vaccinated against COVID-19. *Id.* ¶ 42.

Defendant then considered potential accommodations for exempted employees who could not work fully remotely. *Id.* ¶ 43. While Defendant generally concluded that multiple methods of protection against COVID-19 were important, the medical science at the time confirmed that vaccination was

Case 2:22-cv-00319-TOR    ECF No. 132    filed 12/12/24    PageID.5037    Page 28
of 47

the single most important method. *Id.* Unlike vaccination, the "baseline" requirements did not provide continuous protection 24 hours per day and were susceptible to human error. *Id.* ¶ 44. The Ethical Discernment team concluded that the so-called baseline requirements were no longer sufficient. *Id.* ¶¶ 43-44. Defendant determined that allowing unvaccinated employees to work in person would have subjected other employees and patients to a higher risk of contracting COVID-19, amplifying the risk of severe illness or death among its patients. *Id.* ¶ 48.

**\*9** Defendant then established a committee to review religious exemption requests and began processing such requests. Le Decl. ¶ 18. When Defendant approved a request for religious exemption, the employee's HR partner or supervisor initiated an interview with the employee. *See* Le Decl. ¶¶ 21, 31. However, because Defendant determined that contact between unvaccinated employees and patients or coworkers posed an unacceptable health and safety risk, the only substantive issue during these interviews was whether the employee could perform the essential functions of their position fully remotely. Le Decl. ¶ 21. Defendant placed employees who could not work fully remotely on unpaid leave, permitting use of remaining PTO and continuing their health benefits coverage through the later of November 30, 2021, or the end of the month in which they exhausted PTO. Le Decl. ¶ 23. By August 31, 2021, the review committee had approved 219 of the 226 religious exemption requests it received from its Oregon employees. Le Decl. ¶ 19.

Plaintiff requested a religious exemption to Defendant's COVID-19 vaccine requirement, which Defendant approved. Le Decl. ¶ 30, Ex. 14; Riggs Decl. I Ex. 1 at 9 (RFA Response No. 4). Plaintiff's supervisor and HR partner interviewed Plaintiff to process her request and determined that she could not perform her duties as a medical technologist fully remotely. Le Decl. ¶ 30, Ex. 15; Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). Plaintiff admits that she could not perform the essential functions of her position fully remotely. Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). On September 1, 2021, Defendant placed Plaintiff on unpaid administrative leave. Le Decl. ¶ 32.

3. <u>Analysis</u>

Defendant's determination—that contact between unvaccinated employees and co-workers, patients, and community members in its facilities posed an unacceptable health and safety risk—was directly supported by its internal epidemiological study, consensus among the scientific

medical community at the time, and reliance on guidance from authoritative sources such as the CDC and the OHA. The Court finds there is no genuine dispute of fact that allowing unvaccinated employees to work in person significantly increased health and safety risks to its employees and patients at times relevant in this Complaint. Plaintiff does not dispute that she could not perform her job fully remotely and that performance of her job required close contact with other employees who provided direct care to medically vulnerable individuals. Defendant reasonably concluded that the health and safety risks of allowing unvaccinated employees to work in person created a substantial burden by conflicting directly with its business mission to provide safe and adequate healthcare to the community. Defendant also considered the number of employees seeking a similar accommodation and reasonably concluded that the cumulative burden was substantial.

Plaintiff does not dispute that Defendant conducted an interview with her before making its determination that she could not perform her job fully remotely. Plaintiff argues, without evidence or supporting case law, that Defendant owed her more process before placing her on leave. Defendant's decision to place Plaintiff on unpaid leave was made after it met with her and determined that she could not perform her job fully remotely. Defendant was in the midst of a healthcare crisis which posed an existential threat to its operational abilities. It had hundreds of religious and medical exemption requests to process in a short amount of time. Defendant's decision to place Plaintiff on unpaid leave was made individually. Having reviewed the evidence in the record, the Court finds that there is no genuine dispute of material fact that any accommodation other than leave would have posed an undue hardship on Defendant. Because Defendant has successfully established the affirmative defense of undue hardship, the Court grants Defendant's Motion for Summary Judgment.

## CONCLUSION

**\*10** For the reasons above, Defendant's motion to strike (ECF No. 39) and motion for summary judgment (ECF No. 28) are GRANTED.

DATED this <u>4th</u> day of December 2024.

**All Citations**

Slip Copy, 2024 WL 4979429

---

**Footnotes**

1    In ruling on the admissibility of Dr. French's opinions, the Court need not, and does not, opine on the truth of these opinions. Rather, the Court's ruling is narrowly tailored to whether Dr. French's opinions are based on reliable methodologies and reasoning under Rule 702 and *Daubert*.

2    Dr. French labelled two different exhibits as Exhibit 6. The Court's reference to Exhibit 6 relates to the second Exhibit 6, pdf pages 64-243 of the French Report, Rancourt, D.G., Baudin, M., Hickey, J., Mercier, J. "COVID-19 vaccine-associated mortality in the Southern Hemisphere". *CORRELATION Research in the Public Interest*, Report, 17 September 2023. https://correlation-canada.org/covid-19-vaccine-associated-mortality-in-the-Southern-Hemisphere/.

3    *Oxford English Dictionary* defines "junk science" as "[s]cientific assertions or conclusions which are presented as fact but based on flawed or biased research or analysis[.]" *Junk Science*, Oxford English Dictionary, (online ed. 2023) https://doi.org/10.1093/OED/2767395868 (last visited Nov. 8, 2024).

4    Brown, Catherine M. "Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021." MMWR. Morbidity and Mortality Weekly Report 70 (2021). https://doi.org/10.15585/mmwr.mm7031e2.

5    Singanayagam, Anika, Seran Hakki, Jake Dunning, Kieran J. Madon, Michael A. Crone, Aleksandra Koycheva, Nieves DerquiFernandez, et al. "Community Transmission and Viral Load Kinetics of the SARS-CoV-2 Delta (B.1.617.2) Variant in Vaccinated and Unvaccinated Individuals in the UK: A Prospective, Longitudinal, Cohort Study." The Lancet. Infectious Diseases 22, no. 2 (February 2022): 183–95. https://doi.org/10.1016/S1473-3099(21)00648-4.

6    For a thorough and well-reasoned explanation of these three factors and their relation to *Groff*, *see Lavelle-Hayden v. Legacy Health*, No. 3:22-CV-01752-IM, 2024 WL 3822712, at *8–*10 (D. Or. Aug. 14, 2024).

7    The declaration of Dr. Koekkoek contains a scrivener's error. The paragraphs proceeding ¶ 36 begin at "33". See Koekkoek Decl. at 11. The Court refers to the corrected paragraph number.

8    Stephen J.W. Evans, M.Sc., and Nicholas P. Jewell, Ph.D., *Vaccine Effectiveness Studies in the Field*, The New England Journal of Medicine, Aug. 2. 2021.

9    Mark G. Thompson, et al., *Prevention and Attenuation of Covid-19 with the BNT162b2 and mRNA-1273 Vaccines*, 385(4) N. Eng. J. Med. 320–329 (June 30, 2021).

---

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4979430
Only the Westlaw citation is currently available.
United States District Court, D. Oregon.

TERRI PARSONS, an Individual, Plaintiff,

v.

PEACEHEALTH, a corporation, Defendant.

Case No. 6:22-cv-01246-MTK
|
Filed 12/04/2024

### OPINION AND ORDER

MUSTAFA T. KASUBHAI (He / Him) United States District Judge

**\*1** Plaintiff Terri Parsons ("Plaintiff") brings this religious discrimination claim against her former employer, Defendant PeaceHealth ("Defendant"). Plaintiff alleges Defendant violated Title VII of the Civil Rights Act, 📄 42 U.S.C. § 2000e-5 (Second Claim for Relief) and Or. Rev. Stat. § ("ORS") 659A.030 (First Claim for Relief) by failing to reasonably accommodate her religious beliefs when she objected to taking the COVID-19 vaccine. Defendant moves to exclude the opinions and report of Plaintiff's expert (ECF No. 36) and moves for summary judgment (ECF No. 25) on Plaintiff's claims. Defendant's motions are granted.

### BACKGROUND

Defendant is a not-for-profit Catholic healthcare system with approximately 16,250 employees in medical centers, hospitals, and clinics across Alaska, Washington, and Oregon. Le Decl. ¶ 3, ECF No. 29. Its mission is to promote personal and community health through safe and compassionate care. Le Decl. ¶ 5, Ex. 1.

In early 2020, the SARS-CoV-2 virus, and the COVID-19 infection it causes, began spreading in Oregon. Koekkoek Decl. ¶¶ 4-5, ECF No. 27. Defendant mitigated exposure risks using screening, testing, masking, other forms of personal protective equipment ("PPE"), and social distancing. Le Decl. ¶ 7; Kroll Decl. ¶ 5, ECF No. 28. Once COVID-19 vaccines became available in December 2020, Defendant encouraged its employees to get vaccinated. Le Decl. ¶ 8; Kroll Decl. ¶ 6.

In the summer of 2021, a more transmissible and deadly Delta variant hit Oregon communities and hospitals. The number of COVID-19 cases increased by 300% nationwide. Koekkoek Decl. ¶ 37, Ex. 12 at 1. On August 3, 2021, Defendant announced it would require all employees to be fully vaccinated against COVID-19 by September 1, 2021, if able, and to show proof of COVID-19 vaccination or submit a medical or religious exemption on or before August 31, 2021. Koekkoek Decl. ¶ 29; Le Decl. ¶ 10, Ex. 2 at 5.

Defendant established a committee to review religious exemption requests and began processing such requests. Le Decl. ¶ 18. When Defendant approved a request for religious exemption, the employee's HR partner or supervisor initiated an interview with the employee. Le Decl. ¶ 21. Defendant placed exempted employees who could not work fully remotely on unpaid leave, permitting use of remaining PTO and continuing their health benefits coverage through the later of November 30, 2021, or the end of the month in which they exhausted PTO. Le Decl. ¶ 23.

Defendant employed Plaintiff as a certified medical assistant in the Family Practice Department. Le Decl. ¶ 29. Plaintiff's job duties included preparing patients for examinations and treatment, giving injections, and collaborating with a variety of personnel and departments to ensure smooth clinic operations. Le Decl. Ex. 13 at 1. Plaintiff requested a religious exemption to Defendant's COVID-19 vaccine requirement, which Defendant approved. Le Decl. ¶ 30, Ex. 14; Riggs Decl. I Ex. 1 at 9 (RFA Response No. 4), ECF No. 26-1. Plaintiff's supervisor and HR partner interviewed Plaintiff to process her request and determined that she could not perform her duties as a medical assistant fully remotely. Le Decl. ¶ 31, Ex. 15; Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). On September 1, 2021, Defendant placed Plaintiff on unpaid administrative leave. Le Decl. ¶ 32. Plaintiff filed her Complaint on August 23, 2022. Compl. ECF No. 1. She alleges that Defendant failed to reasonably accommodate her religious opposition to receiving a COVID-19 vaccine in violation of Title VII and ORS 659A.030.

### STANDARDS

**I. Federal Rules of Evidence 702 and *Daubert***

**\*2** The admissibility of an expert's testimony is governed by Fed. R. Evid. 702, as elaborated by the Supreme Court in *Daubert* and its progeny. Rule 702 provides that a witness

who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

### II. Local Rule 56-1(b)

Under LR 56-1(b), rather than filing a motion to strike, the moving party must assert any evidentiary objections in its reply memorandum. "If an evidentiary objection is raised by the moving party in its reply memorandum, the non-moving party may file a surreply memorandum ... within seven days addressing only the evidentiary objection; the moving party may not file further briefing on its evidentiary objection." LR 56-1(b).

### III. Motion for Summary Judgment — Fed. R. Civ. Pro. 56(a)

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec. Service, Inc., 809 F.2d at 630.

### DISCUSSION

Defendant contends that Plaintiff's expert's opinion and report are inadmissible evidence under Rule 702 and *Daubert* and moves for summary judgment on Plaintiff's claims. Defendant argues that it reasonably accommodated Plaintiff and as a matter of law it is entitled to prevail on its affirmative defense that it could not allow Plaintiff to continue working unvaccinated without undue hardship.

### I. Defendant's Motion to Strike

Defendant moves under Rule 702 to exclude the opinions and report of Plaintiff's expert, Dr. French. Defendant asserts that Dr. French's opinions and report are inadmissible evidence because they are based on unreliable methodologies and reasoning. Defendant attaches to its motion the expert report of Dr. Cohen, a Clinical Associate Professor in the Division of Allergy and Infectious Diseases at the University of Washington and the Medical Director of Infection Prevention at the University of Washington Medical Center. Rigg's Decl. II Ex. 1 ("Cohen Report") ¶ 5, ECF No. 37-1. Dr. Cohen's report is a review of Dr. French's report and provides commentary on Dr. French's opinions and use of cited literature. Despite the opportunity to do so under LR 56-1(b), Plaintiff did not submit a surreply in response to Dr. Cohen's well-reasoned rebuttal report.

**\*3** Dr. French is a board-certified emergency medicine physician. Expert Report of Dr. Richard Scott French ("French Report") ¶ 2, ECF No. 35-1. He attests to having extensive experience treating and managing COVID-19 patients in several states and extensive experience and expertise in setting up COVID-19 prevention protocols for hospital facilities. French Report ¶¶ 2, 7–10. Dr. French also has professional experience teaching and presenting at medical schools on immunology, as well as viral transmission prevention, diagnosis, treatment, and management. French Report ¶ 4. The French Report can be categorized into two overarching opinions: (1) the safety and efficacy of the COVID-19 vaccine are unproven, and (2) COVID-19 exposure risks can be effectively mitigated without requiring vaccination. [1]

TERRI PARSONS, an Individual, Plaintiff, v. PEACEHEALTH, a..., Slip Copy (2024)
2024 WL 4979430

When ruling on a motion to strike under Rule 702 and *Daubert*, trial judges are tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993). The Supreme Court in *Daubert* elaborated that expert testimony should be based on a reliable and scientifically valid methodology that fits with the facts of a case. *Id. at 592–93.* "Under *Daubert,* the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982 (9th Cir. 2011) (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 145 (1999)).

"For scientific opinion, the court must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) "[T]he trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on 'the particular circumstances of the particular case.' " *Id.* (quoting *Kumho Tire Co.,* 526 U.S. at 147).

The Court must ensure that the French Report is reliable by examining "whether the expert's testimony reflects scientific knowledge, whether their findings are derived by the scientific method, and whether their work product amounts to good science." *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1315 (9th Cir. 1995) (*Daubert II*) (quotation marks removed) (citing *Daubert,* 509 U.S. at 591–93). And the Court must ensure that the French Report is relevant in that it "logically advances a material aspect of [Plaintiff's] case." *Id.*

The Court has reviewed the French Report and finds that every portion of it falls below the admissibility standard. For the purposes of explanation, the Court discusses the following three significant examples.

In support of his opinion that the COVID-19 vaccines are neither safe nor effective, Dr. French relies on Exhibit 6, which he describes as a "a comprehensive report with many graphs, charts, references and [a] description of their methodology." French Report ¶ 26, citing Ex. 6 [2] ("Rancourt Study"). Dr. French's explanation of the Rancourt Study's scientific legitimacy is cursory and grossly deficient. That the Rancourt Study includes a description of the authors' methodology and contains many graphs, charts, and references is not indicative of its scientific legitimacy. Similarly, its 180 pages proves only its length, not its quality. Having conducted "a preliminary assessment of whether the reasoning or methodology underlying [the French Report] is scientifically valid", *Daubert,* 509 U.S. at 592–93, the Court finds that the Rancourt Study is junk science. [3]

**\*4** The Rancourt Study is a "study regarding COVID-19 vaccine-associated mortality in the Southern Hemisphere looking at the excess mortality rate associated with COVID-19 vaccines in 17 countries, spanning four continents." Rancourt Study at 1-3. It claims "there is no evidence ... of any beneficial effect of COVID-19 vaccines." *Id.* at 1-2. Despite being a correlative study, the authors claim that "[t]he scientific tests for causality are amply satisfied, [and] extensively demonstrate[ ] ... COVID-19 vaccines did not save lives and appear to be lethal toxic agents[.]" *Id.* at 131. Purportedly, its "analysis of ACM [(all cause mortality)] by time in the 17 countries studied shows that the global COVID-19 vaccination campaign was in effect a mass iatrogenic event that killed (0.213 ± 0.006) % of the world population [(approximately 17,000,000 people)] and did not measurably prevent any deaths." *Id.* at 119.

The Rancourt Study's "[m]ethod is designed for cases (jurisdictions) in which there is no evidence in the ACM data for mortality caused by factors other than the vaccine rollouts." *Id.* at 16. The study's methodology is grossly flawed. It relies on a finding that, "no excess mortality occur[ed] in the [COVID-19] pre-vaccination period." *Id.* This finding is baseless given that the data relied on shows that following vaccine rollouts, excess ACM decreased in eight of the 17 countries studied. *Id.* at 26. When looking at the Rancourt Study's data for the 17 countries combined, excess ACM also decreased following vaccine rollouts. *Id.* (table 1, showing total excess ACM in the year preceding vaccine rollout as 2,392,831, and total excess ACM following vaccine rollout as 1,744,829). Plaintiff fails to rebut Defendant's expert's compelling opinion that the Rancourt Study "[i]nexplicably ... ignores that excess deaths across the world correlated with spikes of confirmed COVID-19 cases rather than vaccine rollouts." Cohen Report ¶ 19. Lastly, Dr.

French also fails to explain why the Rancourt Study, and his opinion from which it flows, are reliable despite running contrary to broad scientific consensus that the COVID-19 vaccines are safe. Koekkoek Decl. ¶ 32.

Dr. French's expert opinion is also unreliable because he misconstrues the exhibits cited in his report. In support of his opinion on vaccine efficacy, Dr. French cites to Exhibit 2, an outbreak report describing the transmission of COVID-19 that occurred at a large public event in a Massachusetts town in the summer of 2021. French Report, Ex. 2 [4] ("Outbreak Report") at 1. The Outbreak Report found that 74% of the COVID-19 cases occurred in people who were fully vaccinated. *Id.* From this finding, Dr. French opines that "even as early as 2021, the literature did not demonstrate that the COVID-19 vaccines were effective in transmission mitigation of COVID-19 infection." French Report ¶ 31, citing Ex. 2.

Contrary to Dr. French's opinion, the Outbreak Report explicitly states that "vaccination is the most important strategy to prevent severe illness and death." Outbreak Report at 2. The Outbreak Report continues, "[a]s population-level vaccination coverage increases, vaccinated persons are likely to represent a larger proportion of COVID-19 cases." *Id.* In other words, the fact that many of the people infected at the public gathering were fully vaccinated merely reflects high vaccination rates in that geographical area at the time. The Outbreak Report concludes, "data from this report are insufficient to draw conclusions about the effectiveness of COVID-19 vaccines against SARS-CoV-2, including the Delta variant, during this outbreak." *Id.* at 3. The limitation on the conclusions to be drawn from the data do not call into question the efficacy of COVID-19 vaccines. Rather, the mismatch between Dr. French's opinion and the findings and recommendations of the evidence he relies on, calls into question his capacity to comprehend scientific literature. His specious use of the Outbreak Report undermines the reliability of his methods and reasoning.

**\*5** Similarly, Dr. French incorrectly concludes that Exhibit 3 "indicate[s] that the COVID-19 vaccine was in fact increasing the risk of COVID-19 transmission." French Report ¶ 15, citing Ex. 3. Exhibit 3 is a cohort study on community transmission in vaccinated and unvaccinated individuals in the UK. French Report Ex. 3 [5] ("Cohort Study") at 1. Dr. French's opinion is troubling, given that the Cohort Study explicitly recommends "[i]ncreasing population immunity via booster programmes and vaccination" and concludes

that "[this] analysis suggests that direct protection of individuals at risk of severe outcomes, via vaccination and non-pharmacological interventions, will remain central to containing the burden of disease caused by the delta variant." *Id.* at 12. Dr. French's opinion directly contradicts the scientific research it relies on. Dr. French's interpretation of the Outbreak Report and the Cohort Study are at best incompetent, and at worst, dishonest.

This Court is not alone in finding that Dr. French's opinion on this subject falls below accepted standards of reliability. *See Malone v. Legacy Health*, No. 3:22-CV-01343-HZ, 2024 WL 3316167, at \*3 (D. Or. July 5, 2024) (admonishing Dr. French for his misrepresentation of Exhibits 2 and 3 and citing other district court cases where misrepresentations of these same reports have been called out). Based on the unreliable methods and reasoning of Dr. French, the Court finds that Dr. French's opinions are inadmissible under Rule 702 and *Daubert.*

## II. Motion for Summary Judgment

Plaintiff brings religious discrimination claims based on Defendant's alleged failure to reasonably accommodate her religiously based opposition to receiving a COVID-19 vaccine. Defendant moves for summary judgment on the grounds that there is no genuine dispute that, under the circumstances, allowing Plaintiff to work in person in a healthcare setting would have been an undue hardship and that it reasonably accommodated Plaintiff with unpaid leave. Plaintiff responds that material disputes of fact remain regarding (1) the safety and efficacy of COVID-19 vaccines; (2) the process Defendant used to determine the vaccine mandate; (3) and the process Defendant used when deciding to place Plaintiff on unpaid leave.

### A. Title VII — Failure to Accommodate

Under Title VII, "[t]o establish religious discrimination on the basis of a failure-to-accommodate theory, [the plaintiff] must first set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). If established, the burden then shifts to the defendant to show that it "initiated good faith efforts to

accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Id.* Courts construe Oregon's statutory counterpart, Or. Rev. Stat. § 659.030, as identical to Title VII. *Heller v. EBB Auto Co.*, 8 F.3d 1433, n.2 1437 (9th Cir. 1993). The Court analyzes the state and federal claims under the same legal standards.

On April 24, 2023, the Court bifurcated the present case into two phases, Phase One consisted of two threshold legal questions: (1) was continuing to allow Plaintiff to work at the hospital unvaccinated an undue hardship on Defendant, and (2) was unpaid leave a reasonable accommodation? Scheduling Order 2, ECF No. 16. Phase Two related to the prima facie showing of a failure to accommodate claim. The Court set a dispositive motion deadline on the Phase One questions and ordered Phase Two discovery stayed pending the outcome of Phase One dispositive motions. The Court finds that Defendant is entitled to summary judgment on its affirmative defense of undue hardship. Because undue hardship is dispositive, the Court does not address whether unpaid leave was a reasonable accommodation.

### 1. Undue Hardship

**\*6** Until recently, some lower courts interpreted *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) as holding that an undue hardship under Title VII is merely something more than *de minimis*. *Groff v. DeJoy*, 600 U.S. 447, 471 (2023). In *Groff v. DeJoy*, 600 U.S. 447 (2023), the Supreme Court clarified that under Title VII, an " 'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Id.* at 468. Whether a burden is substantial is a fact-specific inquiry that should be resolved in a "common-sense manner." *Id.* at 471. Under the *Groff* standard, "courts must apply the test in a manner that takes into account all relevant factors in the case at hand." *Id.* at 470. For example, courts may consider "the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer." *Id.* (citation to record and alterations omitted). Consistent with this contextualized and common-sense approach, when conducting an undue hardship analysis, the Court finds it appropriate to consider the following factors: (1) the information available at the time the defendant made its accommodation decision; (2) economic and non-economic costs of the accommodation; and (3) the cumulative

or aggregate effects of an accommodation requested by multiple, similarly situated employees.[6]

Pre-*Groff* EEOC guidance on the undue hardship standard remains instructive. *Id.* at 471 (rejecting full adoption of EEOC's pre-*Groff* interpretation of undue hardship but explaining a "good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by" the Court's clarifying decision). Specific to evaluating undue hardship in the context of COVID-19 vaccinations, the EEOC provides sensible and relevant guidance consistent with *Groff*:

> Considerations relevant to undue hardship can include, among other things, the proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with non-employees, whose vaccination status could be unknown or who may be ineligible for the vaccine. (§ K.12, Updated May 28, 2021).

> Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business—including, in this instance, the risk of the spread of COVID-19 to other employees or to the public.... An employer cannot rely on speculative or hypothetical hardship when faced with an employee's religious objection but, rather, should rely on objective information. Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals). Another relevant consideration is the number of employees who are seeking a similar accommodation, i.e., the cumulative cost or burden on the employer. (§ L.3, Updated March 1, 2022).

*What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, EEOC (last visited September 25, 2024), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-adarehabilitation-act-and-other-eeo-laws [https://perma.cc/73RS-7L62].

### 2. Defendant's Evidence of Undue Hardship

Here, Defendant asserts that for employees who could not work fully remotely, any accommodation other than leave

created an undue hardship by significantly increasing the health and safety risks of its employees and patients. Plaintiff responds that allowing her to continue to work using pre-vaccine protocols would not have created an undue hardship, and that Defendant failed to conduct an individual analysis before placing her on leave.

Having found that the opinions of Plaintiff's expert are inadmissible, Plaintiff's Response in opposition to Defendant's Motion for Summary Judgment is unsupported by admissible evidence. Nonetheless, the Court must view all inferences drawn from the underlying facts in the light most favorable to Plaintiff and resolve all reasonable doubts as to the existence of genuine issues of material fact against Defendant. 🔖 *T.W. Elec. Service, Inc.*, 809 F.2d at 630.

 *7 Defendant relies on the declarations of the following individuals to support its affirmative defense of undue hardship. First, Defendant relies on the declaration of Dr. Koekkoek, Defendant's Chief Physician and Clinical Executive. Koekkoek Decl. ¶ 2. During the summer of 2021 he led Defendant's clinical response to the COVID-19 pandemic and was a member of the Senior Leadership Team. *Id.* ¶ 3. Dr. Koekkoek was also a member of Defendant's Ethical Discernment team, which, after deliberations, decided to implement Defendant's vaccination policy in August 2021. *Id.* ¶¶ 25–29. Second, Defendant offers the declaration of Catherine Kroll, Defendant's System Director of Infection Prevention. Kroll Decl. ¶ 2. Ms. Kroll has worked in Defendant's Infection Prevention Department for over 10 years and has held the System Director role since 2022. Kroll Decl. ¶ 2. And third, is the declaration of Caroline Le, Defendant's Program Director for HR Integration. Le Decl. ¶ 2. Ms. Le has worked in Defendant's HR department for approximately ten years and was elevated to program director in February 2021. Le Decl. ¶ 2. Ms. Le facilitated Defendant's system-wide implementation of its COVID-19 mandate. Le Decl. ¶ 9. Each of these declarations is further supported by numerous exhibits, none of which Plaintiff meaningfully challenges. The Court explores Defendant's evidence in detail below.

Throughout the pandemic, Defendant relied on federal and state recommended and mandated safety measures to develop its policies and responses to the COVID-19 outbreak. Le Decl. ¶ 8; Kroll Decl. ¶¶ 4, 13; Koekkoek Decl. ¶ 9. Early in the pandemic, Defendant mitigated exposure risks using screening, testing, masking, other forms of PPE, and social distancing. Le Decl. ¶ 7; Kroll Decl. ¶ 5. Once COVID-19 vaccines became available in December 2020, Defendant encouraged its employees to get vaccinated. Le Decl. ¶ 8; Kroll Decl. ¶ 6. However, by late July 2021, 19.7% of Defendant's Oregon employees remained unvaccinated or declined to state their vaccination status. Le Decl. ¶ 13.

In the summer of 2021, a more transmissible and deadly Delta variant hit Oregon communities and hospitals. Koekkoek Decl. ¶¶ 10–11. Nationwide, the number of COVID-19 cases increased by 300%. Koekkoek Decl. ¶ 37,[7] Ex. 12 at 1. Defendant monitored COVID-19 forecast models developed at Oregon Health & Science University ("OHSU"). Koekkoek Decl. ¶¶ 13, 19. In mid-July, the OHSU modeling for a faster-spreading variant and slower vaccination rates predicted a September peak exceeding 1,000 COVID-19 hospitalizations in Oregon. Koekkoek Decl. ¶ 19(a), Ex. 4 at 19. By August 26, 2021, the statewide census exceeded 1,000 COVID-19 hospitalizations, and an updated model from OHSU predicted that there would be a peak of approximately 1,200 COVID-19 hospitalizations by September 6—effectively doubling the previous record in November 2020. Koekkoek Decl. ¶ 19(b), Ex. 5 at 23.

With the growing surge and severity of COVID-19 cases, Defendant reasonably believed that it faced a foundational risk to its ability to deliver healthcare services. Koekkoek Decl. ¶¶ 22-23. Defendant convened an Ethical Discernment process to evaluate whether it should require its employees to be vaccinated against COVID-19. Koekkoek Decl. ¶ 24. On July 21, 2021, the Ethical Discernment team reviewed and discussed internal infection prevention data, as well as publicly available information regarding COVID-19 and the vaccines. *Id.* ¶¶ 26, 31.

As part of the ethical discernment process related to the COVID-19 Vaccination Policy, Dr. Koekkoek used his medical background and clinical expertise to synthesize the medical and scientific literature and recommendations from regulatory and accrediting bodies, commonly referenced publications in highly reputable, peer-reviewed medical journals, and epidemiologic, and public health bodies to provide clinical expertise to others on the Ethical Discernment team. *Id.* ¶ 31. For example, Dr. Koekkoek relied on an August 2, 2021 study published in the New England Journal of Medicine which showed that through the end of June 2021, COVID-19 vaccines had averted an estimated 279,000 deaths and 1.25 million hospitalizations in the United States. *Id.* ¶ 33, Ex. 9[8] (concluding, "[a]s the delta variant affects various countries, including the United

Case 2:22-cv-00319-TOR    ECF No. 132    filed 12/12/24    PageID.5045    Page 36 of 47
TERRI PARSONS, an Individual, Plaintiff, v. PEACEHEALTH, a..., Slip Copy (2024)
2024 WL 4979430

States, the current imperative is to vaccinate as many people as possible, as quickly as possible."). Dr. Koekkoek also relied on The Thompson Study, published in the New England Journal of Medicine on June 30, 2021. Koekkoek Decl. Ex. 10 [9] ("Thompson Study"). The Thompson Study researchers "conducted a prospective cohort study involving 3975 health care personnel, first responders, and other essential and frontline workers." Thompson Study at 1. The results showed that being fully vaccinated reduced the risk of infection by 91% and still protected against severe illness and hospitalization if breakthrough infection occurred. Koekkoek Decl. ¶ 34, Thompson Study at 1. Some of the other sources that Dr. Koekkoek consulted included the Oregon Health Authority, the Washington Department of Health, the Centers for Medicare and Medicaid Services, the Centers for Disease Control, the World Health Organization, and the Association for Professionals in Infection Control and Epidemiology. Koekkoek Decl. ¶ 31. Dr. Koekkoek's synthesis of medical and scientific literature and recommendations showed a broad consensus from reliable sources that the vaccines were safe and not only protected the vaccine recipient from contracting the virus but also decreased the likelihood that the recipient would transmit the virus. Koekkoek Decl. ¶ 32.

**\*8** Dr. Koekkoek advised the Ethical Discernment team that the protections afforded by vaccines were vitally important in healthcare facilities, where caregivers treated patients with COVID-19, and the risk of exposing other caregivers and patients, including children and elderly patients and patients with underlying conditions that make them particularly susceptible to COVID-19, was especially prevalent. *Id.* On July 27, 2021, after additional deliberation, the Ethical Discernment team decided unanimously that it would require all its employees to get vaccinated. *Id.* ¶ 27. A CDC report published two days later further supported the Ethical Discernment team decision. Koekkoek Decl. Ex. 11. The CDC report indicated that, when compared with vaccinated individuals, unvaccinated individuals were eight times more likely to contract COVID-19, twenty-five times more likely to be hospitalized if they got COVID-19, and twenty-five times more likely to die as a result of a COVID-19 infection. Koekkoek Decl. ¶ 36, Ex. 11 at 3.

On August 3, 2021, Defendant announced it would require all employees to be fully vaccinated against COVID-19 by September 1, 2021, if able, and to show proof of COVID-19 vaccination or submit a medical exemption on or before August 31, 2021. Koekkoek Decl. ¶ 29; Le Decl. ¶ 10, Ex. 2 at 3. Defendant included information about seeking medical and

religious exemptions to the policy but had not yet finalized a decision as to how it would accommodate employees with approved exemptions. Le Decl. ¶ 12, Ex. 4 at 2, 4; Koekkoek Decl. ¶ 29.

On August 4, 2021, Oregon Governor Brown announced that the OHA was issuing a regulation to require all Oregon healthcare providers and staff to be fully vaccinated against COVID-19 or submit to regular testing; the OHA issued a temporary rule to that effect one day later. Or. Admin. R. 333-019-1010 ("OHA Rule"). Initially, the OHA Rule provided two alternatives for healthcare workers to either: (1) be fully vaccinated by September 30, 2021, or (2) submit to weekly testing. Or. Admin. R. 333-019-1010 (eff. Aug. 5, 2021, to Aug. 24, 2021). However, on August 19, 2021, Governor Brown announced that the OHA would be updating its rule to remove the testing option and require healthcare workers to be fully vaccinated by October 18, 2021, unless they had a documented religious or medical exemption. Governor Kate Brown, Governor Brown Press Conference 8.19.2021, at 22:30, YOUTUBE (Aug. 19, 2021), https://www.youtube.com/watch?v=AxfQIRoPjyw.

On August 16, 2021, the Ethical Discernment team met again to consider potential changes to the COVID-19 Vaccine Requirement Policy and accommodations in light of updated guidance, employee feedback, and the OHA Rule. Koekkoek Decl. ¶ 42, Ex. 18. Defendant's internal epidemiological study determined that its patients were 7.1 times more likely to have been exposed to COVID-19 and 11.6 times more likely to get COVID-19 from an unvaccinated employee as compared to a vaccinated employee. Koekkoek Decl. ¶ 21; Kroll Decl. ¶ 19, Exs. 3, 4. This data were collected while Defendant's other methods of risk exposure mitigation—such as PPE (including N95 masks), testing, social distancing, restrictions on visitation, and additional hand hygiene protocols—were already the "baseline" requirements in use. Koekkoek Decl. ¶ 44. Because of the substantial increase of patient infections due to exposure from unvaccinated employees, the Ethical Discernment team reaffirmed its overall position requiring all employees, absent an approved medical or religious exemption, to be fully vaccinated against COVID-19. *Id.* ¶ 42.

Defendant then considered potential accommodations for exempted employees who could not work fully remotely. *Id.* ¶ 43. While Defendant generally concluded that multiple methods of protection against COVID-19 were important, the medical science at the time confirmed that vaccination was

TERRI PARSONS, an Individual, Plaintiff, v. PEACEHEALTH, a..., Slip Copy (2024)
2024 WL 4979430

the single most important method. *Id.* Unlike vaccination, the "baseline" requirements did not provide continuous protection 24 hours per day and were susceptible to human error. *Id.* ¶ 44. The Ethical Discernment team concluded that the so-called baseline requirements were no longer sufficient. *Id.* ¶¶ 43-44. Defendant determined that allowing unvaccinated employees to work in person would have subjected other employees and patients to a higher risk of contracting COVID-19, amplifying the risk of severe illness or death among its patients. *Id.* ¶ 48.

**\*9** Defendant then established a committee to review religious exemption requests and began processing such requests. Le Decl. ¶ 18. When Defendant approved a request for religious exemption, the employee's HR partner or supervisor initiated an interview with the employee. *See* Le Decl. ¶¶ 21, 31. However, because Defendant determined that contact between unvaccinated employees and patients or coworkers posed an unacceptable health and safety risk, the only substantive issue during these interviews was whether the employee could perform the essential functions of their position fully remotely. Le Decl. ¶ 21. Defendant placed employees who could not work fully remotely on unpaid leave, permitting use of remaining PTO and continuing their health benefits coverage through the later of November 30, 2021, or the end of the month in which they exhausted PTO. Le Decl. ¶ 23. By August 31, 2021, the review committee had approved 219 of the 226 religious exemption requests it received from its Oregon employees. Le Decl. ¶ 19.

Plaintiff requested a religious exemption to Defendant's COVID-19 vaccine requirement, which Defendant approved. Le Decl. ¶ 30, Ex. 14; Riggs Decl. I Ex. 1 at 9 (RFA Response No. 4). Plaintiff's supervisor and HR partner interviewed Plaintiff to process her request and determined that she could not perform her duties as a medical assistant fully remotely. Le Decl. ¶ 30, Ex. 15; Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). Plaintiff admits that she could not perform the essential functions of her position fully remotely. Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). On September 1, 2021, Defendant placed Plaintiff on unpaid administrative leave. Le Decl. ¶ 32.

3. <u>Analysis</u>

Defendant's determination—that contact between unvaccinated employees and co-workers, patients, and community members in its facilities posed an unacceptable health and safety risk—was directly supported by its internal epidemiological study, consensus among the scientific medical community at the time, and reliance on guidance from authoritative sources such as the CDC and the OHA. The Court finds there is no genuine dispute of fact that allowing unvaccinated employees to work in person significantly increased health and safety risks to its employees and patients at times relevant in this Complaint. Plaintiff does not dispute that she could not perform her job fully remotely and that performance of her job required close contact with other employees and direct care to medically vulnerable individuals. Defendant reasonably concluded that the health and safety risks of allowing unvaccinated employees to work in person created a substantial burden by conflicting directly with its business mission to provide safe and adequate healthcare to the community. Defendant also considered the number of employees seeking a similar accommodation and reasonably concluded that the cumulative burden was substantial.

Plaintiff does not dispute that Defendant conducted an interview with her before making its determination that she could not perform her job fully remotely. Plaintiff argues, without evidence or supporting case law, that Defendant owed her more process before placing her on leave. Defendant's decision to place Plaintiff on unpaid leave was made after it met with her and determined that she could not perform her job fully remotely. Defendant was in the midst of a healthcare crisis which posed an existential threat to its operational abilities. It had hundreds of religious and medical exemption requests to process in a short amount of time. Defendant's decision to place Plaintiff on unpaid leave was made individually. Having reviewed the evidence in the record, the Court finds that there is no genuine dispute of material fact that any accommodation other than leave would have posed an undue hardship on Defendant. Because Defendant has successfully established the affirmative defense of undue hardship, the Court grants Defendant's Motion for Summary Judgment.

## CONCLUSION

For the reasons above, Defendant's motion to strike (ECF No. 36) and motion for summary judgment (ECF No. 25) are GRANTED.

**\*10** DATED this <u>4th</u> day of December 2024.

2024 WL 4979430

**All Citations**

Slip Copy, 2024 WL 4979430

---

**Footnotes**

1      In ruling on the admissibility of Dr. French's opinions, the Court need not, and does not, opine on the truth of these opinions. Rather, the Court's ruling is narrowly tailored to whether Dr. French's opinions are based on reliable methodologies and reasoning under Rule 702 and *Daubert*.

2      Dr. French labelled two different exhibits as Exhibit 6. The Court's reference to Exhibit 6 relates to the second Exhibit 6, pdf pages 64-243 of the French Report, Rancourt, D.G., Baudin, M., Hickey, J., Mercier, J. "COVID-19 vaccine-associated mortality in the Southern Hemisphere". *CORRELATION Research in the Public Interest*, Report, 17 September 2023. https://correlation-canada.org/covid-19-vaccine-associated-mortality-in-the-Southern-Hemisphere/.

3      *Oxford English Dictionary* defines "junk science" as "[s]cientific assertions or conclusions which are presented as fact but based on flawed or biased research or analysis[.]" *Junk Science*, Oxford English Dictionary, (online ed. 2023) https://doi.org/10.1093/OED/2767395868 (last visited Nov. 8, 2024).

4      Brown, Catherine M. "Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021." MMWR. Morbidity and Mortality Weekly Report 70 (2021). https://doi.org/10.15585/mmwr.mm7031e2.

5      Singanayagam, Anika, Seran Hakki, Jake Dunning, Kieran J. Madon, Michael A. Crone, Aleksandra Koycheva, Nieves DerquiFernandez, et al. "Community Transmission and Viral Load Kinetics of the SARS-CoV-2 Delta (B.1.617.2) Variant in Vaccinated and Unvaccinated Individuals in the UK: A Prospective, Longitudinal, Cohort Study." The Lancet. Infectious Diseases 22, no. 2 (February 2022): 183–95. https://doi.org/10.1016/S1473-3099(21)00648-4.

6      For a thorough and well-reasoned explanation of these three factors and their relation to *Groff*, *see Lavelle-Hayden v. Legacy Health*, No. 3:22-CV-01752-IM, 2024 WL 3822712, at *8–*10 (D. Or. Aug. 14, 2024).

7      The declaration of Dr. Koekkoek contains a scrivener's error. The paragraphs proceeding ¶ 36 begin at "33". See Koekkoek Decl. at 11. The Court refers to the corrected paragraph number.

8      Stephen J.W. Evans, M.Sc., and Nicholas P. Jewell, Ph.D., *Vaccine Effectiveness Studies in the Field*, The New England Journal of Medicine, Aug. 2. 2021.

9      Mark G. Thompson, et al., *Prevention and Attenuation of Covid-19 with the BNT162b2 and mRNA-1273 Vaccines*, 385(4) N. Eng. J. Med. 320–329 (June 30, 2021).

---

**End of Document**          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:22-cv-00319-TOR    ECF No. 132    filed 12/12/24    PageID.5048    Page 39
ANITA PARKER, an Individual, Plaintiff, v. PEACEHEALTH, a..., Slip Copy (2024)
of 47
2024 WL 4993472

2024 WL 4993472
Only the Westlaw citation is currently available.
United States District Court, D. Oregon.

ANITA PARKER, an Individual, Plaintiff,

v.

PEACEHEALTH, a corporation, Defendant.

Case No. 6:23-cv-00450-MTK
|
Filed 12/05/2024

## OPINION AND ORDER

MUSTAFA T. KASUBHAI (He / Him) United States District Judge

**\*1**  Plaintiff Anita Parker ("Plaintiff") brings this religious discrimination claim against her former employer, Defendant PeaceHealth ("Defendant"). Plaintiff alleges Defendant violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5 (Second Claim for Relief) and Or. Rev. Stat. § ("ORS") 659A.030 (First Claim for Relief) by failing to reasonably accommodate her religious beliefs when she objected to taking the COVID-19 vaccine. Defendant moves to exclude the opinions and report of Plaintiff's expert (ECF No. 26) and moves for summary judgment (ECF No. 15) on Plaintiff's claims. Defendant's motions are granted.

## BACKGROUND

Defendant is a not-for-profit Catholic healthcare system with approximately 16,250 employees in medical centers, hospitals, and clinics across Alaska, Washington, and Oregon. Le Decl. ¶ 3, ECF No. 19. Its mission is to promote personal and community health through safe and compassionate care. Le Decl. ¶ 5, Ex. 1.

In early 2020, the SARS-CoV-2 virus, and the COVID-19 infection it causes, began spreading in Oregon. Koekkoek Decl. ¶¶ 4-5, ECF No. 17. Defendant mitigated exposure risks using screening, testing, masking, other forms of personal protective equipment ("PPE"), and social distancing. Le Decl. ¶ 7; Kroll Decl. ¶ 5, ECF No. 18. Once COVID-19 vaccines became available in December 2020, Defendant encouraged its employees to get vaccinated. Le Decl. ¶ 8; Kroll Decl. ¶ 6.

In the summer of 2021, a more transmissible and deadly Delta variant hit Oregon communities and hospitals. The number of COVID-19 cases increased by 300% nationwide. Koekkoek Decl. ¶ 37, Ex. 12 at 1. On August 3, 2021, Defendant announced it would require all employees to be fully vaccinated against COVID-19 by September 1, 2021, if able, and to show proof of COVID-19 vaccination or submit a medical or religious exemption on or before August 31, 2021. Koekkoek Decl. ¶ 29; Le Decl. ¶ 10, Ex. 2 at 5.

Defendant established a committee to review religious exemption requests and began processing such requests. Le Decl. ¶ 18. When Defendant approved a request for religious exemption, the employee's HR partner or supervisor initiated an interview with the employee. Le Decl. ¶ 21. Defendant placed exempted employees who could not work fully remotely on unpaid leave, permitting use of remaining PTO and continuing their health benefits coverage through the later of November 30, 2021, or the end of the month in which they exhausted PTO. Le Decl. ¶ 23.

Defendant employed Plaintiff as a certified medical assistant in the Family Practice Department. Le Decl. ¶ 29. Plaintiff's job duties included preparing patients for examinations and treatment, giving injections, and collaborating with a variety of personnel and departments to ensure smooth clinic operations. Le Decl. Ex. 13 at 4. Plaintiff requested a religious exemption to Defendant's COVID-19 vaccine requirement, which Defendant approved. Le Decl. ¶ 30, Ex. 14; Riggs Decl. I Ex. 1 at 9 (RFA Response No. 4), ECF No. 16-1. Plaintiff's supervisor and HR partner interviewed Plaintiff to process her request and determined that she could not perform her duties as a medical assistant fully remotely. Le Decl. ¶ 31, Ex. 15; Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). On September 1, 2021, Defendant placed Plaintiff on unpaid administrative leave. Le Decl. ¶ 32. Plaintiff filed her Complaint on March 29, 2023. Compl. ECF No. 1. She alleges that Defendant failed to reasonably accommodate her religious opposition to receiving a COVID-19 vaccine in violation of Title VII and ORS 659A.030.

## STANDARDS

### I. Federal Rules of Evidence 702 and *Daubert*

**\*2**  The admissibility of an expert's testimony is governed by Fed. R. Evid. 702, as elaborated by the Supreme Court in *Daubert* and its progeny. Rule 702 provides that a witness

who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

## II. Local Rule 56-1(b)

Under LR 56-1(b), rather than filing a motion to strike, the moving party must assert any evidentiary objections in its reply memorandum. "If an evidentiary objection is raised by the moving party in its reply memorandum, the non-moving party may file a surreply memorandum ... within seven days addressing only the evidentiary objection; the moving party may not file further briefing on its evidentiary objection." LR 56-1(b).

## III. Motion for Summary Judgment — Fed. R. Civ. Pro. 56(a)

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Service, Inc.*, 809 F.2d at 630.

## DISCUSSION

Defendant contends that Plaintiff's expert's opinion and report are inadmissible evidence under Rule 702 and *Daubert* and moves for summary judgment on Plaintiff's claims. Defendant argues that it reasonably accommodated Plaintiff and as a matter of law it is entitled to prevail on its affirmative defense that it could not allow Plaintiff to continue working unvaccinated without undue hardship.

## I. Defendant's Motion to Strike

Defendant moves under Rule 702 to exclude the opinions and report of Plaintiff's expert, Dr. French. Defendant asserts that Dr. French's opinions and report are inadmissible evidence because they are based on unreliable methodologies and reasoning. Defendant attaches to its motion the expert report of Dr. Cohen, a Clinical Associate Professor in the Division of Allergy and Infectious Diseases at the University of Washington and the Medical Director of Infection Prevention at the University of Washington Medical Center. Rigg's Decl. II Ex. 1 ("Cohen Report") ¶ 5, ECF No. 27-1. Dr. Cohen's report is a review of Dr. French's report and provides commentary on Dr. French's opinions and use of cited literature. Despite the opportunity to do so under LR 56-1(b), Plaintiff did not submit a surreply in response to Dr. Cohen's well-reasoned rebuttal report.

**\*3** Dr. French is a board-certified emergency medicine physician. Expert Report of Dr. Richard Scott French ("French Report") ¶ 2, ECF No. 25-1. He attests to having extensive experience treating and managing COVID-19 patients in several states and extensive experience and expertise in setting up COVID-19 prevention protocols for hospital facilities. French Report ¶¶ 2, 7–10. Dr. French also has professional experience teaching and presenting at medical schools on immunology, as well as viral transmission prevention, diagnosis, treatment, and management. French Report ¶ 4. The French Report can be categorized into two overarching opinions: (1) the safety and efficacy of the COVID-19 vaccine are unproven, and (2) COVID-19 exposure risks can be effectively mitigated without requiring vaccination. [1]

When ruling on a motion to strike under Rule 702 and *Daubert*, trial judges are tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993). The Supreme Court in *Daubert* elaborated that expert testimony should be based on a reliable and scientifically valid methodology that fits with the facts of a case. *Id. at 592–93.* "Under *Daubert,* the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982 (9th Cir. 2011) (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 145 (1999)).

"For scientific opinion, the court must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) "[T]he trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on 'the particular circumstances of the particular case.' " *Id.* (quoting *Kumho Tire Co.,* 526 U.S. at 147).

The Court must ensure that the French Report is reliable by examining "whether the expert's testimony reflects scientific knowledge, whether their findings are derived by the scientific method, and whether their work product amounts to good science." *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1315 (9th Cir. 1995) (*Daubert II*) (quotation marks removed) (citing *Daubert,* 509 U.S. at 591–93). And the Court must ensure that the French Report is relevant in that it "logically advances a material aspect of [Plaintiff's] case." *Id.*

The Court has reviewed the French Report and finds that every portion of it falls below the admissibility standard. For the purposes of explanation, the Court discusses the following three significant examples.

In support of his opinion that the COVID-19 vaccines are neither safe nor effective, Dr. French relies on Exhibit 6, which he describes as a "a comprehensive report with many graphs, charts, references and [a] description of their methodology." French Report ¶ 26, citing Ex. 6 [2] ("Rancourt Study"). Dr. French's explanation of the Rancourt Study's scientific legitimacy is cursory and grossly deficient. That the Rancourt Study includes a description of the authors' methodology and contains many graphs, charts, and references is not indicative of its scientific legitimacy. Similarly, its 180 pages proves only its length, not its quality. Having conducted "a preliminary assessment of whether the reasoning or methodology underlying [the French Report] is scientifically valid", *Daubert,* 509 U.S. at 592–93, the Court finds that the Rancourt Study is junk science. [3]

**\*4** The Rancourt Study is a "study regarding COVID-19 vaccine-associated mortality in the Southern Hemisphere looking at the excess mortality rate associated with COVID-19 vaccines in 17 countries, spanning four continents." Rancourt Study at 1-3. It claims "there is no evidence ... of any beneficial effect of COVID-19 vaccines." *Id.* at 1-2. Despite being a correlative study, the authors claim that "[t]he scientific tests for causality are amply satisfied, [and] extensively demonstrate[ ] ... COVID-19 vaccines did not save lives and appear to be lethal toxic agents[.]" *Id.* at 131. Purportedly, its "analysis of ACM [(all cause mortality)] by time in the 17 countries studied shows that the global COVID-19 vaccination campaign was in effect a mass iatrogenic event that killed (0.213 ± 0.006) % of the world population [(approximately 17,000,000 people)] and did not measurably prevent any deaths." *Id.* at 119.

The Rancourt Study's "[m]ethod is designed for cases (jurisdictions) in which there is no evidence in the ACM data for mortality caused by factors other than the vaccine rollouts." *Id.* at 16. The study's methodology is grossly flawed. It relies on a finding that, "no excess mortality occur[ed] in the [COVID-19] pre-vaccination period." *Id.* This finding is baseless given that the data relied on shows that following vaccine rollouts, excess ACM decreased in eight of the 17 countries studied. *Id.* at 26. When looking at the Rancourt Study's data for the 17 countries combined, excess ACM also decreased following vaccine rollouts. *Id.* (table 1, showing total excess ACM in the year preceding vaccine rollout as 2,392,831, and total excess ACM following vaccine rollout as 1,744,829). Plaintiff fails to rebut Defendant's expert's compelling opinion that the Rancourt Study "[i]nexplicably ... ignores that excess deaths across the world correlated with spikes of confirmed COVID-19 cases rather than vaccine rollouts." Cohen Report ¶ 19. Lastly, Dr.

French also fails to explain why the Rancourt Study, and his opinion from which it flows, are reliable despite running contrary to broad scientific consensus that the COVID-19 vaccines are safe. Koekkoek Decl. ¶ 32.

Dr. French's expert opinion is also unreliable because he misconstrues the exhibits cited in his report. In support of his opinion on vaccine efficacy, Dr. French cites to Exhibit 2, an outbreak report describing the transmission of COVID-19 that occurred at a large public event in a Massachusetts town in the summer of 2021. French Report, Ex. 2 [4] ("Outbreak Report") at 1. The Outbreak Report found that 74% of the COVID-19 cases occurred in people who were fully vaccinated. *Id.* From this finding, Dr. French opines that "even as early as 2021, the literature did not demonstrate that the COVID-19 vaccines were effective in transmission mitigation of COVID-19 infection." French Report ¶ 31, citing Ex. 2.

Contrary to Dr. French's opinion, the Outbreak Report explicitly states that "vaccination is the most important strategy to prevent severe illness and death." Outbreak Report at 2. The Outbreak Report continues, "[a]s population-level vaccination coverage increases, vaccinated persons are likely to represent a larger proportion of COVID-19 cases." *Id.* In other words, the fact that many of the people infected at the public gathering were fully vaccinated merely reflects high vaccination rates in that geographical area at the time. The Outbreak Report concludes, "data from this report are insufficient to draw conclusions about the effectiveness of COVID-19 vaccines against SARS-CoV-2, including the Delta variant, during this outbreak." *Id.* at 3. The limitation on the conclusions to be drawn from the data do not call into question the efficacy of COVID-19 vaccines. Rather, the mismatch between Dr. French's opinion and the findings and recommendations of the evidence he relies on, calls into question his capacity to comprehend scientific literature. His specious use of the Outbreak Report undermines the reliability of his methods and reasoning.

**\*5** Similarly, Dr. French incorrectly concludes that Exhibit 3 "indicate[s] that the COVID-19 vaccine was in fact increasing the risk of COVID-19 transmission." French Report ¶ 15, citing Ex. 3. Exhibit 3 is a cohort study on community transmission in vaccinated and unvaccinated individuals in the UK. French Report Ex. 3 [5] ("Cohort Study") at 1. Dr. French's opinion is troubling, given that the Cohort Study explicitly recommends "[i]ncreasing population immunity via booster programmes and vaccination" and concludes

that "[this] analysis suggests that direct protection of individuals at risk of severe outcomes, via vaccination and non-pharmacological interventions, will remain central to containing the burden of disease caused by the delta variant." *Id.* at 12. Dr. French's opinion directly contradicts the scientific research it relies on. Dr. French's interpretation of the Outbreak Report and the Cohort Study are at best incompetent, and at worst, dishonest.

This Court is not alone in finding that Dr. French's opinion on this subject falls below accepted standards of reliability. *See Malone v. Legacy Health*, No. 3:22-CV-01343-HZ, 2024 WL 3316167, at \*3 (D. Or. July 5, 2024) (admonishing Dr. French for his misrepresentation of Exhibits 2 and 3 and citing other district court cases where misrepresentations of these same reports have been called out). Based on the unreliable methods and reasoning of Dr. French, the Court finds that Dr. French's opinions are inadmissible under Rule 702 and *Daubert*.

## II. Motion for Summary Judgment

Plaintiff brings religious discrimination claims based on Defendant's alleged failure to reasonably accommodate her religiously based opposition to receiving a COVID-19 vaccine. Defendant moves for summary judgment on the grounds that there is no genuine dispute that, under the circumstances, allowing Plaintiff to work in person in a healthcare setting would have been an undue hardship and that it reasonably accommodated Plaintiff with unpaid leave. Plaintiff responds that material disputes of fact remain regarding (1) the safety and efficacy of COVID-19 vaccines; (2) the process Defendant used to determine the vaccine mandate; (3) and the process Defendant used when deciding to place Plaintiff on unpaid leave.

### A. Title VII — Failure to Accommodate

Under Title VII, "[t]o establish religious discrimination on the basis of a failure-to-accommodate theory, [the plaintiff] must first set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). If established, the burden then shifts to the defendant to show that it "initiated good faith efforts to

ANITA PARKER, an Individual, Plaintiff, v. PEACEHEALTH, a..., Slip Copy (2024)
2024 WL 4993472

accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Id.* Courts construe Oregon's statutory counterpart, Or. Rev. Stat. § 659.030, as identical to Title VII. *Heller v. EBB Auto Co.*, 8 F.3d 1433, n.2 1437 (9th Cir. 1993). The Court analyzes the state and federal claims under the same legal standards.

On April 24, 2023, the Court bifurcated the present case into two phases, Phase One consisted of two threshold legal questions: (1) was continuing to allow Plaintiff to work at the hospital unvaccinated an undue hardship on Defendant, and (2) was unpaid leave a reasonable accommodation? Order, ECF No. 11. Phase Two related to the prima facie showing of a failure to accommodate claim. The Court set a dispositive motion deadline on the Phase One questions and ordered Phase Two discovery stayed pending the outcome of Phase One dispositive motions. The Court finds that Defendant is entitled to summary judgment on its affirmative defense of undue hardship. Because undue hardship is dispositive, the Court does not address whether unpaid leave was a reasonable accommodation.

### 1. Undue Hardship

**\*6** Until recently, some lower courts interpreted *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) as holding that an undue hardship under Title VII is merely something more than *de minimis*. *Groff v. DeJoy*, 600 U.S. 447, 471 (2023). In *Groff v. DeJoy*, 600 U.S. 447 (2023), the Supreme Court clarified that under Title VII, an " 'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Id.* at 468. Whether a burden is substantial is a fact-specific inquiry that should be resolved in a "common-sense manner." *Id.* at 471. Under the *Groff* standard, "courts must apply the test in a manner that takes into account all relevant factors in the case at hand." *Id.* at 470. For example, courts may consider "the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer." *Id.* (citation to record and alterations omitted). Consistent with this contextualized and common-sense approach, when conducting an undue hardship analysis, the Court finds it appropriate to consider the following factors: (1) the information available at the time the defendant made its accommodation decision; (2) economic and non-economic costs of the accommodation; and (3) the cumulative

or aggregate effects of an accommodation requested by multiple, similarly situated employees.[6]

Pre-*Groff* EEOC guidance on the undue hardship standard remains instructive. *Id.* at 471 (rejecting full adoption of EEOC's pre-*Groff* interpretation of undue hardship but explaining a "good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by" the Court's clarifying decision). Specific to evaluating undue hardship in the context of COVID-19 vaccinations, the EEOC provides sensible and relevant guidance consistent with *Groff*:

> Considerations relevant to undue hardship can include, among other things, the proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with non-employees, whose vaccination status could be unknown or who may be ineligible for the vaccine. (§ K.12, Updated May 28, 2021).

> Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business—including, in this instance, the risk of the spread of COVID-19 to other employees or to the public.... An employer cannot rely on speculative or hypothetical hardship when faced with an employee's religious objection but, rather, should rely on objective information. Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals). Another relevant consideration is the number of employees who are seeking a similar accommodation, i.e., the cumulative cost or burden on the employer. (§ L.3, Updated March 1, 2022).

*What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws,* EEOC (last visited September 25, 2024), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-adarehabilitation-act-and-other-eeo-laws [https://perma.cc/73RS-7L62].

### 2. Defendant's Evidence of Undue Hardship
Here, Defendant asserts that for employees who could not work fully remotely, any accommodation other than leave

created an undue hardship by significantly increasing the health and safety risks of its employees and patients. Plaintiff responds that allowing her to continue to work using pre-vaccine protocols would not have created an undue hardship, and that Defendant failed to conduct an individual analysis before placing her on leave.

Having found that the opinions of Plaintiff's expert are inadmissible, Plaintiff's Response in opposition to Defendant's Motion for Summary Judgment is unsupported by admissible evidence. Nonetheless, the Court must view all inferences drawn from the underlying facts in the light most favorable to Plaintiff and resolve all reasonable doubts as to the existence of genuine issues of material fact against Defendant. 📄 *T.W. Elec. Service, Inc.*, 809 F.2d at 630.

**\*7** Defendant relies on the declarations of the following individuals to support its affirmative defense of undue hardship. First, Defendant relies on the declaration of Dr. Koekkoek, Defendant's Chief Physician and Clinical Executive. Koekkoek Decl. ¶ 2. During the summer of 2021 he led Defendant's clinical response to the COVID-19 pandemic and was a member of the Senior Leadership Team. *Id.* ¶ 3. Dr. Koekkoek was also a member of Defendant's Ethical Discernment team, which, after deliberations, decided to implement Defendant's vaccination policy in August 2021. *Id.* ¶¶ 25–29. Second, Defendant offers the declaration of Catherine Kroll, Defendant's System Director of Infection Prevention. Kroll Decl. ¶ 2. Ms. Kroll has worked in Defendant's Infection Prevention Department for over 10 years and has held the System Director role since 2022. Kroll Decl. ¶ 2. And third, is the declaration of Caroline Le, Defendant's Program Director for HR Integration. Le Decl. ¶ 2. Ms. Le has worked in Defendant's HR department for approximately ten years and was elevated to program director in February 2021. Le Decl. ¶ 2. Ms. Le facilitated Defendant's system-wide implementation of its COVID-19 mandate. Le Decl. ¶ 9. Each of these declarations is further supported by numerous exhibits, none of which Plaintiff meaningfully challenges. The Court explores Defendant's evidence in detail below.

Throughout the pandemic, Defendant relied on federal and state recommended and mandated safety measures to develop its policies and responses to the COVID-19 outbreak. Le Decl. ¶ 8; Kroll Decl. ¶¶ 4, 13; Koekkoek Decl. ¶ 9. Early in the pandemic, Defendant mitigated exposure risks using screening, testing, masking, other forms of PPE, and social distancing. Le Decl. ¶ 7; Kroll Decl. ¶ 5. Once COVID-19

vaccines became available in December 2020, Defendant encouraged its employees to get vaccinated. Le Decl. ¶ 8; Kroll Decl. ¶ 6. However, by late July 2021, 19.7% of Defendant's Oregon employees remained unvaccinated or declined to state their vaccination status. Le Decl. ¶ 13.

In the summer of 2021, a more transmissible and deadly Delta variant hit Oregon communities and hospitals. Koekkoek Decl. ¶¶ 10–11. Nationwide, the number of COVID-19 cases increased by 300%. Koekkoek Decl. ¶ 37,[7] Ex. 12 at 1. Defendant monitored COVID-19 forecast models developed at Oregon Health & Science University ("OHSU"). Koekkoek Decl. ¶¶ 13, 19. In mid-July, the OHSU modeling for a faster-spreading variant and slower vaccination rates predicted a September peak exceeding 1,000 COVID-19 hospitalizations in Oregon. Koekkoek Decl. ¶ 19(a), Ex. 4 at 19. By August 26, 2021, the statewide census exceeded 1,000 COVID-19 hospitalizations, and an updated model from OHSU predicted that there would be a peak of approximately 1,200 COVID-19 hospitalizations by September 6—effectively doubling the previous record in November 2020. Koekkoek Decl. ¶ 19(b), Ex. 5 at 23.

With the growing surge and severity of COVID-19 cases, Defendant reasonably believed that it faced a foundational risk to its ability to deliver healthcare services. Koekkoek Decl. ¶¶ 22-23. Defendant convened an Ethical Discernment process to evaluate whether it should require its employees to be vaccinated against COVID-19. Koekkoek Decl. ¶ 24. On July 21, 2021, the Ethical Discernment team reviewed and discussed internal infection prevention data, as well as publicly available information regarding COVID-19 and the vaccines. *Id.* ¶¶ 26, 31.

As part of the ethical discernment process related to the COVID-19 Vaccination Policy, Dr. Koekkoek used his medical background and clinical expertise to synthesize the medical and scientific literature and recommendations from regulatory and accrediting bodies, commonly referenced publications in highly reputable, peer-reviewed medical journals, and epidemiologic, and public health bodies to provide clinical expertise to others on the Ethical Discernment team. *Id.* ¶ 31. For example, Dr. Koekkoek relied on an August 2, 2021 study published in the New England Journal of Medicine which showed that through the end of June 2021, COVID-19 vaccines had averted an estimated 279,000 deaths and 1.25 million hospitalizations in the United States. *Id.* ¶ 33, Ex. 9[8] (concluding, "[a]s the delta variant affects various countries, including the United

States, the current imperative is to vaccinate as many people as possible, as quickly as possible."). Dr. Koekkoek also relied on The Thompson Study, published in the New England Journal of Medicine on June 30, 2021. Koekkoek Decl. Ex. 10 [9] ("Thompson Study"). The Thompson Study researchers "conducted a prospective cohort study involving 3975 health care personnel, first responders, and other essential and frontline workers." Thompson Study at 1. The results showed that being fully vaccinated reduced the risk of infection by 91% and still protected against severe illness and hospitalization if breakthrough infection occurred. Koekkoek Decl. ¶ 34, Thompson Study at 1. Some of the other sources that Dr. Koekkoek consulted included the Oregon Health Authority, the Washington Department of Health, the Centers for Medicare and Medicaid Services, the Centers for Disease Control, the World Health Organization, and the Association for Professionals in Infection Control and Epidemiology. Koekkoek Decl. ¶ 31. Dr. Koekkoek's synthesis of medical and scientific literature and recommendations showed a broad consensus from reliable sources that the vaccines were safe and not only protected the vaccine recipient from contracting the virus but also decreased the likelihood that the recipient would transmit the virus. Koekkoek Decl. ¶ 32.

 **\*8** Dr. Koekkoek advised the Ethical Discernment team that the protections afforded by vaccines were vitally important in healthcare facilities, where caregivers treated patients with COVID-19, and the risk of exposing other caregivers and patients, including children and elderly patients and patients with underlying conditions that make them particularly susceptible to COVID-19, was especially prevalent. *Id.* On July 27, 2021, after additional deliberation, the Ethical Discernment team decided unanimously that it would require all its employees to get vaccinated. *Id.* ¶ 27. A CDC report published two days later further supported the Ethical Discernment team decision. Koekkoek Decl. Ex. 11. The CDC report indicated that, when compared with vaccinated individuals, unvaccinated individuals were eight times more likely to contract COVID-19, twenty-five times more likely to be hospitalized if they got COVID-19, and twenty-five times more likely to die as a result of a COVID-19 infection. Koekkoek Decl. ¶ 36, Ex. 11 at 3.

On August 3, 2021, Defendant announced it would require all employees to be fully vaccinated against COVID-19 by September 1, 2021, if able, and to show proof of COVID-19 vaccination or submit a medical exemption on or before August 31, 2021. Koekkoek Decl. ¶ 29; Le Decl. ¶ 10, Ex. 2 at 3. Defendant included information about seeking medical and

religious exemptions to the policy but had not yet finalized a decision as to how it would accommodate employees with approved exemptions. Le Decl. ¶ 12, Ex. 4 at 2, 4; Koekkoek Decl. ¶ 29.

On August 4, 2021, Oregon Governor Brown announced that the OHA was issuing a regulation to require all Oregon healthcare providers and staff to be fully vaccinated against COVID-19 or submit to regular testing; the OHA issued a temporary rule to that effect one day later. 🚩Or. Admin. R. 333-019-1010 ("OHA Rule"). Initially, the OHA Rule provided two alternatives for healthcare workers to either: (1) be fully vaccinated by September 30, 2021, or (2) submit to weekly testing. 🚩Or. Admin. R. 333-019-1010 (eff. Aug. 5, 2021, to Aug. 24, 2021). However, on August 19, 2021, Governor Brown announced that the OHA would be updating its rule to remove the testing option and require healthcare workers to be fully vaccinated by October 18, 2021, unless they had a documented religious or medical exemption. Governor Kate Brown, Governor Brown Press Conference 8.19.2021, at 22:30, YOUTUBE (Aug. 19, 2021), https://www.youtube.com/watch?v=AxfQIRoPjyw.

On August 16, 2021, the Ethical Discernment team met again to consider potential changes to the COVID-19 Vaccine Requirement Policy and accommodations in light of updated guidance, employee feedback, and the OHA Rule. Koekkoek Decl. ¶ 42, Ex. 18. Defendant's internal epidemiological study determined that its patients were 7.1 times more likely to have been exposed to COVID-19 and 11.6 times more likely to get COVID-19 from an unvaccinated employee as compared to a vaccinated employee. Koekkoek Decl. ¶ 21; Kroll Decl. ¶ 19, Exs. 3, 4. This data were collected while Defendant's other methods of risk exposure mitigation—such as PPE (including N95 masks), testing, social distancing, restrictions on visitation, and additional hand hygiene protocols—were already the "baseline" requirements in use. Koekkoek Decl. ¶ 44. Because of the substantial increase of patient infections due to exposure from unvaccinated employees, the Ethical Discernment team reaffirmed its overall position requiring all employees, absent an approved medical or religious exemption, to be fully vaccinated against COVID-19. *Id.* ¶ 42.

Defendant then considered potential accommodations for exempted employees who could not work fully remotely. *Id.* ¶ 43. While Defendant generally concluded that multiple methods of protection against COVID-19 were important, the medical science at the time confirmed that vaccination was

the single most important method. *Id.* Unlike vaccination, the "baseline" requirements did not provide continuous protection 24 hours per day and were susceptible to human error. *Id.* ¶ 44. The Ethical Discernment team concluded that the so-called baseline requirements were no longer sufficient. *Id.* ¶¶ 43-44. Defendant determined that allowing unvaccinated employees to work in person would have subjected other employees and patients to a higher risk of contracting COVID-19, amplifying the risk of severe illness or death among its patients. *Id.* ¶ 48.

 **\*9** Defendant then established a committee to review religious exemption requests and began processing such requests. Le Decl. ¶ 18. When Defendant approved a request for religious exemption, the employee's HR partner or supervisor initiated an interview with the employee. *See* Le Decl. ¶¶ 21, 31. However, because Defendant determined that contact between unvaccinated employees and patients or coworkers posed an unacceptable health and safety risk, the only substantive issue during these interviews was whether the employee could perform the essential functions of their position fully remotely. Le Decl. ¶ 21. Defendant placed employees who could not work fully remotely on unpaid leave, permitting use of remaining PTO and continuing their health benefits coverage through the later of November 30, 2021, or the end of the month in which they exhausted PTO. Le Decl. ¶ 23. By August 31, 2021, the review committee had approved 219 of the 226 religious exemption requests it received from its Oregon employees. Le Decl. ¶ 19.

Plaintiff requested a religious exemption to Defendant's COVID-19 vaccine requirement, which Defendant approved. Le Decl. ¶ 30, Ex. 14; Riggs Decl. I Ex. 1 at 9 (RFA Response No. 4). Plaintiff's supervisor and HR partner interviewed Plaintiff to process her request and determined that she could not perform her duties as a medical assistant fully remotely. Le Decl. ¶ 30, Ex. 15; Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). Plaintiff admits that she could not perform the essential functions of her position fully remotely. Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). On September 1, 2021, Defendant placed Plaintiff on unpaid administrative leave. Le Decl. ¶ 32.

  3. <u>Analysis</u>

Defendant's determination—that contact between unvaccinated employees and co-workers, patients, and community members in its facilities posed an unacceptable health and safety risk—was directly supported by its internal epidemiological study, consensus among the scientific

medical community at the time, and reliance on guidance from authoritative sources such as the CDC and the OHA. The Court finds there is no genuine dispute of fact that allowing unvaccinated employees to work in person significantly increased health and safety risks to its employees and patients at times relevant in this Complaint. Plaintiff does not dispute that she could not perform her job fully remotely and that performance of her job required close contact with other employees and direct care to medically vulnerable individuals. Defendant reasonably concluded that the health and safety risks of allowing unvaccinated employees to work in person created a substantial burden by conflicting directly with its business mission to provide safe and adequate healthcare to the community. Defendant also considered the number of employees seeking a similar accommodation and reasonably concluded that the cumulative burden was substantial.

Plaintiff does not dispute that Defendant conducted an interview with her before making its determination that she could not perform her job fully remotely. Plaintiff argues, without evidence or supporting case law, that Defendant owed her more process before placing her on leave. Defendant's decision to place Plaintiff on unpaid leave was made after it met with her and determined that she could not perform her job fully remotely. Defendant was in the midst of a healthcare crisis which posed an existential threat to its operational abilities. It had hundreds of religious and medical exemption requests to process in a short amount of time. Defendant's decision to place Plaintiff on unpaid leave was made individually. Having reviewed the evidence in the record, the Court finds that there is no genuine dispute of material fact that any accommodation other than leave would have posed an undue hardship on Defendant. Because Defendant has successfully established the affirmative defense of undue hardship, the Court grants Defendant's Motion for Summary Judgment.

### CONCLUSION

For the reasons above, Defendant's motion to strike (ECF No. 26) and motion for summary judgment (ECF No. 15) are GRANTED.

 **\*10** DATED this <u>5th</u> day of December 2024.

**All Citations**

Slip Copy, 2024 WL 4993472

---

### Footnotes

1   In ruling on the admissibility of Dr. French's opinions, the Court need not, and does not, opine on the truth of these opinions. Rather, the Court's ruling is narrowly tailored to whether Dr. French's opinions are based on reliable methodologies and reasoning under Rule 702 and *Daubert*.

2   Dr. French labelled two different exhibits as Exhibit 6. The Court's reference to Exhibit 6 relates to the second Exhibit 6, pdf pages 64-243 of the French Report, Rancourt, D.G., Baudin, M., Hickey, J., Mercier, J. "COVID-19 vaccine-associated mortality in the Southern Hemisphere". *CORRELATION Research in the Public Interest*, Report, 17 September 2023. https://correlation-canada.org/covid-19-vaccine-associated-mortality-in-the-Southern-Hemisphere/.

3   *Oxford English Dictionary* defines "junk science" as "[s]cientific assertions or conclusions which are presented as fact but based on flawed or biased research or analysis[.]" *Junk Science*, Oxford English Dictionary, (online ed. 2023) https://doi.org/10.1093/OED/2767395868 (last visited Nov. 8, 2024).

4   Brown, Catherine M. "Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021." MMWR. Morbidity and Mortality Weekly Report 70 (2021). https://doi.org/10.15585/mmwr.mm7031e2.

5   Singanayagam, Anika, Seran Hakki, Jake Dunning, Kieran J. Madon, Michael A. Crone, Aleksandra Koycheva, Nieves DerquiFernandez, et al. "Community Transmission and Viral Load Kinetics of the SARS-CoV-2 Delta (B.1.617.2) Variant in Vaccinated and Unvaccinated Individuals in the UK: A Prospective, Longitudinal, Cohort Study." The Lancet. Infectious Diseases 22, no. 2 (February 2022): 183–95. https://doi.org/10.1016/S1473-3099(21)00648-4.

6   For a thorough and well-reasoned explanation of these three factors and their relation to *Groff*, *see Lavelle-Hayden v. Legacy Health*, No. 3:22-CV-01752-IM, 2024 WL 3822712, at *8–*10 (D. Or. Aug. 14, 2024).

7   The declaration of Dr. Koekkoek contains a scrivener's error. The paragraphs proceeding ¶ 36 begin at "33". See Koekkoek Decl. at 11. The Court refers to the corrected paragraph number.

8   Stephen J.W. Evans, M.Sc., and Nicholas P. Jewell, Ph.D., *Vaccine Effectiveness Studies in the Field*, The New England Journal of Medicine, Aug. 2. 2021.

9   Mark G. Thompson, et al., *Prevention and Attenuation of Covid-19 with the BNT162b2 and mRNA-1273 Vaccines*, 385(4) N. Eng. J. Med. 320–329 (June 30, 2021).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.